UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

NASDAQ, INC.,

     Plaintiff,

  - against -

EXCHANGE TRADED MANAGERS
GROUP, LLC, ETF MANAGERS GROUP, LLC,
AND SAMUEL MASUCCI,

     Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Case No.  1:17-cv-08252 (PAE)


# DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIMS


**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
**1177 Avenue of the Americas**
**New York, New York 10036**
**(212) 715-9100**

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT ............................................................................ 1

FACTUAL ALLEGATIONS ................................................................................. 4

    A.   The Contracts at Issue ......................................................................... 4

    B.   This Action and the ETFMG Defendants' Counterclaims ....................... 9

ARGUMENT ................................................................................................... 13

THE ETFMG DEFENDANTS HAVE STANDING TO SUE FOR BREACH OF THE
INDEX LICENSE AGREEMENT AND THE SUBLICENSE AGREEMENT ......................... 14

CONCLUSION ................................................................................................. 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Artwear, Inc. v. Hughes*,
    202 A.D.2d 76 (1st Dep't 1994) ................................................................. 18

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................... 13

*Bank of New York Mellon Trust Co. v. Morgan Stanley Mortg. Capital, Inc.*,
    No. 11 Civ. 0505, 2011 WL 2610661 (S.D.N.Y. June 27, 2011) ................ 2

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................... 13

*Flickinger v. Harold C. Brown & Co., Inc.*,
    947 F.2d 595 (2d Cir. 1991) ...................................................................... 17

*Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*,
    58 F. Supp. 2d 228 (S.D.N.Y. 1999) .......................................................... 17

*Krys v. Sugrue (In re Refco, Inc. Sec. Litig.)*,
    No. 07-MDL 1902, 2009 WL 5548666 (S.D.N.Y. Nov. 16, 2009) .............. 16

*Newman & Schwartz v. Asplundh Tree Expert Co., Inc.*,
    102 F.3d 660 (2d Cir. 1996) ...................................................................... 17

*NewSpring Mezzanine Capital II, L.P. v. Hayes*,
    C.A. No. 14-1706, 2015 WL 12859402 (E.D. Pa. May 8, 2015) ................ 17

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000). ......................................................................... 2

*Tarrant Apparel Group v. Camuto Consulting Group, Inc.*,
    40 A.D.3d 556 (1st Dep't 2007) ................................................................. 18

*Variblend Dual Dispensing Sys. v. Seidel GMBH & Co., KG*,
    970 F. Supp. 2d 157 (S.D.N.Y. 2013) ........................................................ 16

**Statutes and Rules**

Fed. R. Civ. P. 12(b)(6) ................................................................................. 1, 13

Defendants/Counterclaim Plaintiffs Exchange Traded Managers Group, LLC ("ETMG") and ETF Managers Group, LLC (together, the "ETFMG Defendants" or "ETFMG") respectfully submit this memorandum of law in opposition to the motion (the "Motion") of Plaintiff Nasdaq pursuant to Fed. R. Civ. P. 12(b) (6) to dismiss the Second Counterclaim contained in the ETFMG Defendants' Answer, Affirmative Defenses, and Counterclaims (the "Counterclaims").[1]

## PRELIMINARY STATEMENT

The Counterclaims illuminate a course of improper conduct remarkable for an institution of Nasdaq's stature.  Contrary to the fictitious tale Nasdaq spins of a plot to steal its property, discovery will confirm that Nasdaq succeeded to ISE's fruitful, cooperative relationship with ETFMG; decided that it did not wish to continue with its legacy obligations; but rather than negotiate an exit chose to sabotage and undermine the parties' relationships in violation of the applicable contracts, its duties as an index provider, and basic obligations of good faith and fair dealing – and further acted to exploit an embedded conflict of interest to the detriment of the parties' most successful fund.  Most astonishing for a global entity providing indexes for billions of dollars in ETFs regulated by the Securities and Exchange Commission, Nasdaq unilaterally cut off ETFMG's access to crucial aspects of two licensed indexes *during trading hours*.

---

[1] The ETFMG Defendants hereby withdraw the indemnification claim asserted in the Third Count of the Counterclaims, without prejudice to assert a claim for indemnification upon final adjudication of the litigation brought by PureShares in New Jersey state court.

A copy of the Counterclaims is annexed to the accompanying Declaration of John P. Coffey dated March 12, 2018 (cited herein as "Coffey Decl.") as Ex. 1.  All abbreviated terms not otherwise defined have the meanings assigned in the Memorandum of Law in Support of Plaintiff Nasdaq, Inc.'s Motion to Dismiss ("Nasdaq Br.").

This motion is emblematic of Nasdaq's strategy of attempting to project its own wrongdoing onto the ETFMG Defendants, who acted at all times in good faith to protect the integrity of the relevant funds and the interests of the ETF shareholders.  Remarkably, Nasdaq cites mainly to its own Complaint for the factual background of its motion, when, of course, it is the allegations in the *Counterclaims* that must be accepted as true and tested for plausibility and sufficiency on this Motion.  In any event, the Motion fails based on the plain language of the governing contracts.[2]

The Motion's core premise is a tortured construction of the Sublicense Agreement as providing ETFMG only the right to use "certain intellectual property" like copyrights and trademarks, but *not* indexes – although, of course, the provision of properly maintained indexes necessary to operate the ETFs was the primary purpose of both the Index License Agreement (Compl. Ex. A) and the Sublicense Agreement (*id.* Ex. B).  Nasdaq tries to narrow the scope of the Sublicense Agreement by quoting only part of its definition of "Intellectual Property," ignoring an express cross-reference to the broader, inclusive definition set forth in the Index License Agreement itself.  The full language makes clear that the indexes were, indeed, the *principal* intellectual property being licensed to PureShares, LLC ("PureShares") and, thereafter, sublicensed to ETFMG.  The ETFMG Defendants therefore have direct standing under the Sublicense Agreement to sue for violation of Nasdaq's obligation to provide properly maintained indexes – and the Motion's central assertion is frivolous on its face.

---

[2] On a motion to dismiss, the Court "may consider the full text of documents that are quoted in or attached to the complaint, or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit."  *Bank of New York Mellon Trust Co. v. Morgan Stanley Mortg. Capital, Inc.*, No. 11 Civ. 0505, 2011 WL 2610661, at *3 (S.D.N.Y. June 27, 2011) (citing *Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d Cir. 2000)).

The Sublicense Agreement also expressly binds ETFMG to the entire main body of the Index License Agreement as a "principal," rendering inexplicable the Motion's flat statement that the ETFMG Defendants have "no standing" under that agreement.  Nasdaq Br. at 1.  Nasdaq's attempt to slice and dice the contract by holding ETFMG liable for PureShares' obligations in launching and operating the ETFs while denying it standing to enforce PureShares' corresponding rights (including with respect to exclusivity and confidentiality) is unsustainable.   The purpose of the Sublicense Agreement was to provide ETFMG with the indexes underlying the ETFs in connection with issuing and operating the funds.  Nasdaq cannot pick and choose which contractual provisions governing that role ETFMG will be permitted to enforce.

Nasdaq's further assertion that the Sublicense Agreement obligated ETFMG to "pay[] ISE/Nasdaq the majority of the profits derived from the operation of the funds" (Nasdaq Br. at 2) is contrary to the plain language of the contract.  The Sublicense Agreement expressly *excludes* the schedules setting the fee split between ISE and PureShares from the provisions of the Index License Agreement to which ETFMG is bound.  Indeed, at the time ETFMG signed the Sublicense Agreement, it was provided only with a *redacted* copy of the attachment that concealed the details of the fee split.  ETFMG's financial obligations with respect to operation of each fund, if any, were set forth in separate agreements, in most cases called Platform Services Agreements ("PSAs"), that it entered into with ISE and/or PureShares.  Those obligations differ from the fee provisions in the Sublicense Agreement attachment, which govern only the split *between ISE and PureShares* of proceeds received under other agreements.

Nasdaq is arguing a tortured reading of the Sublicence Agreement because it has no case under the operative documents.  ETFMG exercised its contractual right to terminate

those contracts due to impermissible interference by Nasdaq and PureShares with the operation of the ETFs and the issuing trust.  Pursuant to those contracts, ETFMG gave NASDAQ and PureShares sixty days to cure the violations and did not receive a response.

In addition, the PSA governing the HACK Fund, the principal fund in dispute here, was an agreement between ETFMG and PureShares – ISE was not even a party.  And the HACK PSA contains *no* obligation for ETFMG to turn over profits from the fund to anyone.  It is therefore indisputable that the governing contracts contain *no* language obligating ETFMG to pay HACK profits to Nasdaq or anyone else – a conclusion that can be confirmed through a dispositive motion once Nasdaq answers the Counterclaims.

## FACTUAL ALLEGATIONS

The Motion's account of the parties' relationships and dealings is rife with misstatements and, as noted, improperly relies on Nasdaq's own Complaint in summarizing the facts, rather than assuming the truth of the Counterclaims' factual assertions.   In any event, the contractual framework underlying this dispute is straightforward, and the Complaint itself attaches, as Exhibits A-F, most of the relevant agreements.

### A.    The Contracts at Issue

Beginning in 2012, ISE and ETFMG's predecessors-in-interest developed a partnership relating to a line of ETFs marketed under PureShares' PureFunds brand (the "PureFunds ETFs").  The parties executed a series of contracts, described below, governing their respective rights, duties, and obligations in connection with the PureFunds ETFs and other matters, including ETF wholesaling.  Countercl. ¶¶ 5-9; Compl. ¶¶ 18-19, 25, 28, 30-31, 34.

The Index License Agreement: On June 18, 2012, ISE and PureShares executed the Index License and Exchange Traded Product Agreement (the "Index License Agreement"), which accomplished two things.  First, it granted PureShares a license to use ISE's indexes and

trademarks for various ETFs, and in that connection set forth, in Section 2, various mutual obligations. Key among those obligations was ISE's commitment, later assumed by Nasdaq, to provide properly maintained stock indexes. This included the duty, directly or through a vendor, to make the indexes continuously available and have them updated *every fifteen seconds* on trading days. Countercl. ¶ 6 & Compl. Ex. A at pp. 2-4. The Index License Agreement included certain other obligations, including (in Section 4) the obligation to refrain from establishing a "substantially similar" competing ETF product and (in Section 9) the duty to maintain confidentiality of proprietary and other confidential information. *Id.* at pp. 6-7, 12-13.

Second, the Index License Agreement listed, in Schedule 1, the three ETF indexes initially licensed to PureShares and set the respective percentage profit splits between ISE and PureShares for each fund. Compl. Ex. A at pp. 18-29. Schedule 1 was later supplemented to add four more funds and set the financing terms and profit split for each. *Id.* at pp. 34-50. The most successful ETF index under this agreement has been for the cyber-security ETF commonly referred to as "HACK" – its NYSE ticker. Compl. ¶¶ 3, 22. The ETFMG Defendants are not parties to the Index License Agreement itself. Compl. Ex. A. p. 17.

The Sublicense Agreement: Because PureShares lacked the capital, operational expertise, and regulatory approvals needed to manage or bring to market an ETF, much less a series of ETFs, ISE approached Factor Advisors, LLC ("Factor"), a predecessor-in-interest of ETFMG, which was an experienced ETF issuer that possessed all of these critical missing components. Compl. ¶ 25. Accordingly, in June 2012, contemporaneously with the Index License Agreement, PureShares and ISE entered into a "Sublicense Agreement" with Factor.[3]

---

[3] Because the original executed copy of the Sublicense Agreement was temporarily lost, the parties decided to re-execute it, more than three years, later on December 2, 2015. Nasdaq

The Sublicense Agreement was deliberately structured to make Factor (and thus ETFMG) a full party with respect to the index licensing and operational portions of the Index License Agreement, while expressly *excluding* the Schedule 1 fee structure governing the division of profits between ISE and PureShares.  It was understood by all concerned that Factor and its affiliated trust were the investment adviser and issuer, respectively, of the ETFs under the Investment Company Act of 1940 and assumed all responsibilities and liabilities under the Act.

As most relevant here, the Sublicense Agreement granted Factor "a non-exclusive and non-transferable sublicense to use the Intellectual Property in connection with the issuance, distribution, marketing, and/or promotion" of the relevant ETFs.  Compl. Ex. B ¶ 1.  The Motion inaccurately quotes the definition of Intellectual Property as limited to "'certain copyright, trademark, and proprietary rights and trade secrets of ISE (as defined in the [Index License Agreement]),'" asserting that this does not include the obligation "to provide indexes for the PureFunds ETFs."  Nasdaq Br. at 9 & n.3.  But the actual language of the Sublicense Agreement is broader, describing the sublicense as applying to "certain copyright, trademark, and proprietary rights and trade secrets of ISE (*as further described* in the License Agreement, the Intellectual Property."  Compl. Ex. B at 1 (emphasis added).

The Index License Agreement, in turn, makes clear that this definition indeed includes the indexes:

> WHEREAS, ISE compiles, calculates, and maintains . . . index(es) (the "Index(es)") that are identified in the Schedules attached hereto . . . and ISE owns rights in and to the Index(es), the proprietary data related thereto, and the ISE Marks (defined below) (such rights, including without limitation, copyright, trademark or

---

attached to the Complaint only the 2015 version.  Compl. Ex. B.  The original 2012 Sublicense Agreement is attached to the Coffey Declaration as Ex. 2.

proprietary rights and trade secrets, being hereinafter collectively
referred to as the "<u>Intellectual Property</u>").

Compl. Ex. A at 1.  By referring to "rights in and to the Index(es)" and then specifically stating

that "such rights" are part of the "Intellectual Property," the Index License Agreement

unambiguously includes the indexes within the scope of Intellectual Property covered by the

sublicense.  This makes perfect sense for a document entitled "Index License . . . Agreement."

The Sublicense Agreement further expressly makes Factor a party to all of the

licensing and operational aspects of the Index License Agreement, but *not* to the portion of the

agreement governing the division of fees.  In return for the sublicense, Factor "acknowledge[ed]

that it has received a copy of the [Index] License Agreement (*excluding the Schedule setting*

*forth license fees*) and agree[d] to be bound by all the provisions thereof, including, without

limitation, those provisions imposing obligations on PureShares."  Compl. Ex. B ¶ 2 (emphasis

added).  This language makes Factor (and hence ETFMG) a full party to the Index License

Agreement for all purposes *other than* fee splitting.  The Sublicense Agreement further confirms

this by reciting that Factor's "obligations under the License Agreement . . . are as principal and

shall be unaffected by any defense or claim that PureShares may have against ISE, the

Licensee."  *Id.* ¶ 3.  This eliminates any doubt that ETFMG was intended to fully step into

PureShares' shoes for purposes of using the indexes.

Nasdaq repeatedly alleges that ETFMG was obligated under the Sublicense

Agreement to pay ISE and Nasdaq (its successor in interest) the percentages of ETF profits

specified in ISE's underlying agreement with PureShares.  Nasdaq Br. at 2, 4, 12.  However,

these profit-sharing obligations are included only in the portion of the Index License Agreement

– the "Schedule setting forth license fees" – to which ETFMG is *explicitly not bound* under the

plain language of the Sublicense Agreement.  Moreover, the relevant profit split information was

- 7 -

*redacted* on the version of the schedule shown to Factor when it signed the Sublicense

Agreement.  Countercl. ¶ 9.  This makes sense, since ETFMG's own financial obligations are set

forth in other agreements, as described below, and are not identical to PureShares' obligations to

Nasdaq (which involve a split *between PureShares and Nasdaq* of whatever proceeds are

received under other agreements).

        The Platform Services Agreements:  For most of the PureFunds ETFs, ETFMG

(through ETMG) entered into PSAs with PureShares and/or ISE.  Compl.  ¶¶ 30-31 & Exs. C-E.[4]

Nearly every PSA, in addition to listing ETFMG's services to be provided to the fund, required

ETFMG to pay ISE the profits generated from the fund, minus its expenses, within ten days of

receiving funds.  Compl. ¶ 32 & Exs. D, E; Coffey Decl. Exs. 3, 4.  However, there was one

major exception: HACK, the first PSA.   Unlike the other PSAs, the HACK PSA did not have

ISE as a party and, crucially, contained no requirement for ETFMG to pay fund-related profits to

either ISE *or* PureShares.  Compl. Ex. C.  At the time the HACK PSA was signed, the parties'

relationships and public roles were evolving.  ISE  entered into an oral agreement with ETFMG

whereby ETFMG would (and did) pay the profits, if any, to ISE and ISE would then pay

PureShares any amounts owed under the Index License Agreement.  Compl. ¶ 39.  Based on

various breaches by PureShares and Nasdaq and the overall deterioration of the parties'

relationships, however, ETFMG exercised its right under Sections 7 and 9 of the PSAs to

terminate those contracts and also terminated its oral contract with ISE regarding HACK profits.

*See* Countercl. ¶¶ 16-24; Compl. ¶¶ 42-45 & Exs. C-E; Coffey Decl. Exs. 3-6.

---

[4]  Nasdaq attaches some, but not all, of the PSAs to its Complaint, despite alleging that the
ETFMG Defendants "materially breached" all of them.  Compl. ¶ 62.  The two missing PSAs –
governing funds known as FINQ and IMED – are attached to the Coffey Declaration as Exhibits
3 and 4.

The Wholesaling Agreement:  Separate and apart from the above-described agreements governing the PureFunds ETFs, on April 23, 2013 ISE entered into a Wholesaling Platform Services Support Agreement (the "Wholesaling Agreement") with GENCAP Advisors, LLC ("GENCAP"), a predecessor-in-interest of ETMG.  Compl. ¶ 34 & Ex. F.  Under that agreement, ISE agreed to pay to create and support a wholesaling sales operation, or "platform," for ISE-supported ETFs (including certain PureFunds ETFs) and third-party ETFs.  *Id.*  The parties have asserted various claims against each other arising out of Nasdaq's attempts to extricate itself from this contract.  *See* Countercl. ¶¶ 15, 31-34; Compl. ¶¶ 52-54.

## B.   **This Action and the ETFMG Defendants' Counterclaims**

On October 26, 2017, Nasdaq commenced this action, asserting claims against the ETFMG Defendants for breach of contract, unfair competition, unjust enrichment, quantum meruit, and breach of the duty of good faith and fair dealing, and against all Defendants (including Mr. Masucci) for conversion.  Compl. ¶¶ 59-89.  Mr. Masucci's motion to dismiss the single claim asserted against him has been fully briefed.

The ETFMG Defendants filed their Counterclaims on January 25, 2018, alleging claims for breach of the Wholesaling Agreement (First Count) and the duty of good faith and fair dealing (Fourth Count) that Nasdaq concedes are adequately pleaded.  Nasdaq Br. at 1 n.2.  The Motion seeks dismissal of two other Counterclaims – the Second Count (asserting breach of the Index License Agreement and Sublicense Agreement) and the Third Count (seeking indemnification under the Wholesaling Agreement) – the latter of which Defendants have withdrawn without prejudice.  *See* above at 1 n.1.

The claim for breach of the Index License Agreement and Sublicense Agreement is based on a remarkable course of misconduct by Nasdaq that began soon after it acquired ISE for $1.1 billion in June 2016.  Up until that point, ETFMG and ISE had worked together

cooperatively to build the ETF business – with ISE properly maintaining the ETF indexes and

honoring its explicit obligation to cover the substantial cost (approximately $1 million annually)

of the wholesaling operation that it had induced ETFMG to build.  Countercl. ¶¶ 1, 5, 10.

> Nasdaq, however, did not want to continue in business with ETFMG, in part

because it created a major conflict of interest.  Nasdaq's index business generated hundreds of

millions of dollars of revenue while the ISE ETF venture business, which put Nasdaq in

competition with its clients, was relatively small and did not fit Nasdaq's business model.  In

addition, First Trust, Nasdaq's single largest index client, which uses NASDAQ indexes for

approximately $23 billion in ETFs, runs a cyber-security ETF known as "CIBR" that is a direct

competitor with HACK.  Indeed, CIBR is a virtual clone of HACK and was created by

NASDAQ and First Trust in response to the success of HACK.  *Id.* ¶¶ 11-12.  However, rather

than negotiate a mutually agreeable exit from its substantial obligations to ETFMG (which it

apparently failed to discover during due diligence for the ISE transaction), Nasdaq attempted to

bully ETFMG into abandoning its contractual rights and its obligations under the 1940 Act, and

began flagrantly to breach its contractual and ethical obligations in a variety of way:

- Although ETFMG immediately raised concerns about the conflict issue as well as
   several ongoing deficiencies in Nasdaq's management of the ETF indexes,
   Nasdaq ignored the concerns and refused to meet with ETFMG to address them.
   *Id.* ¶¶ 14, 21.

- Nasdaq halted payment of expenses under the Wholesaling Agreement and other
   funding agreements, forcing ETFMG to offset these expenses against ETF profits.
   Nasdaq continuously disputed regular charges that had been approved and never
   questioned by ISE.  Although Nasdaq told ETFMG that it "hate[d] the wholesale

agreement" and twice asked for a buyout offer, it ignored ETFMG's subsequent proposals and merely ramped up its improper pressure tactics to escape its contract obligations. *Id.* ¶¶ 15, 31.

- Nasdaq attempted to intimidate ETFMG into (1) abandoning its challenges to Nasdaq's involvement with the nearly identical, competing CIBR ETF and a similar Australian fund using the HACK ticker and the same index as HACK, and (2) withdrawing a proposal to reduce the fee charged to HACK shareholders from .75% to .60% of assets under management – the same fee as CIBR. This change would benefit HACK shareholders but correspondingly hurt CIBR and reduce the net HACK profits paid to Nasdaq. *Id.* ¶¶ 16-19. On information and belief, Nasdaq may have shared confidential information regarding the impending fee reduction with First Trust, in breach of ethical as well as contractual restrictions. *Id.* ¶ 46.

- Nasdaq's disruptive and confrontational behavior appears to have led PureShares to commence a baseless lawsuit against ETFMG in New Jersey state court, apparently with Nasdaq's advance knowledge if not encouragement, alleging several frivolous claims and attempting to interfere with the discretion of ETFMG and the Trust to make judgments in the best interests of ETF shareholders. *Id.* ¶¶ 22-23. As a result of the frivolous suit and other attempts by PureShares and Nasdaq to interfere with management of the funds, including attempts to block the fee cut, ETFMG gave written notice exercising its right to terminate certain PSAs. This triggered a 60-day cure period. *Id.* ¶ 24.

- During the cure period, ETFMG sought to confirm that Nasdaq would continue to honor its obligations under the Sublicense Agreement to provide indexes. NASDAQ did not accept an ETFMG proposal under which Nasdaq would receive a market fee to provide the indexes, and Nasdaq notably declined to confirm that it would continue to honor its obligations. This put ETFMG in an impossible position, because with $1 billion in assets under management it could not risk losing access to regularly updated indexes, and ETFMG had no choice but to notify Nasdaq that it would transition to new indexes at a substantial additional cost to ETFMG  *Id.* ¶¶ 26-28.

- After ETFMG replaced Nasdaq as index provider for three of its ETFs, Nasdaq engaged in deliberate malicious interference with index operations of the remaining two funds  (GAMR and IFLY) – cutting off the access of ETFMG's portfolio managers to critical index files *during trading hours*, a stunning and egregious breach of contract and market practice by a major index provider. ETFMG was forced to make immediate arrangements to replace Nasdaq as index provider on the remaining two funds. *Id.* ¶¶ 29-30.

Nasdaq's conduct outlined above constituted a breach of various contracts as well as a violation of ethical standards governing the conduct of index providers.  Countercl. ¶ 11.  As relevant here, Nasdaq violated the Index License Agreement and Sublicense Agreement in at least the following ways:

- Nasdaq violated Section 2(B) of the Index License Agreement, which required it to provide functioning indexes for the funds, by failing to address quality control issues raised over several months with respect to maintenance and updating of the

indexes; failing to respond to ETFMG's demand for assurances that Nasdaq

would continue to provide indexes as required under both agreements; engaging

in malicious interference with the index operations of two funds during trading

hours; and improperly purporting to terminate the Sublicense Agreement. *Id.*

¶ 47.

- Nasdaq violated Section 4(B) of the Index License Agreement by indexing at least

  two other "Substantially Similar" products (CIBR and HACK Australia). *Id.*

  ¶¶ 43-44.

- On information and belief, Nasdaq may have also violated Section 9 of the Index

  License Agreement by disclosing confidential information about the HACK fee

  cut to First Trust without the ETFMG Defendants' prior written consent. *Id.*

  ¶¶ 45-46.

## ARGUMENT

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) should be denied where the

complaint sets forth "sufficient factual matter . . . to 'state a claim to relief that is plausible on its

face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id.* Here, Nasdaq concedes that the ETFMG Defendants have stated valid

counterclaims for breach of the Wholesaling Agreement and for violation of the duty of good

faith and fair dealing. *See* Nasdaq Br. at 1 n.2. And Nasdaq does not challenge the legal

sufficiency of the ETFMG Defendants' *substantive* allegations that Nasdaq breached the Index

License Agreement and the Sublicense Agreement. Rather, the motion to dismiss the Second

Count is limited to the question of Defendants' *standing*, as a signatory to the Sublicense

Agreement, to sue for breach of Nasdaq's obligations (inherited from ISE) under Sections 2, 4,

and 9 of the Index License Agreement.  As demonstrated below, the motion must be denied

based on the plain language of the relevant contracts.

**THE ETFMG DEFENDANTS HAVE STANDING TO SUE FOR BREACH OF THE INDEX LICENSE AGREEMENT AND THE SUBLICENSE AGREEMENT**

Nasdaq's motion to dismiss the Second Count of the Counterclaims is based on an

unsustainable distortion of the language and purpose of the Index License Agreement and the

Sublicense Agreement.  Nasdaq's motion rests on the fiction that the Sublicense Agreement

granted ETFMG only a "narrow" sublicense of certain discrete intellectual property – which

Nasdaq implies includes trademarks and copyrights, but somehow not the obligation to "provide

indexes for the PureFunds ETFs."  Nasdaq Br. at 9.  In return for this exceedingly constricted

grant, ETFMG supposedly agreed to pay over "the majority of the profits derived from the

operation of the funds."  *Id.* at 2.  But again, Nasdaq has it directly backwards:  The Sublicense

Agreement actually makes ETFMG a party to the Index License Agreement for all operational

purposes – but expressly does *not* bind it to the provisions governing the profit split between

Nasdaq and PureShares.  *See* above at 4-8.

Most frivolous is Nasdaq's assertion that ETFMG lacks standing even to sue for

the proper provision and maintenance of the indexes themselves – the main thing that ISE (and

subsequently Nasdaq) was obligated to provide under the Index License Agreement.  But the

definition of Intellectual Property set forth in that agreement (and incorporated in the Sublicense

Agreement) expressly recited that "ISE compiles, calculates, and maintains" various "index(es)

. . . identified in the Schedules attached" to the Index License Agreement; that it "owns rights in

and to the Index(es)" and "the proprietary data related thereto";  and that "*such rights*, including

without limitation, copyright, trademark or proprietary rights and trade secrets" are within the definition of "Intellectual Property." Compl. Ex. A at 1. The Sublicense Agreement expressly includes this description by reference in its corresponding definition of Intellectual Property. Compl. Ex. B at 1. Thus, ETFMG's sublicense indisputably includes the right to use not just Nasdaq's copyrights and trademarks, but also the underlying *indexes* to which they relate. The copyrights and trademarks are meaningless without the indexes.

This is, indeed, the only logical reading given the purpose of the two agreements. Nasdaq recognizes that the Index License Agreement obligated ISE not just to "grant PureFunds a license to use ISE's indexes and trademarks for various ETFs" but also to "calculate the indexes so that investors would have real-time knowledge of the index and the corresponding ETF's value" and to "provide financial support in connection with the creation, launch, and ongoing operation of the PureFunds ETFs." Nasdaq Br. at 3. At the same time, Nasdaq recognizes that "PureFunds" itself was merely a sales desk and marketing label and thus PureShares had to grant the *sublicense* to ETFMG to actually issue, operate, distribute, and market the ETFs. *Id*. at 3-4. Logically, therefore, ETFMG had to have the same access that PureShares had been granted to the indexes, and the same right to insist that they be properly calculated, updated, and maintained for the benefit of the ETF shareholders. The suggestion that the Sublicense Agreement carved out some limited subset of these rights with no enforcement ability is supported by nothing in the agreement itself and runs contrary to the undeniable purposes and needs of the parties.

Moreover, contrary to Nasdaq's suggestion that the Sublicense Agreement grants only "limited rights and obligations" (Nasdaq Br. at 10), the plain language of that agreement expressly makes Factor (and thus ETFMG) a party to all of the licensing and operational

- 15 -

provisions contained in the Index License Agreement (but, contrary to Nasdaq's assertions, explicitly *excludes* the provisions governing the division of fees):  Factor "acknowledge[ed] that it has received a copy of the [Index] License Agreement (*excluding the Schedule setting forth license fees*) and agree[d] to be bound *by all the provisions thereof, including, without limitation*, those provisions imposing obligations on PureShares."  Compl. Ex. B ¶ 2 (emphasis added).  The recitation that this includes, "*without limitation*," PureShares' obligations makes clear that Factor is not just "bound" by "obligations" but more generally made a party to all the operational provisions.  This conclusion is underscored by the Sublicense Agreement's further statement that Factor's "obligations under the License Agreement . . . are as *principal* and shall be unaffected by any defense or claim that PureShares may have against ISE," the licensor.  *Id.* ¶ 3 (emphasis added).

Nasdaq fails to explain how ETFMG can be "bound" to the entire Index License Agreement (other than the fee provisions) and treated as a "principal" and yet still have no standing to sue to enforce any provisions of the contract.  Such an absurd result would stand basic contract principles on their head by permitting Nasdaq to enforce the Sublicense Agreement against ETFMG while escaping its own responsibilities under the same contract.  "It is well-settled that a party seeking to obtain the benefits of a contract must also accept its burdens."  *Krys v. Sugrue (In re Refco, Inc. Sec. Litig.)*, No. 07-MDL 1902, 2009 WL 5548666, at *9 (S.D.N.Y. Nov. 16, 2009); *see generally Variblend Dual Dispensing Sys. v. Seidel GMBH & Co., KG*, 970 F. Supp. 2d 157, 167 (S.D.N.Y. 2013) (Engelmayer, J.) (party that seeks to enforce assigned contract assumes "obligations as well as the rights thereunder") (citation omitted).

Nasdaq further argues the ETFMG cannot be a third-party beneficiary of the

Index License Agreement because it was only an "incidental" beneficiary of that contract. The Court need not reach this question, because the Sublicense Agreement *directly* binds ETFMG to the Index License Agreement as a "principal," not merely a third-party beneficiary, and each of ISE, PureShares, and ETFMG signed the Sublicense Agreement. But Nasdaq cannot have it both ways. If ETFMG is to be held to all of PureShares' operational obligations under that contract without being considered a party, then the performance expressly directed to ETFMG under the Sublicense Agreement must make it, *at minimum*, a third party beneficiary of the Index License Agreement. Intent to confer a benefit upon a third party can be inferred from the circumstances surrounding an agreement. *See Flickinger v. Harold C. Brown & Co., Inc.*, 947 F.2d 595, 600 (2d Cir. 1991). It is particularly appropriate to find intent where the parties contemplate or provide for performance to be directed to a third party. *See, e.g.*, *Newman & Schwartz v. Asplundh Tree Expert Co., Inc.,* 102 F.3d 660, 662-63 (2d Cir. 1996) (law firm sufficiently stated claim as third-party beneficiary of employment agreement in which employer agreed to pay employee's legal fees even though law firm was not expressly named); *NewSpring Mezzanine Capital II, L.P. v. Hayes*, C.A. No. 14-1706, 2015 WL 12859402, at *2 (E.D. Pa. May 8, 2015) (applying NY law) (motion to dismiss denied where, although contract did not expressly evince intent to benefit non-signatory plaintiff, sub-contract involving same parties and overlapping obligations with performance running to plaintiff demonstrated intent to benefit third party); *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 58 F. Supp. 2d 228, 248 (S.D.N.Y. 1999) (investment funds were third-party beneficiaries of contract between investment advisor and broker-dealers where broker-dealers provided monthly status report of securities to investment funds).

       Here, similarly, ISE and PureShares expressed a clear intent to have performance

run to Factor by including the Sublicense Agreement, already signed by both ISE and PureShares, as Exhibit II to the original Index License Agreement – building into their initial contract the mechanism through which Factor stepped into PureShares' shoes to use the indexes. Compl. Ex. A at pp. 31-32. The current facts are nothing like the primary case Nasdaq cites on this point, *Artwear, Inc. v. Hughes*, 202 A.D.2d 76 (1st Dep't 1994), in which a sublicensee sued the licensor for failing to approve any of the t-shirt designs it created for the licensee, where the original license agreement merely contemplated that the licensee might involve sublicensees but no performance by the licensor was contemplated to run directly to the plaintiff – rendering it merely an incidental, rather than intended, beneficiary. *Id.* at 82. In view of the very different facts here, the parties' intent to convey third-party beneficiary status would present, at the very least, a question of fact for discovery. *See Tarrant Apparel Group v. Camuto Consulting Group, Inc.*, 40 A.D.3d 556, 557 (1st Dep't 2007) (issue of whether sublicensee was third-party beneficiary of master license agreement involved fact questions that could not be resolved on motion to dismiss where defendant's performance under the master license agreement involved the sublicensed products).

Finally, while not necessary in order to sustain the Second Count, the Court should confirm that the plain language of the Sublicense Agreement does *not*, as Nasdaq repeatedly argues, bind ETFMG to pay over ETF profits. As noted, the Sublicense Agreement expressly *excludes* the fee schedule from the scope of Factor's obligations and, consistent with that limitation, the copy given to Factor when it signed the Sublicense Agreement was *redacted* to conceal from Factor the very fee schedule that Nasdaq now contends was intended to bind Factor (and thus ETFMG). *See* above at 7-8. Nasdaq tries to finesse these inconvenient facts by omitting the exclusionary language from its quotation of the Sublicense Agreement; noting that

- 18 -

ETFMG *also* entered into separate operating agreements that usually (but not in the case of HACK) provided for turnover of net profits; and then fudging the point by concluding that "pursuant to the Sublicense Agreement and the operating agreements, ETFMG has, until mid-2017, paid ISE/Nasdaq the profits derived from these funds."  Nasdaq Br. at 4.

   This tricky presentation does not transform the Sublicense Agreement into something it is not. The Agreement on its face simply reflects the agreement of all three parties to have ETFMG step into PureShares' shoes to use the indexes.  That required ETFMG to be subject to PureShares' obligations – and have all of PureShares rights – with respect to actually using the indexes and issuing and operating the funds.  But it makes no sense to speak of ETFMG assuming PureShares' obligation to split profits with Nasdaq in certain percentages. Where ETFMG had the obligation to pay over net profits, for example under the PSA governing the "BIGD" and "IPAY" funds (Compl. Ex. D), it was required to (and did) turn over *all* profits net of fees and expenses.  However, the Index License Agreement provided that ISE and PureShares would *split* those same profits, receiving 75% and 25%, respectively (and a slightly different split once certain expenses were recouped).   Compl. Ex. A, Supplement 2, at pp. 3-4, 7-8.  It is thus apparent that the parties intended for ETFMG's financial obligations, if any, to be determined directly by the PSAs, not indirectly by (and in conflict with the plain terms of) the Sublicense Agreement.  Nasdaq is motivated to find a way around this obvious conclusion because (1) the PSA governing the HACK fund – the main one in dispute here – contains *no* provision for ETFMG to pay over profits (Compl. Ex. C), and (2) Nasdaq and PureShares breached the provision of each PSA prohibiting them from adversely affecting the operations of the funds and the Trust (*e.g.*, *id.* § 7(d)).  Nasdaq's attempt to construct an independent payment obligation in the Sublicense Agreement contrary to an express exclusion should be rejected.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion to dismiss the Second Count of the

ETFMG Defendants' Counterclaims should be denied.

Dated: New York, New York
      March 12, 2018

                KRAMER LEVIN NAFTALIS & FRANKEL LLP

                By:  /s/ John P. Coffey_____

                John P. Coffey
                Jeffrey S. Trachtman
                Michael J. Calb
                Leah S. Friedman

                1177 Avenue of the Americas
                New York, New York  10036
                Tel: (212) 715-9100

                *Attorneys for Defendants*

KL3 3160067.6