USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: **8/21/2018**

NASDAQ, INC.,

Plaintiff,

-v-

EXCHANGE TRADED MANAGERS GROUP, LLC, ETF MANAGERS GROUP, LLC, and SAMUEL MASUCCI,

Defendants.

17 Civ. 8252 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Pending before the Court are two motions to dismiss in this dispute between plaintiff Nasdaq, Inc. ("Nasdaq") and defendants Exchange Traded Managers Group, LLC, ETF Managers Group, LLC, and Samuel Masucci.[1] In its complaint, Nasdaq alleges primarily that defendants unlawfully seized control of the profit stream flowing from certain securities that ETFMG had been hired to manage. ETFMG counterclaims primarily that Nasdaq breached the parties' agreements by maliciously interfering with ETFMG's work, leaving ETFMG no choice but to terminate its partnership with Nasdaq.

The pending motions, filed under Federal Rule of Civil Procedure 12(b)(6), are relatively narrow in scope: Masucci moves to dismiss the sole claim against him on the ground that it fails to state a plausible claim for relief. Nasdaq, for its part, moves to dismiss ETFMG's second and third counterclaims—for breach of contract and indemnification, respectively—as barred by the relevant contracts.

For the reasons that follow, the Court grants Masucci's motion to dismiss the sole claim against him. The Court also grants Nasdaq's motion insofar as it seeks dismissal of ETFMG's

---

[1] The Court refers to the LLC defendants collectively as "ETFMG."

1

second counterclaim. As to Nasdaq's bid to dismiss ETFMG's third counterclaim, however, the motion is held in abeyance pending further submissions from the parties.

## I.     Background

### A.     Factual Background[2]

#### 1.     The Parties

In 2016, Nasdaq, owner of the second largest stock exchange in the world, acquired International Securities Exchange ("ISE"). Compl. ¶¶ 1, 8. In so doing, Nasdaq acquired ISE's interests in a series of agreements, discussed below, that underlie the present dispute.

Before its acquisition, ISE had been in the business of developing and marketing exchange-traded funds, or "ETFs." *Id.* ¶ 8. An ETF is a security that tracks an index, a commodity, bonds, or a collection of assets. *Id.* ¶ 13. Like mutual funds, ETFs charge a management fee payable to the fund's manager. *Id.* ¶ 17. Unlike mutual funds, ETFs are traded like common stocks on a stock exchange. *Id.* ¶ 13. The ETFs at issue in this case tracked indexes in particular industry sectors, including cyber security. *Id.* ¶ 15.

---

[2] The facts related herein are drawn primarily from plaintiff's complaint, Dkt. 1 ("Compl."), and defendants' "Answer, Affirmative Defenses, and Counterclaims," Dkt. 24, as well as the exhibits attached to each. The latter document comprises two separate pleadings: an answer filed on behalf of all defendants, Dkt. 24 at 1–12 (the "Answer"), and counterclaims filed on behalf of the ETFMG defendants, Dkt. 24 at 12–27 (the "Counterclaims"). The Court also relies upon several contracts relevant to this dispute, each of which is incorporated by reference in the pleadings. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002). Several of these contracts were submitted as exhibits to declarations filed by John P. Coffey. *See* Dkt. 23 ("First Coffey Decl."); Dkt. 38 ("Second Coffey Decl."). In resolving Masucci's motion to dismiss, the Court assumes all well-pled facts in the complaint to be true, drawing all reasonable inferences in Nasdaq's favor. In resolving Nasdaq's motion to dismiss, the Court assumes all well-pled facts in the Counterclaims to be true, drawing all reasonable inferences in ETFMG's favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). Except where otherwise noted, the facts related here are not in dispute.

2

Exchange Traded Managers Group is the corporate parent of ETF Managers Group, LLC. *Id.* ¶ 9. Samuel Masucci is the co-founder and CEO of each company. *Id.* ¶ 11. As relevant to the present dispute, defendants' business involved assisting other companies with the issuance and operation of ETFs. *See id.* ¶ 10; Counterclaims ¶ 5.

### 2. The Index License Agreement

In 2012, ISE partnered with PureShares, LLC, doing business as PureFunds, to develop and market a line of ETFs to be marketed under the PureFunds brand. Compl. ¶ 18. To that end, ISE and PureShares signed a contract titled the "Index License and Exchange-Traded Product Agreement." *Id.* ¶ 19; *see also id.* Ex. A (the "Index License Agreement").[3]

Pursuant to this agreement, ISE agreed (1) to grant PureShares a license to use ISE's indexes and trademarks; (2) to regularly calculate the values of the indexes, and to correct any related errors identified by PureShares; and (3) to provide financial support in connection with the creation, launch, and operation of the PureFunds ETFs. *See* Index License Agreement §§ 1–2(B). PureShares, meanwhile, agreed to take the necessary steps to launch the ETFs and to split with ISE the profits generated by the ETFs. *See id.* § 2(C); *id.* Sched. I §§ (1)(H), (2)(H), 3(H), 4(G), 5(H), 6(H), 7(F).

As relevant here, the Index License Agreement also prohibited ISE and PureFunds from introducing products "Substantially Similar" to those contemplated by the agreement, or even from "enter[ing] into discussions, negotiations, or . . . any contract or arrangement with any third party, the principal focus of which is the possible establishment of [a Substantially Similar] exchange-traded product." *See id.* §§ 3, 4(B); *id.* Sched. I (defining "Substantially Similar" for

---

[3] Nasdaq has not filed the exhibits to its complaint on the public docket, citing confidentiality provisions in the underlying documents. *See* Compl. ¶ 19 n.2. Nasdaq is directed within one week of this decision to publicly file all exhibits to its complaint with appropriate redactions, and to file these documents under seal in unredacted form.

each ETF created under the agreement).  The Index License Agreement further prohibited ISE and PureFunds from disclosing designated confidential information without the other party's prior written consent.  *See id.* § 9.

### 3.    The Sublicense Agreement

The Index License Agreement also contemplated that PureShares might, with ISE's consent, sublicense ISE's indexes and trademarks to a third party.  *See* Compl. ¶ 27; Index License Agreement § 2(C)(viii).  To that end, the agreement attached a template sublicensing agreement.  *See* Index License Agreement Sched. II.

On June 18, 2012, using the form template attached to the Index License Agreement, ISE and PureShares entered into a sublicense agreement with Factor Advisors LLC ("Factor"), a company owned by Masucci and a predecessor in interest to ETFMG.  Counterclaims ¶ 8; *id.* Ex. 1.  On December 2, 2015, this agreement was amended, with no material alterations.  *See* Counterclaims ¶ 9; Compl. Ex. B (the "Sublicense Agreement").

The Sublicense Agreement—a one-page contract—granted Factor a sublicense to use certain "Intellectual Property" "in connection with the issuance, distribution, marketing and/or promotion" of the PureFunds ETFs.  Sublicense Agreement § 1.  The Sublicense Agreement defined the "Intellectual Property" by reference to the Index License Agreement, which defined that term as "the Index(es), the proprietary data related thereto, and [ISE's trade names, trademark and/or service mark rights]."  Index License Agreement at 1.

In return, Factor "acknowledge[d] that it ha[d] received and read a copy of the [Index] License Agreement (excluding the Schedule setting forth the license fees) and agree[d] to be bound by all the provisions thereof, including, without limitation, those provisions imposing any obligations on PureShares."  Sublicense Agreement § 2.  Factor also agreed that "its obligations

under the [Index] License Agreement pursuant to Section 2 of this Sublicense Agreement are as principal and shall be unaffected by any defense or claim that PureShares may have against ISE." *Id.* § 3.

### 4.    The Wholesaling Agreement

On April 22, 2013, ISE entered into an agreement with another ETFMG predecessor-in-interest, GENCAP Advisors, LLC ("GENCAP"), to conduct wholesale marketing of the ETFs. Compl. ¶ 34; *id.* Ex. F (the "Wholesaling Agreement"). Pursuant to this agreement, in exchange for fees paid by ISE, GENCAP agreed, *inter alia*, to "recruit and provide ongoing consulting services to people who are qualified and experienced in the field of marketing and selling ETFs . . . to potential investors, advisors, and financial institutions." Wholesaling Agreement § 1.

### 5.    The Platform Services Agreements

Over the next three years, ISE and/or PureShares also entered into "Platform Services Agreements" with ETFMG for most of the PureFunds ETFs. Compl. ¶¶ 30–31; *id.* Exs. C–E; Second Coffey Decl. Ex. 3; *id.* Ex. 4. These agreements provided that ETFMG, in exchange for a fee, would undertake a variety of services related to each ETF, such as preparing prospectuses, paying listing fees, producing marketing materials, and providing assistance with tax and regulatory requirements. *See, e.g.*, Compl. Ex. C ¶ 3 & Ex. B. Further, all but one of the Platform Services Agreements provided that ETFMG would pay ISE and PureShares the profits generated by each fund. *See* Compl. ¶ 32; *id.* Exs. D–E; Second Coffey Decl. Ex. 3; *id.* Ex. 4; *see also* Dkt. 39 at 8.

### 6.    The Parties' Course of Dealing

By 2017, with ETFMG at the helm, at least a few of the ETFs had achieved commercial success. Compl. ¶¶ 36–37; Answer ¶¶ 36–37. At least with respect to the most profitable ETF,

ETFMG dutifully passed the profits along to Nasdaq/ISE and PureShares. *See* Compl. ¶ 39; Answer ¶ 39.

At some point, however, the parties' relationship began to sour. The parties dispute precisely what happened and why. For present purposes, it suffices to relate Nasdaq's allegations, which defendants argue fail to state a claim against Masucci individually.[4]

According to Nasdaq, although the parties' relationship had borne considerable fruit, in early 2017, "defendants initiated a scheme to take control of the PureFunds ETFs." Compl. ¶ 41. To effectuate that scheme, on March 1, 2017, "defendant ETFMG sent a letter to PureFunds' CEO warning him against 'interfering' with the operations of the PureFunds[] ETFs." *Id.* ¶ 42. On April 21, 2017, "defendant ETFMG sent another letter to PureFunds' CEO informing him that ETFMG was terminating the [Platform Services] Agreements for [certain ETFs] because PureFunds' CEO stated publicly that PureFunds was the 'issuer' of these PureFunds ETFs." *Id.* ¶ 43.

On May 24, 2017, Nasdaq alleges, "defendant Masucci sent a letter to Nasdaq and PureFunds stating that ETFMG would no longer pay Nasdaq profits from [one profitable ETF]" for a series of reasons, including that PureShares' CEO had "improperly" contacted third parties about the PureFunds ETFs; PureShares' CEO had marketed the ETFs in violation of federal securities laws; Nasdaq's attorney sent an "inappropriately confrontational" letter to ETFMG; Nasdaq failed to propose a new contractual agreement for one of the ETFs; PureShares' CEO objected to a reduction in another ETF's management fee; and Nasdaq caused PureShares to file a lawsuit against ETFMG, during which PureShares induced or allowed a third party to violate

---

[4] The Court's resolution of Nasdaq's motion to dismiss ETFMG's counterclaims does not depend on any allegations or inferences arising from the parties' course of conduct.

the terms of a nondisclosure agreement between that entity and ETFMG. *Id.* ¶ 44; *see also* Answer Ex. 6.

On June 2, 2017, "Masucci sent a letter to Nasdaq and PureFunds stating that ETFMG was terminating the [Platform Services] Agreements for [the PureFunds ETFs] in sixty days for the reasons listed in his letter of May 24, 2017." Compl. ¶ 45; *see also* Answer Ex. 7.

On July 30, 2017, ETFMG "informed Nasdaq that it was unilaterally renaming [the PureFunds ETFs] that ISE/Nasdaq created and owned," and that ETFMG "would not comply with the Index License Agreement and Sublicense Agreement and refused to pay Nasdaq the profits generated by the operation of the PureFunds ETFs." Compl. ¶¶ 48–49.

### B. Procedural History

On October 26, 2017, Nasdaq filed the complaint in this action. It alleged (1) breach of the Sublicense, Wholesaling, and Platform Services Agreement; (2) conversion; (3) unfair competition; (4) unjust enrichment; (5) quantum meruit; and (6) breach of the duty of good faith and fair dealing. Each claim named the ETFMG entities as defendants; the conversion claim named Masucci as well. Dkt. 1.

On January 25, 2018, defendants filed their Answer and Counterclaims. These alleged (1) breach of the Wholesaling Agreement; (2) breach of the Index License and Sublicense Agreements; (3) indemnification under the Wholesaling Agreement; and (4) breach of the duty of good faith and fair dealing. Dkt. 24.

On January 25, 2018, Masucci filed a motion to dismiss Nasdaq's one claim against him, Dkt. 21, as well as a memorandum of law in support, Dkt. 22 ("Masucci Br."), and the First Coffey Declaration, Dkt. 23. On February 26, 2018, Nasdaq filed a memorandum of law in opposition to Masucci's motion. Dkt. 32 ("Nasdaq Opp.").

The same day, Nasdaq filed a motion to dismiss in part, Dkt. 33, and a memorandum of law in support, Dkt. 34 ("Nasdaq Br."). It argued that ETFMG's second and third counterclaims—for breach of the Index License and Sublicense Agreements and indemnification—failed to state a claim.

On March 5, 2018, Masucci filed a reply memorandum in support of his motion to dismiss. Dkt. 35 ("Masucci Reply").

On March 12, 2018, ETFMG filed a memorandum of law in opposition to Nasdaq's motion to dismiss, Dkt. 39 ("ETFMG Opp."), along with the Second Coffey Declaration, Dkt. 38.

On March 19, 2018, Nasdaq filed a reply memorandum of law in support of its motion to dismiss. Dkt. 40 ("Nasdaq Reply"). Dkt. 40.

## II.     Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss, a district court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quotation marks omitted). However, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare

8

recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[R]ather, the complaint's [f]actual allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quotation marks omitted). A complaint is properly dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

Whether directed at a complaint or counterclaims, motions filed under Rule 12(b)(6) are evaluated under the same standard. *Taupita Inv., Ltd. v. Benny Ping Wing Leung*, No. 14 Civ. 9739 (PAE), 2017 WL 3600422, at *6 (S.D.N.Y. Aug 17, 2017).

## III. Discussion

### A. Masucci's Motion to Dismiss Nasdaq's Claim Against Him

Masucci moves to dismiss Nasdaq's claim against him for failure to state a claim upon which relief may be granted. For the following reasons, the motion is granted.

Count Two of the complaint—the only count directed at Masucci individually—alleges "[c]onversion" by "all [d]efendants." Nasdaq there alleges that "defendants have, intentionally and without authority, interfered with Nasdaq's right to [the PureFunds ETFs] and the profits they generate in a manner so serious as to deprive Nasdaq of the use of those assets and profits." Compl. ¶ 67.

As to Masucci specifically, Nasdaq alleges the following:

> Defendant Samuel Masucci exercised dominion and control over the ETFMG Defendants with respect to the misappropriation from Nasdaq of the PureFunds ETFs. Therefore, defendant Samuel Masucci acted as the alter ego of the ETFMG Defendants and is liable for the ETFMG Defendants' actions and debts.

*Id.* ¶ 68.

Under New York law, "[a] member of a limited liability company cannot be held liable for the company's obligations by virtue of his or her status as a member thereof." *De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 304 n.12 (S.D.N.Y. 2013) (quoting *Matias v. Mondo Props. LLC*, 841 N.Y.S.2d 279, 281 (1st Dep't 2007)) (quotation marks and alterations omitted); *see also* N.Y. Ltd. Liab. Co. Law § 609.[5] Notwithstanding this statutory proscription, a plaintiff may hold a member of an LLC liable "by application of the doctrine of piercing the corporate veil." *De Sole*, 974 F. Supp. 2d at 304 n.12 (quoting *Grammas v. Lockwood Assocs., LLC*, 944 N.Y.S.2d 623, 625 (2d Dep't 2012)). To state a cause of action under this doctrine, a plaintiff must "allege facts that, if proved, indicate that the shareholder exercised complete domination and control over the corporation or LLC and abused the privilege of doing business in the corporate or LLC form to perpetrate a wrong or injustice." *Id.* (quoting *Grammas*, 944 N.Y.S.2d at 625) (alterations omitted). "Factors to be considered in determining whether an individual has abused the privilege of doing business in the corporate or LLC form include the failure to adhere to LLC formalities, inadequate capitalization, commingling of assets, and the personal use of LLC funds." *Id.* (quoting *Grammas*, 944 N.Y.S.3d at 626); *see also Dafeng Hengwei Textile Co. v. Liu*, 720 F. App'x 83, 84 (2d Cir. 2018).

Only three paragraphs of the complaint address Masucci's conduct specifically. The first two allege that Masucci sent letters to Nasdaq and PureShares stating, first, that ETFMG would cease paying Nasdaq profits from one ETF, Compl. ¶ 44, and, second, that ETFMG would, in 60 days, terminate the Platform Services Agreements for each of the PureFunds ETFs, *id.* ¶ 45. The third paragraph concerning Masucci individually is that, quoted above, in which Nasdaq alleges

---

[5] The parties agree that New York law governs this claim. *See* Masucci Br. 9 & n.6; Nasdaq Opp. 6–15.

that because "Masucci exercised dominion and control over the ETFMG Defendants with respect to the misappropriation from Nasdaq of the PureFunds ETFs," he is liable as ETFMG's "alter ego." *Id.* ¶ 68.

These allegations fall well short of a viable bid to pierce the corporate veil. There are no allegations of commingled funds, inadequate capitalization, or any other hallmark of abuse of the LLC form. Instead, Nasdaq offers only letters indicating that, with respect to the events at issue here, Masucci spoke "on behalf of" an LLC that he founded and ran. First Coffey Decl. Exs. 5–6; *see also* Compl. ¶ 11 ("Samuel Masucci is the co-founder and CEO of Exchange Traded Managers Group and ETFMG."). If that fact alone were sufficient to subject a CEO to individual liability for corporate misdeeds, there would be no veil to pierce.

As for the rest of the complaint, Nasdaq alleges only, generally, that Masucci "exercised dominion and control over the ETFMG Defendants with respect to the misappropriation from Nasdaq of the PureFunds ETFs." Compl. ¶ 68. This is the paradigmatic "[t]hreadbare recital[] of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. As such, it will not suffice. *See id.*

Perhaps recognizing as much, Nasdaq devotes the bulk of its briefing to an alternative theory of liability: that Masucci is liable not because he acted on behalf of a business in the course of his official duties, but because he, in his individual capacity, participated in the commission of a tort. *See* Nasdaq Br. 6 (citing *Acco, Ltd. v. Rich Kids Jean Corp.*, No. 15 Civ. 7425 (JSR), 2017 WL 4350576, at *12 (S.D.N.Y. May 3, 2017)). This argument fails for the simple reason that it is not pled in the complaint. Nasdaq alleges there only that Masucci "acted as the alter ego of the ETFMG Defendants" by virtue of his "dominion and control over the

ETFMG Defendants." Compl. ¶ 68. There is no allegation whatsoever that Masucci himself

engaged in tortious conduct except insofar as the organizations he served did so.[6]

For these reasons, Nasdaq has failed to state a claim against Masucci individually.

Accordingly, Masucci's motion is granted. The claim against him is dismissed.[7]

### B. Nasdaq's Motion to Dismiss ETFMG's Second and Third Counterclaims

Nasdaq moves to dismiss ETFMG's second and third counterclaims as barred by the

terms of the contracts on which they are premised. The Court will address each counterclaim in

turn.

#### 1. ETFMG's Second Counterclaim

ETFMG's second counterclaim is nominally for breach of contract of the Index License

and Sublicense Agreements. *See* Counterclaims at 24. In fact, however, the counterclaim refers

only to the Index License Agreement. ETFMG alleges that Nasdaq breached that agreement by

(1) indexing a "Substantially Similar" fund in competition with one of the PureFunds ETFs, *id.*

¶¶ 43–44; (2) disclosing non-public information about a PureFunds ETF's management fee to a

third party, *id.* ¶¶ 45–46; and (3) failing to provide functioning indexes for the PureFunds ETFs,

*id.* ¶ 47.

---

[6] To the extent that Nasdaq seeks to support a direct claim against Masucci with allegations regarding the conduct of "defendants" generally, *see, e.g., id.* ¶ 67, such a claim "impermissibly lump[s] together all defendants" without stating a claim as to any individual, *see Jonas v. Nat'l Life Ins. Co.*, 48 N.Y.S.3d 77, 80 (1st Dep't 2017).

[7] Masucci also argues that the conversion claim against him should be dismissed because it "improperly duplicates Nasdaq's claim for breach of contract." Masucci Br. 12; *see also* Masucci Reply 7. There is no need to address this argument, given the independent deficiency in the conversion claim against Masucci. Without making an assessment as to the merits of this argument, the Court notes that a similar argument may be available to the ETFMG defendants, who have not moved to dismiss the conversion claim as against them. To the extent that these defendants wish to pursue such an argument, they are free to do so at summary judgment.

Nasdaq argues these allegations fail as a matter of law because ETFMG is neither a party to nor an intended beneficiary of the Index License Agreement. Therefore, Nasdaq argues, it lacks standing under New York law to enforce an alleged breach of that agreement. For the following reasons, the Court agrees and dismisses this claim.

Under New York Law,[8] "the terms of a contract may be enforced only by contracting parties or intended third-party beneficiaries of the contract." *Rajamin v. Deutsche Bank Nat'l Tr. Co.*, 757 F.3d 79, 86 (2d Cir. 2014). "A non-party to a contract governed by New York law lacks standing to enforce the agreement in the absence of terms that 'clearly evidence an intent to permit enforcement by the third party' in question." *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (quoting *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 45 (1985)).[9]

"[T]o recover as a third-party beneficiary of a contract, a claimant must establish that the parties to the contract intended to confer a benefit on the third party." *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 124 (2d Cir. 2005). "If not mentioned as a party to the

---

[8] The parties agree that New York law applies. *See* Nasdaq Br. 8; ETFMG Opp. 17; *see also* Index License Agreement ¶ 11(K); Sublicense Agreement ¶ 4.

[9] Like some reported decisions in this area, Nasdaq refers to the power of third parties to enforce contracts as a matter of "standing." Significantly, though, neither Nasdaq nor the cases on which it relies applies the term "standing" in its constitutional sense. Rather, New York's contractual standing doctrine is a species of prudential standing. *See Rajamin*, 757 F.3d at 86–87 (applying New York contractual standing principles under the rubric of prudential standing and concluding that "the district court properly ruled that plaintiffs lacked standing to enforce the agreements to which they were not parties and of which they were not intended beneficiaries"); *see also Warth v. Seldin*, 422 U.S. 490, 509 (1975) (the "prudential standing rule . . . normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves"). Because there is no challenge here to the Court's subject matter jurisdiction, this motion is properly considered, as it was filed, as one brought under Rule 12(b)(6). *See Rajamin*, 757 F.3d at 87 (affirming non-jurisdictional dismissal of contract claim under New York contractual standing doctrine); *Premium Mortg.*, 583 F.3d at 108 (same).

contract, the parties' intent to benefit the third party must be apparent from the face of the contract. Absent clear contractual language evincing such intent, New York courts have demonstrated a reluctance to interpret circumstances to construe such an intent." *Del Norte v. WorldBusiness Capital, Inc.*, No. 14 Civ. 10143 (CM), 2017 WL 4334005, at *12 (S.D.N.Y. Apr. 5, 2017) (quotation marks omitted). The benefit, meanwhile, must be "sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate [the third-party] if the benefit is lost." *Mendel v. Henry Phipps Plaza W. Inc.*, 6 N.Y.3d 783, 786 (2006) (quotation marks omitted).

ETFMG is not a party to the Index License Agreement. Nevertheless, it argues that it is entitled to enforce the provisions of that agreement. First, it argues, the Sublicense Agreement (signed by ISE, PureShares, and Factor) grants it the right to enforce the Index License Agreement. And second, it argues, even if the Sublicense Agreement does not grant it authority to enforce the Index License Agreement, it is a third-party beneficiary of that agreement. The Court will address each argument in turn.

### a. The Sublicense Agreement Does Not Authorize ETFMG to Enforce the Index License Agreement

ETFMG argues that the Sublicense Agreement "makes ETFMG a party to the Index License Agreement for all operational purposes." ETFMG Opp. 14. In support, ETFMG relies on three provisions of that agreement. Under the first, PureShares grants Factor (ETFMG's predecessor in interest) "a non-exclusive and non-transferable sublicense to use the Intellectual Property in connection with the issuance, distribution, marketing and/or promotion" of the PureFunds ETFs. Sublicense Agreement § 1. Because "Intellectual Property" is defined (by reference to the Index License Agreement) as, among other things, Nasdaq's "rights in and to the Index(es)," *see* Index License Agreement at 1, ETFMG argues that it must have standing to

14

challenge Nasdaq's failure to provide and maintain those indexes. *See* ETFMG Opp. 14–15; Counterclaims ¶ 47.

This argument misses the mark. The provision at issue is a grant of a nonexclusive license. "In its simplest form, a license means only leave to do a thing which the licensor would otherwise have a right to prevent." *W. Elec. Co. v. Pacent Reproducer Corp.*, 42 F.2d 116, 118 (2d Cir. 1930); *cf. Canon Inc. v. Tesseron Ltd.*, 146 F. Supp. 3d 568, 575 (S.D.N.Y. 2015) ("[A] nonexclusive license, in its barest form, is just a covenant by the patent owner not to sue the licensee for making, using, or selling the patented invention . . . ." (quotation marks omitted)). Thus the provision here assures only that ETFMG may not be sued for infringement of certain intellectual property rights. It says nothing about what services PureShares, let alone Nasdaq, must provide.

ETFMG counters that the sublicense *must* include the right to enforce access to the indexes, lest the grant of intellectual property be rendered "meaningless." ETFMG Opp. 15. But even assuming *arguendo* that a failure to provide access to the indexes would frustrate the purpose of the Sublicense Agreement, nothing in this provision or the balance of that agreement requires any affirmative conduct on the part of PureShares or Nasdaq. If ETFMG wishes to argue that Nasdaq, through its conduct, denied ETFMG the benefit of its bargain in the Sublicense Agreement, that argument may be available through ETFMG's claim for breach of the duty of good faith and fair dealing in connection with the Sublicense Agreement. *See* Counterclaims ¶¶ 56–59; *see also Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 769 F.3d 807, 817 (2d Cir. 2014) (covenant of good faith and fair dealing ensures that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" (quoting *Moran v. Erk*, 11 N.Y.3d 452, 456 (2008)); *N.Y. Univ.*

*v. Continental Ins. Co.*, 87 N.Y.2d 308, 318 (1995) ("[I]mplicit in every contract is a covenant of good faith and fair dealing which encompasses any promises that a reasonable promisee would understand to be included." (citations omitted)). But in the absence of any provision imposing on Nasdaq a duty to render performance pursuant to the Index License Agreement, the Sublicense Agreement alone cannot support ETFMG's breach of contract claim.

Accordingly, ETFMG looks for a provision of the Sublicense Agreement expressly granting it PureShares' right to enforce the Index License Agreement. But neither provision it cites bears that weight.

In the first provision, Factor agreed to be "bound by all the provisions [of the Index License Agreement], including, without limitation, those provisions imposing any obligations on PureShares." Sublicense Agreement § 2. In the second, the parties agreed that Factor's "obligations under the [Index] License Agreement pursuant to Section 2 [just cited] are as principal and shall be unaffected by any defense or claim that PureShares may have against ISE." *Id.* § 3. It is "absurd," ETFMG argues, that a party "bound" to a contract "without limitation" and treated as a "principal" would lack standing to enforce the provisions of the contract. ETFMG Opp. 16.

ETFMG misconstrues the plain language of the Sublicense Agreement. That agreement, and in particular the provisions cited by ETFMG, merely grant Factor a sublicense, in exchange for which Factor agreed to take on all of PureShares' obligations under the Index License Agreement. In signing the Sublicense Agreement, Factor agreed that its adopted "*obligations*," not rights, "are as principal." Sublicense Agreement § 3 (emphasis added).

As a formal matter, this arrangement leaves ETFMG with fewer enumerated rights than PureShares. But this is the bargain struck in the Sublicense Agreement, and the Court's role is to

16

"give effect to the intent of the contracting parties as revealed by the language they chose to use." *Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993) (quotation marks omitted). As noted, the Sublicense Agreement may include an implicit promise that Nasdaq would maintain and provide access to the indexes, such that the agreement would support a claim for breach of the duty of good faith and fair dealing. The same may also be true of Nasdaq's obligations under the Index License Agreement to refrain from indexing substantially similar ETFs or disclosing non-public information. The Court does not have occasion here to resolve those questions. But because the terms of the Sublicense Agreement do not grant ETFMG PureShares' right to enforce the Index License Agreement, ETFMG may not maintain a breach of contract action for delinquent performance under that agreement.

### b. ETFMG Is Not a Third-Party Beneficiary of the Index License Agreement

In the alternative, ETFMG argues that even if the Sublicense Agreement did not grant it power to enforce the Index License Agreement, the Index License Agreement *itself* granted ETFMG that authority as a third-party beneficiary. As ETFMG frames this argument, ISE and PureShares "expressed a clear intent to have performance run to Factor by including the Sublicense Agreement, already signed by both ISE and PureShares, as Exhibit II to the original Index License Agreement." ETFMG Opp. 17–18. Thus, ETFMG's argument goes, ISE and PureShares "buil[t] into their initial contract the mechanism through which Factor stepped into PureShares' shoes to use the indexes." *Id.* at 18.

To be sure, the Index License Agreement contemplated a future sublicense to Factor. *See* Index License Agreement Schedule II. But "[c]ontract language referring to third parties as necessary to assist the parties in their performance does not . . . show an intent to render performance for the third party's benefit." *Subaru Distribs.*, 425 F.3d at 126. Accordingly, the

New York courts "have consistently held in instances where the contract in issue makes clear that a third party will be retained to assist in the performance by the promisee that such third parties are not intended beneficiaries of the main contract." *Id.* at 125 (quoting *Artwear, Inc. v. Hughes*, 615 N.Y.S.2d 689, 693 (1st Dep't 1994)).

The reasoning of the Appellate Division in *Artwear* applies here. "While the license agreement specifically authorizes [PureShares] to use sublicensees to carry out its contractual duties, the provisions permitting such use are obviously intended to effectuate [PureShares'] performance and thereby generate revenues for both [PureShares] and [ISE]." *Artwear*, 615 N.Y.S.2d at 693. True, the Index License Agreement indicates that both ISE and PureShares intended to choose Factor specifically as a sublicensee, but it is equally clear that any benefit running to Factor "is an incidental by-product of the agreement"—a "mechanism to exploit [the PureFunds ETFs] for the enrichment of [PureShares] and [ISE]." *Id.*

Nothing in the Index License Agreement otherwise remotely indicates an intent to benefit Factor, let alone an "assumption by the contracting parties of a duty to compensate [Factor] if the benefit is lost," *Mendel*, 6 N.Y.3d at 786 (quotation marks omitted). On the contrary, the agreement contains both non-assignment and inurement clauses, *see* Index License Agreement § 11(F), (G), which together "suggest that the parties did not intend that third parties benefit from the contract." *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 164 (S.D.N.Y. 1998).

Thus ETFMG is a prototypical "incidental beneficiary," one that "may derive benefit from the performance of a contract though [it] is neither the promisee nor the one to whom performance is to be rendered." *Del Norte*, 2017 WL 4334005, at *13. Because an incidental beneficiary may not enforce someone else's contract, and because the Sublicense Agreement did

not place ETFMG into PureShares' shoes for purposes of the Index License Agreement, ETFMG's second counterclaim is dismissed.[10]

## 2. ETFMG's Third Counterclaim

ETFMG's third counterclaim is for indemnification under the Wholesaling Agreement. ETFMG alleges that this agreement required Nasdaq to indemnify ETFMG with respect to all relief sought in this matter. *See* Counterclaims ¶¶ 50–53. Nasdaq, relying on a "default presumption" of New York law, *see BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 778 F. Supp. 2d 375, 416 (S.D.N.Y. 2011), argues that the indemnification clause provides only for indemnification as to third-party claims. Nasdaq Br. 13.

Rather than defend this counterclaim against Nasdaq's motion, ETFMG states in its opposition brief that it "hereby withdraw[s] the indemnification claim asserted in the Third Count of the Counterclaims, without prejudice to assert a claim for indemnification upon final adjudication of the litigation brought by PureShares in New Jersey state court." ETFMG Opp. 1 n.1.

ETFMG may not do so unilaterally. Under Rule 41, once a responsive pleading has been served, a counterclaim may be voluntarily dismissed only by joint stipulation or by court order. *See* Fed. R. Civ. P. 41(a)(2), (c). Similarly, under Rule 15, having failed to amend its pleading as a matter of course within 21 days of service of Nasdaq's motion to dismiss, ETFMG now must seek either court approval or Nasdaq's consent should it wish to amend its pleading. *See* Fed. R. Civ. P. 15(a)(1)(B), (a)(2).

---

[10] In opposing Nasdaq's motion, ETFMG asks the Court to decide whether the Sublicense Agreement requires ETFMG to convey to Nasdaq some portion of the profits associated with the PureFunds ETFs. ETFMG Opp. 18–19. As ETFMG concedes, this issue has no bearing on the pending motions to dismiss. *See id.* at 18. The Court will take up that issue, as necessary, later in this case (*e.g.*, at summary judgment), with the benefit of fuller briefing.

While the Court expects that Nasdaq may happily assent to the dismissal of the third counterclaim, the Court cannot assume such consent. To attain dismissal of this claim, therefore, ETFMG will need either to file a joint stipulation as to dismissal of that counterclaim or else file a motion seeking leave to withdraw it without prejudice. *See Wakefield v. N. Telecom, Inc.*, 769 F.2d 109, 114 & n.4 (2d Cir. 1985) ("Whether we view the question as arising under Fed. R. Civ. P. 15 or 41(a)(2), the trial court has considerable discretion in deciding whether to allow a withdrawal of a claim without prejudice."); 6 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1479 (3d ed. 2018) ("[T]he same considerations are relevant to dropping the claim regardless of which rule is invoked.").

Accordingly, by one week from the date of this decision, the parties are directed to file a joint letter indicating whether they stipulate to dismissal of the third counterclaim. The letter is to indicate whether any such joint stipulation contemplates dismissal of this counterclaim with or without prejudice. If the parties cannot agree, they are directed in the same letter to *briefly* set forth their views as to whether the Court should permit amendment of ETFMG's pleading with respect to this counterclaim, and what their respective views are as to dismissal (and the terms of any dismissal) of the third counterclaim.

In the meantime, Nasdaq's motion to dismiss the third counterclaim will be held in abeyance.

## CONCLUSION

For the foregoing reasons, Masucci's motion to dismiss the claim against him is granted. Nasdaq's motion to dismiss is granted as to ETFMG's second counterclaim, and held in abeyance as to ETFMG's third counterclaim.

The Clerk of Court is respectfully directed to close the motion pending at Dkt. 21.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: August 21, 2018
New York, New York