## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **NASDAQ, INC.** | |
| **Plaintiff,** | **CIVIL ACTION NO. 1:17-CV-08252-PAE** |
| **v.** | |
| **EXCHANGE TRADED MANAGERS GROUP, LLC,** | |
| **ETF MANAGERS GROUP, LLC, AND** | |
| **SAMUEL MASUCCI** | |
| **Defendants.** | |

## <u>PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

## <u>TABLE OF CONTENTS</u>

<b>Page</b>

PROPOSED FINDINGS OF FACT ........................................................................ 1

   I.      ISE BACKGROUND ........................................................................ 1

   II.     FIRST THREE PUREFUNDS ETFS ................................................ 4

   III.    THE WHOLESALING AGREEMENT ........................................... 6

   IV.    BACKGROUND OF HACK ............................................................ 9

   V.     HACK ACHIEVES ALMOST INSTANT SUCCESS AND ISE
        BENEFITS FINANCIALLY ......................................................... 12

   VI.    FOUR NEW FUNDS: IPAY, BIGD, GAMR, AND IFLY ............... 15

   VII.   NASDAQ PREPARES TO ACQUIRE ISE ................................... 20

   VIII.  NASDAQ ACQUIRES ISE .......................................................... 22

   IX.    ETFMG SEIZES THE PROFITS FROM THE OPERATION OF SILJ ........ 26

   X.     POST-ACQUISITION ETFMG DEPLOYS A PLAN TO SEIZE THE
        HACK PROFITS .......................................................................... 27

   XI.    ETFMG CAUSED CHANGES TO THE PUREFUNDS ETFS THAT
        HARMED THE FUNDS AND BENEFITTED ETFMG .............................. 31

   XII.   THE ETFMG-NASDAQ-PURESHARES RELATIONSHIP
        DETERIORATES ......................................................................... 36

   XIII.  ETFMG BREACHES ITS CONTRACTS AND REFUSES TO PAY
        NASDAQ BASED ON FRIVOLOUS AND MANUFACTURED
        GROUNDS ................................................................................... 39

   XIV.  ETFMG AND MONACO DECEIVE NASDAQ TO OBTAIN
        NASDAQ'S PROPRIETARY INFORMATION ........................... 48

   XV.   ETFMG ATTEMPTS TO RENEGOTIATE A MORE FAVORABLE
        CONTRACT WITH NASDAQ ..................................................... 50

   XVI.  ETFMG'S OWN ANALYSIS SHOWS HOW THEY STOOD TO
        PROFIT FROM CUTTING NASDAQ AND PURESHARES OUT OF
        THE PUREFUNDS ETFS ............................................................ 53

   XVII. POST-LAWSUIT ETFMG STRAINS TO GET ITS STORY
        STRAIGHT ................................................................................... 55

CONCLUSIONS OF LAW ............................................................................... 55

   XVIII. DEFENDANTS BREACHED THE SUBLICENSE AGREEMENT ........... 56

   XIX.  DEFENDANTS BREACHED THE HACK PSA ........................... 59

   XX.   DEFENDANTS BREACHED THE IPAY/BIGD PSA ................... 62

   XXI.  DEFENDANTS BREACHED ALL OF THE PUREFUNDS PSAS ............. 63

i

XXII.      DEFENDANTS BREACHED THE WHOLESALING AGREEMENT ....... 64

XXIII.     DEFENDANTS BREACHED THE DUTY OF GOOD FAITH AND
           FAIR DEALING ................................................................................. 69

XXIV.      DEFENDANTS ARE LIABLE FOR CONVERSION ................................. 73

XXV.       DEFENDANTS ENGAGED IN UNFAIR COMPETITION ........................ 74

XXVI.      ALLOWING DEFENDANTS TO KEEP THE PROFITS
           GENERATED BY THE PUREFUNDS ETFS WOULD UNJUSTLY
           ENRICH DEFENDANTS ...................................................................... 76

XXVII.     DEFENDANTS ARE LIABLE UNDER THE THEORY OF
           QUANTUM MERUIT ........................................................................... 77

XXVIII.    NASDAQ DID NOT BREACH THE WHOLESALING
           AGREEMENT .................................................................................... 78

XXIX.      NASDAQ DID NOT VIOLATE ITS DUTY OF GOOD FAITH AND
           FAIR DEALING ................................................................................. 79

DAMAGES    ................................................................................................................ 82

XXX.       DAMAGES FOR BREACH OF THE SUBLICENSE AGREEMENT ......... 82

XXXI.      DAMAGES FOR BREACH OF THE HACK PSA ................................... 83

XXXII.     DAMAGES FOR BREACH OF THE IPAY PSA ..................................... 84

XXXIII.    DAMAGES FOR BREACH OF THE GAMR PSA ................................... 84

XXXIV.     DAMAGES FOR BREACH OF THE IFLY PSA ...................................... 85

XXXV.      DAMAGES FOR BREACH OF THE WHOLESALING
           AGREEMENT .................................................................................... 86

XXXVI.     PUNITIVE DAMAGES FOR DEFENDANTS' BREACH OF THE
           PUREFUNDS PSA .............................................................................. 87

XXXVII.    COMPENSATORY DAMAGES IN TORT ............................................. 88

XXXVIII.   PUNITIVE DAMAGES IN TORT ........................................................ 89

XXXIX.     EQUITABLE MONETARY COMPENSATION .......................................... 90

XL.        PREJUDGMENT INTEREST ................................................................ 91

XLI.       EQUITABLE RELIEF .......................................................................... 93

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Phx. Capital Invs. LLC v Ellington Mgt. Grp., L.L.C.*,
    859 N.Y.S.2d 46 (N.Y. App. Div. 2008) ...............................................................79

*511 W. 232nd Owners Corp. v Jennifer Realty Co.*,
    773 N.E.2d 496 (N.Y. 2002) ...............................................................................70

*AgroFresh Inc. v. MirTech, Inc.*,
    257 F. Supp. 3d 643 (D. Del. 2017) .....................................................................66

*Matter of Alu*,
    755 N.Y.S.2d 289 (N.Y. App. Div. 2003) ........................................................77, 78

*Am. Elecs., Inc. v. Neptune Meter Co.*,
    290 N.Y.S.2d 333 (N.Y. App. Div. 1968) .............................................................88

*Anderson Grp., LLC v. City of Saratoga Springs*,
    805 F.3d 34 (2d Cir. 2015) .................................................................................88

*Anwar v. Fairfield Greenwich, Ltd.*,
    728 F. Supp. 2d 372 (S.D.N.Y. 2010) ..................................................................77

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*,
    727 F. Supp. 256 (S.D.N.Y. 2010) ..................................................................91, 92

*Axis Reinsurance Co. v. HLTH Corp.*,
    993 A.2d 1057 (Del. 2010) .................................................................................59

*BioLife Sols. v. Endocare*,
    838 A.2d 268 (Del. Ch. 2003) ........................................................................79, 86

*Bolanos v. Norwegian Cruise Line, Ltd.*,
    No. 01-cv-4182, 2007 U.S. Dist. LEXIS 39226 (S.D.N.Y. May 30, 2007) ...........................71

*Bongo Apparel, Inc. v Iconix Brand Grp., Inc.*,
    2008 N.Y. Misc. LEXIS 1 (N.Y. Sup. Ct. Jan. 2, 2008) ...........................................75

*Borrello v. Perera Co.*,
    381 F. Supp. 1226, 1232 (S.D.N.Y. 1974) ............................................................91

*Broad. Music, Inc. v. Prana Hosp., Inc.*,
    158 F. Supp. 3d 184 (S.D.N.Y. 2016) ..................................................................95

*Broker Genius, Inc. v. Volpone,*
   313 F. Supp. 3d 484 (S.D.N.Y. 2018)...............................................................95

*Carey v. Estate of Myers,*
   C.A. No. S11C-10-029, 2015 Del. Super. LEXIS 325 (Del. Super. Ct. 2015).................79, 86

*Castellotti v. Free,*
   27 N.Y.S.3d 507 (N.Y. App. Div. 2016) ...............................................................76

*Chemours Co. TT, LLC v. Ati Titanium LLC,*
   C.A. No. N15C-03-083, 2016 Del. Super. LEXIS 373 (Del. Super. Ct. July 27,
   2016) ...............................................................73

*City of New York v. Gordon,*
   1 F. Supp. 3d 94 (S.D.N.Y. 2013) ...............................................................95

*Coca-Cola Bottling Co. v. Coca-Cola Co.,*
   988 F.2d 386 (3d Cir. 1993)...............................................................68

*Colavito v N.Y. Organ Donor Network, Inc.,*
   860 N.E.2d 713 (N.Y. 2006)...............................................................73

*Comrie v. Enterasys Networks, Inc.,*
   No. CIV. A. 19254, 2004 Del. Ch. LEXIS 196 (Del. Ch. Feb. 17, 2004) ...............................60

*Cont'l Ins. Co. v. Rutledge & Co.,*
   750 A.2d 1219 (Del. Ch. 2000)...............................................................66, 69

*Conway v. Icahn & Co., Inc.,*
   16 F.3d 504 (2d Cir. 1994)...............................................................91

*Creative Research Mfg. v. Adv. Bio-Delivery LLC,*
   C.A. No. 1211-N, 2007 Del. Ch. LEXIS 15 (Del. Ch. Jan. 30, 2007)...............................86, 87

*De Long Corp. v Morrison-Knudsen Co.,*
   200 N.E.2d 557 (N.Y. 1964)...............................................................92

*Delphi Petrol., Inc. v. Magellan Terminal Holdings, L.P.,*
   No. 47, 2017, 2017 Del. LEXIS 511 (Del. Dec. 12, 2017)...............................92

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC,*
   631 F.3d 42 (2d Cir. 2011)...............................................................80

*Dior v. Milton,*
   155 N.Y.S.2d 443 (N.Y. Sup. Ct. 1956) ...............................................................76

*Drobbin v. Nicolet Instrument Corp.,*
   631 F. Supp. 860 (S.D.N.Y. 1986) ...............................................................94

*Duncan v. Theratx, Inc.*,
  775 A.2d 1019 (Del. 2001) ........................................................................83

*Dunlap v. State Farm Fire & Cas. Co.*,
  878 A.2d 434 (Del. 2005) ...............................................................71, 72, 73

*E.I. DuPont de Nemours and Co. v. Pressman*,
  679 A.2d 436 (Del. 1996) ...................................................................87, 88

*E.J. Brooks Co. v. Cambridge Sec. Seals*,
  105 N.E.3d 301 (N.Y. 2018)...........................................................88, 89, 90

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006).......................................................................................94

*eCommerce Indus., Inc. v. MWA Intelligence, Inc.*,
  C.A. No. 7471, 2013 Del. Ch. LEXIS 245 (Del. Ch. Sept. 30, 2013) .................62, 83, 84, 85

*Electron Trading LLC v. Morgan Stanley & Co. LLC*,
  No. 651370/2015, 2017 N.Y. Misc. LEXIS 1557 (N.Y. Sup. Ct. Apr. 25,
  2017) ..................................................................................................................75

*Fabcon E., L.L.C. v. Steiner Bldg. Co. NYC, LLC*,
  No. 24639/02, 2005 N.Y. Misc. LEXIS 2960 (N.Y. Sup. Ct. Dec. 12, 2005).......................91

*Federated Strategic Income Fund v. Mechala Grp. Jam. Ltd.*,
  No. 99-cv-10517, 1999 U.S. Dist. LEXIS 16996 (S.D.N.Y. Nov. 1, 1999)...........................94

*Fleet Capital Corp. v. Yamaha Motor Corp.*,
  No. 01-cv-1047, 2002 U.S. Dist. LEXIS 18115 (S.D.N.Y. Sept. 25, 2002) ...........................88

*Galantino v. Baffone*,
  46 A.3d 1076 (Del. 2012) ...........................................................................59

*Genencor Int'l, Inc. v. Novo Nordisk A/S*,
  766 A.2d 8 (Del. 2000) .........................................................................83, 84, 85

*Getty Petrol. Corp. v. Island Transp. Corp.*,
  878 F.2d 650 (2d Cir. 1989)......................................................................89

*Graham v. James*,
  144 F.3d 229 (2d Cir. 1998)......................................................................91

*Grgurev v. Licul*,
  299 F. Supp. 3d 267 (S.D.N.Y. 2017)..................................................73, 74

*Gross v. Empire Healthchoice Assurance, Inc.*,
  No. 602848-05, 2006 ..................................................................................70

v

*Harris v. Coleman*,
    863 F. Supp. 2d 336 (S.D.N.Y. 2012)................................................................73, 74

*Horizon Pers. Comm'ns, Inc. v. Sprint Corp.*,
    C.A. No. 1518-N, 2006 Del. Ch. LEXIS 141 (Del. Ch. Aug. 4, 2006) ...................................64

*Hutton v. Klabal*,
    726 F. Supp. 57 (S.D.N.Y. 1989) ...................................................................74, 89

*Indu Craft, Inc. v. Bank of Baroda*,
    47 F.3d 490 (2d Cir. 1995)................................................................................82

*JP Morgan Chase Bank, N.A. v. IDW Grp., LLC*,
    No. 08–cv-9116, 2009 U.S. Dist. LEXIS 9207 (S.D.N.Y. Feb. 9, 2009)...............................81

*Kapsis v. Am. Home Mortg. Servicing Inc.*,
    923 F. Supp. 2d 430 (E.D.N.Y. 2013) ...................................................................80

*LinkCo, Inc. v. Fujitsu Ltd.*,
    230 F. Supp. 2d 492 (S.D.N.Y. 2002)...................................................................89

*Mallis v. Bankers Tr. Co.*,
    717 F.2d 683 (2d Cir. 1983)..............................................................................91

*Marina View Condo. Ass'n of Unit Owners v. Rehoboth Marina Ventures, LLC*,
    C.A. No. 2017-0217, 2018 Del. Ch. LEXIS 79 (Del. Ch. Aug. 22, 2017) ...........................87

*McDougald v. Garber*,
    536 N.E.2d 372 (N.Y. 1989).............................................................................89

*Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*,
    418 F.3d 168 (2d Cir. 2005)..............................................................................90

*In re Mobilative Media, LLC*,
    C.A. No. 5725, 2013 Del. Ch. LEXIS 26 (Del. Ch. Jan. 25, 2013)......................61, 62, 63, 69

*Moran v. Erk*,
    901 N.E.2d 187 (N.Y. 2008).............................................................................69

*Matter of N.Y. State Urban Dev. Corp. (Atl. Yards Land Use Improvement & Civic Project - Phase 1)*,
    No. 32741/09, 2010 N.Y. Misc. LEXIS 364, at *85-86 (N.Y. Sup. Ct. Mar. 1, 2010) ...............................................................................................................90

*N.Y. Univ. v. Cont. Ins. Co.*,
    662 N.E.2d 763 (N.Y. 1995)..............................................................................69

*New Castle Cty., Del. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
   174 F.3d 338 (3d Cir. 1999)............................................................................59

*New York State NOW v. Terry*,
   886 F.2d 1339 (2d Cir. 1989).........................................................................93

*Palmetto Partners, L.P. v. AJW Qualified Partners*, LLC,
   921 N.Y.S.2d 260 (N.Y. App. Div. 2011) ......................................................56

*Preferred Inv. Servs. v. T&H Bail Bonds, Inc.*,
   C.A. No. 5886, 2013 Del. Ch. LEXIS 190 (Del. Ch. July 24, 2013)................79, 86

*Process Am., Inc. v. Cynergy Holdings, LLC*,
   839 F.3d 125 (2d Cir. 2016)...........................................................................81

*Quantum Corporate Funding, Ltd. v. Assist You Home Health Care Servs. of Va.,
L.L.C.*,
   144 F. Supp. 2d 241 (S.D.N.Y. 2001).............................................................94

*Republic of Philippines v. Marcos*,
   806 F.2d 344 (2d Cir. 1986)...........................................................................94

*Rexnord Indus., LLC v. RHI Holdings, Inc.*,
   No. 07C-10-057, 2008 Del. Super. LEXIS 347 (Del. Super. Ct. Sept. 17,
   2008) ...............................................................................................63, 65

*Richbell Info. Serv., Inc. v. Jupiter Partners, LP*,
   765 N.Y.S.2d 575 (N.Y. App. Div. 2003) .......................................................71

*Ross v. DeLorenzo*,
   813 N.Y.S.2d 756 (N.Y. App. Div. 2006) .......................................................77

*Roy Export Co. Establishment v. CBS, Inc.*,
   672 F.2d 1095 (2d Cir. 1982).........................................................................75

*Rule v. Brine, Inc.*,
   85 F.3d 1002 (2d Cir. 1996)...........................................................................78

*Salinger v. Colting*,
   607 F.3d 68 (2d Cir. 2010).............................................................................93

*Sandler v. Fishman*,
   549 N.Y.S.2d 808 (N.Y. App. Div. 1990) .......................................................57

*Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*,
   7 F.3d 1091 (2d Cir. 1993).............................................................................57

*Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*,
   769 F.3d 807 (2d Cir. 2014)................................................................69

*Segovia v. Equities First Holdings, LLC*,
   2008 Del. Super. LEXIS 197 (Del. Super. Ct. May 30, 2008) ................................87

*Tansey-Warner, Inc. v. Hooper*,
   C.A. No. 80C-OC7, 1989 Del. Super. LEXIS 479 (Del. Super. Ct. Nov. 15,
   1989) ................................................................61, 62

*Telecom Int'l Am., Ltd. v. AT&T Corp.*,
   280 F.3d 175 (2d Cir. 2001)................................................................75

*Ticor Title Ins. Co. v. Cohen*,
   173 F.3d 63 (2d Cir. 1999)................................................................93

*Travellers Int'l AG v. Trans World Airlines*,
   722 F. Supp. 1087 (S.D.N.Y. 1989)................................................................94

*Union Carbide Corp. v. Affiliated FM Ins. Co.*,
   947 N.E.2d 111 (N.Y. 2011)................................................................57

*Utilisave, LLC v. Khenin*,
   C.A. No. 7796, 2014 Del. Ch. LEXIS 286 (Del. Ch. Feb. 4, 2014) ......................................68

*Westwood Dev. Partners, LLC v. Draper*,
   C.A. No. K10C-08-018, 2012 Del. Super. LEXIS 162 (Del. Super. Ct. Mar.
   29, 2012) ................................................................61, 62

*Winshall v. Viacom Int'l, Inc.*,
   55 A.3d 629 (Del. Ch. 2011)................................................................71, 72, 73

**Statutes**

28 U.S.C. § 1332................................................................56

28 U.S.C. § 1391................................................................56

Del. Code Ann. tit. 6, § 2301................................................................92

**Other Authorities**

N.Y. C.P.L.R. § 5001(b) ................................................................91

N.Y. C.P.L.R. § 5004................................................................92

Rule 5(B)(iv) ................................................................1

<u>**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**</u>

      In advance of the trial scheduled to begin May 13, 2019, and pursuant to Rule

5(B)(iv) of the Court's Individual Rules and Practices, Plaintiff Nasdaq, Inc. ("Nasdaq")

respectfully submits this Proposed Findings of Fact and Conclusions of Law.

**PROPOSED FINDINGS OF FACT**

**I.     ISE BACKGROUND**

      1.     The International Securities Exchange ("ISE") was a stand-alone

electronic securities exchange that operated the nation's largest options trading exchange.  One

division of ISE, ETF Ventures, constructed options indexes that it licensed to exchange-traded

funds ("ETFs") and also operated as an ETF venture partner, supplying the capital to launch and

support ETFs in exchange for a share of the profits derived from the ETF's operation.

      2.     ETFs are exchange-listed investments which track a specific index.

Gedeon Aff. ¶ 2.  Investing in an ETF allows investors to effectively invest in indexes that

cannot be invested in directly.  Investors can buy and sell ETFs throughout the trading day, just

like stocks on a major exchange.  This provides investors with flexibility to invest in different

ways with different time horizons while still tracking a specific index.  Gedeon Aff. ¶ 2.

      3.     ETF Ventures was headed by ISE employee Kris Monaco and included

ISE employees Mark Abssy, Gaurav Pendse, and Corey Villani.  *See* Gedeon Aff. ¶ 14.

      4.     In 2012, ISE's ETF Ventures discussed with a company called

PureShares, LLC ("PureShares"), headed by Andrew Chanin, launching, under the PureFunds

1

brand a series of ETFs tracking ISE indexes (the "PureFunds ETFs").[1]  K. Monaco Tr. at [ ]; A. Chanin Tr. at [ ].

5.      To effectuate their business plan and govern their relationship, ISE and PureShares entered into an agreement titled the Index License and Exchange-Traded Product Agreement ("Index License Agreement"), which was signed by Paul Zimnisky for PureShares and Boris Ilyevsky for ISE, on June 18, 2012.  JX-1 at 000487.  Boris Ilyevsky, Monaco's superior, signed for ISE because Monaco lacked the authority to enter such an agreement for ISE.  K. Monaco Tr. at [ ].

6.      The Index License Agreement set forth:

the terms and conditions applicable to (i) the licensing of the Index(es) and the ISE Marks by ISE to PureShares; (ii) the development of the Product(s), as well as to establish the parties' respective rights in and to the Product(s), (iii) the listing for trading, marketing and promotion of the Product(s); and (iv) making disclosures about the Product(s) under applicable laws, rules and regulations in order to indicate that ISE is the source of the Index(es).

JX-1 at 000456.

7.      Under the Index License Agreement, ISE "grant[ed] to PureShares a non-transferable, non-exclusive, royalty-bearing license (i) to use the Index(es) solely in connection with issuing and listing for trading of the Product(s) . . . ."  JX-1 at 000456.  The terms of this Agreement demonstrate that the "royalty" was ISE's share of the profits from the operation of the PureFunds ETFs.

8.      Under the Index License Agreement, ISE agreed that it would, among other things: (i) calculate the values of the Index(es); and (ii) provide "certain financial support

---

[1] References to trial testimony are based on expected testimony given deposition testimony and/or documentary exhibits.

in connection with the creation, launch, and on-going operation of the Product(s) . . . ."  JX-1 at 000457-000458.

9.      Under the Index License Agreement, PureShares agreed that it would, among other things: (i) "provide certain financial support in connection with the launch and on-going operation of the Product(s)"; (ii) "coordinate legal and regulatory requirements for launching the Product(s)"; (iii) "coordinate third-party participation in connection with the creation, launch, and on-going operation of the Product(s), including product listing"; (iv) "provide, or cause another party on its behalf to provide marketing and advertising services in connection with the promotion of the Product(s)"; (v) "perform or cause another party on its behalf to perform, portfolio management in connection with the Product(s)"; (vi) cause a third-party to perform distribution services in connection with the Product(s)"; (vii) "incorporate the disclaimer set forth in Exhibit 1 [] in its agreement with any Approved Stock Exchange . . ."; and (viii) "obtain an agreement . . . from any person . . . that issues such products (the 'Sublicensees')."  JX-1 at 000458.  In effect, PureShares was obligated to launch and operate the PureFunds ETFs (or arrange for the launching and operating of the PureFunds ETFs), and to provide marketing support for the products and be the "face" of the PureFunds ETFs.  A. Chanin Tr. at [ ].

10.     The Index License Agreement contemplated ISE and PureShares participating in the launch and operation of as many as ten ETFs.  JX-1 § 4(A) at 000461. However, there is nothing in the Index License Agreement that obligated ISE to partner with PureShares to launch additional, new ETFs.

11.     Attached to the initial version of the Index License Agreement was a "Schedule I" that listed the initial products that would be created pursuant to the agreement,

including: (a) a "Diamond GemStone ETF," referred to as "GEMS;" (b) a "Junior Silver (Small Cap Miners/Explorers) ETF," referred to as "SILJ;" and (c) a "Mining Service ETF," referred to as "MSXX."  JX-1 at 000473-000484.  Schedule I also dictated that ISE would be solely responsible for the "listing, legal, and regulatory costs and expenses" associated with launching the products" and the "costs and expenses associated with the on-going operation" of the products.  Schedule I dictated that PureShares would be responsible for other costs, including costs for "marketing, advertising, and distribution services" for the ETF products.  JX-1 at 000478.  For each of the three initial PureFunds ETFs, Schedule I contained a chart describing how ISE and PureShares would split the profits generated by the operation of the funds.  *See, e.g.*, JX-1 at 000479.

12.     In summary, the Index License Agreement dictated that ISE would be responsible for providing indexes and financing for the PureFunds ETFs that would be created pursuant to the agreement, and that PureShares would be responsible for launching or arranging for launching the products.  Pursuant to the Index License Agreement, ISE and PureShares ultimately agreed to launch the following ETFs more fully described below: GEMS, MSXX, SILJ, HACK, IPAY, BIGD, GAMR, IFLY, IMED, and FINQ.  A. Chanin Tr. at [ ].

13.     ISE/Nasdaq paid over $10.2 million to launch and fund the operation of SILJ, HACK, IPAY, BIGD, GAMR, IFLY, IMED, and FINQ,.  V. Juneja Aff. ¶ 22.

## II.      FIRST THREE PUREFUNDS ETFS

14.     Defendants Exchange Traded Managers, LLC and ETF Managers Group, LLC (collectively referred to as "ETFMG"), and its predecessor FactorShares, marketed itself as a "white label" or "private label" ETF issuer.[2]  Under the white label ETF model, ETFMG

---

[2] While Defendant Exchange Traded Managers Group, LLC appears to be the corporate parent of Defendant ETF Managers Group, LLC, *see* PX-257A, there is no clear delineation between these

provided a service to people or companies who wanted to launch an ETF without creating the

back office functionality to launch and operate the ETF.  Under this model, ETFMG would be

paid a fee to conduct all of the services associated with operating the ETF and then provide its

client the profit (to the extent there was profit) derived from the operation of the ETF.  *See* PX-

72 at 2, PX-2009, PX-2010.  Before this litigation started ETFMG described its business model:

> ETF Managers Group ("ETFMG") is a "private label" ETF
> manager. The business model is to launch ETF s based on third
> party investment ideas with the third party paying all of the costs
> until the fund reaches the "break-even [sic] point of approximately
> $50 million AUM. At that point the third party receives most of the
> profit. ETFMG thus is always earning fees and not supporting
> products. This model has enabled ETFMG to achieve profitability
> in its first full year of operation and appeals to sponsors with a
> unique investment idea who don't want to build their own costly
> regulatory and operational structure.

PX-72 at 2.

15.     ISE and PureShares selected ETFMG to launch and operate the first three

PureFunds ETFs under this white label model.

16.     Because all of the PureFunds ETFs would be passive ETFs, that is they

would track an underlying index, ISE and PureShares needed to sublicense the right to use the

underlying ISE indexes to ETFMG before it could launch the ETFs.  To that end, in August

2012, ISE, PureShares, and ETFMG executed the Sublicense Agreement which gave ETFMG a

"royalty-bearing" license to the ISE indexes in consideration for the obligation that ETFMG

would "be bound by all the provisions of the [Index License Agreement], including, without

---

two parties.  For instance, the PureFunds PSAs, described below, are all printed on "ETF
Managers Group" letterhead, but they are agreements between Defendant Exchange Traded
Managers Group, LLC and ISE/PureShares.  *See, e.g.*, JX-5.  In these agreements Defendant
Exchange Traded Managers Group, LLC is defined as "ETFMG."  *Id.*  Accordingly, ETFMG
refers to both Defendants.

limitation, those provisions imposing any obligations on PureShares." JX-2 at 0022168. The Sublicense Agreement obligated ETFMG to pay ISE or its successor-in-interest (which Nasdaq later became) the profits generated from the operation of the funds based on indexes licensed to ETFMG. T. Wade Aff. ¶¶ 25-26.

17.      Because PureShares did not have the know-how to launch the products, PureShares entered into a contract with FactorShares, a predecessor to Defendants, called the Business Management Agreement. JX-12A. Pursuant to this Business Management Agreement, and consistent with FactorShares/ETFMG's "white label" business model, PureShares agreed to pay Factorshares more than $300,000 annually to operate the three funds originally contemplated by the Index License Agreement: GEMS, MSXX, and SILJ. JX-12A at 093769.

18.      At this time ISE as an exchange operator and index provider did not want to be publicly identified as financing or sponsoring an ETF. K. Monaco Tr. at [ ]. For this reason, ISE did not become a named party to the Business Management Agreement. However, fulfilling its obligations in the Index License Agreement, ISE paid to launch the three initial funds, and then paid the annual fees to operate the three initial ETFs, with the understanding and acknowledgement of PureShares and ETFMG that ISE would receive its share of the profit generated by the funds. K. Monaco Tr. at [ ].

19.      ISE fulfilled the payment obligations necessary to launch and operate the GEMS, MSXX, and SILJ. However, the three initial PureFunds ETFs were not successful. In January, 2014, ISE and PureShares directed ETFMG to close and liquidate GEMS and MSXX. PX-67. At this point, there was only one remaining PureFunds ETF – SILJ.

III.      **THE WHOLESALING AGREEMENT**

20.      To further support the marketing of the PureFunds ETFs, in April 2013, ISE entered into an agreement with Gencap, another predecessor to ETFMG. K. Monaco Tr. at [

].  The purpose of this agreement was to build an infrastructure to market the PureFunds ETFs.

JX-11.  To that end, ISE paid fees to ETFMG, and in exchange, ETFMG managed employees

responsible for wholesaling the ETFs.  JX-11 at 1-4.  These wholesaling services then would be

used to support certain ISE-supported ETFs as well as certain ETFs supported by third parties.

*See id.*  ISE and ETFMG agreed to share in the revenue generated from wholesaling third-party

ETFs, *see id.* Ex. A, and ISE agreed to pay for certain, pre-approved expenses incurred by the

wholesalers, expenses which were to be invoiced to ISE monthly, *see id.* Ex. B.

   21. The Wholesaling Agreement required ISE to make three types of

payments to Gencap.  First, ISE was obligated to pay Gencap a fee based on the assets under

management ("AUM") of the ISE-financed ETFs added to Exhibit B of the Wholesaling

Agreement.  JX-11 at 11.  Second, ISE was obligated to reimburse Gencap for expenses incurred

wholesaling the products on the wholesaling platform.  *Id.*  Third, ISE was obligated to pay the

salary and benefits of the wholesalers Gencap hired to actually market the ETFs on the

wholesaling platform.  JX-11 at 14.  And the Wholesaling Agreement required Gencap to pay

ISE a share of the revenue Gencap generated from wholesaling third-party ETFs.  JX-11 at 12.

Since inception of the Wholesaling Agreement, ISE/Nasdaq paid ETFMG (and its predecessor)

over $2.8 million in fees and reimbursements.  V. Juneja Aff. ¶ 22, Table 1.

   22. The Wholesaling Agreement set out 24 specific items that Gencap "shall"

do to maintain the wholesaling platform and one prohibition – the requirement that Gencap

"shall not provide statutory distribution services for the securities on the Platform . . . which shall

be provided by a third-party service provider . . . ."  JX-11 at 2-3.

   23. The Wholesaling Agreement contained provisions allowing ISE to control

the costs for which it would reimburse Gencap.  Specifically Exhibit C dictated that the

maximum annual amount ISE would be obligated to reimburse Gencap for wholesaler salary and

benefits would be $250,000.  JX-11 at 14.  And Exhibit A dictated that ISE was obligated to pay

"reimbursement of all reasonable expenses in connection with a Wholesaler's sales and

marketing duties . . . [and that] *[a]ll such expenses shall be agreed by ISE and GENCAP in*

*advance of those expenses being incurred, and which shall not exceed $50,000 per year*

*("Expense Cap"), unless specifically agreed in writing by ISE.*"  JX-11 at 11 (emphasis

supplied).

24.     Importantly, the Wholesaling Agreement included an integration clause

and specified that the agreement could not be amended except in writing.  JX-11 at 9.

25.     Exhibit B to the Wholesaling Agreement displayed a chart containing the

funds that ISE and Gencap agreed would be part of the Wholesaling Agreement.  The initial

Exhibit B attached to the Wholesaling Agreement, listed four funds: GEMS, MSXX, SILJ, and

AlphaClone ("ALFA"), an ETF that ISE was financially-supporting but operated by another

company.  JX-11 at 12, K. Monaco Tr. at [ ].

26.     In August 2013, ISE and Gencap executed a written amendment to Exhibit

B of the Wholesaling Agreement ("First Amendment to the Wholesaling Agreement").  The

Amendment added a fifth fund, the YieldShares High Income ETF ("YYY"), that ISE supported

and that was launched by a different ETF issuer.  JX-11A; K. Monaco Tr. at [ ].

27.     In November 2014, ISE and Gencap executed a second written

amendment to Exhibit B of the Wholesaling Agreement ("Second Amendment to the

Wholesaling Agreement").  The Second Amendment removed GEMS and MSXX from the

wholesaling platform, and added the PureFunds ISE Cyber Security ETF ("HACK").  JX-11B;

K. Monaco Tr. at [ ].  As of the Second Amendment to the Wholesaling Agreement, the last

written change, there were four ETFs on the wholesaling platform, ALFA, SILJ, YYY, and HACK.

## IV.       BACKGROUND OF HACK

28.     In or about the fall of 2014, ISE devised the idea to create an index of companies involved in the cybersecurity field and launch an ETF that tracked this index.  K. Monaco Tr. at [ ].

29.     ISE's Kris Monaco again agreed to partner with PureShares' Andrew Chanin to launch this ETF and ISE and PureShares added what would become the PureFunds ISE Cybersecurity ETF ("HACK"), to the Index License Agreement.  A. Chanin Tr. at [ ]. Pursuant to this agreement, ISE would be responsible for financing the launch and operation of HACK and receive 70 percent of the profits created by the operation of the fund, and PureShares would be responsible for doing the work necessary to launch and operate the fund.  JX-1, JX-3 at 4.  Subsequently, ISE partnered with another party – Amplify and its founder Christian Magoon – who would provide additional marketing support in exchange for a percentage of the HACK profits.  K. Monaco Tr. at [ ].

30.     As was the case with GEMS, MSXX, and SILJ, PureShares lacked the operational ability to launch HACK itself.  To that end, Monaco and Chanin solicited proposals from white-label ETF issuers, including ETFMG.  PX-80; K. Monaco Tr. at [ ].  Ultimately, Monaco, Chanin, and Magoon, chose to hire ETFMG to launch and operate HACK, after receiving a proposal from ETFMG's president, Samuel Masucci, detailing the necessary costs. K. Monaco Tr. at [ ]; A. Chanin Tr. at [ ].

31.     Monaco, on behalf of ISE and PureShares, negotiated the fees that ETFMG would charge to launch and operate HACK.  PX-80A.  Thereafter, PureShares, who was contractually obligated for the logistics of launching HACK under the Index License Agreement,

9

entered into a contract called the SEC '40 Act Platform Services Agreement ("HACK PSA")

with ETFMG, which stated how much money ETFMG would be paid to launch and operate

HACK, and reflected Monaco's negotiations with ETFMG.  *See* JX-5.  As was the case with the

first three funds, though ISE would be responsible for paying the expenses associated with

HACK and entitled to the majority of the profits from HACK, ISE chose not to be a named party

to the HACK PSA because it did not want to be publicly identified as the sponsor or financier of

an ETF.  K. Monaco Tr. at [ ].

        32.     The HACK PSA set out the costs that PureShares and ISE would be

responsible for paying to ETFMG to perform specific services associated with launching and

operating HACK.  These costs included over $50,000 in expenses to launch the fund, and over

$200,000 in annual expenses to operate the fund.  JX-5 at 11-14.  ISE, PureShares, and ETFMG

all understood that even though the HACK PSA was ostensibly only between PureShares and

ETFMG, ISE would pay the expenses required by this contract.  K. Monaco Tr. at [ ]; A. Chanin

Tr. at [ ].  After PureShares and ETFMG executed the agreement on or about September 16,

2014, PX-88A, 88B, ETFMG sent an invoice to ISE (and cc'd PureShares) for the HACK PSA

launch expenses, which ISE subsequently paid.  *See* PX-89.

        33.     Though the HACK PSA is silent as to when ETFMG must pay PureShares

the profits from the operation of HACK, PureShares and ETFMG both understood that the

contract required ETFMG to pay these profits promptly after ETFMG received them from the

fund administrator.  A. Chanin Tr. at [ ]; PX-232D at 00098070 ("If it was in our interest to take

away the payment from the ISE we could pay PureFunds *as required by the PSA* . . . .")

(emphasis supplied).

34.      Prior to HACK's launch, ETFMG requested from ISE and PureShares a copy of the Index Licensing Agreement and the "Supplement to Schedule I" of the Index License Agreement that added HACK to that agreement.  PX-93 at 098918.  ISE provided ETFMG a copy of these agreements but redacted the tables showing the specific profit split among ISE and PureShares (described as the "license fees") in the Sublicense Agreement.  PX-93 at 098922-098923 *compare with* JX-3.  ETFMG knew that ISE and PureShares were obligated to split the profit from the operation of the PureFunds ETFs but did not know the specific profit split.  PX 93 at 6 (stating "Each quarterly payment of ISE's share of the Shared Profit shall be accompanied by a statement prepared by PureShares setting forth the calculations on which the payment is based . . . .")  Indeed, there was no reason that ETFMG needed to know the specific profit split between ISE and PureShares.  K. Monaco Tr. at [ ].

35.      In the lead-up to launching HACK, ISE, PureShares, and Magoon chose the ETF management fee – 75 basis points – that HACK would charge investors for managing the fund.  PX-94, PX-95.

36.      As the investment advisor to the PureFunds ETFs, ETFMG was obligated to file a prospectus with the Securities and Exchange Commission ("SEC") for each ETF.  The HACK Prospectus that ETFMG filed with the SEC discussed the relevant contracts that ETFMG entered into regarding HACK.  With respect to PureShares, the HACK Prospectus stated:

> The Adviser [ETFMG] has entered into an Agreement with
> PureShares, LLC (the "Sponsor"), under which the Sponsor agrees
> to sub-license the use of the Underlying Index to the Adviser and
> assumes the obligation of the Adviser to pay all expenses of the
> Fund, except Excluded Expenses.  Although the Sponsor has
> agreed to be responsible for the payment of certain expenses of the
> Fund, the Adviser retains the ultimate obligation to the Fund to pay
> such expenses.  The Sponsor will also provide marketing support
> for the Fund, including distributing marketing materials related to
> the Fund.

11

PX-21 at 18 of 102.  With respect to ISE, the HACK Prospectus stated:

> The ISE Cyber Security Index (Symbol: HXR) (the "ISE Index") is
> a product of ISE.  *The Adviser [ETFMG] has entered into a license
> agreement pursuant to which the Adviser pays a fee to use the ISE
> Index and the marketing name and licensed trademark of ISE
> ("Index Trademark").*  The Adviser is sub-licensing rights to the
> ISE Index to the Fund at no charge.  The Adviser is permitted to
> sub-license the Index Trademark for the purpose of promoting and
> marketing the Fund.
>
> The ISE Index is compiled and calculated by ISE.  ISE has no
> obligation to take the needs of the Adviser or the owners of the
> Fund into consideration in determining, composing or calculating
> the ISE Index.

PX-21 at 11 of 102 (emphasis supplied).

37.     As soon as HACK launched, ETFMG began sending to ISE (and cc'ing

PureShares) the monthly profit and loss statements ("P&L") identifying the monthly profit or

loss derived from the management fee less costs associated with operating the fund.  As required

by the Index License Agreement and the HACK PSA, ISE paid these monthly operating costs

before HACK became profitable.  PX-99; K. Monaco Tr. at [ ].

## V.      HACK ACHIEVES ALMOST INSTANT SUCCESS AND ISE BENEFITS
##         FINANCIALLY

38.     HACK achieved almost instant success.  According to ETFMG's Barney

Karol, the approximate "breakeven point" for an ETFMG ETF is $50 million in AUM.  PX-72 at

2.  This means that once an ETF crosses that breakeven point the management fees (in the case

of HACK 0.0075 percent of HACK's AUM) was sufficient to pay for the operating costs

associated with the Fund.  By its second month in operation, HACK had passed the breakeven

even point and was generating a profit.  JX-176.

39.     At all relevant times, US Bank was the custodian for HACK.  For relevant

purposes, this meant that at the end of every month US Bank would calculate the monthly

management fee and send this amount to ETFMG within a couple of days of the end of the prior

month.  For example, by February 7, ETFMG would receive the management fee from the

operation of HACK for the preceding month of January.

40.     By the end of the first week of a new month, ETFMG would send ISE a

P&L detailing the monthly management fee and monthly expenses, and would shortly thereafter

pay ISE the monthly profit derived from the operation of HACK.  Monaco Tr. at [ ].  After

receiving this monthly profit, per the terms of the Index License Agreement and the agreement

with Magoon, ISE would send PureShares and Magoon their profit split.  K. Monaco Tr. at [ ];

A. Chanin Tr. at [ ].

41.     By the end of July 2015, HACK's AUM grew to over $1.3 billion, and

ETFMG was sending ISE over $600,000 a month in HACK profit.  JX-184.  This was the "fee"

that ETFMG paid to ISE under the License Agreement, as described in the HACK Prospectus.

PX-21 at 11 of 102.

42.     HACK was the first ETF purely focused on cybersecurity companies to

launch, and ISE's HXR index was the first index purely focused on cybersecurity.  Broadly

speaking, an index methodology is a set of rules or criteria that govern an index's creation,

calculation, and maintenance.  D. Gedeon Aff. ¶ 3.  The rules determine the securities that are

eligible for inclusion in the index, the formulas by which the index value is calculated, and the

process for modifying the components.  D. Gedeon Aff. ¶ 3.

43.     The index methodology for the HXR index allowed for the inclusion of

smaller companies with smaller market capitalizations.  D. Gedeon Aff. ¶ 7.  The HXR index and

the HACK ETF that tracked it had relatively low implied liquidity.  V. Juneja Aff. ¶ 65 (citing

PX-2016 at 64-66.)

44.     Implied liquidity is the measure of the liquidity of the underlying components of an ETF.  D. Gedeon Aff. ¶ 8.  An ETF that is composed only of large blue chip companies will necessarily have relatively high implied liquidity, while an ETF composed of only "small cap" thinly-traded companies will have low implied liquidity.  Implied liquidity is simply a measurement of an ETF's underlying liquidity.  There is no connection between an ETF's implied liquidity and its performance (i.e. returns) or its ability to gather AUM.  D. Gedeon Aff. ¶ 8.

45.     In July 2015, prior to Nasdaq's acquisition of ISE, First Trust launched the First Trust Nasdaq Cybersecurity ETF ("CIBR") that was based on a Nasdaq cybersecurity index ("NQCYBR").  D. Gedeon Aff. ¶ 6.  While focused on companies in the cybersecurity sector, NQCYBR had a different methodology than HACK, which did not allow for inclusion of smaller market capitalization (and thus less frequently traded) companies.  D. Gedeon Aff. ¶ 7. Accordingly, from inception NQCYBR and CIBR had significantly greater implied liquidity than HACK.  D. Gedeon Aff. ¶ 7; V. Juneja Aff. ¶¶ 64-65.  CIBR had another factor that distinguished it from HACK.  Whereas HACK's management fee was 75 basis points, CIBR's management fee was 60 basis point.  S. Friske Dep. Tr. at 66:2-22.

46.     As the index provider for CIBR, Nasdaq had a vested interest in seeing CIBR succeed.  From July 2015 and the launch of CIBR until July 1, 2016, when Nasdaq acquired ISE, Nasdaq produced marketing materials highlighting the benefits of the NQCYBR index.  D. Gedeon Aff. ¶ 9.

47.     From CIBR's launch in July 2015 until July 2016, HACK and CIBR experienced starkly different results.  During this approximate one-year time period, HACK went from an AUM of approximately $1.4 billion in July 2015 to an AUM of approximately $671

million in June 30, 2016.  V. Juneja Aff. ¶ 62, Exhibit 12c.  Conversely, during this same period CIBR increased its AUM to approximately $91 million.  V. Juneja Aff. ¶ 62, Exhibit 12c. During this same period, HACK had a negative return of 21 percent and CIBR had a negative return of 12 percent.  V. Juneja Aff. ¶ 61.

48.     During this time period, despite being outperformed by CIBR and losing almost 50% of its AUM, ETFMG did not propose to the ETFMG trust board overseeing HACK that HACK reduce its management fee to match or beat CIBR, and ETFMG did not ask ISE to change the methodology for the HXR index to increase HACK's implied liquidity, or even complained to ISE that implied liquidity was a competitive problem for HACK.  K. Monaco Tr. at [ ].

## VI.     FOUR NEW FUNDS: IPAY, BIGD, GAMR, AND IFLY

49.     In July 2015, ISE and PureShares agreed to launch two new ETFs pursuant to the Index License Agreement, the PureFunds ISE Mobile Payments ETF ("IPAY") and the PureFunds ISE Big Data ETF ("BIGD"), and amended the Index License Agreement to add these funds.  As was the case with the prior four PureFunds ETFs, ISE and PureShares reached an agreement on how to split up the profits from these two ETFs.  JX-4 at 4, 8.

50.     As with HACK, ISE and PureShares chose ETFMG as the white-label ETF issuer to bring IPAY and BIGD to market.  By this time, ISE was no longer concerned about being publicly connected with financing ETFs.  K. Monaco Tr. at [ ].  To this end, ISE and PureShares entered into an SEC '40 Act Platform Services Agreement with ETFMG for IPAY and BIGD ("IPAY/BIGD PSA").  JX-6.  The IPAY/BIGD PSA shared many similarities with the HACK PSA, and again included a schedule describing the "consideration" – the launch and operating fees – that ISE/PureShares would be obligated to pay ETFMG for providing the services in the agreement.  JX-6 § 1, Ex. A, B.

15

51.     As with the HACK PSA, the IPAY/BIGD PSA required ISE and

PureShares to pay ETFMG a "Product Management" fee.  JX-6 at 14.  The IPAY/BIGD PSA

described how the Product Management fee would be calculated:

> The variable portion of the annual Product Management fee shall
> be calculated as an Average Blended Rate ("ABR") *using the
> aggregate net assets of all Funds co-sponsored (i.e., financial and
> other support) by ISE, including the PureFunds ISE Cyber Security
> ETF (symbol HACK) and the PureFunds ISE Junior Silver Miners
> ETF (symbol SILJ).*  The ABR shall be calculated on a monthly
> basis by first adding the net assets of all ISE co-sponsored Funds,
> and then by calculating a weighted average using each tier shown
> above. For example, if the aggregate net assets of all Funds co-
> sponsored by ISE is $500 million, then the ABR shall be calculated
> as follows:
>
> ABR= ($100 million x 10 bps + $100 million x 8 bps + $300
> million x 6 bps) / $500 million= 7.2 bps
>
> The Product Management fee shall be calculated and paid at the
> end of each month based on the ABR calculated using the daily
> aggregate net assets of all ISE co-sponsored Funds during the prior
> month.  The daily fee shall be determined by dividing the ABR by
> number of days in the year, multiplying that amount by the number
> of days in the prior month, and then multiplying that product by
> the aggregate net assets determined at the end of that day. For the
> avoidance of doubt, the annual Product Management fee shall be
> the greater of $36,000 or the aggregate net assets times the ABR.

JX-6 at 14 (emphasis supplied).  In this document (and the PSA for all the PureFunds ETFs

launched after HACK) ETFMG recognized that ISE was financially supporting HACK and SILJ,

and that ETFMG's "product management fee" for each of the PureFunds ETFs, including

HACK, even though ISE was not a named party to that agreement, was based on the collective

AUM of all ISE-financed products.

52.     Unlike the HACK PSA, the IPAY/BIGD PSA contained an explicit, rather

than implicit, provision requiring ETFMG to pay ISE/ETFMG "all Fund Profits within ten (10)

days of such Fund Profit being made available to ETFMG or the administrator of the Funds."

JX-6 § 8(d).

        53.    The IPAY/BIGD PSA also contained a provision guaranteeing ISE's and

PureShares' "right to receive Fund Profit."  JX-6 § 8(e).  In this provision ETFMG agreed it

would "require that any new controlling party or new advisor to the Trust acknowledge Client's

right to receive Fund Profit . . . ."  *Id.*

        54.    On July 15, 2015, ETFMG as the "advisor" to IPAY and BIGD filed a

Prospectus for these funds (the "IPAY/BIGD Prospectus") with the SEC.  The IPAY/BIGD

Prospectus discussed the relevant contracts that ETFMG entered into regarding IPAY and BIGD.

With respect to PureShares, the IPAY/BIGD Prospectus stated:

> The Adviser [ETFMG] has entered into an Agreement with
> PureShares, LLC (the "Sponsor"), under which the Sponsor agrees
> to sub-license the use of the Underlying Indexes to the Adviser and
> assumes the obligation of the Adviser to pay all expenses of the
> Fund, except Excluded Expenses.  Although the Sponsor has
> agreed to be responsible for the payment of certain expenses of the
> Fund, the Adviser retains the ultimate obligation to the Fund to pay
> such expenses.  The Sponsor will also provide marketing support
> for the Fund, including distributing marketing materials related to
> the Fund.

PX-22 at 27 of 107.  With respect to ISE, the IPAY/BIGD Prospectus stated:

> The ISE Big Data Index and ISE Mobile Payments Index (each an
> "ISE Index") are each a product of ISE.  The Adviser has entered
> into a license agreement pursuant to *which the Adviser pays a fee*
> *to the Funds' sponsor* (described below) to use each ISE Index and
> the marketing name and licensed trademark of ISE ("Index
> Trademark").  The Adviser is sub-licensing rights to each ISE
> Index to the applicable Fund at no charge. The Adviser is
> permitted to sub-license the Index Trademark for the purpose of
> promoting and marketing the Funds.

PX-22 at 33-34 of 107 (emphasis supplied).

55. Every month after ETFMG launched IPAY and BIGD, it would send ISE a P&L detailing the management fee received for the prior month and the operating expenses incurred for the prior month. *See, e.g.*, JX-108, JX-277. When these funds did not surpass breakeven, ISE paid the expenses required by ETFMG to operate the Funds. K. Monaco Tr. at [ ]. IPAY did not generate a net profit until December 2016, C. Freire. Aff. ¶ 8, PX-517, and as of the time in June 2017 when ETFMG informed Nasdaq and PureShares that it would no longer pay the profits from the operation of the PureFunds ETFs, BIGD never generated a net profit. V. Juneja Aff. ¶ 22.

56. Later in 2015, ISE and PureShares agreed to launch two new ETFs pursuant to the Index License Agreement, the PureFunds ISE Electronic Gaming ETF ("GAMR") and the PureFunds ISE Drone Technology ETF ("IFLY"). A. Chanin Tr. at [ ]. As was the case with the prior four PureFunds ETFs, ISE and PureShares reached an agreement on how to split up the profits from these two ETFs. A. Chanin Tr. at [ ].

57. Further, on or about December 2, 2015, to effectuate the launch of these two new ETFs, ISE, PureShares, and ETFMG executed a new version of the Sublicense Agreement. PX-71, JX-2A. The Appendix A to the 2015 version of the Sublicense Agreement stated that it was adding two new funds (GAMR and IFLY) to the four existing funds already covered by the Sublicense Agreement (SILJ, HACK, BIGD, and IPAY). Appendix A listed the "rate" that ETFMG would charge as a management fee for the ETFs listed on Appendix A and the "rate" ETFMG used as a basis to calculate ISE's license fee (i.e. the profits generated by the operation of the Funds). PX-71 at 3.

58. As with HACK, IPAY, and BIGD, ISE and PureShares chose ETFMG as the white-label ETF issuer to bring GAMR and IFLY to market. To this end, ISE and

PureShares entered into an SEC '40 Act Platform Services Agreement with ETFMG for GAMR ("GAMR PSA") and IFLY ("IFLY PSA").  JX-8, JX-9.  The GAMR PSA and IFLY PSA were almost identical to the BIGD/IPAY PSA, and again included a schedule describing the consideration – the launch and operating fees – that ISE/PureShares would be obligated to pay ETFMG for providing the services in the agreement, and an explicit provision requiring ETFMG to pay ISE/ETFMG "all Fund Profits within ten (10) days of such Fund Profit being made available to ETFMG or the administrator of the Funds."  JX-8 § 8, JX-9 § 8.

59.     These two funds were structured a little differently, as ISE was not the direct index provider for either of the two funds, but instead contracted with the index providers for the right to license these indexes.  PX-23 at 39; D. Gedeon Aff. ¶ 63.

60.     On March 8, 2016, ETFMG as the "advisor" to GAMR and IFLY filed a Prospectus for these funds (the "GAMR/IFLY Prospectus").  The GAMR/IFLY Prospectus that ETFMG filed with the SEC discussed the relevant contracts that ETFMG entered in to regarding GAMR and IFLY.  With respect to PureShares, the GAMR/IFLY Prospectus stated:

> The Adviser [ETFMG] has entered into an Agreement with PureShares, LLC (the "Sponsor"), under which the Sponsor agrees to sub-license the use of the Underlying Indexes to the Adviser and assumes the obligation of the Adviser to pay all expenses of the Fund, except Excluded Expenses.  Although the Sponsor has agreed to be responsible for the payment of certain expenses of the Fund, the Adviser retains the ultimate obligation to the Fund to pay such expenses.  The Sponsor will also provide marketing support for the Fund, including distributing marketing materials related to the Funds.

PX 23-at 31.  With respect to ISE, the GAMR/IFLY Prospectus stated:

> The EEFund Video Game Tech index (the "Video Game Tech Index") is a product of EE Funds LLC ("EE Funds"), and the Reality Shares Drone Index (the "Drone Index") is a product of Reality Shares, Inc. ("Reality Shares" and together with EE Funds and ISE, the "Index Parties")).  The Adviser has entered into a

> license agreement pursuant to which the Adviser pays a fee to each
> Fund's sponsor (described below) to use the applicable Index and
> the marketing name and licensed trademark of the Index Provider
> (the "Index Trademark"). The Adviser is sub-licensing rights to
> each Index to the applicable Fund at no charge. The Adviser is
> permitted to sub-license each Index Trademark for the purpose of
> promoting and marketing the Funds.

PX 23 at 39.

61.     Every month after ETFMG launched GAMR and IFLY, it would send ISE

a P&L detailing the management fee received for the prior month and the operating expenses

incurred for the prior month.  T. Wade Aff. ¶ 31.  When these funds did not surpass breakeven,

and they did not surpass breakeven while ISE/Nasdaq was involved, ISE paid the expenses

required by ETFMG to operate the Funds.  Every month ISE paid these expenses.  T. Wade Aff.

¶ 31; K. Monaco Tr. at [ ].  Neither of these funds generated a net profit as of the time in June

2017 when ETFMG informed Nasdaq and PureShares that it would no longer pay the profits

from the operation of the PureFunds ETFs.  T. Wade Aff. ¶ 93; V. Juneja Aff. ¶ 22, Table 1.

62.     From 2012 to 2017, ISE/Nasdaq paid ETFMG millions of dollars to

support he PureFunds ETFs.  V. Juneja Aff. ¶ 22, Table 1.

## VII.     NASDAQ PREPARES TO ACQUIRE ISE

63.     In March 2016, Nasdaq announced that it was acquiring ISE.  T. Wade

Aff. ¶ 4.  Following the announcement of the ISE acquisition, Nasdaq employees Terry Wade

and David Gedeon met with and corresponded with Kris Monaco about ISE's ETF Ventures

business.  T. Wade Aff. ¶ 15; D. Gedeon Aff. ¶ 20.  Monaco explained that ETF Ventures had

two business models: licensing indexes to ETF providers for a licensing fee and providing

indexes and financing for ETFs in exchange for a percentage of the profits generated by the ETF

in question.  T. Wade Aff. ¶¶ 5, 6, 13; D. Gedeon Aff. ¶¶ 15, 20.

64.     With respect to this second business model, Monaco explained that ISE had partnered with PureShares to launch the PureFunds ETFs through ETFMG; had partnered with Andrew Chanin to launch the ISE Cyber Security GO UCITS ETF ("ISPY") through ETF Securities; and had partnered with other firms to bring ETFs to market.  T. Wade Aff. ¶ 13.

65.     Monaco also provided Nasdaq copies of the relevant contracts for the PureFunds ETFs and others.  Additionally, Monaco provided copies of P&L statements and invoices sent by ETFMG and explained how the flow of money worked.  T. Wade Aff. ¶ 9-13; D. Gedeon Aff. ¶ 16-20.  *See also* PX-51.

66.     In describing the relationship and agreements between ISE, PureShares, and ETFMG, Monaco never told anyone from Nasdaq about a purported oral agreement between ISE and ETFMG regarding HACK or any of the PureFunds ETFs.  T. Wade Aff. ¶ 17; D. Gedeon Aff. ¶ 22.

67.     After Nasdaq announced it was acquiring ISE in March, Monaco, on behalf of ISE began negotiating a new wholesale agreement with ETFMG that would greatly increase ISE (and subsequently Nasdaq's) financial commitment to ETFMG.  PX-109.  Monaco attempted to convince his superiors at ISE, Boris Ilyevsky and Gary Katz, to agree to the changes and enter into the new wholesaling agreement, because Monaco did not have authority to enter into such an agreement himself.  Ilyevsky refused to agree to the new agreement because the financial obligations on ISE were too onerous, and the Wholesaling Agreement remained unchanged.  K. Monaco Tr. at [ ].

68.     In addition to attempting to bind ISE (and Nasdaq) to a new wholesaling agreement, after Nasdaq announced the ISE acquisition, at this time Monaco began negotiations with PureShares to launch two new ETFs through ETFMG: the PureFunds Solactive FinTech

21

ETF ("FINQ"); and the PureFunds ETFx Healthtech ETF ("IMED"). A. Chanin Tr. at [ ]; PX-139. Similarly to the other PureFunds ETFs, ISE and PureShares entered into SEC '40 Act Platform Services Agreements for both FINQ ("FINQ PSA") and IMED ("IMED PSA") that obligated Nasdaq to pay substantial launch and operating costs for these two funds that had not even been launched at the time Nasdaq acquired ISE. JX-7, JX-10.

## VIII.    NASDAQ ACQUIRES ISE

69.     Nasdaq acquired ISE on June 30, 2016. Upon acquiring ISE, Nasdaq faced a choice about what to do with the PureFunds ETFs and the other ETFs where ISE, and now Nasdaq, was a financing partner: expand the business, maintain the business, or attempt to sell the business. T. Wade Aff. ¶¶ 18-21, 60-61. At the time of the acquisition, Nasdaq, like ISE, had a business licensing indexes to ETF issuers. T. Wade Aff. ¶ 18. Nasdaq decided that it did not want to expand ISE's ETF financing business because it worried that its traditional index license customers may view Nasdaq as a competitor. T. Wade Aff. ¶ 19. It also decided not to sell the business. T. Wade Aff. ¶ 20.

70.     Nasdaq decided that it was going to maintain ISE's ETF venture business but not expand it into new ETFs. T. Wade Aff. ¶¶ 20-21; 24. With respect to the Wholesaling Agreement, Nasdaq planned to abide by the terms of the agreement but endeavored to reduce costs until that time where it was contractually able to terminate the agreement. T. Wade Aff. ¶ 24.

71.     To this end, the Wholesaling Agreement contained a provision requiring ETFMG to automatically remove a fund from the wholesaling platform if the fund failed to achieve $50 Million AUM by its first anniversary or $75 Million AUM by its second anniversary. T. Wade Aff. ¶¶ 41-42; JX-11 at 13. On July 18, 2016, Nasdaq's Terry Wade sent a letter to ETFMG's Samuel Masucci directing him, pursuant to the automatic removal provision

in the Wholesaling Agreement, to remove SILJ, IPAY, and BIGD from the wholesaling

platform.  PX-113.  It was Nasdaq's intent to continue to remove funds from the Wholesaling

Agreement until it could, consistent with the agreement's terms, terminate the Wholesaling

Agreement completely.  T. Wade Aff. ¶ 23.

72.     On July 26, 2016, Masucci responded to Wade, confirming that ETFMG

would remove SILJ, IPAY, and BIGD from the wholesaling platform.  In this letter, Masucci

also purported to explain the contractual relationship between ISE, PureShares, and ETFMG.

PX-147.

73.     Mr. Masucci's letter described ETFMG as a "'private label' issuer of

exchange traded funds" and purported to provide an overview of ETFMG's relationship with

ISE, stating: "Our ISE relationship is governed by several interrelated contracts and it may be

useful to prove an overview . . . ."  PX-147 at 1.  To that end, Mr. Masucci described the PSAs,

the Wholesaling Agreement, and the Index License Agreement.  PX-147 at 2.

74.     With respect to the PSAs, Mr. Masucci wrote:

> ISE is involved in certain funds pursuant to certain Platform
> Service Agreements ("PSAs") whereby the ISE and Pure Funds
> have agreed to provide financial support in return for a profit share.
> They also have certain marketing responsibilities and rights under
> the PSAs. Most of the ISE affiliated funds are marketed under the
> "Pure Funds" label. It is important to recognize that the Trust is the
> issuer and that " Pure Funds" is only a marketing label.

*Id.*

75.     With respect to the Index License Agreement, Mr. Masucci wrote:

> As you know, the ISE relationship with Pure Funds is governed by
> the Index License Agreement between ISE and PureFunds dated
> June 12, 2012 (the "Index Agreement"), as amended on September
> 12, 2014 (the "HACK Amendment"). The ISE obligations to
> ETFMG are independent of the Index Agreement and ISE rights to
> HACK profits, if any, are governed only by the Index Agreement.

23

*Id.* at 2.

76.     With respect to the Wholesaling Agreement, Mr. Masucci wrote:

The Wholesale Agreement requires Gencap/ETFMG to provide a
wholesale effort for ISE supported funds. Section 3 lists 24 specific
responsibilities, including hiring, training, licensing of registered
representatives, travel, marketing, compliance, data and expense support
and such other activities consistent with the overall goal of building and
maintaining a sales force to increase the AUM of ISE supported products.
Pursuant to Section 4, the parties have agreed to engage 4 wholesalers,
subject to the Exhibit C compensation cap and the Section 7 expense
payment obligation. Section 9 provides that the Wholesale Agreement is
in force for as long as the aggregate AUM of the products is more than
$100 million and Section 7(e) commits ISE to refrain from any action to
remove Gencap /ETFMG from its role as wholesaler.

*Id.* at 2.

77.     In his letter, Mr. Masucci does not mention any oral agreements between

ISE and ETFMG, much less one pertaining to the division of profits from the operation of

HACK.  T. Wade Aff. ¶ 50.

78.     It appears that this letter was based on an internal analysis written by

ETFMG's CEO, Samuel Masucci, and President, Barney Karol, regarding the relevant contracts

with PureShares and Nasdaq/ISE.  PX-232A – PX-232E.  In this analysis, ETFMG concluded

that though it has been paying ISE the HACK profits, it was instead "required" under the HACK

PSA to "pay PureFunds" those profits.  PX-232D at 98070.  Masucci and Karol further

concluded that ETFMG could (1) argue that ETFMG's only obligations are to PureFunds and

"take away the payment from the ISE"; or (2) "keep paying ISE" and argue "that the PSA was

modified by conduct and assent."  PX-232D at 98070-98071.  While ETFMG thus acknowledges

the modification by conduct and their own assent, under either interpretation, Masucci and Karol

acknowledge that ETFMG owed either ISE or PureShares the HACK profits pursuant to the

HACK PSA.

79.     Like its July 26, 2016 letter to Nasdaq, ETFMG's own internal analysis contained no mention of any oral agreement between ISE and ETFMG regarding the PureShares ETFs.  PX-232D.

80.     Despite Nasdaq's initial reluctance to expand the business unit formerly referred to as ETF Ventures, Nasdaq continued to invest in this business line.  Sometime in the fall of 2016, Mr. Masucci and PureShares' Andrew Chanin sought to have the PureFunds ETFs (including HACK, IPAY, etc.) added to Morgan Stanley's platform of ETFs.  T. Wade Aff. ¶ 60.

81.     After extensive conversations with Mr. Masucci and Mr. Chanin, Nasdaq committed to pay an additional $50,000 annually to add the PureFunds ETFs to the Morgan Stanley platform because it believed that this would help increase the exposure of the PureFunds ETFs to retail investors and therefore grow the AUM of the PureFunds ETFs.  T. Wade Aff. ¶ 61; PX-163.

82.     After acquiring ISE, Nasdaq also incurred additional fees to launch two new PureFunds ETFs that had been in the works prior to Nasdaq's acquisition of ISE.  In August 2016, ETFMG sent Nasdaq an invoice for $157,650 for expenses related to the launch of IMED and FINQ.  *See* PX-148.  Rather than trying to get out of contracts (and expenses) that ISE entered into pre-acquisition as alleged by ETFMG, Nasdaq paid this invoice and incurred hundreds of thousands of dollars in expenses it paid to ETFMG to operate IMED and FINQ.  T. Wade Aff. ¶ 21; 59; 62; PX-247 at 301761; 301765.

83.     And in September 2016, Nasdaq paid $127,968.11 of invoices that ETFMG sent charging for wholesaler salaries.  T. Wade Aff. ¶ 59; PX-150 at 90827; PX-247 at 301765.

## IX.        ETFMG SEIZES THE PROFITS FROM THE OPERATION OF SILJ

84.        Since SILJ launched in 2012, every month ETFMG would ISE send a P&L showing expenses that ISE needed to pay ETFMG to operate this fund.  Every month ISE paid these expenses.  K. Monaco Tr. at [ ].

85.        In May 2016, right before Nasdaq's acquisition of ISE, ETFMG requested that ISE pay $45,000 to fund a proxy vote of SILJ's shareholders.  PX-131 at 1-2; PX-132.  ISE approved this cost and paid this expense.  K. Monaco Tr. at [ ].  ISE paid these expenses because it fully expected to receive the profits generated by SILJ.  K. Monaco Tr. at [ ].

86.        In June 2016, SILJ almost hit breakeven and ETFMG sent ISE/Nasdaq a P&L statement showing a loss of $1,322.73.  PX-133 at 2.  However, because the SILJ reimbursement account still contained over $42,000 in expenses that ISE had prepaid, ISE/Nasdaq did not need to pay ETFMG any additional money.  PX-133 at 2, 4.

87.        In July 2016, SILJ crossed the breakeven point and became profitable, earning a net profit of $12,682.14.  PX-134 at 1.  ETFMG did not send Nasdaq a P&L statement reflecting this and did not send the profit to Nasdaq.  Despite sending Nasdaq invoices seeking payment for SILJ expenses throughout 2015 and the first half of 2016, ETFMG claimed that the "BMA expired by its terms on May 31, 2015" and ETFMG was not contractually obligated to pay Nasdaq SILJ profits.  PX-136 at 1.  ETFMG's contention was a surprise to both ISE's Monaco and PureShares' Chanin who had been paying ETFMG to operate SILJ since 2012 when it launched, and after 2015 when the BMA allegedly expired.  K. Monaco Tr. at [ ]; A. Chanin Tr. at [ ].

88.        Despite ISE financing SILJ the entire time it was unprofitable, once SILJ became profitable ETFMG refused to pay ISE/Nasdaq the profits generated by that fund.

Additionally, ETFMG did not refund to Nasdaq the $42,883.27 that ISE/Nasdaq had prepaid for SILJ expenses.  PX-134 at 3; PX-250 at 3; J. Flanagan Tr. at [ ].

## X.        POST-ACQUISITION ETFMG DEPLOYS A PLAN TO SEIZE THE HACK PROFITS

89.      Following Nasdaq's acquisition of ISE, ETFMG concocted a plan to use the Wholesaling Agreement to exert leverage on Nasdaq and ultimately force it to abandon its entitlement to the profits derived from the operation of HACK and the other PureFunds ETFs.

90.      On October 31, 2016, ETFMG's Samuel Masucci and Barney Karol met with PureShares' Andrew Chanin and invited him to join their plan to lock Nasdaq out of HACK.  Masucci and Karol told Chanin that they spent a "small fortune" on a plan to use the Wholesaling Agreement to "squeeze" Nasdaq out of the PureFunds ETFs.  A. Chanin Tr. at [ ].

91.      ETFMG's plan to force Nasdaq from HACK had started earlier.  Prior to Nasdaq's acquisition of ISE, ETFMG sent ISE monthly P&L statements showing how much money ETFMG owed ISE for HACK within a week of the close of the prior month.  C. Freire Aff. ¶¶ 5, 6 (citing PX-1001).  Immediately following the Nasdaq acquisition, ETFMG routinely waited 20 to 30 days (or more) days after the close of the month to send these P&L statements.  C. Freire Aff. ¶¶ 5, 6 (citing PX-1001).  This delay allowed ETFMG to keep the money it contractually owed to ISE/Nasdaq for a longer period of time.

92.      But more importantly, ETFMG simply stopped paying Nasdaq the profits from HACK.  C. Freire Aff. ¶ 7 (citing PX-1002).  From July 2016 until October 2016, ETFMG did not pay Nasdaq (or PureShares) any of the HACK monthly profits for these months.  C. Freire Aff. ¶ 7 (citing PX-1002), ¶ 10.

93.     Throughout this period, Nasdaq sent ETFMG reminders that ETFMG had failed to pay Nasdaq these HACK monthly payments.  PX-161 (asking for HACK profits for July and August 2016), PX-428 (July), PX-429 (August).

94.     On or about October 18, 2016, ETFMG's then controller sent Nasdaq the first of what would be four "netting statements."  This October 2016 netting statement netted monies ETFMG owed Nasdaq for HACK for July 2016 against various types of payments ETFMG claimed that Nasdaq owed ETFMG.  T. Wade Aff. ¶ 66; PX-221.  The result was that instead of paying Nasdaq the undisputed gross amount ETFMG owed Nasdaq for HACK, as it previously had, ETFMG deducted expenses related to other contracts, including some that were contested, and paid Nasdaq the net amount.

95.     There were numerous problems with ETFMG netting payments in this way.  First, ETFMG did not include the HACK profits for August and September which totaled close to $700,000.  PX-429, PX-430.  Though ETFMG had been paid the monthly management fee from US Bank, it did not pay what it owed Nasdaq for August and September.  *See* PX-247 at 45 (301765) (showing a 9/2/16 deposit from "US Bank" of $551,798.92), PX-247 at 49 (301769) (showing a 10/4/16 deposit from "US Bank" of $558,309.09).

96.     Second, though Nasdaq refused to approve a $17,750 wholesaling expense, T. Wade Aff. ¶ 73(f), C. Freire Aff. ¶ 15, ETFMG simply disregarded ISE/Nasdaq's contractually bargained for prerogative to preapprove wholesaling expenses and netted this payment anyway.  This fact demonstrates ETFMG's willful disregard for the terms of the Wholesaling Agreement.  On August 8, 2016, ETFMG sent Nasdaq a "July Wholesaler T&E Invoice."  PX-121.  This invoice included charges for: (a) Alex Gordon Travel and Expenses for $1,404.56; (b) Harold Janecek Travel and Expenses for $151.76; and (c) "10th Annual Inside

ETFs Conference January 22-25, 2017" for $17,750, for a total of $19,306.32.  PX-121 at 3.

ETFMG had not sought Nasdaq's pre-approval for the $17,750 for "Inside ETFs" and Nasdaq

would not approve this expense.  After receiving this invoice, Nasdaq's Terry Wade emailed

ETFMG's Samuel Masucci asking why Nasdaq was being charged to pay for a booth for

ETFMG at this conference.  PX-114.  Ultimately, Nasdaq decided not to pay this expense

because ETFMG had not sought Nasdaq's approval prior to incurring it and because Nasdaq was

already paying for a booth at this conference and offered ETFMG the ability to take advantage of

this.  PX-160 at 1-2.  Upon hearing Nasdaq's position, ETFMG's General Counsel Barney Karol

remarked: "I see this as a dance rather than a declaration of war."  PX-160 at 1.  ETFMG then

netted this expenses and reimbursed itself.  T. Wade Aff. ¶ 73(f).

97.     Third, ETFMG deducted expenses that Nasdaq had already paid.  T. Wade

Aff. ¶ 74.  And fourth, ETFMG deducted payments for expenses that had no invoice or backup

of any kind.  T. Wade Aff. ¶ 74, 81.

98.     Throughout the second half of 2016 and the first half of 2017, Nasdaq's

Terry Wade complained numerous times to ETFMG about this "netting," arguing that (a)

ETFMG was not paying Nasdaq HACK profits in the month following the month they had been

earned, as ETFMG had paid ISE; (b) the netting made it difficult for Nasdaq's accounting

department to reconcile; (c) ETFMG was netting expenses that under the contracts it could not

unilaterally charge Nasdaq; and (d) that ETFMG was netting wholesaler compensation by the

quarter, in direct contradiction to the Wholesaling Agreement.

99.     The Wholesaling Agreement required ISE/Nasdaq to pay ETFMG

wholesaler compensation on a monthly basis prior to the month in which that compensation

would be paid by ETFMG.  JX-11 at 14.  Rather than follow the terms of the contract, ETFMG

netted from monies it otherwise owed Nasdaq, three months of payments (that as described below ETFMG was arbitrarily increasing each quarter). ETFMG's Masucci claimed that it was ETFMG's policy to net payments involving different contracts. PX-176 at 24561. But this was not true. ETFMG had never netted payments to ISE in this way. T. Wade Aff. ¶¶ 67, 108-09.

100. As they had agreed between themselves, Masucci and Karol had begun to execute a plan to take advantage of the Wholesaling Agreement with the end goal of terminating Nasdaq's right to the HACK profits.

101. In addition to slowing down payment and the "netting" described above, ETFMG used two additional tactics to attempt to cause Nasdaq to abandon its interest in the PureFunds ETFs. The first tactic that ETFMG used was increasing the costs to Nasdaq associated with the compensation paid to the wholesalers under the Wholesaling Agreement. The Wholesaling Agreement stated that Nasdaq was obligated to pay a maximum of $250,000 a year for two wholesalers and that this could not be changed without an express writing. JX-11 § 13(k) at 9. The invoices that ETFMG sent to ISE show that from 2013 when the Wholesaling Agreement began until July 2016 when Nasdaq acquired ISE, ETFMG charged Nasdaq between $50,000 and $80,000 a quarter for wholesaler compensation. Juneja Aff. ¶ 28 (citing Juneja Report Ex. 4). However, after Nasdaq acquired ISE, these invoices increased, immediately and dramatically by over fifty percent, with no explanation or written change to any agreement. C. Freire Aff. ¶¶ 83-85. The Wholesaling Agreement contained a "Compensation Cap" of $250,000 on wholesaler compensation, but by spring 2017, ETFMG was charging Nasdaq (and then netting out) annualized wholesaler compensation exceeding $550,000. C. Freire Aff. ¶¶ 82-83.

102.    The second tactic that ETFMG used was ignoring Nasdaq's contractual right to approve wholesaling expenses before ETFMG incurred them, and then consequently caused Nasdaq to reimburse them.  JX-11 at 11.  Prior to the Nasdaq acquisition, ETFMG would discuss large expenses with ISE's Monaco and he would decide whether ISE would approve them.  K. Monaco Tr. at [ ].  That stopped after Nasdaq acquired ISE.  ETFMG refused to comply with Nasdaq's decisions not to approve certain expenses and rather than give Nasdaq the opportunity to approve (or reject) wholesaling expenses ETFMG incurred these expenses and then netted them against monies that it indisputably owed Nasdaq.  C. Freire Aff. ¶ 23.  Additionally, the Wholesaling Agreement required Nasdaq's approval, *in writing*, for annual expenses exceeding $50,000.  ETFMG disregarded this provision of the Wholesaling Agreement as well.  C. Freire Aff. ¶ 23 (citing JX-11 at 11).

103.    Despite these aggressive tactics by ETFMG, Nasdaq continued to invest in the PureFunds ETFs, even when it was not contractually required to do so.

104.    Through May 2017, ETFMG sent Nasdaq three more "netting" statements, in December 2016, PX-173, February 2017, PX-223, and May 2017, PX-224.  C. Freire Aff. ¶¶ 35, 44, 53.  Like the first netting statement, in the three subsequent netting statements, ETFMG continued to: (a) send Nasdaq late and partial HACK payments; (b) net large wholesaling expenses that Nasdaq did not approve; (c) net quarterly and increasingly large quarterly wholesaler compensation; and (d) deduct wholesaling expenses that were erroneous, had already been netted before, or had no backup.  C. Freire Aff. ¶¶ 36-39; 49-52; 56-63.

## XI.    ETFMG CAUSED CHANGES TO THE PUREFUNDS ETFS THAT HARMED THE FUNDS AND BENEFITTED ETFMG

105.    In the period when Nasdaq's acquisition of ISE had been announced but not yet consummated, ETFMG, in an internal analysis, assessed its contracts with ISE/Nasdaq

and PureShares and its various options.  PX-232D.  In its analysis of "Obligations to ETFMG

under Platform Service Agmts" ETFMG concluded:

> PureFunds has a profit participation and not an ownership or
> control interest.  They have the right to approve all marketing
> materials and thus have the ability to significantly influence the
> public position and brand of the fund.  *We can reduce the fee*
> *unilaterally without board approval.*

106.    PX-232D at 98071 (emphasis supplied).  Later in this analysis, when

speculating "what Nasdaq will do," ETFMG wrote: "[Nasdaq] will have obligations to us under

the PSAs of at least $1m for two years and of around $500,000 under the Wholesale Agt.  They

could net this against HACK profits but need to recognize that HACK has been in redemption

and that we could reduce the fee."  PX-232D at 98073. I interpret this to mean that in assessing

how to handle Nasdaq's acquisition of ISE, ETFMG contemplated reducing the HACK

management fee.

107.    In early 2017, when ETFMG was working to cause Nasdaq to abandon its

interests in the PureFunds ETFs, it used the tactic of reducing the HACK management fee to

create additional pressure.

108.    When HACK launched, ISE and PureShares instructed ETFMG to make

the HACK management fee 75 basis points.  PX-94.  From HACK's launch through 2016, the

management fee was 75 basis points.  This meant that every year ETFMG as the adviser of the

fund was contractually entitled to collect a fee of 75 basis points from the investors in the fund as

the "management fee."  PX-21 at 3 of 102.  Every month ETFMG took a pro rata portion of this

management fee, deducted the expenses it was entitled to under the HACK PSA, JX-5 at 13, and

then sent a P&L statement to ISE/Nasdaq demonstrating the amount the net amount that was due

to ISE/Nasdaq.  *See, e.g.*, PX-411, JX-194, PX-436.  Accordingly, the management fee was used

to calculate the gross revenue of the fund and ultimately generate the net profit due to ISE/Nasdaq.

109.    In April 2017, ETFMG informed Nasdaq and PureShares that it had recommended to the trust board, which exercised authority over fund decisions, that the HACK management fee should be reduced from 75 basis points to 60 basis points.  T. Wade Aff. ¶ 123. This would have the result of reducing the gross revenue by 20 percent, and the net profit to Nasdaq (and PureShares) by more than that.  T. Wade Aff. ¶ 123.  However, because ETFMG's fees were not connected to the management fee, *see* JX-5 at 13, it would receive the same amount of money and Nasdaq (and its partners) would suffer from the change.  T. Wade Aff. ¶ 123.

110.    ETFMG's explanation that the HACK fee cut was justified by market factors, PX-186, was pretextual.  CIBR, another cybersecurity ETF, which had a management fee of 60 basis points had launched in July 2015.  S. Friske Dep. 58:12-13; 66:19-22.  From the time CIBR launched until July 2016 when Nasdaq acquired ISE, HACK performed worse than CIBR from a returns standpoint and lost approximately half of its AUM while CIBR gained AUM.  V. Juneja Aff. ¶ 61-62.  However, ETFMG has offered no evidence that it contemplated reducing the HACK management fee during this time period when such a change would have actually been justified.  After Nasdaq acquired ISE, HACK's performance reversed.  It matched CIBR's performance and had high growth in its AUM.  V. Juneja Aff. ¶ 61-62.  Thus, the timing of the HACK fee cut is not justified by market conditions, but rather driven by ETFMG's business strategy of seeking to cause Nasdaq to abandon its interest in the PureFunds ETFs.

111.    Further supporting the conclusion that the justification for the HACK fee reduction was pretextual is the fact that shortly after reducing the HACK management fee to 60

basis points, and after ETFMG terminated the relevant contracts with Nasdaq and PureShares, ETFMG increased the "operating expenses" investors in HACK would pay to 64 basis points, effective January 31, 2018, to account for "extraordinary legal expenses."  T. Wade Aff. ¶ 141 (citing PX-24).  The "Annual Fund Operating Expenses" are the "expenses [an owner of HACK] pay[s] each year as a percentage of the value of [his or her] investment."  PX-24.  The management fee is one component of the Annual Fund Operating Expenses, and "Other Expenses," is another component.  PX-24.  Thus, shortly after ETFMG had advised the trust board that reducing HACK's fee was necessary given market conditions and ETFMG had pushed Nasdaq out of the PureFunds ETFs, ETFMG raised the fee for HACK (and all of the other PureFunds ETFs).

112.    At the time of both fee changes, the ETFMG trust board was composed of ETFMG's principle Samuel Masucci, and "independent" trustees John Southard, and Terry Loebs.  The ETFMG trust board was a rubber stamp for ETFMG's recommendations.

113.    In 2017, the ETFMG trust board, upon ETFMG's recommendation ratified two changes that were not in the best interest of the PureFunds ETFs.  In 2016, ETFMG recommended that the trust board approve the decision to replace an unaffiliated third party company, Penserra, as the portfolio manager with ETFMG internal personnel.  A. Chanin Tr. at [ ].  The portfolio manager (also known as the subadvisor) plays an important role for an ETF, and is "primarily responsible for the day to day management of the Fund. . . . including, but not limited to, investing cash inflows, implementing investment strategy, researching and reviewing investment strategy, and overseeing members of his portfolio management team with more limited responsibilities."  PX-21 at 19 of 102.

114.    Since the launch of the PureFunds ETFs, Penserra had been responsible for their portfolio management.  A. Chanin Tr. at [ ].  Penserra had significant experience handling portfolio management for ETFs.  A. Chanin Tr. at [ ].  ETFMG had no experience doing portfolio management.  However, based solely on ETFMG's recommendation, the ETFMG trust board approved removing Penserra as the PureFunds ETFs portfolio manager and allowing ETFMG to provide this function instead.  J. Southard Dep. Tr. at 45:18-46:19; T. Loebs Tr. at [ ].

115.    There is no doubt this change was financially beneficial for ETFMG. Each of the PSA for the PureFunds ETFs stated that ETFMG was entitled to a portfolio management fee of approximately $20,000 or 5 basis point (whichever was greater) (described as "Sub Advisory").  *See* JX-5 at 13; JX-6 at 14.  When Penserra served as the portfolio manager for the PureFunds ETFs, ETFMG largely passed this amount through to Penserra.  PX-21 at 19 of 102.  However, after the ETFMG trust board approved the replacement of Penserra as portfolio manager with ETFMG, without conducting any independent analysis, ETFMG retained these fees for itself.  These fees were not insignificant.  For instance, assuming that HACK has an AUM of $1.6 billion, the five basis point fee is approximately $800,000 per year.

116.    The second change the ETFMG trust board rubber stamped was ETFMG's recommendation that the PureFunds ETFs replace the experienced statutory distributor, Alps, with ETFMG Financial, a subsidiary of defendant Exchange Traded Managers Group.

117.    Like the portfolio manager, the statutory distributor for an ETF plays an important role for an ETF.  The statutory distributor is responsible for ensuring that those marketing the fund are complying with the securities laws.  A. Chanin Tr. at [ ].

35

118.    Since the launch of the PureFunds ETFs, Quasar, and then Alps, served as the statutory distributor for the PureFunds ETFs.  Both Quasar and Alps have significant experience and operations in this area.  A. Chanin Tr. at [ ].  In 2017, defendants formed a subsidiary, ETFMG Financial to take over this role.

119.    In 2017, ETFMG recommended to the ETFMG trust board that it replace Alps with the nascent ETFMG Financial.  A. Chanin Tr. at [ ].  The ETFMG trust board did no independent analysis regarding this recommendation.  J. Southard Dep. Tr. at 52:18-53:25; T. Loebs Tr. at [ ].  There is no doubt this change was financially beneficial for ETFMG.  Each PSA for the PureFunds ETFs stated that ETFMG was entitled to receive approximately $15,000 or 1.5 basis points (whichever was greater) for statutory distribution.  *See* JX-5 at 13; JX-6 at 14.  After the ETFMG trust board approved this change, ETFMG retained these fees for itself.  These fees were not insignificant.  For instance, assuming that HACK has an AUM of $1.6 billion, the 1.5 basis point fee is approximately $240,000 per year.

120.    Each PSA  required that: "Statutory distribution and compliance support to be provided by *Third Party* Service Provider . . . ."  *See, e.g.*, JX-5 at 12, JX-6 at 13 (emphasis added).   Likewise, the Wholesaling Agreement dictated that "GENCAP shall . . . ensure that each Wholesaler will be registered with, and supervised by, a third-party FINRA registered Broker Dealer ("Distributor"), JX-11 § 1 at 1, and "GENCAP shall not provide statutory distribution services for the securities on the Platform . . . which will be provided by a third-party service provider ('Statutory Distributor')," JX-11 § 3 at 3.

## XII.    THE ETFMG-NASDAQ-PURESHARES RELATIONSHIP DETERIORATES

121.    In addition to using the Wholesaling Agreement in an attempt to cause Nasdaq to abandon its interest in the PureFunds ETFs, ETFMG used two other tactics to create friction in its relationship with Nasdaq.  First, after Nasdaq's acquisition of ISE, ETFMG began

asserting that Nasdaq had a conflict of interest because in addition to its role with HACK, Nasdaq served as the index provider to CIBR.  T. Wade Aff. ¶ 112.

122.     The contracts between ISE/Nasdaq and ETFMG did not give ETFMG an exclusive right to the HXR index or restrict Nasdaq's ability to develop and contribute to competing products.  The Sublicense Agreement specifically states that ETFMG is acquiring a "non-exclusive" license.  JX-2A § 1 at 1.  Thus Nasdaq could have licensed the HXR index itself to another ETF issuer in addition to ETFMG, without ETFMG's consent.  While the Index License Agreement prohibits ISE/Nasdaq and/or PureShares from "establishing" a product that is "Substantially Similar," JX-1 § 4(B) at 6, to a product launched pursuant to the Index License Agreement, ETFMG was not a party or a third-party beneficiary to the Index License Agreement and had no right to enforce that provision.  D.E. 50 at 14-19.

123.     Indeed, prior to Nasdaq's acquisition in November 2015, ISE licensed a variant of the HXR index to be used as the underlying index for the ISPY ETF, a cybersecurity ETF launched in Europe.  D. Gedeon Aff. ¶ 27; 38.  ISE's ETF Ventures partnered with Andrew Chanin to launch the ISPY ETF with another white label ETF issuer.  D. Gedeon Aff. ¶ 27.

124.     After Nasdaq acquired ISE it implemented changes to eliminate potential concerns that it was or could favor HACK over CIBR or vice versa.  Prior to Nasdaq's acquisition of ISE, Nasdaq published research promoting the NQCYBR index, underlying CIBR, as a means of investing in the cybersecurity industry.  Post-acquisition, Nasdaq only published research promoting investing in the cybersecurity industry generically, and also published research promoting both NQCYBR and HXR.  D. Gedeon Aff. ¶ 29.  While ETFMG alleges that Nasdaq showed favoritism to CIBR and First Trust, there is no evidence in the record that supports the conclusion that after Nasdaq acquired ISE, it favored CIBR over HACK.

125.     After ETFMG began implementing its plan to cause Nasdaq to abandon its interest in the PureFunds ETFs, in early 2017 ETFMG also claimed concern about HACK's lack of implied liquidity.  T. Wade Aff. ¶ 114.  These claimed concerns over HACK's lack of implied liquidity were pretextual.

126.     Since inception, the HXR index underlying HACK has included smaller, less voluminously traded companies.  D. Gedeon Aff. ¶ 7.  The NQCYBR index underlying CIBR was designed to include larger capitalized stocks, and had greater liquidity.  D. Gedeon Aff. ¶ 7.  From CIBR's launch in July 2015 until Nasdaq's acquisition of ISE in July 2016, including during periods of extreme growth in HACK AUM, CIBR was significantly more liquid than HACK.  V. Juneja Aff. ¶ 65.  However, ETFMG did not claim concern about HACK's lack of implied liquidity until Nasdaq acquired ISE and ETFMG was attempting to coerce Nasdaq into abandoning its interest in the PureFunds ETF.

127.     ETFMG had no contractual right to dictate changes to the HXR index.  No provision in the Sublicense Agreement, JX-2A, or the HACK PSA, JX-5, gives ETFMG the contractual right to dictate changes to HXR, the index underlying HACK.  Instead, the HACK Prospectus disclaims any such right:

> The ISE Cyber Security Index (Symbol: HXR) (the "ISE Index") is a product of ISE.  The Adviser [ETFMG] has entered into a license agreement pursuant to which the Adviser pays a fee to use the ISE Index and the marketing name and licensed trademark of ISE ("Index Trademark").  The Adviser is sub-licensing rights to the ISE Index to the Fund at no charge.  The Adviser is permitted to sub-license the Index Trademark for the purpose of promoting and marketing the Fund.
>
> The ISE Index is compiled and calculated by ISE.  *ISE has no obligation to take the needs of the Adviser or the owners of the Fund into consideration in determining, composing or calculating the ISE Index.*

PX-21 at 9-11 of 102 (emphasis supplied).

128.     There is no connection between an ETF's implied liquidity and its performance or its ability to gather AUM.  D. Gedeon Aff. ¶ 8.  Indeed, since inception HACK had relatively low implied liquidity by design, and was an overnight success, increasing its AUM to close to $1.4 billion less than a year after launching.  V. Juneja Aff. ¶ 62; 65.

129.     In any event, to maintain the parties' relationship, Nasdaq addressed ETFMG's concerns over HACK's lack of implied liquidity.  In 2017, Nasdaq's Terry Wade and David Gedeon met with ETFMG and discussed this issue.  Thereafter, Gedeon constructed a plan that would have improved HACK's liquidity without altering the HXR index's underlying methodology.  D. Gedeon Aff. ¶ 40.  ETFMG terminated the relevant contracts with Nasdaq before Gedeon had the opportunity to implement this plan.  D. Gedeon Aff. ¶ 41.

## XIII.  ETFMG BREACHES ITS CONTRACTS AND REFUSES TO PAY NASDAQ BASED ON FRIVOLOUS AND MANUFACTURED GROUNDS

130.     In February/March 2017, the relationship between Nasdaq and ETFMG began to come to a head as a result of ETFMG's campaign of hostility.  As of February 15, 2017, despite HACK's substantial profitability, ETFMG had failed to pay Nasdaq any profits for HACK for October 2016, November 2016, December 2016, and January 2017, totaling more than $1.2 million.  C. Freire Aff. ¶ 7, PX-1002.  At a meeting in mid-February 2017, Wade implored Masucci to stop netting payments and to discuss marketing expenses with Nasdaq before incurring such expenses.  T. Wade Aff. ¶ 107.

131.     On February 28, 2017, Masucci sent Nasdaq a new netting statement, that netted HACK profits that ETFMG owed Nasdaq from October – December (but did not include HACK profits from January, or IPAY profits from December and January), against monies ETFMG claimed that Nasdaq owed for expenses ETFMG incurred in December and January,

and future expenses for wholesaler expenses for the second quarter of 2017, and future expenses for six other PureFunds ETFs.  C. Freire Aff. ¶ 48.

132.   In response to this netting statement, Nasdaq's Casey Freire and Wade both emailed ETFMG asking for backup for the underlying costs that ETFMG was netting against Nasdaq, and to stop the process of netting.  PX-184, PX-185.  ETFMG refused to provide backup for the expenses and refused to stop netting these payments.  *Id.*

133.   On March 1, 2017, Wade emailed Masucci writing: "[t]here is no need or provision for you to advance bill and net the wholesaler fees for the second quarter in February. We will have many other questions, but we request you send us today the $138k you netted from the money we are owed."  PX-185.

134.   On March 1, 2017, Masucci responded:

It has been our policy and procedure from the beginning of the wholesale agreement to hold a minimum of 90 days wholesaler expenses in advance of the expenditure. The management of the ISE was in full agreement with this policy. If you review the net payment calculation from last quarter you will see that we followed the same procedure. The reason that we have always handled it this way is that the wholesaler expenses are quite substantial and fixed and we took on this large fixed commitment at the request of your predecessor the ISE. The gross revenue from the funds that we net expenses against are variable. The variability is impacted by several factors including current AUM levels, expenses reimbursement account maintenance for funds that have not achieved break even asset levels, new fund launches such as the ForceShares Funds and the gross management fees charged to each fund which are ultimately set by the Trust Board and can change. We will continue this policy going forward as long as the current Platform Wholesale Agreement is in effect. Again, this is the same policy that was used when we were working with the ISE.

PX-185.

135.     Masucci's response to Wade's complaints about ETFMG's netting threatened that the management fees for the PureFunds ETFs "can change," demonstrating his intent to use this change of fee punitively and in bad faith, to induce Nasdaq to abandon its contractual rights to profit from the Pureshares ETFs, having already invested heavily in the development of those ETFs. The next day, Wade responded: "I disagree with you netting this cost and it is not in compliance with the agreement.  We will pay the fees owed when they are due per the agreement. Please return these funds to us immediately. Are you recommending to the boards any changes in managements fees of any of the funds we are involved in. You communicated to us that you would discuss this with us and the other partners before making any recommendations or changes."  PX-185.

136.     On March 2, 2017, Masucci responded by making his threats explicit.  He told Wade that he expected the ETFMG board to make a decision about lowering the HACK management fee at its board meeting on March 15, 2017, and/or taking some other action against Nasdaq based on alleged problems with the index underlying HACK.  PX-186.

137.     On March 14, 2017, Nasdaq's outside counsel sent a letter to Masucci and ETFMG's other board members expressing concern about ETFMG's threats and possibility that ETFMG would claim an unsupported breach of the contracts between Nasdaq and ETFMG.  PX-189.

138.     Upon receiving this letter, Masucci forwarded the letter to ETFMG's other board members, writing: "The bottom line is that the concerns we have expressed about the way Nasdaq has been maintaining our indexes and our threat of moving to another index provider has gotten their attention and should result in better products. . . .  [W]e are *encouraged* by the letter to the Board . . . ."  PX-190 at 1-2 (emphasis supplied).

139.    On March 22, 2017, based on the recommendation from ETFMG, the ETFMG trust board reduced the management fee for HACK from 75 basis points to 60 basis points.  PX-195.  The purported basis for this reduction was competitive pressure from CIBR. This had the effect of reducing Nasdaq's profits from the operation of HACK by more than 20 percent.  ETFMG did not lower any of the fees it received to operate the HACK ETF.

140.    Approximately one month later, on April 19, 2017, ETFMG's Karol emailed Wade to tell him that the Board of Trustees of the ETF Managers Trust had voted to reduce the HACK fee effective May 1, 2017.  PX-195.

141.    Two days later, on April 21, 2017, Karol emailed Wade a copy of a letter Karol had contemporaneously sent to PureShares' Andrew Chanin asserting that Chanin had violated the securities laws and that as a result of these actions ETFMG was terminating the Platform Service Agreements for HACK, IMED, and IFLY.  PX-197.  Specifically, the letter asserted that Chanin engaged in illegal marketing on two occasions.  First, ETFMG accused Chanin of illegal marketing because an article published April 18, 2017 by MarketWatch identified Chanin as CEO of "Purefunds which operates the funds" and the article also says "PureFunds also operates what could be the greatest success of the thematic category, the PureFunds Cyber Security ETF HACK."  PX-197 (citing PX-198).  ETFMG claimed that in this article Chanin also unlawfully marketed IFLY by discussing the components of the ETF. Second, ETFMG alleged that in an April 17, 2017 Zacks podcast, PureFunds is identified as the "issuer of HACK and other funds, including IMED," and that during this podcast Chanin illegally marketed these funds.  At the time ETFMG sent this letter it knew that the allegations in the letter were false and/or did nothing to determine if they were accurate.

142.    With respect to the first claim, while the article identifies PureFunds as the operator of IFLY and HACK, it does not attribute these statements to Andrew Chanin. Similarly, the article does not contain any quotes attributable to Chanin where he markets IFLY. PX-198.

143.    The second claim is even more problematic.  Had ETFMG inquired it would have learned that Chanin recorded this Zacks podcast while he was a licensed representative of Alps, the distributor for the PureFunds ETFs, and legally allowed to market the funds.  A. Chanin Tr. at [ ].  But even more problematic is that contrary to the claim in Barney Karol's letter of April 21, 2017, nowhere in this podcast is PureFunds identified as the issuer of HACK and other funds.  PX-199.  The claim is simply wrong and it appears that these termination grounds were fabricated as a means of terminating the PSA and Nasdaq and PureShares' right to the profits from the funds.

144.    Six days later, on April 27, 2017, ETFMG's Karol sent Chanin (cc'ing Wade and others including ETFMG's litigation counsel) a second letter asserting that Chanin had violated the securities laws, this time in connection with IPAY.  PX-200.  This letter asserted that Chanin violated the securities laws because in a separate podcast "PureFunds is identified as the issuer of IPAY" and Chanin "spoke at length about IPAY and its holdings."  Again, ETFMG either knew that the claims in this letter were false or did nothing to determine if they were accurate.  Had ETFMG inquired, they would have learned that Chanin recorded this podcast while he was a licensed representative of Alps, the distributor for the PureFunds ETFs, and legally allowed to market the funds.  A. Chanin Tr. at [ ].  Additionally, the article never identifies PureFunds as the "issuer of IPAY," and even if it had, that would not be a basis for alleging Chanin violated the securities laws.  PX-200A.

145.     As part of its obligations as the investment advisor and distributor of the PureFunds ETFs, ETFMG prepared regular compliance reports for the ETFMG trust board.  PX-249A at 295036-295042.  In these compliance reports ETFMG purported to identify and discuss compliance issues that occurred with respect to the funds.  Despite ETFMG's claims in the letters of April 21, 2017 and April 27, 2017, that Andrew Chanin had engaged in serious violations of the securities laws and ETFMG's assertions that "[Chanin's] actions have had an adverse effect on the Trust and the Funds is beyond is dispute," ETFMG's quarterly compliance made no mention of these claimed serious violations.  PX-249A at 2950360-295042.

146.     Less than a month later, on May 24, 2017, ETFMG's Masucci sent a letter to Chanin and Wade regarding the "Cessation of HACK Profit-Sharing."  PX-202.  Masucci stated that ETFMG was not obligated to pay Nasdaq and/or PureShares HACK profits but only chose to do so because it hoped to build a relationship with Nasdaq.  PX-202 at 1.  This conflicted with ETFMG's own analysis it had conducted prior to Nasdaq acquiring ISE.  *See* PX 232D at 98070 ("If it was in our interest to take away the payment from the ISE we could pay PureFunds *as required by the PSA* . . . .")  Second, Masucci said that ETFMG was going to cease paying Nasdaq and/or PureShares HACK profits because of nine actions Chanin and/or Nasdaq undertook that eliminated "the basis for ETFMG's decision to make HACK payments to Nasdaq."  PX-202 at 2.

147.     A week later, on June 2, 2017, Masucci sent a similar letter to Chanin and Wade purporting to terminate the PSA for HACK, IPAY, BIG, GAMR, IFLY, FINQ, and IMED for the reasons listed in his letter of May 24, 2017.  This letter asserted, without explanation or basis, that the "actions described" in the letter have had an adverse effect on the Trust and the Funds.  PX-204.

148.    Each of the nine actions listed in Masucci's letters of May 24, 2017 and June 2, 2017, was either frivolous as a basis for terminating these payments, factually wrong, or fabricated to create a purported basis to end these payments.  T. Wade Aff. ¶ 133.

149.    Masucci's letter of May 24, 2017 and June 2, 2017 ignored ETFMG's obligations to pay HACK profits under the HACK PSA and the Sublicense Agreement.

150.    On May 26, 2017, at the same time that ETFMG informed Nasdaq that it would no longer pay Nasdaq the profits from the operation of the PureFunds ETFs, ETFMG sent Nasdaq a fourth and final netting statement.  PX-224.  This netting statement purported to pay Nasdaq for profits from the operation of HACK for January 2017 and February 2017, and profits for the operation of IPAY for December 2016, January 2017, and February 2017, netted against expenses ETFMG claimed it was owed for expenses it incurred in January – April 2017, and for the next quarter of expenses associated with eight PureShares ETFs.

151.    There were significant problems with this netting statement.  First, it netted expenses that Nasdaq had not approved.  In this case, this included legal fees ETFMG incurred and paid to counsel of record Kramer Levin in conjunction with ETFMG's legal dispute with Nasdaq and PureShares.  T. Wade Aff. ¶ 105.

152.    Second, it fraudulently netted over $200,000 in expenses that it had previously netted against monies owed to Nasdaq in December 2016, causing Nasdaq to pay the same expenses twice.  T. Wade Aff. ¶¶ 80, 100.  And third, it indicated that it was going to send Nasdaq the money it owed, but ETFMG never paid this amount.  C. Freire Aff. ¶ 68.

153.    At the time ETFMG terminated the PSAs for the PureFunds ETFs, it had not paid Nasdaq any profits from the operation of HACK for all of 2017, and had not paid Nasdaq any profits from the operation of IPAY for all of 2017 and December 2016.  In total, this

amounted to more than $2 million.  C. Freire Aff. ¶¶ 71, 73.  Netting the expenses that Nasdaq

owed ETFMG through July 2017 against the amounts that ETFMG owed Nasdaq through July

2017 shows that as of July 31, 2017, ETFMG owed Nasdaq at least $2,267,838.73 because this

number fails to take into account significant other problems with ETFMG's bills.  C. Freire Aff.

¶ 81.

154.    On June 16, 2017, in response to ETFMG's unilateral termination of the

PSA for HACK, IPAY, BIGD, GAMR, IFLY, FINQ, and IMED, and refusal to pay Nasdaq the

profits from the operation of these ETFs, counsel for Nasdaq wrote to ETFMG stating its

disagreement with the wrongful termination of the PSA.  PX-177A-E, PX-180A, B.

155.    Each PSA for the different PureFunds ETFs explained what should happen

in the event of the termination of the specific PSA:

> Upon termination of this agreement, the parties agree to cooperate
> and provide the services necessary to wrap up and liquidate the
> Fund(s) in an orderly and timely fashion, including, but not limited
> to, the preparation and filing of required regulatory documents,
> financial statements, tax filings, and investor statements.

*See, e.g.* JX-5 § 9 at 5, JX-6 § 9 at 6.  Even after unlawfully terminating the agreements, ETFMG

breached the agreements again by failing to liquidate the PureFunds ETFs and instead running

them for ETFMG's sole benefit.

156.    ETFMG's wrongful termination of the PSA for the PureFunds ETFs also

had a dramatic effect on the Wholesaling Agreement.  ISE had originally entered into that

agreement for the purpose of building a platform to wholesale ISE-supported funds.  JX-11 at 1.

ETFMG's termination of the PSA meant that the PureFunds ETFs on the wholesaling platform

were no longer ISE-financed ETFs, and eliminated the purpose undergirding the entire

agreement.  *See* PX-209 (stating that "As of August 1, 2017 SILJ, HACK, IPAY, BIGD, GAMR, IFLY, IMED and FINQ will be 'Third Party' ETFs, rather than 'ISE-Supported.'").

157.     On July 11, 2017, counsel for Nasdaq wrote ETFMG a letter terminating the Wholesaling Agreement on the grounds that: (a) ETFMG violated the agreement by operating as a "distributor" for the funds on the wholesaling platform; (b) ETFMG charged Nasdaq for funds that were never added to Exhibit B of the Wholesaling Agreement, and products that should have been automatically removed from the platform; (c) ETFMG violated the expense provisions in the agreement by incurring and charging expenses to Nasdaq without pre-approval and exceeding the annual expense cap of $50,000 without written approval; (d) ETFMG violated the Wholesaling Agreement by charging Nasdaq for unreasonable expenses and funds that had nothing to do with the wholesaling platform; (e) ETFMG violated the Wholesaling Agreement by charging Nasdaq for wholesaler salaries that exceeded the $250,000 annual cap in Exhibit C of the Wholesaling Agreement; (f) ETFMG violated the Wholesaling Agreement by failing to provide Nasdaq with copies of invoices ETFMG sent to third-party ETFs; and (g) ETFMG violated the payment provision of the Wholesaling Agreement by netting unauthorized and excessive expenses against monies ETFMG owed to Nasdaq for HACK profits.  PX-218.

158.     ETFMG refused to withdraw its termination of the PSAs for the PureFunds ETFs and agree to pay Nasdaq the profits generated by the PureFunds ETFs, and ETFMG refused to cure its breaches of the Wholesaling Agreement.  T. Wade Aff. ¶ 139.

**XIV.**     **ETFMG AND MONACO DECEIVE NASDAQ TO OBTAIN NASDAQ'S PROPRIETARY INFORMATION**

159.    Since as early as March of 2017, ETFMG was preparing for the hostile takeover of the PureFunds ETFs.  As part of this scheme, ETFMG requested and received proprietary information from Nasdaq, and provided that information to Kris Monaco.

160.    After Kris Monaco left ISE/Nasdaq in July 2016, he and a partner formed a new index provider, named Prime Indexes.  PX 302.

161.    In March, 2017 Kris Monaco emailed Masucci a presentation about Prime Indexes.  PX 303.  In this presentation, Monaco celebrated the fact that he was "Responsible for the creation of the industry's first Cyber Security ETF (HACK), which amassed over $1 billion in AUM within 9 months."  *Id.* at 15.  Monaco also claimed that he created the index for HACK and "retained the largest revenue stake."  *Id.* at 26244.

162.    The following month, on April 11, 2017, ETFMG employee Tim Collins emailed Kris Monaco (and cc'd Sam Masucci and Barney Karol) discussing "index issues" and thanking Monaco for his "involvement."  PX-312.  Ten days later Monaco replied "We're reviewing now and looking forward to talking later this morning."  *Id.*

163.    On April 24, 2017, Monaco emailed Masucci and Collins regarding ETFMG's "request for additional information" and "questions to consider asking the index provider."  PX-311 at 2.  This email requested that Collins and Masucci obtain from Nasdaq and provide Monaco non-public proprietary information about the construction of Nasdaq's HXR and Nasdaq's NQCYBR indexes.  D. Gedeon Aff. ¶¶ 47-50.  In this email Monaco also listed questions that ETFMG should ask the "index provider," for NQCYBR and HXR (which Monaco, Collins, and Masucci knew was Nasdaq).  PX-311 at 2.  The clear import of this exchange is that ETFMG was preparing to replace Nasdaq with Monaco's Prime and

surreptitiously sought to obtain Nasdaq's data so that ETFMG and Prime would be better prepared for this transition.

164.    On May 2, 2017, Collins emailed Monaco and implied that ETFMG was in the process of asking Nasdaq for its proprietary information about the HXR and NQCYBR indexes.  PX-311 at 1.  ETFMG never divulged to Nasdaq that he intended to pass along Nasdaq's proprietary information to the CEO of a competitor.  D. Gedeon Aff. ¶ 48.  Nasdaq only provided ETFMG this information because it was the portfolio adviser for the PureFunds ETFs.  It would not have provided ETFMG this information if it knew ETFMG was going to provide it to a competitor.

165.    Later that day on May 2, 2017, Monaco responded to Collins that "I am under the impression that Nasdaq's management of the HXR methodology is different from how ISE managed it, so I suggest that Nasdaq disclose how they define it.  Nevertheless, there should be a record of each component's classification."  PX-311 at 1.  On May 4, 2017, Travis Trampe, another ETFMG employee emailed Monaco the "Start of Day files for HXR and NQCYBR (Both Total Return) for the 3rd Friday going back to the quarter after the inception of the fund."  PX-311 at 1.  Trampe acquired these proprietary "Start of Day" files from Nasdaq.  D. Gedeon Aff. ¶ 48.  Had Nasdaq been told that ETFMG was acquiring this proprietary information to provide it to a competitor who ETFMG was helping launch a competing index, Nasdaq would have never provided this information.  D. Gedeon Aff. ¶ 48.

166.    The Index License Agreement states that "PureShares also expressly acknowledges and agrees that the Index(es) and the ISE Marks are valuable assets of ISE and PureShares agrees that it will take reasonable measures to prevent any unauthorized use of the information provided to it concerning the selection, compilation, coordination, arrangement and

preparations of the Index(es).  JX-1 § 5(H) at 9.  Through the Sublicense Agreement, ETFMG

explicitly agreed to be bound by PureShares obligations.  JX-2A at 1.

167.    The information that ETFMG obtained from Nasdaq related to HXR,

NQCYBR, and SILJ, was information related to Nasdaq's "selection, compilation, coordination,

arrangement and preparations of the Index(es)" and after ETFMG requested it from Nasdaq they

should not have shared it with a third party.  D. Gedeon Aff. ¶ 49.

168.    Just two months later, ETFMG again shared Nasdaq's information with a

competitor.  On July 14, 2017, ETFMG employee Travis Trampe emailed Kris Monaco and his

partner Christopher Yeagley, and cc'd a number of people including ETFMG's outside litigation

counsel, Sean Coffey.  PX-307.  Although Monaco and Yeagley were not affiliates of ETFMG,

Trampe sought to hide the transmission of Nasdaq's proprietary information from later discovery

by Nasdaq or PureShares by copying Coffey and (inaccurately) labeling the email in its subject

line:  "CONFIDENTIAL: Attorney/Client Privilege – June Rebalance Files."  *Id.*  In this email

Trampe provides Monaco and Yeagley "files from the June Rebalance" for the SILJ ETF.  These

files were provided to ETFMG by Nasdaq, and is another instance of ETFMG requesting

proprietary information from Nasdaq and then surreptitiously passing it along to Monaco to

prepare his own competing indexes.  Gedeon Aff. ¶ 50.

## XV.    ETFMG ATTEMPTS TO RENEGOTIATE A MORE FAVORABLE CONTRACT WITH NASDAQ

169.    Following ETFMG's termination of the relevant contracts, its intentions

became clear.  On June 29, 2017, counsel for ETFMG and for the ETFMG Trust board wrote a

letter to counsel for Nasdaq stating:

> On or about August 1, 2017, PureShares will cease to have any
> involvement in the [PureFunds ETFs].  Please confirm that Nasdaq
> will continue to provide the ISE Indexes to ETF Managers Group
> for use in the Funds after that date. . . .  ETF Managers Group

> looks forward to the index discussions Nasdaq proposed in its
> letters of March 14, 2017 and April 3, 2017.

PX-205.

170.     This letter demonstrates that ETFMG's complaints about Nasdaq's conflict of interest and maintenance of the HXR index were driven more by strategy than principle.  For more than six months ETFMG had complained about Nasdaq's performance.  However, now ETFMG wanted assurance that Nasdaq would continue to supply the indexes for the PureFunds ETFs despite the fact that ETFMG was no longer paying Nasdaq the profits from the operation of the PureFunds ETFs.

171.     On July 11, 2017, counsel for ETFMG and for the ETFMG Trust board sent another letter to counsel for Nasdaq regarding the indexes.  PX-208.  This letter asserted: "While the actions of PureShares LLC compelled ETF Managers Group to terminate the PSAs, the Sublicense Agreement dated December 2, 2015 remains in effect.  We seek confirmation that Nasdaq will continue to honor the terms of the Sublicense Agreement and provide indexes for use by SILJ, HACK, IPAY, BIGD, GAMR, and IFLY."  PX-208

172.     Despite earlier asserting that the actions of Nasdaq and PureShares caused ETFMG to send the termination letters of May 24, 2017 and June 2, 2017, PX-202, PX-204, ETFMG was now asserting that PureShares was solely at fault.  Moreover, ETFMG asserted that Nasdaq was contractually obligated to continue to allow ETFMG to use the indexes for the PureFunds ETFs pursuant to the Sublicense Agreement, despite the fact that ETFMG had said that it was not going to compensate Nasdaq.

173.     On July 14, 2017, counsel for ETFMG sent another letter to counsel for Nasdaq discussing, among other things, working together with Nasdaq to bring new ForceShares ETFs to market.  PX-209 at 4.  In this letter ETFMG again asserted that "ETFMG terminated the

[PSA] in response to the breaches of contract by PureShares, rather than as an effort to end its relationship with Nasdaq." PX-209 at 3. This statement – as well as ETFMG's proposal to work with Nasdaq to launch new ETFs – stands in stark contrast to the allegations in the Masucci letters of May 24, 2017 and June 2, 2017, PX-202, PX-204, and supports the conclusion that those letters were pretextual.

174.    On or about July 14, 2017, counsel for ETFMG called counsel for Nasdaq and proposed a new license agreement for the PureFunds ETFs. Rather than pay Nasdaq the money it was entitled to as the index provider *and* venture partner for the PureFunds ETFs – which amount to more than $10 million from December 2016 through October 2018, ETFMG proposed to pay Nasdaq a license fee to license the indexes for the PureFunds ETFs. PX-209 at 3; D. Gedeon Aff. ¶ 56. ETFMG's proposal to have Nasdaq continue to supply the indexes for the PureFunds ETFs (and especially HACK) are incongruous with ETFMG's claims regarding Nasdaq's poor performance.

175.    Given that (i) ETFMG's complaints about Nasdaq do not bear out on their merits; (ii) were inconsistent with ETFMG's prior dealings with ISE; (iii) were inconsistent with its aforementioned expressed desire to continue working with Nasdaq on existing and new indexes / ETFs; (iv) this proposed new financial new arrangement would have significantly reduced Nasdaq's revenue received for the PureFunds ETFs, eliminated PureShares' revenue, and greatly increased ETFMG's revenues, it is evident that ETFMG's complaints about Nasdaq were driven by a business strategy to appropriate the PureFunds ETFs profits for itself, rather than actual concerns

176.    Nasdaq rejected ETFMG's offer. PX-209 at 3-4. Less than two weeks later ETFMG informed Nasdaq that ETFMG was replacing Nasdaq as the index provider for

HACK, IPAY, and SILJ as of August 1, 2017, with Kris Monaco's new company, Prime. D. Gedeon Aff. ¶¶ 59, 63. It is thus evident that when ETFMG had months earlier solicited from Nasdaq its proprietary data in order to covertly provide it to Prime, that effort was necessary to and laying the groundwork for improperly terminating ETFMG's use of and payments to Nasdaq. ETFMG currently pays Prime two to three million dollars per year.

177. Up until this point, Nasdaq had provided ETFMG access to information related to the indexes for the PureFunds ETFs, including start-of-day files, the daily data feed, and end-of-day files. D. Gedeon Aff. ¶ 60. Nasdaq typically charges companies for access to this data. D. Gedeon Aff. ¶ 60. On August 1, 2017, because ETFMG had informed Nasdaq that it would no longer meet its obligation to convey to Nasdaq profits from the operation of the funds, and was switching the indexes for the funds, Nasdaq terminated ETFMG's access to this data. D. Gedeon Aff. ¶ 61.

XVI. **ETFMG'S OWN ANALYSIS SHOWS HOW THEY STOOD TO PROFIT FROM CUTTING NASDAQ AND PURESHARES OUT OF THE PUREFUNDS ETFS**

178. In discovery, ETFMG produced its balance sheet as of 12/31/16, PX-243, and its balance sheet as of 12/31/17, PX-245.

179. ETFMG's balance sheet for 2016 shows cash on hand of $696,576.53 and accounts payable of $2,004,624.77, including $967,335.20 due to Nasdaq. PX-243. This demonstrates that ETFMG did not have sufficient funds to pay the money it owed to counter-parties including Nasdaq. ETFMG's 2016 balance sheet does show as an asset $1,000,000 "due from officers" which suggests that ETFMG's officers took $1,000,000 out of the company in 2016, in addition to whatever salary they received. PX-243.

180. In discovery, ETFMG produced a document that ETFMG's CFO created to analyze how ETFMG would be effected by the severing of its relationship with Nasdaq and

PureShares.  PX-250; J. Flanagan Tr. at [ ].  On July 13, 2017, ETFMG's CFO sent ETFMG's

Masucci an email with the subject "NASDAQ ROLLOFF," and wrote: "

> Sam – Lots of moving parts, but I believe I have them captured on
> TAB 1 of the attached worksheet.  All in – For the remainder of
> the calendar year I estimate that we're cash flow positive by $612k
> ahead of where we otherwise would be – all other things being
> equal.  Annualized, estimate approximately $1.4 million ahead of
> where we otherwise would be . . . assuming that the cost of the
> Wholesaling desk (salaries) and other expenses that we billed back
> to NASDAQ was about $60k per month ($720k) per year.

*Id.*  Attached to this email was a spreadsheet that calculate "Revenue Pickup" or the monies that

ETFMG would have previously paid Nasdaq, less "lost revenue" from the closure of certain

unprofitable ETFs and revenue ETFMG would no longer receive from Nasdaq for unprofitable

ETFs, and lost revenue from the Wholesaling Agreement.  J. Flanagan Tr. at [ ].  Based on the

assumption that AUM for HACK, IPAY, SILJ, GAMR, and IFLY would total $1.4 billion in

AUM, Flanagan's projections showed that ETFMG would make almost $1.4 million more on an

annualized basis with Nasdaq out of the picture.  PX-250.  Given that the AUM for HACK,

IPAY, SILJ, GAMR, and IFLY is much higher than $1.4 billion (approximately $2 billion), it

appears that ETFMG is making much more than $1.4 million as a result of cutting Nasdaq out of

the PureFunds ETFs.

       181.     Subsequently, ETFMG's Masucci asked Flanagan to update this analysis

to assume ETFMG would pay 6.5 basis points to index providers rather than 8 basis points.  PX-

251.  When Flanagan updated the model, he now concluded that ETFMG would make

approximately $1.6 million more than it otherwise would with Nasdaq out of the picture.  PX-

252.

## XVII.   POST-LAWSUIT ETFMG STRAINS TO GET ITS STORY STRAIGHT

182.    At no point prior to the time Nasdaq filed its lawsuit did anyone from ETFMG discuss or refer to in any email or other writing – either internally or in communications with Nasdaq, PureShares, or ISE – an oral agreement between ISE and ETFMG that entitled ISE to HACK profits.  T. Wade Aff. ¶¶ 17; 50; A. Chanin Tr. at [ ].  Indeed, this notion of an oral agreement is absent from ETFMG's internal analysis of all agreements governing the ISE/PureShares/ETFMG relationship, and even absent from ETFMG's Answer and Counterclaim.  DE 24.

183.    Following the initiation of this lawsuit, in April 2018, ETFMG's Masucci emailed Kris Monaco in April 2018 a document titled "Lawyer questions" that Masucci wrote was "a list of the questions that the lawyers are interested in speaking with you about . . . Let me know if you want to discuss in advance."  PX-2007.  This document which was not produced in discovery by ETFMG and Kris Monaco until September 27, 2018, PX-320A, PX-320B, months after ETFMG and Monaco had purportedly completed their document production.

184.    The "Lawyer questions" document contained the following section: "What was your oral agreement with Masucci in regards to the HACK profits?"  PX-2007.  This document suggests that ETFMG sought to convince Monaco to adopt its defense of this case.

## CONCLUSIONS OF LAW

185.    Nasdaq asserts the following claims: (a) breach of the Sublicense Agreement; (b) breach of the PureFunds' PSAs; (c) breach of the Wholesaling Agreement; (d) breach of the implied duty of good faith and fair dealing; (e) conversion; (f) unfair competition; (g) unjust enrichment; and (h) quantum meruit.

186.    ETFMG asserts the following counterclaims: (a) breach of the Wholesaling Agreement; and (b) breach of the implied duty of good faith and fair dealing.

187.    The parties' claims for breach of the PSAs and the Wholesaling Agreement are governed by Delaware law.

188.    The parties' claims for breach of the Index License Agreement and Sublicense Agreement, breach of duty of good faith and fair dealing, and remaining tort and equitable claims are governed by New York law.

189.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332, because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interests and costs.

190.    This Court has personal jurisdiction over ETFMG and venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391.

## XVIII.    DEFENDANTS BREACHED THE SUBLICENSE AGREEMENT

191.    To recover damages for breach of contract under New York law, a plaintiff must prove "(1) the existence of a contract, (2) the plaintiff's performance under the contract, (3) the defendant's breach of the contract, and (4) resulting damages." *Palmetto Partners, L.P. v. AJW Qualified Partners*, *LLC*, 921 N.Y.S.2d 260, 264 (N.Y. App. Div. 2011) (citations omitted).

192.    In the Index License Agreement, ISE provided PureShares a "royalty-bearing" license for the indexes underlying the PureFunds ETFs, in exchange for the right to a percentage of the profits generated by the PureFunds ETFs.  JX-1 at 1.

193.    In the Sublicense Agreement, ISE and PureShares agreed to sublicense ISE's indexes to ETFMG.  And ETFMG agreed to "be bound by all the provisions [of the Index License Agreement] including, without limitation, those provisions imposing any obligations on PureShares," JX-2A § 2 at 1, and that "its obligations under the License Agreement . . . are as

principal and shall be unaffected by any defense or claim that PureShares may have against ISE, the Licensee."

194.     Appendix A of the 2015 Sublicense Agreement includes the "Rate" for each PureFund ETF that ETFMG used to calculate the management fee and ultimately ISE/Nasdaq's profit share.

195.     Under New York law, the Court's role is to "give effect to the intent of the contracting parties as revealed by the language they chose to use."  (D.E. 50 at 16-17 (quoting *Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993)).

196.     I find that pursuant to the language of the Index License Agreement and the Sublicense Agreement, ETFMG agreed to pay ISE/Nasdaq and PureShares the profits generated by the operation of the PureFunds ETFs.  Moreover, the inclusion of Appendix A in the 2015 Sublicense Agreement with the "Rate" further supports the conclusion that the parties agreed that ETFMG would calculate the revenue generated by each PureFund ETF using the "Rate" and then send the net profit to ISE/Nasdaq.

197.     And even were the language in these agreements unclear, extrinsic evidence demonstrates that the parties intended for ETFMG to pay ISE/Nasdaq and PureShares profits from the PureFunds ETFs.  "[W]here the meaning of a writing is clear from its text, extrinsic evidence will not be considered."  *Union Carbide Corp. v. Affiliated FM Ins. Co.*, 947 N.E.2d 111, 114 (N.Y. 2011).  But if the parties have "not expressed themselves clearly in writing, . . . resort to extrinsic evidence will be necessary."  *Id.*  In particular, evidence of parties' conduct following the execution of an agreement can be used to clarify ambiguous terms in the agreement.  *See, e.g.*, *Sandler v. Fishman*, 549 N.Y.S.2d 808, 810 (N.Y. App. Div. 1990) (affirming the use of parol evidence to clarify the objective of an agreement).

198.     The HACK Prospectus explicitly states that ETFMG is paying a license fee to use the index underlying HACK.  The only such fee ever paid was ETFMG's consistent conveying of profits to ISE and then Nasdaq.  This Prospectus, filed in 2014 with the SEC, is an admission that ETFMG believed that it was obligated to pay ISE, and then Nasdaq, the profits generated by the operation of HACK.

199.     ISE/Nasdaq performed under the Sublicense Agreement by licensing the ISE indexes to Defendants.

200.     The evidence adduced at trial, mainly ETFMG's refusal to pay Nasdaq the profits generated from the operation of the PureFunds ETFs, demonstrates that ETFMG breached the Sublicense Agreement.

201.     The evidence establishes that Defendants also breached the Sublicense Agreement when they acquired proprietary information from Nasdaq and shared it with a competitor, Prime, enabling Prime, as planned by Defendants, to replace Nasdaq.

202.     The Index License Agreement states that "PureShares also expressly acknowledges and agrees that the Index(es) and the ISE Marks are valuable assets of ISE and PureShares agrees that it will take reasonable measures to prevent any unauthorized use of the information provided to it concerning the selection, compilation, coordination, arrangement and preparations of the Index(es).  JX-1 § 5(H) at 9.  Through the Sublicense Agreement, ETFMG explicitly agreed to be bound by PureShares' obligations under the Index License Agreement. JX- 2A at 1.

203.     Defendants materially breached the Sublicense Agreement in May 2017 by sharing information related to the ISE Indexes that Nasdaq provided to them pursuant to the Sublicense Agreement with Prime.

# XIX.   DEFENDANTS BREACHED THE HACK PSA

204.    The HACK PSA is silent as to when and whether ETFMG must pay the profits from the operation of HACK.

205.    However, I read this contract to require ETFMG to pay the HACK profits to PureShares and ISE/Nasdaq.  It would not make sense to read this contract alternatively because if ETFMG was permitted to keep the HACK profits, PureShares (and ISE/Nasdaq) would be obligated to pay "consideration" for no benefit.  *See* JX-5 § 1 at 1 (stating that "in consideration of the fees set forth in Exhibits A and B [totaling $231,800 annually] . . . ETFMG hereby agrees to . . . operate the Funds.").  Under Delaware law, where a contract provision lends itself to two interpretations, a court will not adopt the interpretation that leads to unreasonable results, but instead will adopt the construction that is reasonable and that harmonizes the affected contract provisions.  *See Axis Reinsurance Co. v. HLTH Corp.*, 993 A.2d 1057, 1063 (Del. 2010), *as corrected*, (May 10, 2010).  And Delaware law requires courts to interpret contracts "in a common sense manner."  *New Castle Cty., Del. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa*., 174 F.3d 338, 343 (3d Cir. 1999).

206.    Under Delaware law, the parol evidence rule "bars the admission of evidence extrinsic to an unambiguous, integrated written contract."  *Galantino v. Baffone*, 46 A.3d 1076, 1081 (Del. 2012).

207.    Upon reviewing the circumstances I find that the parties' actions also demonstrate that the HACK PSA requires ETFMG to pay the HACK profits.  Since HACK launched, ETFMG has consistently sent the monthly profits to ISE/Nasdaq as ISE/Nasdaq, PureShares, and ETFMG all agreed ETFMG should do.  Additionally, ETFMG's admission that the HACK PSA required it to pay PureShares the profits from HACK also supports this conclusion.  *See* PX-232D.

208.    Though ISE/Nasdaq is not a named party in the HACK PSA, I find that ISE/HACK was an intended beneficiary of that agreement.

209.    Under Delaware law, "a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate the promisee intends to give the beneficiary the benefit of the promised performance." *See Comrie v. Enterasys Networks, Inc.*, No. CIV. A. 19254, 2004 Del. Ch. LEXIS 196, at *13 n.25 (Del. Ch. Feb. 17, 2004).

210.    The evidence demonstrates that both PureShares and ETFMG considered ISE/Nasdaq an intended beneficiary of the HACK PSA, including the fact that: (a) ISE negotiated the HACK PSA with ETFMG; (b) ETFMG knew and expected ISE to pay the expenses that PureShares was obligated to pay it in the HACK PSA, and ISE did so; (c) as soon as HACK was profitable ETFMG consistently sent the profits to ISE; (d) at the time the HACK PSA was agreed to, ISE and PureShares had already entered in to the Index License Agreement where ISE agreed to pay the expenses necessary to launch and operate HACK in exchange for a majority of the profits generated by HACK; (e) the subsequent PureFunds PSA all included language stating that ISE/Nasdaq "co-sponsored" HACK; and (f) PureShares' CEO testified that both PureShares and ETFMG understood that under the PSA the HACK profits would be conveyed by ETFMG to ISE / NASDAQ to then be divided between ISE/NASDAQ and ETFMG according to their separate profit sharing agreement.

211.    ISE/Nasdaq and PureShares performed under the HACK PSA by timely paying the required launch and annual operating fees.

212.    I find that by the time ETFMG sent letters terminating the HACK PSA in April, May, and June 2017, ETFMG had already materially breached the HACK PSA by refusing to pay ISE/Nasdaq and PureShares the monthly HACK profits in a timely manner. Indeed, at the time ETFMG purported to terminate the HACK PSA, it had failed to pay Nasdaq or PureShares the HACK profit for any month in 2017.

213.    Moreover, I find that ETFMG terminated the HACK PSA in bad faith. Even where a party is entitled to terminate an agreement, it cannot do so in violation of its duty of good faith and fair dealing.  *See, e.g.*, *Westwood Dev. Partners, LLC v. Draper*, C.A. No. K10C-08-018, 2012 Del. Super. LEXIS 162, at *6-7 (Del. Super. Ct. Mar. 29, 2012); *Tansey-Warner, Inc. v. Hooper*, C.A. No. 80C-OC7, 1989 Del. Super. LEXIS 479, at *11 (Del. Super. Ct. Nov. 15, 1989) (holding that plaintiff could be entitled to a commission under a listing agreement where the defendant terminated the agreement in bad faith).

214.    The termination grounds in ETFMG's letters of April 21, 2017, PX-197, May 24, 2017, PX-202, and June 2, 2017, PX-204, were either fabricated, frivolous, or offered in reckless disregard for their accuracy.  Accordingly, ETFMG terminated the HACK PSA in bad faith and thereby breached the duty of good faith and fair dealing it owed to Nasdaq.

215.    In any event, the grounds proffered by ETFMG to justify its termination of the agreement were not material to the agreement.  *See In re Mobilactive Media, LLC*, C.A. No. 5725, 2013 Del. Ch. LEXIS 26, at *43-44 (Del. Ch. Jan. 25, 2013) (listing factors for materiality of breach, including the "extent to which the injured party will be deprived of the benefit which he reasonably expected" and whether the injured party can adequately be compensated).  A party's performance under a contract is not excused where the other party commits only a non-material breach.  *See id.*  Because neither PureShares nor ISE/Nasdaq committed a material

breach of the HACK PSA, ETFMG was not entitled to terminate it and breached the agreement itself by failing to perform under it.

## XX.        DEFENDANTS BREACHED THE IPAY/BIGD PSA

216.    The IPAY/BIGD PSA required ETFMG to "distribute all Fund Profits to [Nasdaq or PureShares] within ten (10) days of such Fund Profit being made available to ETFMG or the administrator of the Funds."  JX-6 § 8(d) at 5.

217.    ISE/Nasdaq performed under the IPAY/BIGD PSA by timely paying the required launch and operation fees.

218.    IPAY reached profitability in December 2016 and was profitable every month going forward.  However, ETFMG failed to pay Nasdaq or PureShares this Fund Profit within ten days of such fund profit being made available to ETFMG, and indeed, never paid this fund profit to Nasdaq or PureShares.  This was a material breach of the agreement.  *See eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, C.A. No. 7471, 2013 Del. Ch. LEXIS 245, at *40-41 (Del. Ch. Sept. 30, 2013) (a material breach is a breach that "defeats the *essential purpose* of the contract" and "defeats the object of the parties in entering into the contract" (quotation omitted)).

219.    Moreover, the termination grounds in ETFMG's letters of April 27, 2017, PX-197, May 24, 2017, PX-202, and June 2, 2017, PX-204, were either fabricated, frivolous, or offered in reckless disregard for their accuracy.  Accordingly, I find that ETFMG terminated the IPAY/BIGD PSA in bad faith.  *See, e.g.*, *Westwood Dev. Partners, LLC*, 2012 Del. Super. LEXIS 162, at *6-7; *Tansey-Warner, Inc.*, 1989 Del. Super. LEXIS 479, at *11.

220.    In any event, the grounds proffered by ETFMG to justify its termination of the agreement were not material to the agreement.  *See In re Mobilactive Media, LLC*, C.A. No. 5725, 2013 Del. Ch. LEXIS 26, at *43-44 (Del. Ch. Jan. 25, 2013) (listing factors for materiality

of breach, including the "extent to which the injured party will be deprived of the benefit which he reasonably expected" and whether the injured party can adequately be compensated). A party's performance under a contract is not excused where the other party commits only a non-material breach. *See id.* Because ISE/Nasdaq did not commit a material breach of the IPAY/BIGD PSA, ETFMG was not entitled to terminate it and breached the agreement itself by failing to perform under it.

## XXI.    DEFENDANTS BREACHED ALL OF THE PUREFUNDS PSAS

221.    Each of the PureFunds PSAs included a provision stating that "Statutory distribution and compliance support to be provided by Third Party Service Provider under separate agreement." *See, e.g.*, JX-6 at 13.

222.    In 2017, ETFMG Financial became the "Statutory Distributor" for all of the PureFunds ETFs.

223.    ETFMG Financial is a wholly-owned subsidiary of defendant Exchange Traded Managers Group, LLC, the signatory to all of the PureFunds PSAs.

224.    Using ETFMG Financial to provide statutory distribution for the PureFunds ETFs breached the PureFunds PSAs. Under Delaware law, use of the term "third party" in a contract does not include a party's corporate family. *Rexnord Indus., LLC v. RHI Holdings, Inc.*, No. 07C-10-057, 2008 Del. Super. LEXIS 347, at *33-35 (Del. Super. Ct. Sept. 17, 2008), *as corrected*, (Sept. 23, 2008).

225.    Each of the PureFunds PSA included a termination provision requiring the given fund to be liquidated upon termination of the PSA. *See, e.g.*, JX-6 § 9 at 6.

226.    Though ETFMG purported to terminate all of the PureFunds PSAs, *see* PX-204, ETFMG did not liquidate the funds, and instead operated the funds for its own benefit. This too was a material breach of each of the PureFunds PSAs.

227.    ISE/Nasdaq, on the other hand, performed under each of the PureFunds

PSAs by timely paying the required launch and operation fees.

## XXII.    DEFENDANTS BREACHED THE WHOLESALING AGREEMENT

228.    Under the Wholesaling Agreement, ISE/Nasdaq was required to pay

Defendants: (a) wholesaling fees based on the AUM of the ISE-Supported ETFs on the

wholesaling platform; (b) reimbursement of preapproved expenses the wholesalers incurred; and

(c) annual compensation for the wholesalers subject to a maximum compensation cap.

ISE/Nasdaq performed under this agreement.

229.    ISE/Nasdaq performed under the Wholesaling Agreement by timely

paying all expenses required under the Agreement.

230.    Defendants breached the Wholesaling Agreement in numerous, material

ways.

231.    First, the purpose of the Wholesaling Agreement was to create a platform

"to support the selling and marketing of ETFs that are financially supported by ISE ("ISE-

Supported ETFs") . . . as well as ETFs that are not financially supported by ISE . . ."  JX-11 at 1.

232.    When Defendants terminated the PureFunds PSAs, they unilaterally

removed the PureFunds ETFs from the Wholesaling Agreement.  There is no provision in the

Wholesaling Agreement that allowed ETFMG to unilaterally remove ISE-Supported ETFs from

the Wholesaling Agreement.  Nor would it make any economic sense for the agreement to allow

Defendants to unilaterally remove ISE-Supported ETFs from the Wholesaling Agreement.  The

Wholesaling Agreement only contained provisions allowing ISE to remove funds from the

wholesaling platform.  JX-11 Ex. B at 13 ("ISE may . . . remove an ISE-Supported ETF from the

Wholesaling Platform.").  Therefore Defendants did not have the right to remove ISE-Supported

ETFs from the wholesaling platform.  *Cf., e.g.*, *Horizon Pers. Comm'ns, Inc. v. Sprint Corp.*,

C.A. No. 1518-N, 2006 Del. Ch. LEXIS 141, at *46 & n.107 (Del. Ch. Aug. 4, 2006) (relying on

the "plain and unambiguous language" of the contract and concluding that "the Court will not

read into the contract anything more than Plaintiffs bargained for and received").

233.    Defendants' removal of the PureFunds ETFs from the wholesaling

platform was a material breach of the Wholesaling Agreement.

234.    Second, the Wholesaling Agreement dictated that "GENCAP shall . . .

ensure that each Wholesaler will be registered with, and supervised by, a third-party FINRA

registered Broker Dealer ("Distributor"), JX-11 § 1 at 1, and "GENCAP shall not provide

statutory distribution services for the securities on the Platform . . . which will be provided by a

third-party service provider ("Statutory Distributor"), JX-11 § 3 at 3.

235.    In 2017, ETFMG Financial became the "Statutory Distributor" for all of

the PureFunds ETFs.  ETFMG Financial is a wholly-owned subsidiary of defendant Exchange

Traded Managers Group, LLC.

236.    Defendant Exchange Traded Managers Group, LLC is the successor-in-

interest to Gencap Advisors, LLC, the signatory to the Wholesaling Agreement.  PX-257, 257A.

237.    Using ETFMG Financial to provide statutory distribution for the

Wholesaling Agreement materially breached that Agreement.  Under Delaware law, the term

"third party" does not include a party's corporate family.  *Rexnord Indus., LLC v. RHI Holdings,*

*Inc.*, No. 07C-10-057, 2008 Del. Super. LEXIS 347, at *33-35 (Del. Super. Ct. Sept. 17, 2008),

*as corrected*, (Sept. 23, 2008).  Defendants' actions harmed Nasdaq because it replaced an

experienced statutory distributor with Defendants' own inexperienced personnel.

238.    Third, the Wholesaling Agreement required that any changes to the

agreement would be in writing.  JX-11 § 13(k) at 9.  Accordingly, in 2013 and 2014 when ISE

and Defendants sought to add new funds to the Wholesaling Agreement, the parties executed amendments to the Wholesaling Agreement.  *See* JX-11A, JX-11B.

239.    At some point prior to the time Nasdaq acquired ISE, Defendants added new ETFs, including BIGD, GAMR, IFLY, IPAY, LARE, and CNCR, to the Wholesaling Agreement without amending the Wholesaling Agreement.  Defendants then charged ISE/Nasdaq AUM-based fees related to these ETFs and sought reimbursement for expenses associated with wholesaling these ETFs.  Courts are reluctant to hold that parties have modified their agreements verbally or through a course of conduct where there is an express contract clause requiring amendments to be in writing.  *See AgroFresh Inc. v. MirTech, Inc.*, 257 F. Supp. 3d 643, 660 (D. Del. 2017).  A party asserting an oral modification must prove the intended change with specificity and directness as to leave no doubt of the intention of the parties to change what they previously solemnized by formal document.  *Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1230 (Del. Ch. 2000).

240.    I cannot conclude that given the Wholesaling Agreement's express contract clause requiring amendments to be in writing that there was a specific oral modification that leaves no doubt of the intention of the parties.  Therefore, I conclude that Defendants materially breached the Wholesaling Agreement by charging ISE/Nasdaq expenses associated with ETFs that were never added to the wholesaling platform.

241.    Fourth, the Wholesaling Agreement contained provisions requiring Defendants to seek ISE/Nasdaq's approval prior to incurring expenses related to wholesaling. *See* JX-11 at 11.

242.    After Nasdaq acquired ISE, Defendants disregarded these provisions. Defendants failed to seek Nasdaq's pre-approval for expenses.  Then when Nasdaq balked at

reimbursing Defendants for expenses which Nasdaq did not approve, Defendants engaged in self-help and unilaterally netted these expenses against monies that Defendants otherwise owed Nasdaq.

243.    Defendants' failure to abide by the pre-approval requirements in the Wholesaling Agreement was a material breach of that agreement because it eliminated Nasdaq's ability to control the costs associated with the Agreement and led directly to Nasdaq being forced to reimburse Defendants for expenses Nasdaq had never approved. .

244.    Fifth, the evidence shows that Defendants reimbursed themselves using Nasdaq's money (by netting these expenses against monies otherwise owed Nasdaq), for expenses unrelated to the Wholesaling Agreement.  For instance, Defendants reimbursed themselves for:

   a.    Expenses related to ETFs that were not financially supported by ISE, such as "WSKY" and Blue Star ETFs, T. Wade Aff. ¶ 103;

   b.    Expenses related to products that were never added to the Wholesaling Agreement, T. Wade Aff. ¶ 103;

   c.    Expenses for individuals and employees who were not wholesalers, T. Wade Aff. ¶ 102; and

   d.    Tens of thousands of dollars in litigation expenses relating to their disputes with PureShares and Nasdaq, T. Wade Aff. ¶ 105.

245.    There was no provision in the Wholesaling Agreement that allowed Defendants to unilaterally make decisions about what qualified as legitimate expenses under the Wholesaling Agreement and then force Nasdaq to reimburse Defendants for these expenses through netting.  These actions too constituted a material breach of the Wholesaling Agreement.

*See, e.g.*, *Utilisave, LLC v. Khenin*, C.A. No. 7796, 2014 Del. Ch. LEXIS 286, at \*33-34 (Del.

Ch. Feb. 4, 2014) (a CEO's unilateral distributions violated contract provisions requiring

majority approval); *Coca-Cola Bottling Co. v. Coca-Cola Co.*, 988 F.2d 386, 409-10 (3d Cir.

1993) (affirming the district court's decision that unilateral action by one party constituted a

breach of the relevant agreement).

246.    Sixth, the Wholesaling Agreement capped the amount ISE/Nasdaq would

be obligated to pay for wholesaler compensation.  JX-11 at 14.  The Agreement listed this

"Compensation Cap" as $250,000.  *Id.*  From the time right before Nasdaq completed its

acquisition of ISE to the time in June when ETFMG terminated the PureFunds PSA, Defendants

increased quarterly wholesaler compensation from $80,819.39 (PX-119) for an estimated annual

expense of approximately $320,000 to $138,638.11 (PX-223) for an estimated annual expense of

more than $554,000.  *See* C. Freire Aff. ¶ 83.

247.    Additionally, the Wholesaling Agreement specified that:

> ISE shall pay this amount in equal monthly installments, or in
> prorated terms based on the number of calendar days in a month
> that the Wholesaler was included in this schedule through the date
> of termination.  GENCAP shall submit invoices to ISE twenty (20)
> business [days] prior to the end of the month for the Base Annual
> Compensation that is due for the following month.  ISE shall pay
> the invoices within twenty (20) days upon receipt of the invoice.

JX-11 at 14.  By netting wholesaler compensation on a quarterly basis, Defendants disregarded

this provision in the Wholesaling Agreement.

248.    I have seen no evidence that the Wholesaling Agreement was modified to

account for and allow for this increase in compensation or for Defendants to net our quarterly

expenses in this fashion.  Under Delaware law, a party asserting an oral modification must prove

the intended change with specificity and directness as to leave no doubt of the intention of the

parties to change what they previously solemnized by formal document. *Cont'l Ins. Co.*, 750 A.2d at 1230. There was no modification—oral or otherwise— that supports Defendants' actions.

249. These breaches, individually and all together, substantially deprive Nasdaq of the benefit which it reasonably expected by entering into the Agreement and, accordingly, I conclude that Defendants materially breached the Wholesaling Agreement. *See In re Mobilactive Media, LLC*, C.A. No. 5725, 2013 Del. Ch. LEXIS 26, at *43-44 (Del. Ch. Jan. 25, 2013) (listing factors for materiality of breach).

250. Because of these numerous breaches, Nasdaq was entitled to terminate the Wholesaling Agreement pursuant to the terms of that agreement. JX 11 § 9(c). I find that Nasdaq legally terminated the Wholesaling Agreement based on Defendants' breaches.

## XXIII.   DEFENDANTS BREACHED THE DUTY OF GOOD FAITH AND FAIR DEALING

251. In addition to breaching the Sublicense Agreement, the PureFunds PSA, and the Wholesaling Agreement, by their conduct, Defendants also materially breached their duty of good faith and fair dealing.

252. New York law governs the Sublicense Agreement. Under New York law, "implicit in every contract is a covenant of good faith and fair dealing which encompasses any promises that a reasonable promise would understand to be included." *N.Y. Univ. v. Cont. Ins. Co.*, 662 N.E.2d 763, 769 (N.Y. 1995) (citations omitted). The covenant of good faith and fair dealing ensures that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 769 F.3d 807, 817 (2d Cir. 2014) (quoting *Moran v. Erk*, 901 N.E.2d 187, 190 (N.Y. 2008)). "While the duties of good faith and fair dealing do not imply obligations

inconsistent with other terms of the contractual relationship, they do encompass any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *511 W. 232nd Owners Corp. v Jennifer Realty Co.*, 773 N.E.2d 496, 500-01 (N.Y. 2002) (quotations omitted).

253.    I have already concluded that, under the Sublicense Agreement, Defendants were obligated to pay to ISE/Nasdaq the profits generated by the PureFunds ETFs because PureShares was required to make those payments under the Index License Agreement.

254.    After Nasdaq acquired ISE, Defendants delayed providing Nasdaq the P&L statements showing the amount of money owed to Nasdaq, C. Freire Aff. ¶¶ 5,6, delayed paying Nasdaq these amounts, C. Freire Aff. ¶ 7, then netted against these amounts expenses purportedly owed to Defendants for different time period and under different contracts, and then ceased paying Nasdaq altogether.

255.    In March 2017, Defendants recommended that the ETFMG trust board reduce the HACK management fee from 75 basis points to 60 basis points, which reduced Nasdaq's profits significantly.  The evidence demonstrates that Defendants took these actions as part of their strategy to cause Nasdaq to abandon its interests in the PureFunds ETFs, rather than out of concern for the shareholders in the HACK ETF.

256.    These actions acted to deprive Nasdaq of the fruits of this agreement. Delaying payments due under a contract and withholding or setting off unrelated payments constitutes bad faith conduct.  *Gross v. Empire Healthchoice Assurance, Inc.*, No. 602848-05, 2006 NYLJ LEXIS 2915, at *12 (N.Y. Sup. Ct. June 15, 2006) (claims that party "withheld payments on disputed and unrelated claims or setoff of the paid amounts against future payments" alleged breach of good faith and fair dealing).  And even if a contract affords a

party discretion, the party cannot exercise that discretion "in bad faith so as to frustrate the other party's rights to the benefit under the agreement." *Id.* at *11-12 (citation omitted); *see also Richbell Info. Serv., Inc. v. Jupiter Partners, LP*, 765 N.Y.S.2d 575, 587 (N.Y. App. Div. 2003) (explaining that exercising a contractual right "malevolently, for [the party's] own gain as part of a purposeful scheme designed to deprive plaintiffs of the benefits of the [contract]," constitutes improper bad faith conduct). Here, Defendants' delayed and offset payments, as well as their decision to reduce the HACK management fees, constituted a breach of their duty to act in good faith. *See, e.g.*, *Richbell Info. Serv., Inc.*, 765 N.Y.S.2d at 587 (bad faith conduct is "malevolence in the guise of business dealings); *Bolanos v. Norwegian Cruise Line, Ltd.*, No. 01-cv-4182, 2007 U.S. Dist. LEXIS 39226, at *12-13 (S.D.N.Y. May 30, 2007) (adopting a holding that an excessive delay in paying claims under a settlement agreement constituted a breach of the duty of good faith and fair dealing).

257.    Delaware law applies to the PureFunds PSA and the Wholesaling Agreement. Similar to New York, Delaware law recognizes an implied covenant of good faith and fair dealing in every contract. *Winshall v. Viacom Int'l, Inc.*, 55 A.3d 629, 636 (Del. Ch. 2011). The implied covenant requires a party to a contract to "refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (internal citations omitted). A party breaches the implied covenant when its conduct "frustrates the overarching purpose of the contract by taking advantage of [its] position to control implementation of the agreement's terms." *Id.* Although the duty to act in good faith cannot be invoked to alter contractual terms, it protects a party "when it is clear from the underlying contract that 'the contracting parties would have agreed to proscribe the act later complained of .

71

. . had they thought to negotiate with respect to that matter.'" *Winshall*, 55 A.3d at 637 (quoting *Dunlap*, 878 A.2d at 442).

258.    I have already concluded that the HACK PSA obligated Defendants to pay ISE/Nasdaq and PureShares the profits generated by the operation of HACK.  Defendants' conduct that violated the duty of good faith and fair dealing with respect to the Sublicense Agreement also violated the duty of good faith and fair dealing with respect to the HACK PSA. These actions deprived Nasdaq of the fruits of the HACK PSA.

259.    Defendants breached the duty of good faith and fair dealing with respect to the Wholesaling Agreement in the following ways:

      a.    Defendants arbitrarily and excessively increased the compensation for the wholesalers;

      b.    Rather than invoicing Defendants for costs and expenses associated with the Wholesaling Agreement which would have allowed Nasdaq to review these expenses and the invoices to determine whether they were appropriate, correct, and supported by adequate backup, Defendants switched post-acquisition of ISE to netting these expenses against monies Defendants otherwise owed Nasdaq.  In many instances these invoices contained expenses that Nasdaq had not approved, expenses that Defendants had already charged Nasdaq for, and expenses that did not provide adequate backup or were not related to the Wholesaling Agreement.

260.     These actions deprived Nasdaq of the fruits of this agreement.  Nasdaq

bargained for the right to approve wholesaling expenses and "would have agreed to proscribe"

Defendants' conflating these expenses with other monies owed to Nasdaq.  *Winshall*, 55 A.3d at

637 (quoting *Dunlap*, 878 A.2d at 442).  And the Wholesaling Agreement's compensation cap

notwithstanding, Nasdaq expected and was entitled to pay wholesalers only reasonable

compensation that was not set arbitrarily or malevolently.  *See, e.g.*, *Chemours Co. TT, LLC v.*

*Ati Titanium LLC*, C.A. No. N15C-03-083, 2016 Del. Super. LEXIS 373, at *31-35 (Del. Super.

Ct. July 27, 2016) (party to a supply agreement violated duty of good faith and fair dealing when

it chose a component supplier that "resulted in commercially unreasonable and uncompetitive . .

. prices for" the other party).

## XXIV.   DEFENDANTS ARE LIABLE FOR CONVERSION

261.     As I have already determined that Defendants are liable for breach of

contract, I do not need to consider whether they are also liable for tortious conduct.  But in the

alternative I conclude that in the absence of a viable breach of contract claim, Defendants would

be liable for conversion.

262.     Under New York law, a cause of action for conversion arises when

"someone, intentionally and without authority, assumes or exercises control over personal

property belonging to someone else, interfering with that person's right of possession."  *See*

*Colavito v N.Y. Organ Donor Network, Inc.*, 860 N.E.2d 713, 717 (N.Y. 2006).  A person's

possessory interest in money can be subject to conversion so long as the amount of money is

discrete and identifiable.  *See, e.g.*, *Grgurev v. Licul*, 299 F. Supp. 3d 267, 287 (S.D.N.Y. 2017)

(collecting cases).  And even an intangible property right can be subject to conversion if it

"relate[s] to specifically identifiable money."  *Harris v. Coleman*, 863 F. Supp. 2d 336, 344 &

n.57 (S.D.N.Y. 2012) (collecting cases).

263.     The evidence shows that Nasdaq's predecessor, ISE, created the concepts underlying the PureFunds ETFs (and HACK in particular) and developed indexes based on those concepts, which it then licensed to PureShares and, eventually, ETFMG, through a royalty-bearing license.  The profits generated by the ETFs belonged to Nasdaq, less amounts owed to or shared with other parties to the licensing and related agreements.  Nasdaq therefore had a possessory interest in a certain discrete and identifiable sum of money, *see Grgurev*, 299 F. Supp. 3d at 287, or at least an interest in an intangible right that "relate[d] to specifically identifiable money," *Harris*, 863 F. Supp. 2d at 344 & n.57.

264.     By refusing to pay Nasdaq its portion of the profits generated by the PureFunds ETFs, Defendants unlawfully converted Nasdaq's property.  *See, e.g.*, *Grgurev*, 229 F. Supp. 3d at 288 (claims that defendants siphoned money from cash receipts and FEMA claims proceeds sufficient to allege conversion).

265.     Moreover, punitive damages may be awarded for conversion "if the conversion was accomplished with malice or reckless disregard of plaintiffs' rights."  *Hutton v. Klabal*, 726 F. Supp. 57, 73 (S.D.N.Y. 1989) (quotation omitted).  I find that Defendants acted maliciously and with reckless disregard of Plaintiffs' rights, and therefore, Nasdaq is entitled to punitive damages from Defendants.

## XXV.     DEFENDANTS ENGAGED IN UNFAIR COMPETITION

266.     As I have already determined that Defendants are liable for breach of contract, I do not need to consider whether they are also liable for tortious conduct.  But in the alternative I conclude that in the absence of a viable breach of contract claim, Defendants would be liable for unfair competition.

267.     Under New York law, "the essence of an unfair competition claim is that one may not act in bad faith to misappropriate the skill, expenditures, and labor of another."

74

*Bongo Apparel, Inc. v Iconix Brand Grp., Inc.*, 2008 N.Y. Misc. LEXIS 1, at *36-37 (N.Y. Sup. Ct. Jan. 2, 2008) (citations omitted).  The law of unfair competition entitles a plaintiff to damages where the "defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship."  *Telecom Int'l Am., Ltd. v. AT&T Corp.*, 280 F.3d 175, 197-98 (2d Cir. 2001) (quotation omitted).  In general, unfair competition is "a broad and flexible doctrine" that encompasses "any form of commercial immorality."  *Id.* (quoting *Roy Export Co. Establishment v. CBS, Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982)).

268.    The evidence shows that Nasdaq's predecessor, ISE, created the concepts underlying the PureFunds ETFs (and HACK in particular), developed indexes based on those concepts, and then paid millions of dollars to launch and operate the ETFs based on those indexes.  Nasdaq/ISE had a property interest in those indexes when it developed them, and retained an interest in the profits and other benefits that would derive from them when it licensed the use of the indexes to PureShares.

269.    The evidence also shows that Defendants acted in bad faith to create conflict with Nasdaq, then purportedly terminated the contracts with Nasdaq on grounds that were frivolous, incorrect, or fabricated, and then sought to renegotiate the contracts with Nasdaq on more favorable terms to Defendants.  In addition, prior to seizing Nasdaq's property, Defendants sought Nasdaq's proprietary data and gave it to a competitor without Nasdaq's consent, so that the competitor could use this data to replace Nasdaq.  *See, e.g.*, *Electron Trading LLC v. Morgan Stanley & Co. LLC*, No. 651370/2015, 2017 N.Y. Misc. LEXIS 1557, at *13-14 (N.Y. Sup. Ct. Apr. 25, 2017) (unfair competition can be established by showing that defendant "t[ook] and us[ed] . . . the plaintiff's property to compete against the plaintiff's own use of the

same property" and that the defendant obtained some "commercial advantage" from its

misconduct (citations omitted)); *Dior v. Milton*, 155 N.Y.S.2d 443, 457 (N.Y. Sup. Ct. 1956)

(unfair competition where defendants defrauded plaintiffs into gaining access to plaintiffs'

clothing designs and then passed on those designs to competitors).

## XXVI.  ALLOWING DEFENDANTS TO KEEP THE PROFITS GENERATED BY THE PUREFUNDS ETFS WOULD UNJUSTLY ENRICH DEFENDANTS

270.    As I have already determined that Defendants are liable for breach of

contract, I do not need to consider whether they are also liable for tortious conduct.  But in the

alternative I conclude that in the absence of a viable breach of contract claim, Defendants would

be unjustly enriched if they were permitted to keep the profits generated by the PureFunds ETFs.

271.    Under New York law, to establish unjust enrichment, "a plaintiff must

show that the defendant was enriched, at the plaintiff's expense, and that it is against equity and

good conscience to permit the defendant to retain what is sought to be recovered."  *See*

*Castellotti v. Free*, 27 N.Y.S.3d 507, 510 (N.Y. App. Div. 2016).

272.    The evidence shows that Nasdaq's predecessor, ISE, created the concepts

underlying the PureFunds ETFs (and HACK in particular), developed indexes based on those

concepts, and then paid for the expenses to launch, grow the business of, and operate the ETFs

based on those indexes.

273.    The evidence also shows that ISE/Nasdaq and PureShares hired and paid

Defendants to launch, grow the business of, and operate the PureFunds ETFs in anticipation that

it would share in the profits generated by those ETFs.  Defendants were a service provider that

Nasdaq and PureShares paid a fee for their work with the expectation that they would deliver the

profits from the operation of the PureFunds ETFs to Nasdaq and PureShares.

274.     ISE/Nasdaq invested in the PureFunds ETFs and paid Defendants significant sums of money to launch and operate the ETFs with the reasonable expectation that it would be entitled to the profits generated by the operation of the funds.  It would be inequitable and against good conscience to allow Defendants to retain the profits generated by these ETFs, especially when they already have been paid all that they were due.  *See, e.g.*, *Anwar v. Fairfield Greenwich, Ltd.*, 728 F. Supp. 2d 372, 421 (S.D.N.Y. 2010) (defendants were "undoubtedly enriched at Plaintiffs' expense by the millions of dollars of fees they collected" for managing plaintiffs' investments).

## XXVII.   DEFENDANTS ARE LIABLE UNDER THE THEORY OF QUANTUM MERUIT

275.     As I have already determined that Defendants are liable for breach of contract, I do not need to consider whether they are also liable for tortious conduct.  But in the alternative I conclude that in the absence of a viable breach of contract claim, Nasdaq is entitled to recover the reasonable value of the uncompensated benefit it provided to Defendants when it developed and spent money toward the launch and management of the PureFunds ETFs.

276.     Under New York law, "[i]n order to make out a claim in quantum meruit, a claimant must establish (1) the performance of the services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services."  *Ross v. DeLorenzo*, 813 N.Y.S.2d 756, 760 (N.Y. App. Div. 2006) (quoting *Matter of Alu*, 755 N.Y.S.2d 289, 290 (N.Y. App. Div. 2003)).  Indeed, "[a]s a general rule, the performance and acceptance of services gives rise to the inference of an implied contract to pay for the reasonable value of such services."  *Alu*, 755 N.Y.S.2d at 290.

277.    The evidence shows that, pursuant to the Index Licensing Agreement, the Wholesaling Agreement, and the PureFunds PSAs, Nasdaq provided significant and valuable benefits to Defendants in the form of the contributions ISE/Nasdaq made toward the development of the PureFunds ETFs and the payments it made to finance the launch, marketing, and operation of the ETFs.

278.    The evidence also shows that Defendants knowingly accepted and retained the benefits conferred by Nasdaq, and that Nasdaq had a reasonable expectation that it would be compensated for the value of the benefit it conferred on Defendants through a share of the profits generated by the PureFunds ETFs.

279.    Nasdaq performed valuable services for the benefit of Defendants, which were accepted and retained by Defendants and for which Nasdaq reasonably expected compensation.  *See Alu*, 755 N.Y.S.2d at 290 (evidence that plaintiff expected to be paid for services rendered supports a quatum meruit claim).  Accordingly, Nasdaq is entitled to payment of the reasonable value of the benefit retained by Defendants.  *See, e.g.*, *Rule v. Brine, Inc.*, 85 F.3d 1002, 1014 (2d Cir. 1996) (in the absence of a contract, plaintiff may be entitled to "recovery on a quantum meruit basis" from defendant who had been selling products using plaintiff's inventions while refusing to pay plaintiff certain portions of the profits).

## XXVIII.  NASDAQ DID NOT BREACH THE WHOLESALING AGREEMENT

280.    Defendants contend that Nasdaq breached the Wholesaling Agreement by unlawfully terminating it.

281.    The Wholesaling Agreement authorizes either party to terminate the contract "if the other party fails to perform its obligations," provided notice and an opportunity to cure are given.  JX-11 § 9(c) at 6.  As I have already found that Defendants materially breached the Wholesaling Agreement in numerous ways, and the evidence shows that Nasdaq timely

notified Defendants of its intent to terminate the agreement and provided them the requisite

opportunity to cure, I conclude that Nasdaq's termination of the Wholesaling Agreement was

within its contractual rights.  JX-11 § 9(c) at 6.  And in any event, under Delaware law, a

material breach by one party excuses the other party from performing under the contract.  *BioLife*

*Sols.* v. *Endocare*, 838 A.2d 268, 278 (Del. Ch. 2003); *see also Carey v. Estate of Myers*, C.A.

No. S11C-10-029, 2015 Del. Super. LEXIS 325, *67-68 (Del. Super. Ct. 2015) ("Material

breach acts as a termination of the contract going forward, abrogating any further obligations

to perform by the non-breaching party.").  Given, therefore, their multiple prior material

breaches of the Wholesaling Agreement, Defendants' claim that Nasdaq unlawfully terminated

the Agreement is "beside the point."  *Preferred Inv. Servs. v. T&H Bail Bonds, Inc.*, C.A. No.

5886, 2013 Del. Ch. LEXIS 190, at *74-75 (Del. Ch. July 24, 2013) (rejecting a counter-claim

for unlawful termination of a contract where the defendant materially breached the agreement

and thus entitled plaintiff to stop performing under, and terminate, the contract).

## XXIX.   NASDAQ DID NOT VIOLATE ITS DUTY OF GOOD FAITH AND FAIR DEALING

282.     The implied covenant will be enforced "only to the extent it is consistent

with the provisions of the contract."  *Phx. Capital Invs. LLC v Ellington Mgt. Grp., L.L.C.*, 859

N.Y.S.2d 46, 48 (N.Y. App. Div. 2008).

283.     Defendants contend that Nasdaq breached the duty of good faith and fair

dealing by (a) supporting a competing ETF product; (b) refusing to change the Nasdaq-owned

index underlying the HACK ETF based on ETFMG's complaints; and (c) turning off ETFMG's

access to index feeds for the GAMR and IFLY ETFs after Defendants refused to pay Nasdaq the

profits from the operation of the PureFunds ETFs.

284.     There are two overarching defects with Defendants' claim.  First, Defendants cannot establish a breach of the duty of good faith and fair dealing based on the denial of rights for which they never bargained, and which are inconsistent with the rights they did bargain for in the Sublicense Agreement.  And second, Defendants have no damages for any of these claims.

285.     "A breach of the implied covenant of good faith and fair dealing is merely a breach of the underlying contract."  *Kapsis v. Am. Home Mortg. Servicing Inc.*, 923 F. Supp. 2d 430, 452 (E.D.N.Y. 2013)).  To prevail on a breach of contract claim under New York law, the claimant must prove: (1) the existence of a contract between the parties; (2) performance of plaintiff's obligations under the contract; (3) breach of the contract by defendant; and (4) damages to plaintiff caused by defendant's breach.  *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011).

286.     Defendants cannot establish a breach of contract by Nasdaq.  First, contrary to their assertions, Defendants did not bargain for an exclusive license to Nasdaq's cybersecurity index or for the right to preclude Nasdaq from establishing a competing product.  Rather, Defendants obtained a "non-exclusive" license.  JX-2.  By the terms of the Sublicense Agreement Nasdaq could have licensed the same index to another ETF provider and Defendants would have had no recourse.  This undermines their claim that Nasdaq's support of a competing cybersecurity ETF was a breach of the duty of good faith and fair dealing.

287.     Second, Defendants had no contractual right to dictate the composition of the HXR index.  The Index License Agreement explicitly states: "the Index(es) and their compilation and composition, and any changes therein, are and will be in the complete control

and sole discretion of [Nasdaq] . . . ."  JX-1 § 1(f) at 2.  Defendants confirmed this in the HACK

Prospectus when they wrote:

> The ISE Cyber Security Index (Symbol: HXR) (the "ISE Index") is
> a product of ISE.  The Adviser [ETFMG] has entered into a license
> agreement pursuant to which the Adviser pays a fee to use the ISE
> Index and the marketing name and licensed trademark of ISE
> ("Index Trademark").  The Adviser is sub-licensing rights to the
> ISE Index to the Fund at no charge.  The Adviser is permitted to
> sub-license the Index Trademark for the purpose of promoting and
> marketing the Fund.
>
> The ISE Index is compiled and calculated by ISE.  ISE has no
> obligation to take the needs of the Adviser or the owners of the
> Fund into consideration in determining, composing or calculating
> the ISE Index.

PX-21 at 9-11 of 102.  I find that Defendants had no right to dictate the composition of the HACK

index, such that Nasdaq's inaction in response to Defendants' complaint about the lack of

liquidity in the HACK index cannot sustain Defendants' claim.

 288. Third, Nasdaq turned off Defendants' data feed for the indexes underlying

GAMR and IFLY after Defendants informed Nasdaq that it would no longer pay Nasdaq the

profits from the operation of the ETFs.  By this time, Defendants had already breached the

Sublicense Agreement and had no right to obtain something for free which they previously had

paid for.  *See Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 136 (2d Cir. 2016)

(stating "Under New York law, a party's performance under a contract is excused where the

other party . . . has committed a material breach.").

 289. To succeed on its claim for breach of the implied covenant of good faith

and fair dealing, ETFMG must establish that Nasdaq's actions "so directly destroy[ed] the value

of the contract . . . that the acts may be presumed to be contrary to the intention of the parties . . .

."  *JP Morgan Chase Bank, N.A. v. IDW Grp., LLC*, No. 08–cv-9116, 2009 U.S. Dist. LEXIS

9207, at *11 (S.D.N.Y. Feb. 9, 2009).  Defendants did not put forth *any* evidence showing they

suffered damages as a result of Nasdaq's alleged breach of the duty of good faith and fair

dealing.  Accordingly, I cannot conclude that Nasdaq's actions "destroyed the value of the

contract" and for this independent reason, I cannot conclude that Nasdaq breached the duty of

good faith and fair dealing.

## DAMAGES

## XXX.    DAMAGES FOR BREACH OF THE SUBLICENSE AGREEMENT

290.    Nasdaq has provided evidence proving its claimed damages resulting from

Defendants' breach of the Sublicense Agreement.   Under New York law, a successful plaintiff

in a breach of contract action is entitled to damages in the "amount necessary to put the plaintiff

in the same economic position he would have been in had the defendant fulfilled his

contract." *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 495 (2d Cir. 1995) (citations

omitted).

291.    Dr. Vinita Juneja provided a damages model for profits that Nasdaq would

have received for GAMR, HACK, IFLY, IPAY, and SILJ but for Defendants' breach.  Juneja

Aff. ¶ 52.

292.    The testimony of Dr. Vinita Juneja establishes that Nasdaq's damages for

this breach are between $39 million to $105 million depending on how long the ETFs are

expected to operate into the future and depending on alternative approaches to estimating

damages.  These numbers are composed of: (a) $10,908.711 in damages suffered between

January 2017 and October 31, 2018; and (b) prospective damages based on the present value of

damages as of August 1, 2017, the date of Defendant's breach.  Juneja Aff. ¶ 30.

293.    I agree with Dr. Juneja that the "constant AUM" model fails to account for

likely AUM growth for the PureFunds ETFs.  Accordingly, I concur that Dr. Juneja's growth

model for AUM growth is the most likely scenario and conclude that Nasdaq's damages from

Defendants' breach of the Sublicense Agreement is $105,062,425 as of August 1, 2017.  Juneja

Aff. ¶ 30.

## XXXI.   DAMAGES FOR BREACH OF THE HACK PSA

294.    Nasdaq has provided sufficient evidentiary support for its claimed

damages resulting from Defendants' breach of the HACK PSA.  Under Delaware law, a non-

breaching party is entitled to recover expectation damages, which are "measured by the amount

of money that would put the promissee in the same position as if the promisor had performed the

contract."  *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001).  "The remedy for a breach

of contract is intended to give the non-breaching party the benefit of the bargain by putting that

party in the position it would have occupied but for the breach."  *eCOMMERCE Indus. v. MWA*

*Intelligence, Inc.*, C.A. No. 7471, 2013 Del. Ch. LEXIS 245, at *145 (Del. Ch. Sept. 30, 2013)

(citing *Genencor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 11 (Del. 2000)).

295.    Dr. Vinita Juneja provided a damages model for profits that Nasdaq would

have received under the HACK PSA but for Defendants' breach.  Juneja Aff. ¶ 57 (Exhibit 9).

296.    Dr. Juneja found that Nasdaq suffered $9,442,115 in retrospective

damages for the period from January 2017 through October 31, 2018, PX-2016 at Ex. 6, and that

Nasdaq suffered damages in the amount of $59,942,091 in prospective damages related to

HACK moving in to the future.  Juneja Aff. ¶ 57 (Exhibit 9); ¶ 59 (Exhibit 10).

297.    However, given that I have concluded that Defendants' breached the

Sublicense Agreement and that damages for breach of the HACK PSA are a subset of the

damages Nasdaq suffered as a result of Defendants' breach of the Sublicense Agreement, I do

not conclude that Nasdaq is entitled to additional damages for this breach.

## XXXII.   DAMAGES FOR BREACH OF THE IPAY PSA

298.   Nasdaq has provided sufficient evidentiary support for its claimed damages resulting from Defendants' breach of the IPAY PSA.  As the non-breaching party, Nasdaq is entitled to "the benefit of the bargain by putting that party in the position it would have occupied but for the breach."  *eCOMMERCE Indus. v. MWA Intelligence, Inc.*, C.A. No. 7471, 2013 Del. Ch. LEXIS 245, at *145 (Del. Ch. Sept. 30, 2013) (citing *Genencor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 11 (Del. 2000)).

299.   Dr. Vinita Juneja provided a damages model for profits that Nasdaq would have received under the IPAY PSA but for Defendants' breach.  Juneja Aff. ¶ 57 (Exhibit 9).

300.   Dr. Juneja found that Nasdaq suffered $2,037,885 in retrospective damages for the period from January 2017 through October 31, 2018, PX-2016, Ex. 6, and that Nasdaq suffered damages in the amount of $25,992,163 in prospective damages related to IPAY moving in to the future.  Juneja Aff. ¶ 57 (Exhibit 9); ¶ 59 (Exhibit 10).

301.   However, given that I have concluded that Defendants' breached the Sublicense Agreement and that damages for breach of the IPAY PSA are a subset of the damages Nasdaq suffered as a result of Defendants' breach of the Sublicense Agreement, I do not conclude that Nasdaq is entitled to additional damages for this breach.

## XXXIII.  DAMAGES FOR BREACH OF THE GAMR PSA

302.   Nasdaq has provided sufficient evidentiary support for its claimed damages resulting from Defendants' breach of the GAMR PSA.  As the non-breaching party, Nasdaq is entitled to "the benefit of the bargain by putting that party in the position it would have occupied but for the breach."  *eCOMMERCE Indus. v. MWA Intelligence, Inc.*, C.A. No. 7471, 2013 Del. Ch. LEXIS 245, at *145 (Del. Ch. Sept. 30, 2013) (citing *Genencor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 11 (Del. 2000)).

303.    Dr. Vinita Juneja provided a damages model for profits that Nasdaq would have received under the GAMR PSA but for Defendants' breach.  Juneja Aff. ¶ 57 (Exhibit 9).

304.    Dr. Juneja found that Nasdaq suffered $174,956 in retrospective damages for the period from January 2017 through October 31, 2018, PX-2016, Ex. 6, and that Nasdaq suffered damages in the amount of $6,446,806 in prospective damages related to GAMR moving in to the future.  Juneja Aff. ¶ 57 (Exhibit 9); ¶ 59 Exhibit 10.

305.    However, given that I have concluded that Defendants' breached the Sublicense Agreement and that damages for breach of the GAMR PSA are a subset of the damages Nasdaq suffered as a result of Defendants' breach of the Sublicense Agreement, I do not conclude that Nasdaq is entitled to additional damages for this breach.

## XXXIV.  DAMAGES FOR BREACH OF THE IFLY PSA

306.    Nasdaq has provided sufficient evidentiary support for its claimed damages resulting from Defendants' breach of the IFLY PSA.  As the non-breaching party, Nasdaq is entitled to "the benefit of the bargain by putting that party in the position it would have occupied but for the breach."  *eCOMMERCE Indus. v. MWA Intelligence, Inc.*, C.A. No. 7471, 2013 Del. Ch. LEXIS 245, at *145 (Del. Ch. Sept. 30, 2013) (citing *Genencor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 11 (Del. 2000)).

307.    Dr. Vinita Juneja provided a damages model for profits that Nasdaq would have received under the IFLY PSA but for Defendants' breach.  Juneja Aff. ¶ 57 (Exhibit 9).

308.    Dr. Juneja found that Nasdaq suffered a ($191,042) in retrospective damages for the period from January 2017 through October 31, 2018, PX-2016, Ex. 6, and that Nasdaq suffered damages in the amount of $1,975,117 in prospective damages related to IFLY moving in to the future.  Juneja Aff. ¶ 57 (Exhibit 9); ¶ 59 (Exhibit 10).

309.    However, given that I have concluded that Defendants' breached the Sublicense Agreement and that damages for breach of the IFLY PSA are a subset of the damages Nasdaq suffered as a result of Defendants' breach of the Sublicense Agreement, I do not conclude that Nasdaq is entitled to additional damages for this breach.

## XXXV.    DAMAGES FOR BREACH OF THE WHOLESALING AGREEMENT

310.    Nasdaq has provided sufficient evidentiary support for its right to terminate the Wholesaling Agreement as a result of Defendants' material breaches.  I find that Nasdaq appropriately terminated the Wholesaling Agreement pursuant to the terms of that agreement.  JX 11 § 9(c).

311.    Under Delaware law, a material breach by one party excuses the other party from performing under the contract.  *BioLife Sol*s. v. *Endocare*, 838 A.2d 268, 278 (Del. Ch. 2003); *see also Carey v. Estate of Myers*, C.A. No. S11C-10-029, 2015 Del. Super. LEXIS 325, *67-68 (Del. Super. Ct. 2015) ("Material breach acts as a termination of the contract going forward, abrogating any further obligations to perform by the non-breaching party.").  Once a party materially breaches a contract, the other party may cease performance and terminate the deal.  *See Preferred Inv. Servs. v. T&H Bail Bonds, Inc.*, C.A. No. 5886, 2013 Del. Ch. LEXIS 190, at *74-75 (Del. Ch. July 24, 2013).  Because of Defendants' material breaches, Nasdaq is entitled to forgo performance under the Wholesaling Agreement.

312.    Nasdaq also is entitled to rescission of the Wholesaling Agreement and rescissory damages to compensate Nasdaq for the expenses it has incurred in connection with the contract.  Delaware law allows equitable rescission of a contract in the case of "[a]n outright refusal of one party to a contract to perform the contract" or "an unjustified failure to perform basic terms of a contract."  *Creative Research Mfg. v. Adv. Bio-Delivery LLC*, C.A. No. 1211-N, 2007 Del. Ch. LEXIS 15, at *22 (Del. Ch. Jan. 30, 2007).  Rescission is the appropriate remedy

"when the relief needed is more than a judicial declaration that a contract is invalid" and "remedies situations when damages are not available, the amount of damages not ascertainable, or when damages are inadequate to do justice." *Marina View Condo. Ass'n of Unit Owners v. Rehoboth Marina Ventures, LLC*, C.A. No. 2017-0217, 2018 Del. Ch. LEXIS 79, at *14 (Del. Ch. Aug. 22, 2017) (quotation omitted).  The goal of equitable rescission is to put "each party in as close to the position they would have been in but for the creation of the contract," *see Creative Research Mfg.*, 2007 Del. Ch. LEXIS 15, at *25, and requires "an award returning the money or property to the plaintiff to restore them to their original condition," *Rehoboth Marina Ventures*, 2018 Del. Ch. LEXIS 79, at *14.

313.    The evidence establishes that Nasdaq expended $2,878,893 associated with its performance under the Wholesaling Agreement.

314.    The evidence also establishes an unjustified failure on the part of Defendants to perform the basic terms of the Wholesaling Agreement.  Because of this, and because traditional damages for breach are inadequate and difficult to ascertain, I hereby rescind the Wholesaling Agreement and award Nasdaq $2,878,893 to compensate it for the expenses it incurred in connection with the Wholesaling Agreement and to "restore [it] to [its] original condition." *Rehoboth Marina Ventures*, 2018 Del. Ch. LEXIS 79, at *14.

## XXXVI.  PUNITIVE DAMAGES FOR DEFENDANTS' BREACH OF THE PUREFUNDS PSA

315.    Nasdaq has provided sufficient evidentiary support for the recovery of punitive damages from Defendants for their breach of the PureFunds PSAs.

316.    Delaware law authorizes punitive damages in breach-of-contract actions where "the breach also amounts to a tort." *Segovia v. Equities First Holdings, LLC*, 2008 Del. Super. LEXIS 197, at *85 (Del. Super. Ct. May 30, 2008) (citing *E.I. DuPont de Nemours and*

*Co. v. Pressman,* 679 A.2d 436, 445 (Del. 1996)).  Punitive damages also are available, in some circumstances, where the breaching party acts in bad faith.  *See Pressman*, 679 A.2d at 445-47.

317.    Because Defendants' breaching conduct independently constituted the torts of conversion and unfair competition, and because Defendants acted in bad faith when breaching the contract, I hold that Nasdaq is entitled to punitive damages from Defendants in the amount of $_____.

## XXXVII. COMPENSATORY DAMAGES IN TORT

318.    Nasdaq has provided sufficient evidentiary support for its claimed damages resulting from Defendants' conversion of Nasdaq's property and unfair competition.

319.    Because of Defendants' tortious conduct, Nasdaq is entitled to compensatory damages, which "are designed to place the plaintiff in a position substantially equivalent to the one that he would have enjoyed had no tort been committed." *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 52 (2d Cir. 2015); *see also E.J. Brooks Co. v. Cambridge Sec. Seals*, 105 N.E.3d 301, 307 (N.Y. 2018) ("The fundamental purpose of compensatory damages is to have the wrongdoer make the victim whole." (quotations omitted)).

320.    "The usual measure of damages for conversion is the value of the property at the time and place of the conversion, plus interest." *Fleet Capital Corp. v. Yamaha Motor Corp.*, No. 01-cv-1047, 2002 U.S. Dist. LEXIS 18115, at *88 & n.32 (S.D.N.Y. Sept. 25, 2002) (citations omitted).

321.    I concur with Dr. Juneja's calculation as to the amount of damages Nasdaq suffered as a result of Defendants' conversion of Nasdaq's property and conclude that Nasdaq's damages from Defendants' conversion is $105,062,425.  Juneja Aff. ¶ 30 (Table 2).

322.    "The basic rule of damage in a case of unfair business competition is the amount plaintiff would have made except for defendant's wrong." *Am. Elecs., Inc. v. Neptune*

*Meter Co.*, 290 N.Y.S.2d 333, 335 (N.Y. App. Div. 1968).  In other words, "damages in unfair

competition cases should correspond to plaintiff's losses [that] were a proximate result of

defendants' conduct."  *E.J. Brooks Co.*, 105 N.E.3d at 307-08 (quotations omitted).

"[D]amages in unfair competition cases are typically determined by plaintiff's lost profits

resulting from defendant's improper conduct.  The losses must be directly attributable to the

unfair acts of defendant."  *LinkCo, Inc. v. Fujitsu Ltd.,* 230 F. Supp. 2d 492, 503 (S.D.N.Y. 2002)

(citation omitted).

> 323.    I concur with Dr. Juneja's calculation of the losses Nasdaq suffered as a
result of Defendants' tortious conduct and conclude that Nasdaq's damages from Defendants'
unfair competition is $105,062,425.  Juneja Aff. ¶ 30 (Table 2).

## XXXVIII.    PUNITIVE DAMAGES IN TORT

> 324.    Nasdaq has provided sufficient evidentiary support for the recovery of
punitive damages from Defendants for their conversion of Nasdaq's property and unfair
competition.

> 325.    New York law authorizes punitive damages where the tortious conduct is
"intentional, malicious, outrageous, or otherwise aggravated beyond mere negligence."
*McDougald v. Garber*, 536 N.E.2d 372, 374 (N.Y. 1989).  Punitive damages may be awarded for
conversion "if the conversion was accomplished with malice or reckless disregard of plaintiffs'
rights."  *Hutton v. Klabal*, 726 F. Supp. 57, 73 (S.D.N.Y. 1989) (quotation omitted).  And for "a
claim for unfair competition, New York law clearly permits punitive damages where a wrong is
aggravated by recklessness or willfulness, . . . whether or not directed against the public
generally . . . ."  *Getty Petrol. Corp. v. Island Transp. Corp.*, 878 F.2d 650, 657 (2d Cir. 1989)
(quotation omitted).

326.    Because Defendants engaged in conversion of Nasdaq's property and unfair competition willfully and maliciously, I hold that Nasdaq is entitled to punitive damages from Defendants of $_____.

## XXXIX.  EQUITABLE MONETARY COMPENSATION

327.    Nasdaq has provided sufficient evidentiary support demonstrating that Defendants will be unjustly enriched by their actions.

328.    Under New York law, the Court "may analyze quantum meruit and unjust enrichment together as a single quasi contract claim." *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) (citations omitted). Recovery for a quasi-contract claim "is available not only where there has been an actual benefit to the other party but, in the instance of a wrongdoing defendant, to restore the plaintiff's former status, including compensation for expenditures made in reliance upon defendant's representations." *Matter of N.Y. State Urban Dev. Corp. (Atl. Yards Land Use Improvement & Civic Project - Phase 1)*, No. 32741/09, 2010 N.Y. Misc. LEXIS 364, at *85-86 (N.Y. Sup. Ct. Mar. 1, 2010) (discussing unjust enrichment, and quoting *Martin H. Bauman Assoc. v H & M Int'l Transp.*, 567 N.Y.S.2d 404, 408 (N.Y. App. Div. 1991), discussing quantum meruit).  More than being repaid for its services, therefore, equity allows Nasdaq to recover the benefits unjustly realized and retained by Defendants.  "Especially when defendant's enrichment has come about by wrongdoing, plaintiff's recovery may even include defendant's gains." *E.J. Brooks Co. v. Cambridge Sec. Seals*, 105 N.E.3d 301, 324 (N.Y. 2018).

329.    Dr. Vinita Juneja provided a damages model for profits that Nasdaq would have received for GAMR, HACK, IFLY, IPAY, and SILJ but for Defendants' breach of contract. Juneja Aff. ¶ 52.  I conclude that Dr. Juneja's determination of damages also represent the gains by which Defendants were unjustly enriched.

330.    However, given that I have concluded that Defendants' breached the relevant agreements and engaged in tortious conduct, I do not conclude that Nasdaq is entitled to additional monies under the theory of unjust enrichment or quantum meruit.

## XL.    PREJUDGMENT INTEREST

331.    Under New York law, "prejudgment interest is normally recoverable as a matter of right in an action at law for breach of contract."  *Graham v. James*, 144 F.3d 229, 239 (2d Cir. 1998) (internal citations omitted).  "In a breach of contract action, pre-judgment interest ordinarily accrues from the date of the breach."  *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, 727 F. Supp. 256, 295 (S.D.N.Y. 2010).  Interest on damages incurred after the initial breach is calculated from the date on which those damages occurred.  *Id.* at 295-96 (citations omitted).  The Court, however, has "wide discretion" to determine a reasonable date from which to calculate interest where "damages are incurred at various times after the cause of action accrues."  *Id.* at 296 (quoting *Conway v. Icahn & Co., Inc.*, 16 F.3d 504, 512 (2d Cir. 1994)).

332.    New York law also allows prejudgment interest on damages arising from the breach of the implied covenant of good faith and fair dealing, *see, e.g.*, *Fabcon E., L.L.C. v. Steiner Bldg. Co. NYC, LLC*, No. 24639/02, 2005 N.Y. Misc. LEXIS 2960, at *50-51 (N.Y. Sup. Ct. Dec. 12, 2005), as well as "a matter of right in all actions grounded in intentional torts which interfered with property rights."  *Mallis v. Bankers Tr. Co.*, 717 F.2d 683, 694-95 (2d Cir. 1983).  Like with contract actions, interest is calculated from the date on which the damages were incurred.  *See* N.Y. C.P.L.R. § 5001(b).  Therefore, Nasdaq is entitled to prejudgment interest on the damages it incurred as a result of Defendants' breach of their duty of good faith and fair dealing, *see, e.g.*, *Fabcon E., L.L.C.*, 2005 N.Y. Misc. LEXIS 2960, at *50-51, conversion of Nasdaq's property, *see, e.g.*, Borrello v. Perera Co., 381 F. Supp. 1226, 1232 (S.D.N.Y. 1974),

and unfair competition, *see, e.g.*, *De Long Corp. v Morrison-Knudsen Co.*, 200 N.E.2d 557, 558 (N.Y. 1964).

333.     Under Delaware law, "[p]re-judgment interest is awarded as a matter of right in a[n] action based on breach of contract or debt." *Delphi Petrol., Inc. v. Magellan Terminal Holdings, L.P.*, No. 47, 2017, 2017 Del. LEXIS 511, at *4 (Del. Dec. 12, 2017). "Generally, pre-judgment interest accumulates from the date payment was due to a party or alternatively when the plaintiff first suffered a loss at the hands of the defendant." *Id.* (quotation omitted).

334.     The prejudgment interest rate for the damages Nasdaq incurred as a result of Defendants' breach of the Sublicense Agreement, breach of the implied covenant of good faith and fair dealing, conversion, and unfair competition shall be the statutory rate of 9%. *See* N.Y. C.P.L.R. § 5004.

335.     The prejudgment interest rate for the damages Nasdaq incurred as a result of Defendants' breach of the PureFunds PSAs shall be the statutory rate of 5% over the Federal Reserve discount rate, including any surcharge thereon. Del. Code Ann. tit. 6, § 2301.

336.     Accordingly, in order to fully "indemnify [Nasdaq] for the non-payment of what is due to them," *Aristocrat Leisure Ltd.*, 727 F. Supp. at 295, I will award Nasdaq 9% interest on the damages incurred as a result of Defendants' breaches of the Sublicense Agreement, breach of their implied covenant of good faith and fair dealing, conversion, and unfair competition, accruing from the date on which each breach or tort occurred. I also will award Nasdaq 5% over the Federal Reserve discount rate interest on the damages incurred as a result of Defendants' breaches of the Wholesaling Agreement and PureFunds PSAs, accruing from the date each breach occurred.

337.    Nasdaq is entitled to $17,113,561.64 in prejudgment interest based on damages of $105,062,425 as of August 1, 2017.

## XLI.    EQUITABLE RELIEF

338.    Given the substantial prospective damages incurred by Nasdaq as a results of Defendants' conduct, it is unlikely that Defendants will be able to make Nasdaq whole and adequately compensate Nasdaq for its losses absent the continued operation of the legacy PureFunds ETFs.

339.    Nasdaq seeks a permanent injunction affirming its rights to the profits generated by the legacy PureFunds ETFs and prohibiting defendants, and all persons acting under their permission or authority, from having any further involvement in the legacy PureFunds ETFs as an investment adviser, statutory distributor, portfolio adviser, or in any other capacity.

340.    Under New York law, "to obtain a permanent injunction a party must show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." *New York State NOW v. Terry*, 886 F.2d 1339, 1362 (2d Cir. 1989) (affirming award of injunctive relief).  Stated differently, "[a]n injunction should be granted when the intervention of a court of equity is essential to protect a party's property rights against injuries that would otherwise be irremediable." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999) (same). However, an injunction should be granted only where the plaintiff has established the following four elements: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.  *Salinger v.*

*Colting*, 607 F.3d 68, 77 (2d Cir. 2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S.

388, 391 (2006)).

341.   I conclude that Nasdaq has suffered an irreparable injury because, absent

an injunction ordering the continued operation of the legacy PureFunds ETFs, ETFMG will be

unable to adequately compensate Nasdaq for the money damages it incurred.  In general, the

Second Circuit has held that injunctions are "proper to prevent a defendant from making a

judgment uncollectible." *Republic of Philippines v. Marcos*, 806 F.2d 344, 356 (2d Cir. 1986)

(citing cases).  Even though injunctions typically are unavailable where the harm is quantifiable,

an exception exists where the plaintiff may not be able to collect that money.  "In those

situations, preliminary injunctive relief may be necessary because, while monetary damages may

be theoretically available, 'as a practical matter, the defendant would not or could not respond

fully for those damages.'" *Federated Strategic Income Fund v. Mechala Grp. Jam. Ltd.*, No. 99-

cv-10517, 1999 U.S. Dist. LEXIS 16996, at *24 (S.D.N.Y. Nov. 1, 1999) (quoting *Drobbin v.

Nicolet Instrument Corp.*, 631 F. Supp. 860, 912 (S.D.N.Y. 1986)).  And injunctions ordering

specific performance on a contract are appropriate where "(1) the contract is valid, (2) plaintiff

has substantially performed under the contract and is willing and able to perform its remaining

obligations, (3) defendant is able to perform its obligations, and (4) plaintiff has no adequate

remedy at law." *Travellers Int'l AG v. Trans World Airlines*, 722 F. Supp. 1087, 1104 (S.D.N.Y.

1989) (citations omitted) (requiring continued performance of a profit-sharing contract where

terminating the contract would constitute significant and irreparable harm to plaintiff).

342.   Defendants' pattern of intentional misconduct further evidences the need

for injunctive relief.  *See Quantum Corporate Funding, Ltd. v. Assist You Home Health Care

Servs. of Va., L.L.C.*, 144 F. Supp. 2d 241, 249 (S.D.N.Y. 2001) (citing defendants' prior bad

faith as reason to enter injunction preventing them from terminating operations which would impede plaintiff's ability to collect a judgment); *cf. also City of New York v. Gordon*, 1 F. Supp. 3d 94, 109 (S.D.N.Y. 2013) (("Where a history of misconduct exists, courts may craft broad injunctions . . . to prevent future violation." (quotation omitted)).  Defendants have demonstrated that they will repeatedly take actions for their own financial benefit—regardless of whether those actions violate their contractual and other duties—or that harm the PureFunds ETFs and the investors in those funds.  Given Defendants' pattern of intentional misconduct and the likelihood of repetition of misconduct absent injunctive relief, I conclude that Defendants should have no role, as an investment adviser or otherwise, in connection with the legacy PureFunds ETFs.  *Cf. Broad. Music, Inc. v. Prana Hosp., Inc.*, 158 F. Supp. 3d 184, 195-96 (S.D.N.Y. 2016) (in a copyright case, enjoining the continued infringing conduct by defendants where their prior bad faith and disregard for legal obligations evidenced that continued unlawful conduct was likely).

343.    I also find that the public interest would not be disserved by a permanent injunction.  Each of the PSAs for the PureFunds ETFs states that that ETF will be liquidated if the PSA is terminated.  However, liquidation would not only deprive Nasdaq of the profit stream generated by those funds but destroy the ETFs' value for the investing public as well.  In addition, Defendants, as part of their pattern of misconduct, replaced a well-established third party portfolio manager with its own, inexperienced employees, and replaced a statutory distributor with years of experience with a nascent subsidiary.  Such conduct harms the public interest, and removing ETFMG from any role in the legacy PureFunds ETFs would ensure that such self-dealing in violation of the parties' bargain and at the expense of the public does not continue.  *Cf, e.g.*, *Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 510 (S.D.N.Y. 2018)

(finding that the public interest would not be disserved by the issuance of an injunction in part given "the public's interest in the enforcement of binding contracts").

344.    For this reason, I also impose the following injunctive relief:

a.    I affirm Nasdaq's rights and obligations in the legacy PureFunds ETFs as delineated in the BMA for SILJ and the PSAs for HACK, IPAY, GAMR, and IFLY;

b.    Except for the stated actions herein, I enjoin Defendants, and all persons acting under their permission or authority, from having any further involvement in the legacy PureFunds ETFs as an investment adviser, trustee, statutory distributor, portfolio adviser, or in any other capacity;

c.    Defendants shall direct the ETFMG trust to transfer oversight of the legacy PureFunds ETFs to another trust identified by Nasdaq and consented to by PureShares to oversee and operate these funds (the "Trust ETF Transfer");

d.    The Trust ETF Transfer will occur within 10 business days of such other trust being identified by Nasdaq and consented to by PureShares, and that other trust accepting the Trust ETF Transfer;

e.    When notifying Defendants of the new trust, Nasdaq shall also certify that it has obtained PureShares' consent to the Trust ETF Transfer.

345.    Each of the PSAs for the PureFunds ETFs states that that ETF will be liquidated if the PSA is terminated. Termination of the ETFs, however, would destroy the value of the profit stream generated by those funds, causing irreparable harm to Nasdaq. Accordingly, I do not conclude it is enough to simply award Nasdaq damages for Defendants' breach. Rather, I find that Nasdaq, unimpeded by ETFMG and with ETFMG's cooperation, should facilitate the

transfer of the legacy PureFunds ETFs to a different trust, run by different trustees, and advised

by a different investment adviser.