UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NASDAQ, INC. <br><br>         Plaintiff, <br><br> v. <br><br> EXCHANGE TRADED MANAGERS GROUP, LLC, <br> ETF MANAGERS GROUP, LLC, AND <br> SAMUEL MASUCCI <br><br>         Defendants. | CIVIL ACTION NO. 1:17-CV-08252-PAE |

RESPONSE TO DEFENDANTS' PRETRIAL MEMORANDUM OF LAW

# Table of Contents

Page

I.     PRELIMINARY STATEMENT ................................................................. 1

II.    RELEVANT FACTS ............................................................................... 3

       A.   ISE and PureShares Partner to Launch the PureFunds ETFs ............... 3

       B.   ISE And PureFunds Hire ETFMG To Manage The PureFunds ETFs.................. 4

            1.   The PSAs .......................................................................... 5

            2.   The Wholesaling Agreement ...................................................... 6

       C.   Defendants' Scheme to Retain the Profits Generated By the PureFunds
            ETFs ......................................................................................... 7

       D.   ETFMG's Shifting Story................................................................. 8

       E.   Nasdaq's Damages ....................................................................... 9

III.   ARGUMENT ....................................................................................... 10

       A.   ETFMG's Refusal to Pay to Nasdaq Profits Generated by the PureFunds
            ETFs Breached the Sublicense Agreement ........................................ 10

       B.   ETFMG Breached the Platform Service Agreements.............................. 13

            1.   ETFMG's Refusal to Pay Nasdaq Was a Breach of the HACK
                 PSAs.................................................................................... 13

            2.   ETFMG Breached the IPAY/BIGD PSA .................................... 18

            3.   ETFMG Breached All of the PSAs (and the Wholesaling
                 Agreement) by Hiring Its Own Affiliate to Provide Statutory
                 Distribution Services to the PureFunds.................................... 18

            4.   ETFMG Concedes It Terminated the PSAs without Basis ............ 20

       C.   ETFMG Breached the Wholesaling Agreement ................................... 20

       D.   ETFMG'S Damages Claim for Breach of the Wholesaling Agreement Is
            Legally Unsupportable............................................................... 23

IV.    CONCLUSION..................................................................................... 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*AgroFresh Inc. v. MirTech, Inc.*,
   257 F. Supp. 3d 643 (D. Del. 2017)......................................................................22

*Allen v. Westpoint-Pepperell, Inc.*,
   No. 90-cv-3841, 1996 U.S. Dist. LEXIS 6 (S.D.N.Y. Jan. 2, 1996) ......................11

*Arrowood Indem. Co. v. Hartford Fire Ins. Co.*,
   774 F. Supp. 2d 636 (D. Del. 2011)......................................................................15

*Artesian Water Co. v. State Dep't of Highways & Transp.*,
   330 A.2d 441 (Del. 1974) .....................................................................................18

*Axis Reinsurance Co. v. HLTH Corp.*,
   993 A.2d 1057 (Del. 2010) ...................................................................................14

*Bromwich v. Hanby*,
   C.A. No. S08C-07-008, 2010 Del. Super. LEXIS 578 (Del. Sup. Ct. July 1,
   2010) ....................................................................................................................15

*Carlson v. Hallinan*,
   925 A.2d 506 (Del. Ch. 2006)...............................................................................19

*Coca-Cola Bottling Co. v. Coca-Cola Co.*,
   988 F.2d 386 (3d Cir. 1993)..................................................................................21

*Comrie v. Enterasys Networks, Inc.*,
   No. C.A. 19254, 2004 Del. Ch. LEXIS 196 (Del. Ch. Feb. 17, 2004) ...................15

*Cont'l Ins. Co. v. Rutledge & Co.*,
   750 A.2d 1219 (Del. Ch. 2000).............................................................................22

*eCommerce Indus., Inc. v. MWA Intelligence, Inc.*,
   C.A. No. 7471, 2013 Del. Ch. LEXIS 245 (Del. Ch. Sept. 30, 2013) ...................18

*Haft v. Dart Grp. Corp.*,
   841 F. Supp. 549 (D. Del. 1993)......................................................................17, 18

*Horizon Pers. Commc'ns, Inc. v. Sprint Corp.*,
   C.A. No. 1518-N, 2006 Del. Ch. LEXIS 141 (Del. Ch. Aug. 4, 2006) ..................23

*In re Lipper Holdings, LLC*,
   766 N.Y.S.2d 561 (N.Y. App. Div. 2003) ........................................................12, 14

*Mobileye, Inc. v. Picitup Corp.*,
   928 F. Supp. 2d 759 (S.D.N.Y. 2013)..........................................................................9

*Progressive Int'l Corp. v. E.I. du Pont de Nemours & Co.*,
   C.A. No. 19209, 2002 Del. Ch. LEXIS 91 (Del. Ch. July 9, 2002).........................19

*PureShares, LLC v. ETF Managers Group, LLC*,
   C-63-17 (Superior Court of Union County New Jersey) ...........................................8

*Rexnord Indus., LLC v. RHI Holdings, Inc.*,
   No. 07C-10-057, 2008 Del. Super. LEXIS 347 (Del. Super. Ct. Sept. 17,
   2008) ..........................................................................................................................19

*Seidensticker v. Gasparilla Inn, Inc.*,
   C.A. No. 2555-CC, 2007 Del. Ch. LEXIS 155 (Del. Ch. Nov. 8, 2007).................19

*United Rentals, Inc. v. Ram Holdings, Inc.*,
   937 A.2d 810 (Del. Ch. 2007).................................................................................14

*Utilisave, LLC v. Khenin*,
   C.A. No. 7796, 2014 Del. Ch. LEXIS 286 (Del. Ch. Feb. 4, 2014) ........................21

*VICI Racing, LLC v. T-Mobile USA, Inc.*,
   763 F. 3d 273 (3d Cir. 2014)....................................................................................24

*Weyerhaeuser Co. v. Domtar Corp.*,
   204 F. Supp. 3d 731 (D. Del. 2016).........................................................................23

**Other Authorities**

Federal Rules of Civil Procedure Rules 26(a)(2)(B) and 37(c)(1) ..................................9

Plaintiffs' Memorandum of Law in Support of its Motion in Limine to Introduce
   Evidence of Prior Federal Conviction, D.E. 91 ......................................................23

PureFunds *as required by the PSA*..........................................................................6, 16

Restatement (Second) of Contracts § 350 cmt. b..........................................................24

Rule 26 .........................................................................................................................10

Rule 26(a)(2)(B).............................................................................................................9

Rule 37(c)(1) ..................................................................................................................9

## I.     PRELIMINARY STATEMENT

ETFMG was a white-label ETF issuer that marketed a service to parties who sought to bring ETFs to market.  Under this business model, ETFMG did not keep the profits from the ETFs it launched (if there were profits).  Instead, ETFMG was paid an operational fee that they kept whether or not the ETFs prospered, and then passed profits on to their clients, like ISE, Nasdaq's predecessor who had paid ETFMG to launch and operate the PureFunds ETFs.  ISE, PureShares, and ETFMG drafted and entered into contracts to reflect this arrangement.  Under this model, ISE (and then Nasdaq) paid ETFMG to launch and operate the HACK ETF.  And it was wildly successful.  And for three years, every month Nasdaq paid ETFMG what it was owed under the relevant contracts, and ETFMG paid Nasdaq the profits (more than $300,000 per month) that it was owed under the relevant contracts.  The model worked.  ISE/Nasdaq paid ETFMG millions to launch various ETFs.  Some were not successful and were losses to ISE/Nasdaq, while ETFMG earned its service fees.  Others, however, had ETFMG not breached the contracts and seized these profits for themselves, would have generated more than $100 million in profits for Nasdaq and PureShares.  PFF ¶ 293.

After Nasdaq acquired ISE in mid-2016, ETFMG saw its opportunity to push Nasdaq out of HACK and the PureFunds ETFs.  ETFMG's documents and direct testimony, even before any live cross examination, cannot help but support this narrative.  Indeed, ETFMG calculated just how much money – more than $1.4 million per year – it stood to gain by ending its relationship with Nasdaq.  PFF ¶ 180-181.  ETFMG used three tactics to accomplish this result.  First, it delayed, then simply stopped paying Nasdaq what it owed for the profits generated by the PureFunds ETFs.  In its trial testimony affidavits, ETFMG has now conceded it owed – but did not pay – Nasdaq $2 million of HACK ETF profit from 2017.  *See* S. Masucci Aff.  ¶ 133 n.41; J. Flanagan Aff.  ¶¶ 40-42.  This is a new position that ETFMG denied in its pleadings.  *See* D.E.

24 at 11 ("NINTH DEFENSE: "Plaintiff's claims are barred because Defendants have paid all that is owed to Nasdaq under the Relevant Agreements, directly and through appropriate set-off against amounts owed to Defendants.").  Second, it used another agreement – the Wholesaling Agreement – to increase Nasdaq's costs without its consent and therefore in violation of that agreement, S. Masucci Aff. ¶¶ 112, 150, to drive a wedge into the parties' overall relationship. Third, it created pretextual conflicts with Nasdaq to assert that Nasdaq was somehow favoring another cybersecurity ETF allegedly in breach of its contractual obligations.  PFF ¶ 148.  The reality is that Nasdaq complied with its contractual obligations, and the results belie anything to the contrary.  In the period before Nasdaq acquired ISE, the HACK ETF had rapidly lost assets under management ("AUM"), but after Nasdaq acquired ISE and became involved in the PureFunds ETFs, the HACK ETF reversed course, increasing in AUM from approximately $700 million to $1.1 million, to the benefit of all parties and HACK's shareholders.  *See* V. Juneja Aff. ¶ 62.

After ETFMG believed it had accomplished its goal and Nasdaq would walk away from the PureFunds ETFs, it sent Nasdaq four "termination" letters based on frivolous or false grounds.  Indeed, even ETFMG's laying its own groundwork for this termination and switch to another index provider involved unlawful conduct.  Discovery has showed that while ETFMG was concocting pretextual grounds to terminate the relevant agreements, it was also (i) surreptitiously obtaining Nasdaq's proprietary data to provide to an index-providing competitor, to facilitate the transition from Nasdaq to that competitor; and (ii) manipulating accounting statements to improperly retain another $200,000 from Nasdaq to add to the $2 million in profits it never paid.  PFF ¶ 152; 159-167.

ETFMG's affidavits and legal argument also show there is no dispute that ETFMG breached the Wholesaling Agreement. That Agreement obligated ETFMG to seek ISE and then Nasdaq's preapproval for expenses. ETFMG concedes that after Nasdaq acquired ISE, ETFMG stopped seeking Nasdaq's preapproval because Nasdaq was questioning certain expenses when ISE had not done so. S. Masucci Aff. at ¶¶ 112; 150. This is not a justification for breaching this bargained for right. Rather, it's an admission that ETFMG breached the Wholesaling Agreement.

This case is straightforward. ISE/Nasdaq, through its payments to ETFMG a white-label service provider, invested in ETFs that became valuable revenue-producing assets. When Nasdaq acquired ISE, ETFMG saw an opportunity to seize this revenue stream for itself. ETFMG's arguments cannot undercut the facts that its own documents – and at times its own witnesses – admit. Nasdaq is entitled to compensation for ETFMG's misappropriation of the profits from the PureFunds ETFs.

## II.     RELEVANT FACTS

The factual background for this case is set forth fully in Nasdaq's Proposed Findings of Fact and Conclusions of Law ("PFF") (D.E. 97) and in Nasdaq's Summary in the Joint Pretrial Order (D.E. 98).[1] Nasdaq recites here certain facts relevant to this Response.

### A.     ISE and PureShares Partner to Launch the PureFunds ETFs

In 2012, International Securities Exchange ("ISE"), partnered with PureShares, LLC ("PureShares") to develop, launch, and market a line of ETFs under the PureFunds brand (the "PureFunds ETFs"). PFF ¶ 4. To effectuate this plan, ISE and PureShares entered into the

---

[1] Citations in Nasdaq's pretrial memorandum of law in the form "D.E." are to the Court's Docket Entries. Citations in the form "JX", "PX", or "DX" are citations to the parties' trial exhibits, submitted with the Joint Pretrial Order.

"Index License and Exchange-Traded Product Agreement" (the "Index License Agreement") (JX-1).  PFF ¶ 5.  Under the Index License Agreement, ISE "grant[ed] to PureShares a non-transferable, non-exclusive, royalty-bearing license (i) to use the Index(es) solely in connection with issuing and listing for trading of the Product(s) . . . ." JX-1 at 000456; PFF ¶ 7.  PureShares was responsible for the operational aspects of bringing the ETFs to market.  JX-1 at 000456-58; PFF ¶¶ 8, 9.

     **B.**     ISE And PureFunds Hire ETFMG To Manage The PureFunds ETFs

     PureShares was not in a position to launch and operate the PureFunds ETFs, so ISE and PureShares hired Defendants to run the day-to-day operations of the funds and to collect and deliver the profits derived from the funds to PureShares and ISE.  ETFMG marketed itself as a "white label" or "private label" ETF issuer.  PFF ¶ 15.  Before this litigation started ETFMG described its business model:

> ETF Managers Group ("ETFMG") is a "private label" ETF manager. The business model is to launch ETF s based on third party investment ideas with the third party paying all of the costs until the fund reaches the "break-even [sic] point of approximately $50 million AUM. At that point the third party receives most of the profit. ETFMG thus is always earning fees and not supporting products. This model has enabled ETFMG to achieve profitability in its first full year of operation and appeals to sponsors with a unique investment idea who don't want to build their own costly regulatory and operational structure.

PX-72 at 2.

     In August 2012, ISE, PureShares, and ETFMG executed the Sublicense Agreement which gave ETFMG a "non-exclusive royalty-bearing license" to use the ISE indexes, JX-2 § 1(A), in consideration for the obligation that ETFMG would "be bound by all the provisions of the [Index License Agreement], including, without limitation, those provisions imposing any obligations on PureShares."  PFF ¶ 16; JX-2 § 2.  Those provisions included the obligation to,

*inter alia*, pay ISE the profits generated from the operation of the funds based on indexes licensed to ETFMG.

        1.      <u>The PSAs</u>

In or about the fall of 2014, ISE devised the idea to create an index of companies involved in the cybersecurity field and launch an ETF that tracked this index.  ISE agreed to partner with PureShares to launch this ETF and ISE and PureShares added what would become the PureFunds ISE Cybersecurity ETF ("HACK"), to the Index License Agreement.  PFF ¶ 29.  Pursuant to this agreement, ISE would be responsible for financing the launch and operation of HACK and receive 70 percent of the profits created by the operation of the fund, and PureShares would be responsible for doing the work necessary to launch and operate the fund.  JX-1, JX-3 at 4.  As was the case with the first PureFunds ETFs, PureShares lacked the operational ability to launch HACK itself and ultimately decided to hire ETFMG to serve this role.  PFF ¶ 30.

The Sublicense Agreement set out ETFMG's right to use ISE's intellectual property and ETFMG's obligation to pay ISE the profits generated by the operation of the PureFunds ETFs.  But it did not specify what PureShares and ISE would pay ETFMG for launching and operating the PureFunds ETFs.  ISE negotiated the fees that ETFMG would charge to launch and operate HACK.  PX-80A.  Thereafter, PureShares, who was contractually obligated for the logistics of launching HACK under the Index License Agreement, entered into a contract called the SEC '40 Act Platform Services Agreement ("HACK PSA") with ETFMG, which stated how much money ETFMG would be paid to launch and operate HACK, and reflected Monaco's negotiations with ETFMG.  *See* JX-5.  ISE, PureShares, and ETFMG all understood that even though the HACK PSA was ostensibly only between PureShares and ETFMG, ISE would pay the expenses required by this contract.  PFF ¶ 32.  Though the HACK PSA is silent as to when ETFMG must pay PureShares the profits from the operation of HACK, PureShares and ETFMG both understood

that the contract required ETFMG to pay these profits promptly after ETFMG received them from the fund administrator.  PFF ¶ 33 (citing PX-232D at 00098070 ("If it was in our interest to take away the payment from the ISE we could pay PureFunds *as required by the PSA* . . . .") (emphasis supplied)).

        2.    <u>The Wholesaling Agreement</u>

To further support the marketing of the PureFunds ETFs, in April 2013, ISE entered into an agreement with Gencap, another predecessor to ETFMG.  PFF ¶ 20.  The purpose of this agreement was to build an infrastructure to market the PureFunds ETFs.  JX-11.  To that end, ISE paid fees to ETFMG, and in exchange, ETFMG managed employees responsible for wholesaling the ETFs.  JX-11 at 1-4.  These wholesaling services then would be used to support certain ISE-supported ETFs as well as certain ETFs supported by third parties.  *See id.*

The Wholesaling Agreement required ISE to make three types of payments to Gencap. First, ISE was obligated to pay Gencap a fee based on the assets under management ("AUM") of the ISE-financed ETFs added to Exhibit B of the Wholesaling Agreement.  JX-11 at 11.  Second, ISE was obligated to reimburse Gencap for expenses incurred wholesaling the products on the wholesaling platform.  *Id.*  Third, ISE was obligated to pay the salary and benefits of the wholesalers Gencap hired to actually market the ETFs on the wholesaling platform.  JX-11 at 14. And the Wholesaling Agreement required Gencap to pay ISE a share of the revenue Gencap generated from wholesaling third-party ETFs.  JX-11 at 12.

The Wholesaling Agreement set out 24 specific items that Gencap "shall" do to maintain the wholesaling platform and one prohibition – the requirement that Gencap "shall not provide statutory distribution services for the securities on the Platform . . . which shall be provided by a third-party service provider . . . ."  JX-11 at 2-3.

The Wholesaling Agreement also contained provisions allowing ISE to control the costs

for which it would reimburse Gencap.  Specifically Exhibit C dictated that the maximum annual

amount ISE would be obligated to reimburse Gencap for wholesaler salary and benefits would be

$250,000.  JX-11 at 14.  And Exhibit A dictated that ISE was obligated to pay "reimbursement of

all reasonable expenses in connection with a Wholesaler's sales and marketing duties . . . [and

that] *[a]ll such expenses shall be agreed by ISE and GENCAP in advance of those expenses*

*being incurred, and which shall not exceed $50,000 per year ("Expense Cap"), unless*

*specifically agreed in writing by ISE.*"  JX-11 at 11 (emphasis supplied).

**C.**     Defendants' Scheme to Retain the Profits Generated By the PureFunds ETFs

After Nasdaq acquired ISE, ETFMG arrived at a plan to cause Nasdaq to abandon its

interests in the PureFunds ETFs.  The plan involved three primary components: (1) delaying and

ultimately ceasing payment to Nasdaq of profits from the PureFunds ETFs, PFF ¶¶ 91-92; (2)

arbitrarily increasing the costs of the wholesaler compensation under the Wholesaling

Agreement and ignoring Nasdaq's contractual right to preapprove wholesale expenses and then

netting these expenses from monies ETFMG otherwise owed Nasdaq, PFF ¶¶ 99-102; and (3)

raising pretextual conflict points concerning the HACK ETF, PFF ¶¶ 121-129.

After nine months of executing these plans, in April 2017, ETFMG began sending a

series of letters purporting to terminate the PSAs for the PureFunds ETFs and informing Nasdaq

that ETFMG would no longer pay Nasdaq the profits generated by the operation of the

PureFunds ETFs.  PFF ¶¶ 140-147.  The grounds for termination were frivolous and false, as

ETFMG's subsequent attempts to renegotiate the contracts with Nasdaq and partner to launch

new products established.  PFF ¶¶ 174-176.  As of the termination, ETFMG had admittedly not

paid Nasdaq any profits from the operation of HACK for all of 2017, and had not paid Nasdaq

any profits from the operation of IPAY for all of 2017 and December 2016.  J. Flanagan Aff. ¶44.

> **D.**     ETFMG's Shifting Story

Two examples (though there are many more) highlight the incongruity between the facts and how ETFMG is willing to misconstrue reality to escape liability.  First, in 2014, at the time HACK launched, ETFMG filed the HACK Prospectus with the SEC.  As required by the securities laws, this Prospectus explained that ETFMG had sublicensed the index underlying HACK from PureShares and was paying a fee to use the ISE index, PFF ¶ 36, accurately summarizing the Sublicense Agreement.  PFF ¶ 16.  *See also* B. Karol Dep. Tr. at 372:16-73:3 (ETFMG's President and Founder conceding that the HACK Prospectus's description of ETFMG paying a fee to use the "ISE Index" is a reference to the "sublicense agreement."). However, now ETFMG claims that the Sublicense Agreement cannot be interpreted that way.  S. Masucci Aff. ¶ 31 ("The Sublicense Agreement imposed no financial obligation whatsoever on ETFMG."); ¶ 33 ("If I ever thought the redacted terms in a contract were going to obligate ETFMG, I never would have accepted a redacted copy.").

Second, ETFMG's recent admission that it owes Nasdaq over $2,000,000 in profits from as early December 2016 underscores ETFMG's shifting and factually untethered positions.  J. Flanagan Aff. ¶44.  ETFMG thus admits to breaching its contracts with Nasdaq long before ETFMG trumped up grounds to terminate the contracts, and compels a finding of liability in Nasdaq's favor.  But it is also another departure from prior representation to a court.

In May 2017, PureShares filed an action in New Jersey state court seeking in effect, an accounting to establish that ETFMG had failed to pay Nasdaq and PureShares what ETFMG owed.  *PureShares, LLC v. ETF Managers Group, LLC*, C-63-17, (Superior Court of Union

County New Jersey) D.E. 1.  At a hearing on that motion, ETFMG represented to the Court that

ETFMG had paid Nasdaq everything that it owed, stating:

> [E]very month the net profit [for the profitable ETF funds] after those
> expenses are paid goes back to NASDAQ.  And that's what's been
> happening.
>
> ***
>
> *Did ETFMG refuse to pay the profit?  No.  They did pass the – they still
> sent the check and NASDAQ hasn't received a penny less than it would
> be entitled to . . . .*  But it hasn't resulted in a penny less net to NASDAQ,
> which then is supposed to pay PureShares.  That's their arrangement.
>
> So we're learning that NASDAQ hasn't been doing that.  So they haven't
> been paying the expenses for ETFMG and apparently they haven't been
> paying the profit share to PureShares.  That's not our problem.  They
> should be suing NASDAQ.

DX-277; *Pure Shares, LLC v. ETF Managers Group, LLC*, UNN-C-63-17, (Superior Court of

Union County New Jersey D.E. 4 at 28-29) (emphasis added).[2]  This statement was false and

inconsistent with ETFMG's current admissions.  But ETFMG used this misrepresentation to

obtain a denial of PureShares' request for appointment of a third party to determine whether

ETFMG was paying its debts.

    **E.**    Nasdaq's Damages

    Nasdaq paid ETFMG as a white-label ETF issuer to launch and operate the PureFunds

ETFs.  Nasdaq paid ETFMG over $10 million for this service, PFF ¶ 13, and as a result of this

investment, the PureFunds ETFs bloomed into a profit-producing source that conservatively will

generate over $100 million for Nasdaq and its revenue share partners.[3]  PFF ¶ 293.  Through its

---

[2] Nasdaq has attached a copy of the transcript from this hearing and respectfully requests that the
Court accept the transcript as PX-2040 for purposes of trial.

[3] In an effort to limit Nasdaq's damages, ETFMG has attempted to introduce new expert
testimony at the 11th hour, in violation of Rules 26(a)(2)(B) and 37(c)(1) of the Federal Rules of
Civil Procedure.  Dr. May submitted two expert reports detailing his opinions as required by
Rule 26(a)(2)(B).  PX-2023 and PX-2024.  In the May Affidavit submitted by ETFMG, Dr. May

breach(es) ETFMG has unlawfully seized this revenue stream despite its status as a white-label

service provider, hired by Nasdaq and PureShares to fulfill a job.[4]

## III.   ARGUMENT

### A.   ETFMG's Refusal to Pay to Nasdaq Profits Generated by the PureFunds ETFs Breached the Sublicense Agreement

ETFMG materially breached the Sublicense Agreement by refusing, throughout all of

2017, to pay to Nasdaq the profits generated by the PureFunds ETFs, which is mandated by the

plain language of the governing agreements and supported by extrinsic evidence.   In relevant

part, the Sublicense Agreement provides:

> The Sublicensee acknowledges that is has received and read a copy
> of the [Index] License Agreement (excluding the Schedule setting
> forth the license fees) and agrees to be bound by all provisions
> thereof, including, without limitation, those provisions imposing
> any obligation on PureShares.

JX-2A ¶ 2.  ETFMG further agreed that its obligations under the Sublicense Agreement "are as

principal."  JX-2A ¶ 3.  Schedule 1 of the Index License Agreement (and the supplements

---

offers expert testimony about fee compression, in paragraph 4 (bullet point 3 and 5) and
paragraphs 13-17, that is not found anywhere in his expert reports.  Nasdaq respectfully asks the
Court to strike these new expert opinions pursuant to Rule 37(c)(1).  *Mobileye, Inc. v. Picitup
Corp.*, 928 F. Supp. 2d 759, 766 (S.D.N.Y. 2013) (striking an expert report which added new
opinions and noting that "attempts to proffer expert testimony without compliance with Rule 26
violate both the rules and principles of discovery, and the obligations lawyers have to the court.
Exclusion and forfeiture are appropriate consequences to avoid repeated occurrences of such
manipulation of the litigation process.").

[4] Recognizing the weakness of its contract position, ETFMG attempts to argue that industry
custom trumps contractual bargaining.  To this end it has retained an expert Matthew Chambers
who has submitted an expert report about customary roles and duties related to ETF operations.
Mr. Chambers' opinions have no applicability to this case.  He has already testified in deposition
that he has no experience with white-label ETF issuers or ETFs issued under this business model,
that he has no foundation for testifying about what is industry custom in the white-label scenario
actually at issue in this case, and that his testimony relates to the "Blackrock model," where the
ETF sponsor (Blackrock) who funds the launch and operation of the ETF is also the investment
adviser (Blackrock) who operates the ETF, and has created the trust that oversees the investment
adviser.

thereto) set forth PureShares' obligations to pay to Nasdaq profits with respect to specific PureFunds ETFs. *See, e.g.*, JX-3A. Thus, under the plain language of the Sublicense Agreement, ETFMG assumed PureShares' obligation to pay to Nasdaq the profits generated by the PureFunds ETFs. *See Allen v. Westpoint-Pepperell, Inc.*, No. 90-cv-3841, 1996 U.S. Dist. LEXIS 6, at *6 (S.D.N.Y. Jan. 2, 1996) (in interpreting a contract, "the Court strives to effectuate the intent of the contracting parties 'as revealed by the language they chose to use.'" (*quoting Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992))). The only right granted to ETFMG under the Sublicense Agreement was an assurance "that ETFMG may not be sued for infringement of certain intellectual property rights." *See* D.E. 50 (Opinion & Order) at 15.

The version of the Index License Agreement ETFMG received in 2012 includes a parenthetical phrase clarifying that the profit split percentages as between PureShares and Nasdaq was redacted from the copy of Schedule 1 provided to Defendants. *See* JX-2 ("Financing and Profit Split"). But ETFMG's argument that this somehow relieves them from the obligation to pay the fund profits to Nasdaq makes no sense. As is clear from the unredacted portions of the Index License Agreement, Nasdaq and PureShares agreed to split the profits generated by the PureFunds ETFs. *See, e.g.*, JX-3A ¶ G ("Financing and Profit Split"). For example, the redacted versions of these documents mandate:

> Each quarterly payment of ISE's share of the Shared Profit shall be accompanied by a statement prepared by PureShares setting forth the calculations on which the payment is based and shall be paid to ISE within (30) days after the end of each quarter. For the avoidance of doubt, the respective percentages of Shared Profit shall be determined on a quarterly basis and applied to the previous calendar quarter.

T. Wade Aff. ¶ 27 (citing JX-3A § 4(I)).

ETFMG's contention that the Sublicense Agreement did not require it to send the fund profits to Nasdaq and PureShares is contrary to the plain language and core purpose of the Index License Agreement and the Sublicense Agreement.  Such a nonsensical interpretation of the contract cannot save ETFMG from its failure to pay Nasdaq the fund profits.  *See, e.g.*, *In re Lipper Holdings, LLC*, 766 N.Y.S.2d 561, 562 (N.Y. App. Div. 2003) ("A contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties." (citations omitted)).

To the extent there is any ambiguity in the plain language of the Sublicense Agreement, extrinsic evidence demonstrates ETFMG's position makes even less sense in light of the parties' business relationships.  *See supra* at 3-4.  Nasdaq was the index provider and provided financial support for launching and operating the PureShares ETFs; PureShares was the "sponsor" of the PureShares ETFs and provided financial support; and ETFMG was hired by Nasdaq and PureShares to issue and operate the PureShares ETFs.  The only way Nasdaq would have benefitted from this arrangement is by receiving a share of the ETF profits.  In the HACK Prospectus filed with the Securities and Exchange Commission, ETFMG described the parties' roles and disclosed they were obligated to pay a license fee to use Nasdaq's indexes and intellectual property:

> The Adviser [ETFMG] has entered into an Agreement with
> PureShares, LLC (the "Sponsor"), under which the Sponsor agrees
> to sub-license the use of the Underlying Index to the Adviser and
> assumes the obligation of the Adviser to pay all expenses of the
> Fund, except Excluded Expenses.  Although the Sponsor has
> agreed to be responsible for the payment of certain expenses of the
> Fund, the Adviser retains the ultimate obligation to the Fund to pay
> such expenses.  The Sponsor will also provide marketing support
> for the Fund, including distributing marketing materials related to
> the Fund.

PX-21 at 18 of 102.  With respect to ISE, the HACK Prospectus stated:

> The ISE Cyber Security Index (Symbol: HXR) (the "ISE Index") is a product of ISE.  *The Adviser [ETFMG] has entered into a license agreement pursuant to which the Adviser pays a fee to use the ISE Index and the marketing name and licensed trademark of ISE ("Index Trademark").*  The Adviser is sub-licensing rights to the ISE Index to the Fund at no charge.  The Adviser is permitted to sub-license the Index Trademark for the purpose of promoting and marketing the Fund.
>
> The ISE Index is compiled and calculated by ISE.  ISE has no obligation to take the needs of the Adviser or the owners of the Fund into consideration in determining, composing or calculating the ISE Index.

PX-21 at 11 of 102 (emphasis supplied).  As the Sublicense Agreement states, the "license fees" were Nasdaq's share of the PureFunds ETF profits.  ETFMG's after-the-fact interpretation would necessarily mean that it obtained a right to use Nasdaq's indexes and intellectual property for the PureShares ETFs with no financial obligation.  Such an interpretation makes no economic sense, and reads out of the contracts the payment obligations under the Sublicense Agreement.

When ETFMG stopped paying Nasdaq the profits from the operation of the PureFunds ETFs (as it has confessed it did) *and* when ETFMG informed Nasdaq it would not pay Nasdaq the future profits from the operation of the PureFunds ETFs, it breached the Sublicense Agreement.  PFF ¶¶ 199-203.

**B.**     ETFMG Breached the Platform Service Agreements

1.     ETFMG's Refusal to Pay Nasdaq Was a Breach of the HACK PSAs

ETFMG's failure to pay Nasdaq PureFund ETF profits also constitutes a breach of the HACK PSA.  Each PSA sets forth the tasks Defendants were to perform for certain consideration.  The HACK PSA was the first of these agreements.  Unlike the subsequent PSAs, the HACK PSA is only between PureShares and Defendants, because ISE did not want to publicly identify as an ETF sponsor.  And the HACK PSA contains no provision describing

when and how Defendants were to pay profits, whereas the subsequent PSAs require Defendants to pay Nasdaq its share of the profits within ten days of receiving it.

However, nothing in the HACK PSA entitles ETFMG to retain the fund profits. The PSA expressly enumerates the consideration that ETFMG was to receive in exchange for the services it agreed to provide under the contract. JX-5 ¶ 1. This is consistent with the parties' relationships and ETFMG's role as a white-label ETF issuer. *Id.* ETFMG's argument that it is entitled to retain the HACK ETF profits has no basis in the HACK PSA and is contrary to the reasonable expectations of the parties. *Axis Reinsurance Co. v. HLTH Corp.*, 993 A.2d 1057, 1063 (Del. 2010), *as corrected*, (May 10, 2010) ("[W]here a contract provision lends itself to two interpretations, a court will not adopt the interpretation that leads to unreasonable results, but instead will adopt the construction that is reasonable and that harmonizes the affected contract provisions."). Further undermining Defendants' contentions that it was entitled to keep the fund profit, the PSAs provide that the Funds are to be "liquidated" in the event the agreements are terminated. *See, e.g.*, JX-5 ¶ 9. This demonstrates that the parties did not contemplate that ETFMG could terminate the PSAs and continue to operate those ETFs for their own benefit.

Moreover, the conduct of the parties demonstrates that the parties understood that the HACK PSA required ETFMG to share the profits and that Nasdaq was the intended beneficiary of this contract. *See United Rentals, Inc. v. Ram Holdings, Inc.*, 937 A.2d 810, 835 (Del. Ch. 2007) (the "business context" of the deal and the parties' conduct can evidence contractual intent). Defendants' argument that the Court should ignore its self-described "white label" issuer status and treat it as any other ETF fund advisor is misplaced. Defendants'/Counterclaim Plaintiffs' Pretrial Memorandum of Law ("ETFMG Mem.") at 6. It is undisputed that: (i) ETFMG and PureShares intended to benefit ISE/Nasdaq; (ii) establishing the contract was meant

to satisfy PureShares' debt to ISE/Nasdaq under the Index License Agreement and Defendants' obligations under the Sublicense Agreement; and (iii) a material purpose of the HACK PSA was benefitting ISE/Nasdaq. *See Arrowood Indem. Co. v. Hartford Fire Ins. Co.*, 774 F. Supp. 2d 636, 658 (D. Del. 2011) ("[T]o be deemed a third-party beneficiary to a contract, (i) the contracting parties must have intended that the third party benefit from the contract, (ii) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (iii) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract." (quotation omitted)); *see also Comrie v. Enterasys Networks, Inc.*, No. C.A. 19254, 2004 Del. Ch. LEXIS 196, at *13 n.25 (Del. Ch. Feb. 17, 2004) ("[A] beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate the promisee intends to give the beneficiary the benefit of the promised performance." (quotation omitted)).

ETFMG's citation to *Bromwich v. Hanby*, C.A. No. S08C-07-008, 2010 Del. Super. LEXIS 578 (Del. Sup. Ct. July 1, 2010), for the proposition that "contract language must 'clearly contemplate' third-party beneficiary status," misses the point. ETFMG Mem. at 19. That case explicitly acknowledges that "it is not necessary that a third party beneficiary be specifically named and identified in the contract"; rather, what is key is that "the conferring of the beneficial effect on [a] third-party . . . [is] a material part of the contract's purpose." 2010 Del. Super. LEXIS 578, at *6 (quoting *Guardian Constr. Co. v. Tetra Tech Richardson, Inc.*, 583 A.2d 1378, 1387-87 (Del. Super. Ct. 1990)). That is exactly the case here. ISE negotiated the HACK PSA

because all the parties knew that ISE was going to pay ETFMG the expenses required by that contract (as it was required to do by the Index License Agreement) and receive the profits.

In an effort to avoid its obligations to pay Nasdaq the fund profits, ETFMG concocted an oral agreement that they assert is terminable at will, and explains why, until January 2017, they paid Nasdaq the HACK profits. This litigation-driven strategy is unsupported by any contemporaneous document or consideration. No pre-litigation document or communication discusses the existence of an oral agreement, even though numerous documents discuss the operative contracts. For example, in 2016, Defendants' co-founder and President Barney Karol drafted an internal analysis of the relevant contracts. PX-232D. Nowhere does Mr. Karol mention an oral agreement with respect to the HACK profits. Indeed, Mr. Karol acknowledges that the PSA does not allow ETFMG to retain the HACK profits—"If it was in our interest to take away the payment from the ISE we could pay PureFunds *as required by the PSA* . . . ." PX-232D (emphasis supplied). Nor does ETFMG's CEO Samuel Masucci mention the purported oral agreement in a July 2016 letter to Nasdaq explaining the relevant contracts. PX-147 ("ISE's rights to HACK profits, if any, are governed only by the Index Agreement.").

As the testimony at trial will demonstrate, the only oral agreement between the parties was nothing more than an understanding among ISE, PureShares, and ETFMG as to how ETFMG would fulfill its payment obligation under the HACK PSA to the third-party beneficiary of that agreement, ISE. The HACK Amendment to the Index License Agreement obligated ISE/Nasdaq to pay the costs to launch and operate HACK, JX-3A § 4(G)(i), and obligated PureShares (and ETFMG through the Sublicense Agreement) to pay ISE/Nasdaq the "Shared Profit" from the operation of the fund, JX-3A § 4(G)(ii). ETFMG, instead of paying PureShares, paid the Shared Profit directly to ISE. Indeed, ETFMG's fulfillment of its obligations under the

HACK PSA by paying HACK profits to ISE rather than PureShares is further evidence of Nasdaq's third-party beneficiary status.  B. Ilyevsky Aff. ¶ 13 ("[I]n return for ISE paying the start-up and operating expenses of HACK directly to ETFMG, ETFMG would send to ISE any net profits generated by HACK.").

This oral agreement was merely a modification of the existing HACK PSA, not a stand-alone agreement terminable at will.  As ETFMG's Barney Karol wrote about this specific subject in June 2016, right before Nasdaq acquired ISE:

> The HACK PSA is bi-lateral between ETFMG and PureFunds. We have no legal relationship with the ISE under the HACK PSA. However we have been paying HACK profits to ISE even though the PSA states that payments should go to PureFunds.  We could go either way on this.  It if was in our interest to take away the payment from the ISE we could pay PureFunds as required by the PSA – ISE is not a party.  *Or if [it] was in our interest to keep paying ISE even if PureFunds objects, we have a good argument under Delaware law (the chosen law of the PSA) that the PSA was modified by conduct and assent even though the PSA has a clause that says modifications must be in writing.*

PFF ¶ 33 (citing PX-232D at 00098070) (emphasis supplied).  The flaw in ETFMG's litigation strategy—as ETFMG itself admits in the above-cited text from Barney Karol—is that an oral modification of an existing contract does not destroy the old contract.  *See Haft v. Dart Grp. Corp.*, 841 F. Supp. 549, 567-68 (D. Del. 1993) ("A new contract . . . does not destroy the obligation of the former agreement, except as it is inconsistent therewith, unless it is shown that the parties intended the new contract to supersede the old contract entirely.").  The parties' agreement that ETFMG would satisfy its payment obligations directly to ISE/Nasdaq did not upend ETFMG's payment obligations more generally, let alone any other of its contractual duties.  *Cf. id.* (defendant's continued payment to plaintiff even after plaintiff transferred positions was evidence that plaintiff continued to be employed by defendant for purposes of a

share repurchase agreement).  Once the parties' agreement was modified, ETFMG could only

exit the payment arrangement through termination of the HACK PSA or obtaining mutual assent

to a further modification.  *See, e.g.*, *Artesian Water Co. v. State Dep't of Highways & Transp.*,

330 A.2d 441, 443 (Del. 1974) ("[A] contract remains in force until and unless it has been

terminated according to its terms or by actions of the parties."); *see also Haft*, 841 F. Supp. at

567 & n.24 (explaining that a party who does not intend to modify a contract can either "rescind

the contract without delay" or "consent to the modification," noting that a party who acquiesces

to a modification cannot later "claim [the] remedy of repudiating the contract, since that remedy

is inconsistent with performance of the contract" (quoting *Wolf v. Globe Liquor Co.*, 96 A.2d

235, 240 (Del. Ch. 1953), *aff'd*, 103 A.2d 774 (Del. 1954))).  There is no basis to claim that any

part of the parties' agreement was a standalone contract that was terminable at will, and

Defendants remained obligated under the HACK PSA to render payments to ISE/Nasdaq.

### 2.     ETFMG Breached the IPAY/BIGD PSA

Unlike the HACK PSA, the IPAY PSA contained an explicit provision requiring ETFMG

to pay ISE/Nasdaq "all Fund Profits within ten (10) days of such Fund Profit being made

available to ETFMG or the administrator of the Funds."  JX-6 § 8(d).  ETFMG concedes that it

failed to pay Nasdaq any profits from the operation of IPAY for December 2016 and all of 2017.

*See* S. Masucci Aff. at ¶133, FN 41.  ETFMG's admitted failure to pay IPAY profits to Nasdaq

is a material breach of the IPAY/BIGD PSA.  *See eCommerce Indus., Inc. v. MWA Intelligence,

Inc.*, C.A. No. 7471, 2013 Del. Ch. LEXIS 245, at *40-41 (Del. Ch. Sept. 30, 2013) (a material

breach is a breach that "defeats the *essential purpose* of the contract" and "defeats the object of

the parties in entering into the contract" (quotation omitted)).

### 3.     ETFMG Breached All of the PSAs (and the Wholesaling Agreement) by Hiring Its Own Affiliate to Provide Statutory Distribution Services to the PureFunds

Each of the PureFunds PSAs included a provision stating that "Statutory distribution and compliance support [was] to be provided by Third Party Service Provider under separate agreement." *See, e.g.*, JX-6 at Ex. B, VIII.  In turn, the Wholesaling Agreement provides that: "[ETFMG] shall not provide statutory distribution services for the securities on the Platform . . . which will be provided by a third-party service provider."  JX-11 ¶ 3 at 3.

In 2017, ETFMG breached those provisions by hiring its wholly-owned subsidiary, ETFMG Financial, to act as the "Statutory Distributor" for all of the PureFunds ETFs. ETFMG's contention that the parties "merely acknowledged" that the contract provides that ETFMG "shall not" serve as statutory distributor—and that therefore this limitation on ETFMG was not a binding obligation—strains credulity.  ETFMG Mem. at 15-16.  Further, ETFMG's assertion that this clause really meant that since "GENCAP was not a FINRA-licensed broker-dealer, it needed to outsource the statutory distribution function until it could create an affiliate" is created from thin air and is not supported by the text of the clear language in the Wholesaling Agreement.  *Carlson v. Hallinan,* 925 A.2d 506, 527 (Del. Ch. 2006) ("A court may only resort to extrinsic evidence to ascertain the meaning of the contract if it is ambiguous."); *Progressive Int'l Corp. v. E.I. du Pont de Nemours & Co.*, C.A. No. 19209, 2002 Del. Ch. LEXIS 91, at *22 (Del. Ch. July 9, 2002) ("[T]he language of a contract governs when no ambiguity exists.").

Additionally, Defendants' argument that its corporate subsidiary is not a "third-party" would effectively read out of the agreement the requirement that a "third-party" be engaged.  *See Rexnord Indus., LLC v. RHI Holdings, Inc.*, No. 07C-10-057, 2008 Del. Super. LEXIS 347, at *33-35 (Del. Super. Ct. Sept. 17, 2008), *as corrected*, (Sept. 23, 2008) (rejecting assertion that "third party" includes party's corporate family); *see also Seidensticker v. Gasparilla Inn, Inc.*, C.A. No. 2555-CC, 2007 Del. Ch. LEXIS 155, at *9 (Del. Ch. Nov. 8, 2007) ("When

interpreting contracts, this Court gives meaning to every word in the agreement and avoids interpretations that would result in 'superfluous verbiage.'").

4.      ETFMG Concedes It Terminated the PSAs without Basis

As the basis for terminating the PSA, ETFMG cited PureShares' filing of a lawsuit in New Jersey state court.  PX-202, PX-204.  But ETFMG has now admitted that at the time PureShares filed its lawsuit, ETFMG had not paid Nasdaq or PureShares any HACK profit for all of 2017 and had not paid IPAY profit since December 2016, *see* S. Masucci Aff. at ¶133, FN 41; J. Flanagan Aff. at ¶¶40-42—the very grounds for PureShares' lawsuit.   Thus, at the time ETFMG terminated the PSAs, it knew that it had not paid Nasdaq and PureShares what it owed, but claimed that a lawsuit to compel these payments was itself a breach of those agreements. ETFMG's game of "heads I win, tails you lose" was not countenanced by the agreements, and ETFMG's insistence otherwise resulted in its own breach of the PSAs.  Allowing a party to engage in this type of contractual gamesmanship would upend the bargain to which the parties agreed—ETFMG was not entitled to walk away from the agreement because of conduct that ETFMG's actions themselves compelled, and ETFMG's decision otherwise constituted a breach.

C.      ETFMG Breached the Wholesaling Agreement

ETFMG not only breached the Wholesaling Agreement by, as described above, hiring its own affiliate to provide statutory distribution services and removing ISE-supported ETFs from the Wholesaling Agreement.  *See* PFF ¶ 119.  ETFMG also committed numerous other breaches of the agreement's express and plain contractual provisions by: (1) refusing to let Nasdaq pre-approve marketing expenses (for which ETFMG reimbursed itself from HACK profits), PFF ¶ 102; 104; (2) arbitrarily increasing the compensation Nasdaq was obligated to pay for wholesaler compensation beyond the $250,000 limit in the agreement, PFF ¶101; (3) and purporting to add

new ETFs, including BIGD, GAMR, IFLY, IPAY, LARE, and CNCR, to the Wholesaling

Agreement without amending the contract, PFF ¶ 239.

Each of these actions was prohibited by the Wholesaling Agreement.  There is no

provision in the Wholesaling Agreement that allowed Defendants to unilaterally decide what

qualified as legitimate expenses under the Wholesaling Agreement and then force Nasdaq to

reimburse Defendants for these expenses through netting.  Rather, the Wholesaling Agreement

explicitly required Nasdaq's preapproval.  PFF ¶ 102; JX-11 at 11.  These actions too constituted

a material breach of the Wholesaling Agreement.  *See, e.g.*, *Utilisave, LLC v. Khenin*, C.A. No.

7796, 2014 Del. Ch. LEXIS 286, at *33-34 (Del. Ch. Feb. 4, 2014) (a CEO's unilateral

distributions violated contract provisions requiring majority approval); *Coca-Cola Bottling Co. v.*

*Coca-Cola Co.*, 988 F.2d 386, 409-10 (3d Cir. 1993) (affirming the district court's decision that

unilateral action by one party constituted a breach of the relevant agreement).

ETFMG's litigation explanation that its netting was actually an exercise of its right to

"common law setoff" is not supported by the record or the law.  ETFMG Mem. at 22.  At the

time ETFMG started netting, it owed Nasdaq significantly more money than Nasdaq owed

ETFMG, and it explained that it was netting, not because of common law setoff, but for

Nasdaq's "convenience."  Wade Aff. ¶ 73.  The law also does not support ETFMG's position.

ETFMG claims "netting expenses . . . cannot be an independent basis for declaring a breach if

the items so set off were actually owed."  ETFMG Mem. at 22.  The problem for ETFMG is that

the amounts set off were not actually owed.  ETFMG violated the expense preapproval

provisions and then set off that amount against what it owed Nasdaq.  The evidence will show

that ETFMG netting was not justified.  Just weeks before ETFMG started netting, Nasdaq paid

ETFMG over $300,000 in expenses connected to the Wholesaling Agreement and other contracts.  PFF ¶¶ 81-83.

In an effort to avoid liability for these clear breaches of the Wholesaling Agreement, ETFMG argues that the parties orally modified the agreement or that ISE/Nasdaq waived enforcement of provisions ETFMG does not like.  ETFMG Mem. at 9-10.  These arguments are not supported by the record.  *AgroFresh Inc. v. MirTech, Inc.*, 257 F. Supp. 3d 643, 660 (D. Del. 2017) ("Delaware courts are reluctant to hold that parties have modified their agreements verbally or through a course of conduct where there is an express contract clause requiring amendments to be in writing.").  Under Delaware law, a party "asserting an oral modification must prove the intended change with specificity and directness as to leave no doubt of the intention of the parties to change what they previously solemnized by formal document."  *Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1230 (Del. Ch. 2000) (quotation omitted).  There was no modification—oral or otherwise—that supports ETFMG's actions.

Even ETFMG's affidavits do not support ETFMG's argument that the Wholesaling Agreement was orally modified or that ISE/Nasdaq waived contractual provisions.  While ETFMG's Masucci claims that he and ISE's Monaco agreed to hire additional wholesalers beyond the two specifically discussed in the Wholesaling Agreement, JX-11 Ex. C, Masucci does not assert that the agreement was modified to increase the $250,000 compensation cap to $500,000.  S. Masucci Aff. ¶ 54.  And prior to Nasdaq's acquisition, ETFMG charged ISE at most approximately $80,000 a quarter in annual wholesaling compensation.  V. Juneja Aff. ¶ 28 (citing Juneja Report Ex. 4).  However, post-acquisition, ETFMG dramatically increased this amount without legal basis.  C. Freire Aff. ¶¶ 83-85.

At base, the plain language of the Wholesaling Agreement required ISE/Nasdaq's preapproval of expenses. JX-11 Ex. A. Masucci does not assert that ISE waived or orally modified this provision prior to Nasdaq's acquisition; he simply states that ISE previously paid wholesaling expenses "without questioning their substance or amounts" because there was "mutual trust." S. Masucci Aff. ¶ 55. *See Weyerhaeuser Co. v. Domtar Corp.*, 204 F. Supp. 3d 731, 740 (D. Del. 2016) ("Waiver [of a contractual right] must be proven with clear and convincing evidence." (quotation omitted)). In any event, ISE's Monaco previously testified in deposition that prior to the Nasdaq acquisition ETFMG would seek ISE's preapproval for significant expenses. K. Monaco Dep. Tr. at 220:21-24.

Unlike Nasdaq, ETFMG had no contractual right to remove the PureFunds ETFs from the wholesaling platform and, accordingly, its attempt to do so frustrated the primary purpose of the agreement and constituted a breach of that agreement. PFF ¶ 232-233. Allowing ETFMG to unilaterally remove ISE-supported ETFs from the Wholesaling Agreement while obligating ISE/Nasdaq to continue to pay for wholesaling services makes no sense. *Cf., e.g.*, *Horizon Pers. Commc'ns, Inc. v. Sprint Corp.*, C.A. No. 1518-N, 2006 Del. Ch. LEXIS 141, at *46 & n.107 (Del. Ch. Aug. 4, 2006) (relying on the "plain and unambiguous language" of the contract and concluding that "the Court will not read into the contract anything more than Plaintiffs bargained for and received"). Because of these numerous breaches, Nasdaq was entitled to terminate the Wholesaling Agreement. JX-11 § 9(c).

**D.** **ETFMG'S Damages Claim for Breach of the Wholesaling Agreement Is Legally Unsupportable**

ETFMG claims that as a result of Nasdaq's breach of the Wholesaling Agreement it is entitled to $37 million in damages. ETFMG Mem. at 23. There are three inescapable problems with ETFMG's argument. First, this analysis is premised solely on the testimony and analysis of

a witness who has lied repeatedly under oath.  *See* Plaintiffs' Memorandum of Law in Support of its Motion in Limine to Introduce Evidence of Prior Federal Conviction, D.E. 91 at 4-8.

Second, Dr. May's damages calculation is not supported by law.  ETFMG's damages (if any) are limited to future lost AUM-based fees under the Wholesaling Agreement.  Nasdaq had three payment obligations under the Wholesaling Agreement: (1) AUM-based fees; (2) reimbursement of compensation for wholesaler salaries; and (3) reimbursement of preapproved expenses.  JX-11 at 11.  Dr. May estimated ETFMG's damages by calculating the total amount of AUM-based fees, reimbursement for wholesaler compensation, and reimbursement for expenses, ETFMG would have received had the Wholesaling Agreement gone on in perpetuity. PX-2023 ¶ 22-25.  This was a fatal error.

Under Delaware law, damages for breach of contract is limited to expectation damages, which are "calculated by (1) the loss to the non-breaching party (2) plus any loss, including incidental or consequential loss, caused by the breach (3) less any cost or other loss that the non-breaching party avoided by not having to perform."  *VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F. 3d 273, 293 (3d Cir. 2014) (citing Restatement (Second) of Contracts § 347).  "Once the loss attributable to nonperformance has been determined, a court must subtract any costs avoided as a result of the breach that are evident in the record."  *Id.* at 294.  "Contract damages 'are designed to place the injured party in an action for breach of contract in the same place as he would have been if the contract had been performed.  Such damages should not act as a windfall.'"  *Id.* (quoting *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146-47 (Del. 2009)).

The only portion of Dr. May's damages that actually would have gone to ETFMG are the AUM-based fees.  The other two components—reimbursements for compensation and expenses for wholesaling—are pass-through expenses that ETFMG could reasonably avoid.  *See*

Restatement (Second) of Contracts § 350 cmt. b. ("Once a party has reason to know that performance by the other party will not be forthcoming, he is ordinarily expected to stop his own performance to avoid further expenditure.").  Dr. May conducts no analysis as to whether the wholesaler compensation reimbursement and wholesaler expenses are costs that ETFMG avoided as a result of the breach.  Therefore, ETFMG's damages under the Wholesaling Agreement are limited to, at most, $1.639 million.  *See* PX-2023 May Report ¶ 50.

Third, Dr. May's analysis fails to account for the fact that by its terms, the Wholesaling Agreement would have terminated in September 2018, and even ignoring Dr. May's inclusion of reimbursement expenses, ETFMG's damages are limited to $1,213,250.  PX-2030 ¶ 7.

## IV.    CONCLUSION

The evidence shows that ETFMG breached the relevant contracts and engaged in tortious conduct.  For the reasons herein and the reasons stated in Nasdaq's Proposed Findings of Fact and Conclusions of Law, Nasdaq respectfully requests that the Court enter judgment in Nasdaq's favor, award it compensatory damages, punitive damages, and injunctive relief, and dismiss ETFMG's claims.

Date:  April 22, 2019                              Respectfully submitted,

*/s Justin W. Lamson*
Justin W. Lamson
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY  10019
Tel:  212.223.0200
Fax:  212.223.1942
lamsonjw@ballardspahr.com

Stephen J. Kastenberg*
David L. Axelrod*
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103

Tel:  215.665.8500
Fax:  215.864.8999
kastenberg@ballardspahr.com
axelrodd@ballardspahr.com
*Attorney for Plaintiff Nasdaq, Inc.*

*\*Admitted pro hac vice*