UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— X

NASDAQ, INC.,

                Plaintiff/Counterclaim-Defendant,

          - against -

EXCHANGE TRADED MANAGERS GROUP, LLC
AND ETF MANAGERS GROUP, LLC,

          Defendants/Counterclaim-Plaintiffs.

———————————————————————— X

Case No. 1:17-cv-08252 (PAE)

**DEFENDANTS'/COUNTERCLAIM-PLAINTIFFS'**
**<u>PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

KRAMER LEVIN NAFTALIS & FRANKEL LLP

John P. Coffey
Jeffrey S. Trachtman
Michael J. Calb
Leah S. Friedman
1177 Avenue of the Americas
New York, New York 10036
Tel: (212) 715-9100

BRIAN J. FRUEHLING, ESQ.
14 Main Street
Suite 300
P.O. Box 476
Madison, New Jersey 07940
(973) 377-0505

*Attorneys for Defendants/Counterclaim-Plaintiffs*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................... iv

TABLE OF DEFINED TERMS ................................................................................. vii

I.    PROPOSED FINDINGS OF FACT ................................................................. 1

    A.    Jurisdiction and Venue.......................................................................... 1

    B.    The Parties ............................................................................................ 1

    C.    The Business of Exchange-Traded Funds.............................................. 2

    D.    The Trilateral Relationship: ETFMG, ISE, and PureFunds....................... 5

        i.    The Original PureFunds ETFs ............................................... 5

        ii.    The HACK ETF and the Oral Agreement with ETFMG.................. 10

        iii.    The Remaining PureFunds ETFs ........................................... 12

    E.    The Wholesaling Agreement ................................................................ 15

    F.    Nasdaq's Acquisition of ISE and Determination to Exit Ventures............................. 18

    G.    Nasdaq's Conflict of Interest Over the HACK ETF.................................. 23

    H.    Nasdaq's Non-Payment and ETFMG's Self Protection ............................. 26

    I.    Mr. Chanin's Interference with the Operations of the Trust and Funds ................... 30

    J.    ETFMG Terminates the PureFunds PSAs and Oral  Agreement Governing HACK Profits ........................................................................................ 31

    K.    Nasdaq's Refusal to Confirm Indexes ...................................................... 33

    L.    Nasdaq's August 2017 Index Interruption ................................................. 36

    M.    Nasdaq's Improper Termination of the Wholesaling Agreement................................ 39

II.    PROPOSED CONCLUSIONS OF LAW ................................................................ 42

    A.    Governing Law ..................................................................................... 42

    B.    Nasdaq Is Not Entitled to HACK Fund Profit ........................................... 42

    i.     ISE Was Entitled to HACK Fund Profit Only Pursuant to an Oral
           Agreement ..................................................................................... 42

    ii.    The HACK PSA Does Not Entitle Nasdaq To HACK Fund Profit ................... 45

    iii.   Neither the Index License Agreement Nor the  Sublicense Agreement
           Entitle Nasdaq To HACK Fund Profit ................................................. 47

C.   Nasdaq Is Not Entitled To SILJ Fund Profit ................................................. 49

D.   Nasdaq, Not ETFMG, Breached the Sublicense Agreement ....................................... 50

E.   Nasdaq, Not ETFMG, Breached the Remaining PureFunds PSAs ........................... 54

F.   Nasdaq, Not ETFMG, Breached the Wholesaling Agreement ................................. 57

    i.     Nasdaq Could Not Terminate the Agreement Under Section 9(c) ................... 57

    ii.    Nasdaq Could Not Terminate the Agreement Under Section 9(d) ................... 62

G.   Nasdaq's Tort and Quasi-Contract Claims  Seeking Fund Profit Are Barred As
     Duplicative ..................................................................................... 63

    i.     Conversion ............................................................................. 63

    ii.    Unfair Competition ................................................................... 64

    iii.   Unjust Enrichment ................................................................... 65

    iv.    Quantum Meruit ...................................................................... 65

    v.     Breach of the Duty of Good Faith and Fair Dealing .......................... 66

H.   ETFMG's Damages ................................................................................. 66

I.   Alternative Conclusions on Nasdaq's Damages ....................................... 69

J.   Conclusion ..................................................................................... 71

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*2009 Caiola Family Trust v. PWA, LLC*,
   No. 8028-VCP, 2015 WL 6007596 (Del. Ch. Oct. 14, 2015) ................................................61

*Axis Reinsurance Co. v. HLTH Corp.*,
   993 A.2d 1057 (Del. 2010) .....................................................................................................46

*Biolife Solutions, Inc. v. Endocare, Inc.*,
   838 A.2d 268 (Del. Ch. 2003).................................................................................................60

*Brause v. Goldman*,
   10 A.D.2d 328 (1st Dep't 1960), *aff'd*, 9 N.Y.2d 620 (1961) .................................................48

*Briarpatch Ltd. v. Geisler Roberdeau, Inc.*,
   148 F. Supp. 2d 321 (S.D.N.Y. 2001).....................................................................................64

*Bricklayers & Allied Crafts Union Local No. 1 of DE/PA Welfare Fund v. Edward Wilkinson Co.*,
   No. 07-145-GMS, 2008 WL 4948654 (D. Del. Nov. 19, 2008)..............................................47

*Bromwich v. Hanby*,
   No. So8C-07-008, 2010 WL 8250796 (Del. Super. Ct. July 1, 2010)....................................45

*Chesapeake Energy Corp. v Bank of New York Mellon Tr. Co., N.A.*,
   No. 13 CIV. 1582, 2015 WL 4191419 (S.D.N.Y. July 10, 2015) (Engelmayer, J.), *aff'd*, 837 F.3d 146 (2d Cir. 2016) ....................................................................................65

*Crow v. Erectors*,
   1988 WL 7617 (Del. Super. Ct. Jan. 21, 1988) ......................................................................45

*Dorset Indus., Inc. v. Unified Grocers, Inc.*,
   893 F. Supp. 2d 395 (E.D.N.Y. 2012) ....................................................................................65

*Elma RT v. Landesmann Int'l Mktg Corp.*,
   No. 98 CIV. 3662, 2000 WL 297197 (S.D.N.Y. Mar. 22, 2000) .......................................63,64

*In re Garden Ridge Corp.*,
   386 Fed. Appx. 41 (3d Cir. 2010) ...........................................................................................60

*Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*,
   263 F.3d 296 (3d Cir 2001).....................................................................................................60

*Gerstley v Mayer*,
   No. N12C-10-126, 2015 WL 756981 (Del. Super. Ct. Feb. 11, 2015)....................................45

*Gierlinger v. Gleason*,
  160 F.3d 858 (2d Cir. 1998)..............................................................................69

*Hadami S.A. v. Xerox Corp.*,
  272 F. Supp. 3d 587 (S.D.N.Y. 2017) (Engelmayer, J.) ......................................43

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*,
  595 F.3d 459 (2d Cir. 2010)..............................................................................48

*Lester v. Basner*,
  676 F. Supp. 481 (S.D.N.Y. 1987)......................................................................49

*Majestic Farms Supply Ltd. v. Serv. Riding Apparel, Ltd.*,
  137 A.D.2d 501 (2d Dep't 1988) ........................................................................43

*Mayer v. Morgan Stanley & Co.*,
  703 F. Supp. 249 (S.D.N.Y. 1988)......................................................................64

*McLean v. Garage Mgmt. Corp.*,
  No. Civ. 3950(DLC), 09 ....................................................................................69

*Mercon v DiPasquale*,
  No. 04 CIV. 2793, 2005 WL 696885 (S.D.N.Y. Mar. 25, 2005) ...........................44

*Merial Inc. v. Ceva Sante Animale S.A.*,
  No. 3:15-CV-40, 2015 WL 5882964 (M.D.Ga. Oct. 7, 2015).................................45

*NetJets Aviation, Inc. v. LHC Commc'ns, LLC*,
  537 F.3d 168 (2d Cir. 2008)..............................................................................63

*Preferred Fin. Servs., Inc. v. Bus. Builders for Entrepreneurs, LLC*,
  No. CPU4-15-001583, 2016 WL 4537759 (Del. Ct. Comm. Pl. Aug. 30, 2016)...................56

*Preston Frankford Shopping Ctr. Dallas TX. Ltd. P'ship v Butler Dining Serv.,
  LLC*,
  No. 10-CV-6448L, 2010 WL 3609469 (W.D.N.Y. Sept. 15, 2010)........................44

*Process Am., Inc. v. Cynergy Holdings, LLC*,
  839 F.3d 125 (2d Cir. 2016)..............................................................................53

*Prof'l Merch. Advance Capital, LLC v. C Care Servs., LLC*,
  No 13-cv-6562, 2015 WL 4392081 (S.D.N.Y. July 15, 2015)...............................65

*Salomon v Citigroup Inc.*,
  123 A.D.3d 517 (1st Dep't 2014) .......................................................................66

*Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*,
  769 F.3d 807 (2d Cir. 2014)..............................................................................53

*Siga Techs., Inc. v. PharmAthene, Inc.*,
   132 A.2d 1109 (Del. 2015) .................................................................................................66, 69

*Street Search Partners, L.P. v. Ricon Int'l, L.L.C.*,
   No. Civ.A.04C-09-156, 2005 WL 1953094 (Del. Super. Ct. Aug. 1, 2005) ...........................46

*Weyerhaeuser Co. v. Domtar Corp.*,
   721 Fed. Appx. 186 (3d Cir. 2018) ..................................................................................59, 63

**Statutes**

28 U.S.C. § 1332 ....................................................................................................................1

28 U.S.C. § 1391 ....................................................................................................................1

Investment Company Act of 1940 ..................................................................................... *passim*

Securities Exchange Act of 1934 ...............................................................................................4

**Other Authorities**

N.Y. C.P.L.R. § 5004 ..............................................................................................................69

## TABLE OF DEFINED TERMS

| Defined Term | Description |
|---|---|
| BMA | October 19, 2012 Business Management Agreement |
| Chambers Report | Expert report of Matthew A. Chambers (DX-804) |
| DX | ETFMG's Trial Exhibit |
| ETFMG | ETF Managers Group, LLC<br>*Except where otherwise noted, "ETFMG" is used collectively to refer to ETFMG, ETMG, and their predecessors |
| ETFMG Financial | ETFMG Financial, LLC |
| Factor | Factor Advisors, LLC |
| Flanagan Aff. | Affidavit of John A. Flanagan |
| GENCAP | GENCAP Advisors, LLC |
| Ilyevsky Aff. | Affidavit of Boris Ilyevsky |
| Index License Agreement | Index License and Exchange Traded Product Agreement (JX-1) |
| Investment Advisory Agreement | October 16, 2014 Factorshares Trust Form of Investment Advisory Agreement with Factor Advisors, LLC (DX-8), as amended June 24, 2016 with ETF Managers Group, LLC (DX-9) |
| ISE | International Securities Exchange |
| Juneja Report | Expert report of Vinita Juneja, Ph.D. (DX-838) |
| JX | Parties' Joint Trial Exhibit |
| Loebs Aff. | Affidavit of Terrence E. Loebs |
| Karol Aff. | Affidavit of Bernard Karol |
| Mahaffey Aff. | Affidavit of David Mahaffey |
| Masucci Aff. | Affidavit of Samuel R. Masucci III |
| May Aff. | Expert affidavit of Donald M. May, Ph.D |
| May Rebuttal Report | Expert rebuttal report of Donald M. May, Ph.D (DX-839) |
| May Report | Expert report of Donald M. May, Ph.D. (DX-800) |
| Nasdaq | Nasdaq Inc. |
| P&L Statement | Profit and Loss Statement |
| PSA | SEC '40 Act Platform Service Agreement |
| Sublicense Agreement | 2012 Sublicense Agreement (JX-2), as amended in 2015 (JX-2A) |
| Trust | Factorshares Trust, renamed ETF Managers Trust |
| Wholesaling Agreement | April 22, 2013 Wholesaling Platform Services Agreement, as amended (JX-11, 11A, 11B) |
| Wholesaling Expenses | All expenses (including wholesalers' salaries) necessary for the creation and maintenance of a permanent ETF sales force |
| Wholesaling Fees | Monthly AUM-based fees to keep each of its ISE-Supported ETFs on the Wholesaling Platform |
| Wholesaling Platform | ETFMG's wholesaling sales operation |

ETFMG respectfully submits these proposed findings of fact and proposed conclusions of law for the Court's consideration.  ETFMG anticipates that additional evidentiary support for many of the most significant findings herein will be developed through live testimony at trial, including cross-examination of Nasdaq's witnesses and in particular the testimony of Kris Monaco, the former senior manager at ISE who played a central role in the relationship between ISE and ETFMG prior to Nasdaq's acquisition of ISE in 2016.[1]

# I.       PROPOSED FINDINGS OF FACT[2]

## A.      Jurisdiction and Venue

1.       This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between Nasdaq and ETFMG and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

2.       Venue in this District is proper under 28 U.S.C. § 1391 because Nasdaq is headquartered in the Southern District of New York, and because both all parties conduct business in the Southern District of New York.

## B.      The Parties

3.       Exchange Traded Managers Group LLC is a New Jersey limited liability company, headquartered in Summit, New Jersey.  Exchange Traded Managers Group is the corporate parent to ETF Managers Group, LLC.

4.       ETF Managers Group, LLC is a registered investment advisor under the Investment Company Act of 1940 (the "'40 Act"), headquartered in Summit, New Jersey. ETFMG acts as the investment advisor to ETF Managers Trust, formerly known as Factorshares

---

[1] Mr. Monaco declined ETFMG's request to provide a direct testimony affidavit and has been subpoenaed by both parties to testify live at trial.

[2] Please refer to the defined terms table (*supra*, p. vi) for a description of capitalized terms used herein.

Trust.  The Trust has a three-member board of trustees, two of whom are independent of ETFMG.

       5.       Nasdaq, Inc. is a publicly traded Delaware Corporation, headquartered in New York, New York.  Nasdaq owns the second largest stock exchange in the world and provides a variety of other financial services.  In 2016, Nasdaq acquired International Securities Exchange, primarily for its commodity exchange business.  As part of this acquisition, Nasdaq acquired all the assets, investments, and intellectual property owned by ISE, including its business developing and marketing various ETFs.

      **C.**        **The Business of Exchange-Traded Funds**

       6.       The dispute between the parties involves the management, indexing, distribution, and marketing of exchange traded funds ("ETFs").  ETFs are a relatively new form of investment company, first introduced in 1993.  Like mutual funds, ETFs offer investors a way to pool their money in funds that invest in stocks, bonds, or other financial assets and, in return, to receive an interest in that investment pool.  Masucci Aff. ¶ 10; DX-804 (Chambers Report), at ¶¶ 16-17.

       7.       The principal law governing the management and administration of ETFs is the '40 Act.  The '40 Act dictates that ETFs be issued by an independent trust, whose board must have a majority of independent trustees.  A trust can issue more than one ETF; when it does, the trust is said to have a "series" of ETFs.  The trustees meet periodically (typically at least quarterly), request and review reports relating to ETF matters, and engage in discussions with the investment advisor, counsel, auditors, and others.  They oversee financial reporting, compliance, portfolio performance, valuation, and disclosure, among other functions.  In

addition, the chief compliance officer of the fund reports directly to the independent trustees. Masucci Aff. ¶ 11; DX-804 (Chambers Report), at ¶¶ 23, 25.

8.      The day-to-day operations of running and marketing an ETF is typically the responsibility of an investment advisor hired by the independent trustees.  The advisor must be registered with the SEC under the '40 Act and, among other roles, generally has responsibility for portfolio management and trading; statutory distribution; recommending and implementing changes in investment policy; engagement and supervision of service providers, including fund administrator and fund custodian; regulatory reporting, compliance, and disclosures; shareholder votes; sales activity; fund taxes; and other responsibilities imposed by the SEC.  Masucci Aff. ¶ 12; DX-804 (Chambers Report), at ¶ 22.

9.      The advisor may choose to perform these functions itself, through an affiliate, or by hiring a third party.  The advisor typically has a seat on the trust board, but the advisory contract between the trust and the advisor must be approved by vote of the independent trustees and is up for renewal at least annually.  Masucci Aff. ¶ 12; DX-804 (Chambers Report), at ¶ 21.

10.      At all relevant times, the two independent trustees of the Trust retained ETFMG or its predecessor to act as the Trust's advisor and renewed the advisory contract at each annual review.  DX-804 (Chambers Report), at ¶ 23.

11.      An ETF advisor is paid a management fee (sometimes called an advisory fee or unitary fee) that is set by its investment advisory contract with the trust.  Most typically, and in the case of ETFMG, the fee is a percentage of the ETF's assets under management ("AUM").  DX-9, § 7, Schedule A.  To calculate the management fee over any given period, the stated fee – for example, 0.05% of the fund's AUM (or fifty basis points) – is divided by 365 and

multiplied by the average AUM for that period.  Masucci Aff. ¶ 13; DX-804 (Chambers Report), at ¶ 32.

12.     The fee paid to ETFMG for its services to the Trust and its series of ETFs ("Management Fee") was set from time to time by unanimous vote of the independent trustees of the Board.  Masucci Aff. ¶ 13; Loebs Aff. ¶¶ 10, 14-18, 20.

13.     Most ETFs track the performance of an index.  Indexes are designed to measure, as closely as possible, the value of a specific financial market or segment of that market.  An index-based ETF, in turn, seeks to earn the return of the subset of the market captured by the index that it aims to replicate.  It is ordinarily the job of the ETF's advisor, subject to board approval, to identify the index the ETF will track and select the index provider. The index provider, usually in exchange for an AUM-based fee, maintains the index and adjusts it for changes in the underlying securities, corporate events, and other actions.  It is critical that the index provider supply daily files describing changes to the index, because the advisor uses this information during market hours to administer the ETF so that it tracks the index.  Masucci Aff. ¶ 14; DX-804 (Chambers Report), at ¶ 18.

14.     ETFMG, as advisor to the Trust, has a fiduciary duty to ensure that the Trust's index provider is properly maintaining the indexes and acting in the best interests of the shareholders.  Masucci Aff. ¶ 14.

15.     An ETF board selects a principal underwriter for the ETF (also known as a distributor), which is tasked with selling or distributing ETF shares and must be a registered broker-dealer under the Securities Exchange Act of 1934.  Typically, the distributor is an affiliate of the ETF's sponsor or adviser.  Under the '40 Act, the distributor must serve pursuant to a written contract approved by the board at least annually.  The distributor plays a key role in the

creation and redemption of ETF shares.  A distributor of an ETF has a number of responsibilities, including effecting transactions with authorized participants, communicating the details of creation and redemption baskets, and reviewing and submitting advertising and marketing materials to the Financial Industry Regulatory Association ("FINRA").  Masucci Aff. ¶¶ 18, 90; Loebs Aff. ¶ 24.

      **D.**     **The Trilateral Relationship: ETFMG, ISE, and PureFunds**

        i.    The Original PureFunds ETFs

      16.    Many of the ETFs issued by the Trust tracked ISE indexes since inception. Prior to its acquisition by Nasdaq in June 2016, ISE was an equity options exchange that had a small business developing and marketing various ETFs called ISE ETF Ventures ("Ventures"). In or about late 2011, Kris Monaco, the head of Ventures, entered into discussions with the ETF branding and marketing firm PureShares, LLC (d/b/a PureFunds) ("PureFunds").  DX-12.  The idea was for ISE to provide index design and financial support for three new thematic equity ETFs.  *Id.*  In exchange, ISE would receive a tiered revenue share with PureFunds if and when those ETFs reached "breakeven" (that is, once the ETF reached the point at which its Management Fee covered all of its expenses, and above which, the remaining Management Fee is "Fund Profit").  *Id.*  Those ETFs were Junior Silver ETF (ticker symbol "SILJ"); Diamond/Gemstone ETF ("GEMS"); and Mining Service EFT ("MSXX") (together, the "Original PureFunds ETFs").  Ilyevsky Aff. ¶¶ 3-4, 6.

      17.    PureFunds, a small entity then operated by Paul Zimnisky and Andrew Chanin, had neither the operational expertise nor the various regulatory approvals required to launch and operate ETFs.  ISE had no interest in taking on the operational burden of running an ETF day-to-day, so Mr. Monaco worked with PureFunds to engage Samuel Masucci at Factor

Advisors, LLC, which would create the Trust to issue these ETFs and act as advisor to the Trust pursuant to the '40 Act.  The parties agreed that Mr. Chanin would manage fund marketing and act as the public face of the funds.  Ilyevsky Aff. ¶ 7; Masucci Aff. ¶ 22.  This arrangement led to a number of agreements, both written and oral, among the various parties:

    a.      On or about June 18, 2012, ISE signed the Index License and Exchange Traded Product Agreement with PureFunds.  JX-1.  This agreement granted PureFunds a license to use ISE's indexes for the Original PureFunds ETFs in return for PureFunds' promise to perform, or engage someone else (i.e., Factor) to perform, certain day-to-day operational functions for those funds.  JX-1, §2(C); Masucci Aff. ¶ 30.

    b.      Because ISE, PureFunds, and Factor all intended that it would be Factor – not PureFunds – that would create and operate the Original PureFunds ETFs, ISE and PureFunds entered into a contemporaneous Sublicense Agreement with Factor, which granted Factor "a non-exclusive and non-transferable sublicense to use the Intellectual Property in connection with the issuance, distribution, marketing, and/or promotion" of the Original PureFunds ETFs.  JX-2, at ¶ 1; Masucci Aff. ¶ 31.[3]  The Sublicense Agreement imposed no financial obligation on Factor. Rather, it was intended to protect ISE's right to the index and ISE's related intellectual property; it permitted Factor to use ISE's index marks and data but required Factor to recognize ISE's ownership over that property.  *See* DX-303 (November 15, 2012 email from Monaco noting that the Sublicense Agreement was a "standard form" that was "meant to address . . . usage of marks, copyrights,

---

[3] The Sublicense Agreement was re-executed on December 2, 2015 with an updated list of pertinent ETFs.  JX-2A.

logos, and other IP").  The Sublicense Agreement expressly excludes (in ¶ 2) anything contained in the Schedule to the Index License Agreement (the "Schedule"), which, among other things, laid out the license fees and certain fee-splitting terms between PureFunds and ISE.  JTX-2, ¶ 2.  ("[Factor] acknowledges that it has received and read a copy of the [Index] License Agreement (*excluding the Schedule setting forth the license fees*) and agrees to be bound by all the provisions thereof . . . .") (emphasis added).  When the Trust board asked ISE and PureFunds to provide a copy of the full Index License Agreement, Mr. Zimnisky and Mr. Monaco agreed to provide the board with a redacted version; there was no reason for the Trust to know the license fees or how ISE and PureFunds would allocate between themselves any Fund Profit they might receive.  Masucci Aff. ¶ 32; DX-301 (Monaco October 2012 email exchange with PureFunds); DX- 302 (Monaco November 14, 2012 email forwarding redacted copy to Factor).[4]

c.   In October 2012, as the parties got closer to launch of the Original PureFunds ETFs, the Trust entered into a Business Management Agreement with PureFunds, whereby, among other things, PureFunds was to be responsible for "general management of the Funds' affairs" and obligated to pay the start-up and (with limited exception) the ongoing operating expenses of the Original PureFunds ETFs.  JX-12B, § 1 & Ex. A; Masucci Aff. ¶ 24.  In exchange for the financial support and management required by the BMA, the Trust would pay to PureFunds a Management Fee of 69 basis points based on AUM.  JX-12B, Ex. B.  Pursuant

---

[4] In March 2016, the SEC required that the Board review an un-redacted version of ISE's agreement with PureFunds.  This was the first time that ISE shared the un-redacted agreement with ETFMG.  *See* Monaco's related email correspondence at DX-72; DX-73; DX-74; DX-75. *See also*  DX-413 (March 17, 2016 Board Minutes), at 8.

to the Schedule attached to the Index License Agreement, PureFunds would then

pay to ISE the share prescribed in the Schedule.  JX-1, at 20, 24, 28.

d.      As noted above, however, ISE, PureFunds, and Factor all understood that

PureFunds had neither the operational expertise nor financial wherewithal to

fulfill its obligations to the Trust under the BMA and merit the prescribed

compensation.  Masucci Aff. ¶ 24.  Accordingly, it was orally agreed between

Factor (by its principal, Mr. Masucci) and ISE (by Mr. Monaco, with the

concurrence of Ventures' Managing Director, Boris Ilyevsky, and ISE CEO, Gary

Katz) that ISE, not PureFunds, would pay to Factor the start-up costs and fund

expenses of the Original PureFunds ETFs not covered by the Management Fees.

In return, Factor and ISE orally agreed that Factor would send to ISE, not

PureFunds, any net profits generated by the Original PureFunds ETFs, consisting

of revenues remaining after all expenses.  Ilyevsky Aff. ¶¶ 9-10; Masucci Aff.

¶¶ 24-25.

18.      Neither the Index License Agreement, the Sublicense Agreement, nor the

BMA required ISE to pay to Factor any of the expenses associated with the Original PureFunds

ETFs; pursuant to the oral agreement ISE made with Factor, ISE did so nonetheless.  The

decision to make ISE's arrangement with Factor an oral agreement as opposed to a written

agreement was carefully considered within ISE.  Ilyevsky Aff. ¶¶ 9-10; Masucci Aff. ¶¶ 24-

25.  At the time, senior leadership at ISE, including CEO Katz and General Counsel Simon, had

concerns about engaging directly in writing with the funds' advisor (Factor).  This was in part

due to perceived regulatory issues at the time, as well as a preference for maintaining lower

visibility for ISE in what was then a novel business arrangement.  Ilyevsky Aff. ¶ 10.

19.     The Board's independent trustees were not comfortable authorizing the launch of the Original PureFunds ETFs without assurances that some person or entity other than PureFunds – which had no financial means – would pay any potential shortfall (that is, the operating costs of an ETF not covered by the Management Fee (the "Fund Shortfall")) until the funds reached breakeven.  Messrs. Chanin, Monaco, and Masucci explained the terms of their oral financial arrangement to the Board in October 2012.  DX-400 (October 3, 2012 Board Minutes), at 26-27; Masucci Aff. ¶ 26.  When Mr. Monaco affirmed that ISE would pay the fund operating expenses directly to ETFMG in return for ETFMG sending Fund Profit directly to ISE, the Board authorized launching the funds.  *Id.* at 27-29; Masucci Aff. ¶ 26.

20.     The Original PureFunds ETFs launched in November 2012.  Each month thereafter, Factor sent to ISE statements showing the amount of the Management Fee that Factor had received for each ETF (which was a function of that month's average daily AUM for each respective ETF), the monthly operating expenses for each ETF, and the amount ISE needed to pay to Factor because these ETFs had not yet reached breakeven.  *See, e.g.*, JX-309-321 (October 2014 – October 2015 SILJ Profit and Loss Statements).  ISE approved and paid every invoice received from Factor or, later, Factor's successor ETFMG.  However, GEMS and MSXX did not acquire any meaningful assets.  Masucci Aff. ¶ 28.  In the fall of 2013, ISE decided that it would terminate the indexes for GEMS and MSXX.  DX-20-22 (late 2013 ISE discussions concerning terminating the indexes for these funds).  Mr. Masucci thereafter recommended that the Board close GEMS and MSXX, which it agreed to do.  DX-406 (May 28, 2014 Board Minutes), at 5; Masucci Aff. ¶ 28; Loebs Aff. ¶ 11; Ilyevsky Aff. ¶ 11.

21.     In 2014, Mr. Masucci and Mr. Monaco discussed adjusting the arrangement between ISE and (what was now) ETFMG to ensure that ETFMG would have the

cash available to pay expenses as they came due, rather than wait for reimbursement from ISE. *See* DX-34 (November 13, 2014 email regarding establishing escrow account).  Accordingly, ISE and ETFMG orally agreed that ISE would pre-fund expenses by periodically wiring funds to ETFMG, which ETFMG would then debit to meet each month's Fund Shortfall.  Masucci Aff. ¶ 47 n.10; Flanagan Aff. ¶ 25.

22.     Although the remaining Original PureFunds ETF, SILJ, had not yet reached breakeven, Mr. Monaco believed the fund presented a possible opportunity for repurposing.  DX-62 (Monaco's December 2015 emails regarding options for SILJ).  However, ISE was not ready to make a decision regarding repurposing by the time the BMA expired on its own terms on October 18, 2015.  JX-12B, at § 4; DX-62.  Notwithstanding the expiration of the BMA, ISE continued to pay the operating expense deficit for SILJ from month to month beyond October 2015, *see, e.g.*, JX-325 (March 7, 2016 SILJ invoice), as Mr. Masucci and Mr. Monaco discussed various options, including changing the focus of the ETF to something other than silver mining related securities.  ISE had not decided on the next steps for SILJ at the time Nasdaq acquired ISE in June 2016.  Masucci Aff. ¶¶ 29, 107-09; Flanagan Aff. ¶ 30, n.12.

ii.     The HACK ETF and the Oral Agreement with ETFMG

23.     In 2014, Mr. Monaco and his colleague at ISE, Corey Villani, came up with the idea to create and finance the industry's first cybersecurity fund, which was ultimately given the ticker symbol "HACK."  DX-27.  After considering several options, ISE decided to use the PureFunds brand as the fund sponsor.  Amending ISE's existing agreement with PureFunds to include HACK would be the quickest path for bringing the ETF to market.  JX-3 (HACK

supplement to the Schedule).[5]  As with the Original PureFunds ETFs, ETFMG would launch

HACK and run its day-to-day operations, with PureFunds as the brand name.  Masucci Aff.

¶¶ 35-36, 41; Loebs Aff. ¶ 14; Flanagan Aff. ¶ 15.

24.     The parties decided to market HACK differently than the Original

PureFunds ETFs.  DX-28.  Mr. Zimnisky had left PureFunds in early 2014, Mr. Chanin's track

record in marketing the Original PureFunds ETFs was mixed, and ISE felt that it needed

someone with more ETF industry experience and media savvy.  ISE and ETFMG decided to

engage Christian Magoon as the principal public face of HACK.  Mr. Magoon was an industry

veteran who had worked for a successful ETF issuer in the past, and who was known for creating

and marketing thematic concepts.  Masucci Aff. ¶ 36; Ilyevsky Aff. ¶ 12.

25.     Mr. Monaco and Mr. Masucci discussed how best to structure the overall

deal.  Rather than expand the scope of the BMA, it was decided that HACK would be governed

by a separate SEC '40 Act Platform Services Agreement.  Consistent with their expressed

concern when documenting the contractual arrangements for the Original PureFunds ETFs

(*supra* ¶ 18), Mr. Katz and Mr. Simon did not want ISE to be party to a written agreement to

index and finance a fund with the advisor (now owned by ETFMG).  *See* DX-306 (October 9,

2014 related email chain).  Accordingly, ISE decided not to be a party to the HACK PSA.  *See*

DX-119.  Nor did the HACK PSA did not contain any provision for the payment of Fund Profit.

Rather, as part of the overarching positive relationship, Mr. Masucci and ISE agreed – with the

concurrence of Mr. Chanin – that the oral financial arrangement the parties had in place for the

Original PureFunds ETFs would apply as well to HACK.  Namely, ISE would pay ETFMG the

---

[5] As with the original Index License Agreement and Schedule, ETFMG was provided only with a
redacted copy of this supplement.  DX-30 (Monaco's October 10, 2014 email sending redacted
supplement).

start-up and any unpaid operating expenses for HACK and, in turn, ETFMG would pay any Fund

Profit generated by HACK to ISE.  Masucci Aff. ¶¶ 37-40; Ilyevsky Aff. ¶ 13; Flanagan Aff.

¶ 15, 17; Loebs Aff. ¶ 15.

26.    In October 2014, the Board authorized the launch of HACK under the

PureFunds brand, with ETFMG as advisor.  DX-407 (October 16, 2014 Board Minutes), at 7-10.

Under the Investment Advisory Agreement, ETFMG was to receive the entire Management Fee

in return for operating the fund.  *See* DX-8 (October 16, 2014 Investment Advisory Agreement),

§ 7 & Schedule A.

27.    HACK launched on November 12, 2014.  Notwithstanding that there was

no written agreement requiring it do so, ISE paid to ETFMG HACK's start-up costs (JX-173)

and first month's Fund Shortfall (JX-175).  Masucci Aff. ¶¶ 42-43; Ilyevsky Aff. ¶ 14.

28.    HACK was a huge success and surpassed breakeven in December 2014,

one month after its launch.  By June 2015, HACK's AUM had surpassed $1.2 billion.  DX-848

(chart of all ETFs issued by Trust).  Each month, ETFMG sent ISE a P&L Statement and paid

ISE the entirety of HACK's Fund Profit.  JX-176-195 (December 2014 – June 2016 HACK P&L

Statements).  Because HACK's Management Fee was higher than its operating costs, ISE

stopped paying any of HACK's operating expenses to ETFMG.  Rather, those fees were

deducted from the Management Fee, and notwithstanding the lack of any written agreement to

do so, ETFMG paid the difference (i.e., the Fund Profit) to ISE.  Masucci Aff. ¶ 44; Loebs Aff.

¶¶ 16-17.

iii.    The Remaining PureFunds ETFs

29.     Encouraged by HACK's success, in 2015 ISE and ETFMG began working to develop additional sector-specific ETFs.[6]  The result was six new ETFs:

a.     PureFunds ISE Big Data ETF (ticker: "BIGD" – originally BDAT);

b.     PureFunds ISE Mobile/Electronic Payments ETF (ticker: "IPAY");

c.     PureFunds Video Game Tech ETF (ticker: "GAMR");

d.     PureFunds Drone Economy Strategy ETF (ticker: "IFLY");

e.     PureFunds ETFx HealthTech ETF (ticker: "IMED"); and

f.     PureFunds Solactive FinTech ETF (ticker: "FINQ").

30.     These six ETFs (collectively, the "Remaining PureFunds ETFs" and, together with HACK and the Original PureFunds ETFs, the "PureFunds ETFs") operated in much the same way as HACK.  Each was launched by the Board, marketed under the PureFunds brand, advised and managed by ETFMG (and its subcontractors), and financially supported by ISE.  Additionally, like HACK, each was governed by a PSA.  Masucci Aff. ¶¶ 45-46, Flanagan Aff. ¶¶ 22-23; Loebs Aff. ¶¶ 16, 18, 20.  *See* JX-6 (BIGD / IPAY PSA); JX-7 (FINQ PSA); JX-8 (GAMR PSA); JX-9 (IFLY PSA); JX-10 (IMED PSA).

31.     There were, however, significant differences between the HACK PSAs and the PSAs for the Remaining PureFunds ETFs.  Unlike the HACK PSA, the Remaining PureFunds PSAs included ISE as a party along with ETFMG and PureFunds.  ISE had incorporated Ventures as a separate LLC in 2015, which ameliorated ISE's regulatory concerns and made it more comfortable taking a public role in broader business activities with investment advisors such as ETFMG.  In addition, the Remaining PureFunds PSAs put in writing both ISE's

---

[6] As with HACK and the Original PureFunds ETFs, PureFunds had no more than *de minimus* involvement in the research or analysis of any of these launches.

obligations as the financial backstop for expenses and ETFMG's obligation to pay any Fund Profit to ISE. *Id.* (all at §§ 7(c), 8(d)-(e)).[7]  Ilyevsky Aff. ¶¶ 15-16; Masucci Aff. ¶ 47; Flanagan Aff. ¶ 23.

32.     However, because ISE had developed a positive and mutually beneficial business relationship with Mr. Masucci and ETFMG, it was comfortable relying on the oral agreement under which the parties had been operating since HACK's inception.  ISE did not seek to amend the HACK PSA either to add itself as a party or to insert payment terms.  ETFMG continued regularly sending HACK Fund Profit to ISE pursuant to the oral agreement described in paragraph 25 above.  Ilyevsky Aff. ¶¶ 15-16; Masucci Aff. ¶ 47.

33.     The Board's independent trustees approved the launch of the Remaining PureFunds ETFs with ETFMG as advisor.[8]  DX-409 (June 5, 2015 Board Minutes), at 6-8; DX-410 (September 10, 2015 Board Minutes), at 6-10; DX-412 (December 2, 2016 Board Minutes), at 5-9; DX-416 (June 22, 2016 Board Minutes), at 7-16.  In April 2015, the Index License Agreement's Schedule was further supplemented to include BIGD and IPAY.  JX-4.  In October 2015, that Schedule was supplemented again to include GAMR.  DX-6.  In each instance, as with the HACK supplement to the Schedule in 2014, ETFMG was provided only with a redacted copy, which blacked out the license terms and fee-splitting provisions for the newly added funds. Loebs Aff. ¶¶ 16, 18, 20; Masucci Aff. ¶ 48.

---

[7] In addition, the Remaining PureFunds PSAs required ISE to prefund an expense reimbursement account every 90 days from which ETFMG could extract monies to cover the expenses of funds for which there was a monthly shortfall.  JX-6-10 (all at § 7(c)); DX-38 (Masucci email to Monaco showing deduction from prefunded expense reimbursement account for November 2014  HACK Fund Shortfall).  This had always been the way in which funds had flowed going back all the way to the 2012 Original PureFunds ETFs, but for the first time it was memorialized in writing as an ISE requirement.

[8] Each fund was added to the Investment Advisory Agreement between ETFMG and the Trust, under which ETFMG receives the entire Management Fee in return for operating the funds.  See DX-9 (June 24, 2016 Amended Investment Advisory Agreement), at § 7 & Schedule A.

34.     None of the Remaining PureFunds ETFs proved nearly as successful as HACK.  Three funds – BIGD, IMED, and FINQ – never reached breakeven and were closed by the Board in mid-2017.  DX-422 (August 24, 2017 Board Minutes), at 2; DX-423 (September 21, 2017 Board Minutes), at 3; DX-848 (chart of all ETFs issued by Trust).  By the end of 2016, IPAY was the only Remaining PureFunds ETF that had generated Fund Profit.  *See* JX-225-234 (IFLY March 2016 – December 2016 P&L Statements); JX-141-151 (GAMR March 2016 – December 2016 P&L Statements); JX-273-287 (IPAY October 2015 – December 2016 P&L Statements).  Masucci Aff. ¶ 49; Flanagan Aff. ¶¶ 24-25.

35.     Upholding its obligations under the Remaining PureFunds PSAs, ISE paid for the launch of these funds, as well as the substantial Fund Shortfall, notwithstanding the failure of all but one of them to generate Fund Profit.  And, as had always been the case for HACK and the Original PureFunds ETFs, ISE did not dispute the expenses enumerated on these funds' P&L Statements.  Masucci Aff. ¶ 50; Flanagan Aff. ¶ 24.

        E.     **The Wholesaling Agreement**

36.     Separate and apart from the above-described written and oral agreements concerning the PureFunds ETFs, in 2013, an opportunity arose for ISE to invest in the creation and support of a wholesaling sales operation at GENCAP Advisors, LLC (Factor's parent entity).  The idea was to market not only the funds that ISE launched in partnership with Factor, such as the Original PureFunds ETFs, but also funds that ISE or Factor launched with other partners.  DX-15.  Mr. Masucci and Mr. Monaco negotiated the terms of the Wholesaling Agreement.  JX-11.  ISE would pay monthly to GENCAP AUM-based fees ("Wholesaling Fees") to keep each of ISE's ETFs on the Wholesaling Platform.  *Id*., Exs. A, B.  Conversely, GENCAP would pay ISE a cut of the AUM-based Wholesaling Fees that Factor received from third-party ETFs added to

the Platform ("Third-Party Fees").  *Id*., Ex. A.  Additionally, ISE agreed to pay all expenses for the sales force necessary to carry out the sales operation for the funds on the Wholesaling Platform ("Wholesaling Expenses").  These Wholesaling Expenses would include the individual wholesalers' annual compensation (*id*., Ex. C), as well as expenses related to regulatory fees, administration, accounting, travel, entertainment, conferences, and trade shows (*id*., Ex. A).  Masucci Aff. ¶¶ 51-54; Flanagan Aff. ¶ 26.

    37.    Following execution of the Wholesaling Agreement, ISE and GENCAP (and later ETFMG) agreed to add various funds to the Wholesaling Platform.  In some cases – such as HACK, IFLY, and GAMR – a written amendment to Exhibit B (listing funds) was executed.  *See* JX-11A-11B.  In other cases,  Mr. Monaco and Mr. Masucci orally agreed to add both ISE-Supported Funds and Third-Party Funds to the Wholesaling Platform.  *See* DX-315 (June 29, 2016 email from Monaco explaining that "we never had a chance to execute addenda for the other funds [not listed on Ex. B]").  These oral agreements were permissible, as the Wholesaling Agreement provides only that "changes to the Wholesaling Platform must be mutually agreed upon [by] ISE and GENCAP."  JX-11, § 7.b.  Masucci Aff. ¶ 56.

    38.    The Wholesaling Agreement continued to evolve as the ETFMG-ISE relationship grew and the support needs for the ETFs increased.  As a result, and given HACK's success and the importance of continued marketing of all funds on the Wholesaling Platform, the sales team needed an expansion.  Although the Wholesaling Agreement originally capped the number of wholesalers at two and their combined annual compensation at $250,000 (JX-11, at Ex. C), ISE agreed to add more wholesalers to the platform in 2015 and 2016 and to increase their salaries.  *See, e.g.*, JX-393 (December 16, 2015 wholesaler invoice reflecting three wholesalers); DX-81 (Monaco's May 12, 2016 email to Ilyevsky approving wholesaler invoice

reflecting four wholesalers); DX-109 (August 22, 2016 wholesaler invoice reflecting higher salaries); DX-110 (August 2016 Nasdaq slide deck on ISE integration and Wholesaling Agreement: "salary and benefits for 4 wholesalers."), at slide 2 ("Summary").  This agreement to add the additional wholesalers was permissible under the Wholesaling Agreement, which states that the "number of Wholesalers and the Compensation Cap may be amended from time to time as mutually agreed to by the parties."  JX-11, at Ex. C.  Masucci Aff. ¶ 55.

39.      The Wholesaling Agreement provided that Wholesaling Expenses "be agreed upon by ISE and [ETFMG] in advance of those expenses being incurred" and "not exceed $50,000" annually absent ISE consent.  However, Mr. Ilyevsky and Mr. Monaco authorized and ISE paid various Wholesaling Expenses without pre-authorization and which exceeded $50,000 in both 2015 and 2016.  This practice was based in part on the understanding that ETFMG was best suited to decide which expenses were reasonable and necessary for marketing the funds on the Wholesaling Platform.  The fact that ETFMG was exceeding the cap was discussed at ISE among Mr. Monaco, Mr. Katz, and ISE Senior Vice President of Finance and Administration Lance Emmons, and given ISE's relationship with ETFMG, they did not view this as a problem.  In fact, ISE was considering whether to enter into an even closer relationship with ETFMG, either by making additional investments in the Wholesaling Platform or restructuring the Wholesaling Agreement.  *See, e.g.*, DX-304; DX-76; DX-78; DX-79 (emails concerning potential modifications to ETFMG relationship); Masucci Aff. ¶ 55.

40.      ISE and ETFMG envisioned that the Wholesale Platform would exist in perpetuity, regardless of the success of the Original PureFunds ETFs, so long as the funds on the platform continued to perform at a certain asset level.  The Wholesaling Agreement specifically required ISE to "refrain from initiating or participating in any action related to the removal of

[ETFMG] from its role in the Wholesaling Platform.  *See* JX-11, at §§ 7(d), 9(a)-(f), Ex. B.

Moreover, ISE decided to waive its option to automatically remove funds from the Wholesaling

Platform that were performing below the set asset level.  These sunset provisions allowed the

funds to be removed without any affirmative action by ISE, but also allowed ISE to retain the

option to continue paying for promising funds to remain on the platform regardless of whether

they were below their AUM milestones, as changes to the Wholesaling Platform itself could be

mutually agreed upon by ISE and ETFMG.  JX-11, § 7(b); Masucci Aff. ¶ 58.

        41.     The relationship and dealings between ISE and ETFMG were cooperative

and positive, and the parties operated under the combination of oral and written agreements

without conflict until 2016, when Nasdaq came on the scene.  Although Nasdaq has alleged that

ETFMG thereafter launched a campaign to disrupt the parties' relationship, the evidence at trial

did not support that conclusion.  Rather, the evidence overwhelmingly establishes that it was

Nasdaq which determined to undermine and escape from its contractual relationships with

ETFMG and engaged in a pattern of provocative and disruptive conduct, including fomenting

conflict between ETFMG and PureFunds, that reasonably led ETFMG to sever the parties'

written and oral contractual relationships regarding the sharing of Fund Profit.  Masucci Aff.

¶¶ 57-58.

      **F.**     **Nasdaq's Acquisition of ISE and Determination to Exit Ventures**

        42.     In March 2016, Nasdaq announced that it would acquire ISE for $1.1

billion, principally for its substantial commodity exchange business.  ISE's much smaller

Ventures business was not a part of the company that interested Nasdaq and actually conflicted

with its current business model.  Masucci Aff. ¶¶ 59-60;  *see* DX-68 (March 4, 2016 Gedeon

email: "Ventures business model is not consistent with our own."); DX-71 (March 14, 2016

Gedeon email: "[Ventures] creates unnecessary tension with ou[r] ETF provider customers.  If we have the ability to take a concept directly to market through funding [] ETF operational expenses, I believe our customers will stop candid interaction with us on product development.").  Nasdaq employees viewed Ventures as a "horrific" business (DX-90 (June 20, 2016 Gedeon and Spector Lync conversation)) and had little interest in maintaining Ventures' partnerships and contracts.

43.     The acquisition closed on June 30, 2016 and key Ventures' employees were immediately let go.  Ilyevsky Aff. ¶ 3.  However, Nasdaq had not performed adequate due diligence with respect to Ventures' business and contracts.[9]  *See* DX-119 (Nasdaq gathering and reviewing contracts in September, after close of the acquisition); DX-100 (July 28, 2016 Hughes Lync conversation: "we have no idea about anything"; "who owns this right now and what are the expectations"); DX-106 (August 16, 2016 Fisher Lync conversation: "damn, accounting people don't know how it's calculated"; "that's scary").

44.     Instead, Nasdaq focused on exiting as much of the Ventures business as possible (DX-116 (September 8, 2016 Gedeon email: "Nasdaq is looking at strategic alternatives around its ownership of ETF Ventures")), since it was "one of the worst concepts," a "mess," a "headache," and something Nasdaq would like to "kill."  *See* related emails and Lync conversations at DX-87; DX-90; DX-92; DX-101.  Nasdaq chose to treat Ventures and its associated expenses as a one-time, non-recurring merger expense, showing that it did not understand the ongoing nature of its obligations, particularly under the Wholesaling Agreement.

---

[9] In fact, Nasdaq was not aware that ETFMG had only received a redacted copy of the Index License Agreement until Mr. Wade was confronted with it as his deposition on December 22, 2017.  Furthermore, Mr. Wade testified that he had not read the Wholesaling Agreement until after the acquisition closed. December 22, 2017 deposition of Terry Wade 47:19-21.

DX-313 (March 16, 2017 email between Nasdaq accounting personnel:  "Marketing, Contract

Services, and Comp Ops are expenses related to ETF Venture funds that [Global Information

Services][10] is exiting from.").[11]  The accounting details of exiting Ventures was discussed at the

highest levels of the company.  In preparing for a meeting with Nasdaq CEO Adena Friedman,

Business Unit CFO Sumeet Chawla pressed accounting personnel for further detail on the

"synergies related to external costs for index operations and marketing" because "in the meetings

with Adena and Michael, we get into the details a fair bit."  DX-314 (April 10, 2017 Chawla

email).  Mr. Chawla was told that the details are the same as have been provided to Ms.

Friedman in the past.  *Id*. (April 11, 2017 DeGeorge email).  Specifically, that Nasdaq was

"leveraging the Non-Recurring Merger treatment for funds that [they were] looking to exit but

ha[d] not as of yet."  *Id*.  These expenses included all aspects of the relationship with ETFMG –

Contract Services, Third Party Marketing, and Index Calculation expense.  *Id*.

      45.     Months after the closing, Nasdaq still did not have a grasp on the Ventures

contracts or its inherited obligations.  *See* DX-154 (January 4, 2017 Freire email: "For the ETF

Ventures transition, we intend to walk through all the funds to understand the process and roles

within the process, where the data comes from, and how current we are in the billing, etc."); *see

also* related emails and Lync conversations from six to eight months post acquisition discussing

questions about the contracts and accounting obligations at DX-151, DX-164-166, DX-175.  As

a result, Nasdaq fell behind in paying out its revenue shares to various partners.  DX-138

(December 8, 2016 Magoon email: "I have not received the last two Magoon Capital payments

on the HACK ETF despite getting statements and it being over 70 days.").  Some partners –

---

[10] Mr. Wade's unit, referred to hereafter as "GIS".

[11] ETFMG was then given as an example of "Contract Services".

including Mr. Chanin – had not yet even been entered into Nasdaq's accounting system as of December 2016 – five months after Nasdaq should have started paying out revenue shares to these partners.  DX-143 (December 14, 2016 Aponte email asking: "can you get PureShares set up as a vendor so we can issue a check request for them?").

46.     Nasdaq was especially eager to terminate the Wholesaling Agreement, but concluded that it could not escape its substantial financial obligations under that contract. Masucci Aff. ¶ 64; *see* DX-85 (June 3, 2016 Wade email to Aponte: Wholesale Agreement "is for $1m a year and cannot be terminated by ISE"); *see also* DX-157 (January 10, 2017 DeGeorge email to Freire: "This note makes me concerned there is no way we get out [of] ETFMG wholesaler agreement"); DX-86 (June 6, 2016 Wade email to Aponte noting that Wholesaling Agreement may not be cancelled until November 2019 at the earliest).  This fact was presented to Ms. Friedman in August 2016, when Mr. Terry Wade did a "deep dive on ISE and all the contract issues" with Nasdaq CEO Friedman.  DX-110 (August 22, 2016 Donde email to Wade and attached August 2016 Nasdaq ISE Integration deck: "Wholesaler agreement is costing approximately $1M per year, but demonstrating little benefit… Appears to be terminable in 11/2019"), at slide 2 ("Summary").  This in turn raised an alarm bell over the accounting treatment Nasdaq had chosen for its Venture obligations.  DX-157 (January 10, 2017 DeGeorge email to Freire: "Huge risk to the Non-Recurring Merger treatment beyond June 2017.").

47.     Nasdaq's first written communication with ETFMG was a July 18, 2016 letter from Mr. Wade seeking confirmation that SILJ, BIGD, and IPAY had been automatically removed from the Wholesaling Platform because these funds had not reached their applicable AUM thresholds and, if not, to do so immediately.  DX-259.  Masucci Aff. ¶ 65.

48.     Notwithstanding that ISE had previously decided to waive the AUM-threshold requirement for SILJ, BIGD, and IPAY (*see ¶ 40, supra*), ETFMG confirmed in its response to Mr. Wade  that it would remove the three funds from the Wholesaling Platform, but took the opportunity also to describe the Ventures business, from its inception with the Original PureFunds ETFs until the present.  DX-261.  Among other things, the letter described ETFMG's role as advisor, PureFunds' role as marketing label, the BMA's expiration the prior October, the parties' obligations under the Wholesaling Agreement, and ETFMG's concerns that Nasdaq had a conflict of interest in indexing competing funds.  *Id*.  ETFMG ended its letter expressing eagerness to "meet as soon as possible to determine how to best continue the partnership to the benefit of all parties."  *Id.*  Masucci Aff. ¶ 66.

49.     The following week, Mr. Wade met with Mr. Masucci and Mr. Karol at Nasdaq's offices in New York.  Mr. Wade informed them that Nasdaq would not continue to grow Ventures and wished to exit all related contracts as soon as it could.  Mr. Wade said that he wanted to get out of the Wholesaling Agreement, which was consistent with the general feeling at Nasdaq.  Masucci Aff. ¶ 67; DX-98 (July 26, 2016 Hughes email to Wade).  Mr. Wade suggested a buyout of the entire Ventures business.  *See* DX-103 (Wade August 15, 2016 email: "I will be proposing that we begin preliminary conversations around the sale of ETF Ventures including the wholesaler contract ASAP."); DX-110 (August 2016 ISE Integration deck presented to Friedman: "Find a willing buyer to assume all contracts"), at slide 4 ("ETF Ventures – Options"); DX-129.

50.     ETFMG was amenable to Mr. Wade's suggestion of a buyout.  Masucci Aff. ¶ 67.  Mr. Masucci sent Mr. Wade a buyout proposal in September 2016.  DX-124 (September 14, 2016 email from Mr. Masucci)).  Mr. Wade never responded to the offer.  In

February 2017 Mr. Wade met with Mr. Karol and Mr. Masucci at ETFMG's offices in New Jersey. At this meeting, Mr. Wade stated that he "hate[d]" the Wholesaling Agreement and mentioned a potential opportunity for a buyout of the Wholesaling Agreement. ETFMG made a buyout offer a few weeks later, but it was promptly rejected with no counter offer. Masucci Aff. ¶ 118; DX-196 (March 10, 2017 email from Masucci to Wade).

51.     ETFMG consistently tried to build a relationship with the new owner of its index provider, including proposing to amend the HACK PSA to add Nasdaq as a party. DX-122. Nasdaq declined. DX-127 (November 10, 2016 letter from Nasdaq's in-house counsel). Masucci Aff. ¶ 132, n. 38. Additionally, in January 2017, Mr. Wade called Mr. Masucci and threatened legal action unless ETFMG entered into a new agreement granting Nasdaq rights to SILJ profit. Masucci Aff. ¶ 111; DX-163 (January 23, 2017 Wade email to Masucci); DX-169. ETFMG offered to negotiate a new contract in a show of good faith and commitment to developing a positive relationship, but never heard back from Nasdaq after Mr. Wade said he would speak with Mr. Chanin about the final details. Masucci Aff. ¶ 111.

**G.     Nasdaq's Conflict of Interest Over the HACK ETF**

52.     When Nasdaq acquired ISE, it was already providing the underlying index to the First Trust, Advisors, L.P. ("First Trust") Nasdaq Cybersecurity ETF ("CIBR"), which was the direct competitor of HACK. Nasdaq has a large business relationship with First Trust. Nasdaq provides index services to over sixty First Trust ETFs with approximately $13 billion in assets under management. DX-547  (July 2016 Nasdaq ETF revenue calculation). *See also* DX-126 (November 3, 2016 Nasdaq Global Indexes Monthly Report circulated to Nasdaq leadership, including CEO Friedman). Nasdaq had created the index to assist First Trust to launch an ETF that would take aim directly at HACK. DX-89 (June 10, 2016 email in which Gedeon is

identified as CIBR index creator); DX-57 (September 30, 2015 Friske email to Gedeon noting a

"great opportunity to hack HACK"); DX-46 (July 9, 2015 internal First Trust email: "people are

already talking about how much better [CIBR] is than HACK. Time to get in the trenches and

fight"). ETFMG was optimistic about partnering with Nasdaq, despite its concerns regarding the

conflict of interest inherent in indexing both HACK and CIBR. However, after its July 2016

meeting with Mr. Wade, ETFMG grew concerned about Nasdaq's failure to address issues

ETFMG had raised regarding HACK's index vis-à-vis CIBR's index. Masucci Aff. ¶¶ 60, 69;

Loebs Aff. ¶ 37.

       53. Although indexing competing funds is not categorically prohibited, the

index provider must take concrete steps to ameliorate the conflict of interest. Masucci Aff. ¶ 60;

DX-804 (Chambers Report), at ¶¶ 33-36.[12] A conflict is most likely to arise when the indexes

are similar. Indeed, the market views HACK and CIBR to be as closely related as Coke and

Pepsi. *See* DX-55; DX-841, DX-605-606 (market reports); Karol Aff. ¶ 14..

       54. In July 2016, when Nasdaq took over, HACK had a higher AUM than

CIBR, but CIBR was growing at a faster rate in part because two significant competitive

advantages over HACK: (i) higher implied liquidity of its index;[13] and (ii) a lower Management

Fee. Masucci Aff. ¶ 72; *see* DX-144 (December 15, 2016 internal First Trust email noting

---

[12] Nasdaq is a global provider of trading and information serves, such as indexes. As a benchmark provider, Nasdaq is obligated to "disclose any material conflicts of interests to [its] users" and to "seek to mitigate existing or potential conflicts created by its ownership structure or control." *See* DX-600 (IOSCO Principles for Financial Benchmarks Final Report), at 16.

[13] Implied liquidity is a measure of the liquidity of the underlying assets referenced by an ETF. It is primarily dictated by the smallest stock or the least average daily volume stock in the ETF's basket. Investors are highly interested in an ETF's implied liquidity because a fund with higher implied liquidity is easier to sell quickly. For more information on implied liquidity – and specifically how that measure differed as between HACK and CIBR – *see* DX-839 (May Rebuttal Report), at ¶¶ 59-61. *See also* DX-804 (Chambers Report), at ¶ 59.

benefit of CIBR has been "primarily driven by differences in index methodology, which led

CIBR to avoid (or relatively underweight) many of the smallest stocks that have been a drag on

the performance of HACK over the past year and a half.  These differences have also provided a

much more liquid underlying portfolio for CIBR vs. HACK."); DX-237 (August 3, 2018 internal

First Trust email noting that "One of the reasons that HACK underperformed CIBR over the past

couple years was its exposure to small, illiquid stocks.").  However, because a fund's index

provider has sole discretion over the holdings and weightings of the fund's index, neither

ETFMG nor the Board could address HACK's implied liquidity without Nasdaq's cooperation.

Mr. Monaco had been considering ways that HACK could better compete with CIBR, including

fixing its implied liquidity, but the analysis necessary for those changes to be implemented was

not completed by the time of the Nasdaq acquisition.  Masucci Aff. ¶ 72; DX-64.

        55.     Nasdaq implausibly denied that there was any problem to address with

HACK's index or any conflict of interest.  *See*, *e.g.*, DX-131 (November 22, 2016 Wade email to

Masucci: "[W]e continue to believe there is no conflict of interest."); DX-123 (October 25, 2016

Wade email to Masucci: "[W]e do not believe that there is a current conflict of interest.").[14]

However, First Trust, CIBR's sponsor, immediately recognized after the March 2016

announcement of the ISE acquisition that Nasdaq "[would] have to go from poking holes in [the

HACK] index to supporting it" (DX-59) and speculated that inevitably "Nasdaq was going to

---

[14] It appears that this was part of a broader effort to exclude ETFMG from any discussion concerning the
PureFunds ETFs.  Masucci Aff. ¶ 73; *see* DX-88 (June 9, 2016 Fisher email to Wade regarding how to
"work with PureShares to terminate the ETFMG"); DX-95 (July 12, 2016 Wade email to Gedeon relaying
Chanin's request for Nasdaq not to communicate with Chanin about ETFMG on Chanin's business email
account, which ETFMG monitored as part of its supervisory regulatory duties); DX-98 (July 26, 2016
Wade email that he was "not sure we can or should share this with ETF MG" with regard to Chanin's
potential new distribution platform); DX-137 (December 8, 2016 Gedeon email to Wade: "I don't feel a
need to bring in ETFMG to these conversations.")..

have to do something with the index behind HACK" (October 22, 2018 deposition of Scott

Friske at 105:11-12); Masucci Aff. ¶¶ 73-76.

56.     In an effort to cut into CIBR's competitive advantage on price, the Board

considered lowering HACK's Management Fee from 75 to 60 basis points.[15]  Loebs Aff. ¶¶ 27-

30; Masucci Aff. ¶¶ 82-84; DX-419 (March 22, 2017 Board Minutes), at 20.  Although Mr.

Wade and his colleagues knew that HACK's Management Fee was high (*see* DX-52 (November

10, 2014 First Trust email about HACK launch: "Good thing they are charging 75 bps")), they

also knew that reducing HACK's fee would reduce HACK's Fund Profit to Nasdaq (*see* DX-212

(April 19, 2017 Wade email to Gedeon noting that fee cut "will reduce the HACK revenue by

20% after May 1").  And they understood that reducing the fee would reduce CIBR's

competitive advantage over HACK.  Accordingly, Nasdaq sought to intimidate the Board into

not cutting HACK's Management Fee by having its outside counsel send a confrontational letter

(the "K&L Gates Letter") eight days before the Board would be voting on the fee cut.  DX-

265.[16]  The K&L Gates Letter took aim at the trustees with a threat of liability, twice stating that

ETFMG's actions (which included recommending the fee cut) should "concern" the Board.  *Id.*

at 1-2; Masucci Aff. ¶¶ 85-86; Loebs Aff. ¶ 31; DX-804 (Chambers Report), at ¶¶ 49-54;

Mahaffey Aff. ¶ 8.

57.     Counsel for the Board and ETFMG, David Mahaffey of Sullivan &

Worcester LLP, responded to the K&L Gates Letter.  DX-266 (March 23, 2017 letter to K&L

---

[15] When originally setting the fee for HACK in 2014, the Board chose a relatively high fee of 75 bps because there were no other competing funds at the time.  DX-407 (October 16, 2014 Board Minutes), at 8-10.  However, Mr. Monaco and Mr. Chanin both recognized that the fee would have to be lowered in the future if a competing ETF surfaced.  *See* DX-31 and DX-32 (related October 2014 emails).

[16] The letter also cited Nasdaq research regarding HACK and CIBR that purported to show differences between the two funds, in an effort to minimize Nasdaq's obvious conflict of interest.  DX-265, at 2 n.1. DX-605-606.

Gates). He communicated Board concerns regarding potential advantages enjoyed by the CIBR index, noted the "obvious competition between HACK and CIBR", and emphasized ETFMG's desire to work with Nasdaq. *Id*. While noting that the March 14, 2017 K&L Gates letter was inappropriate, Mr. Mahaffey nonetheless invited a meeting with Nasdaq to discuss how best to increase the investibility and liquidity of the HACK index. *Id*. at 3. Despite Nasdaq's stated willingness to do so (DX-270 (April 3, 2017 letter from K&L Gates)), ETFMG's efforts to schedule a meeting were unsuccessful. Masucci Aff. ¶¶ 77-78, 87; Loebs Aff. ¶ 39.

###### H.    Nasdaq's Non-Payment and ETFMG's Self Protection

58.    Nasdaq's hostility to the ETFMG relationship manifested itself as well in attempts to apply economic pressure by disrupting payment patterns that had been routine under ISE. Following the Nasdaq acquisition, ETFMG continued to send Nasdaq (as it had sent ISE) regular monthly invoices for Wholesaling Fees and Wholesaling Expenses due ETFMG. *See, e.g.*, JX-377 (invoice for December 2016 Wholesaling Fees); JX-396 (invoice for October to December 2016 wholesaler salaries). However, Nasdaq attempted to avoid paying the amounts it owed under the Wholesaling Agreement. Specifically, Nasdaq: (i) failed to timely pay wholesaling invoices sent in July and August 2016 (*see* DX-308, DX-311); (ii) refused to pre-pay the expenses, even though Nasdaq was aware that this had been the practice with ISE for many years (*see* DX-152 (December 28, 2016 Freire email to Aponte noting "ISE would set up a prepaid [account] for the net expense")); (iii) questioned expenses listed on wholesaling invoices and demanded backup receipts and other supporting documents; and (iv) failed to send ETFMG invoices for Fund Profit, which ETFMG had told Nasdaq would be required to remit payment. Masucci Aff. ¶ 112.

59.    In light of the disdain toward the Ventures/ETFMG relationship that they had witnessed first-hand from Mr. Wade, Messrs. Masucci and Karol of ETFMG understood this behavior by Nasdaq as an attempt to apply economic pressure.  To protect itself, ETFMG thus decided in October 2016 that, while it would pay Nasdaq what it was owed, it would reduce those payments to reflect what Nasdaq owed ETFMG.  Specifically, using figures on fund P&L Statements and wholesaling invoices and statements, it would add up Fund Profit (from HACK and IPAY) and Third Party Fees (from the Wholesaling Platform) owed Nasdaq and subtract from that all the Fund Shortfall, Wholesaling Expenses, and Wholesaling Fees that Nasdaq owed to ETFMG.  After sending each netting statement, ETFMG remitted to Nasdaq the net amount it was owed.  The intent was to place in Nasdaq's hands exactly what it would have netted had Nasdaq paid the various expenses and ETFMG paid the full HACK Fund Profit.[17]  Masucci Aff. ¶ 115; Flanagan Aff. ¶¶ 33-34.

60.    In total ETFMG sent Nasdaq four netting statements: the first on October 18, 2016 (JX-406); the second on December 9, 2016 (JX-407); the third on February 28, 2017 (JX-408, 409); and the fourth on May 26, 2017 (JX-410).  Each netting statement contained a summary of the amounts due both ETFMG and Nasdaq, stated the difference between the two, and attached the relevant P&L Statements and invoices.[18]

---

[17] Nasdaq had other partners who netted payments (see DX-167-168).  Additionally, Nasdaq considered "netting" money owed to PureFunds and Mr. Magoon.  DX-147.

[18] ETFMG did not remit the net amount due Nasdaq reflected on the May 26, 2017 netting statement because of the escalation in the dispute and probable termination of the relationship.  Nasdaq has been paid HACK profits through the end of 2016.  During the course of this litigation ETFMG was made aware of certain errors in its calculations that resulted in Nasdaq being overcharged approximately $200,000 in Wholesaling Fees.  Upon this discovery, counsel for ETFMG advised Nasdaq's counsel that ETFMG would instruct its damages expert to apply a credit in that amount to the damages it would seek at trial.  JX-411 (October 24, 2018 Coffey letter to Axelrod); *see* Flanagan Aff. ¶¶ 36-48; DX-800 (May Report), at ¶¶ 20-52.

- 28 -

61.     Because the netting statements stated the amount of Fund Profit being credited, Nasdaq was readily able to calculate and pay the revenue shares due to its partners, such as Mr. Chanin and Mr. Magoon.  Neither of these partners were parties to the Wholesaling Agreement, so their rights to any PureFunds revenue were unaffected by monies Nasdaq owed to ETFMG under that separate contract – whether paid via netting or separate cash payments. Nasdaq employees observed that the partners should not be paid any less simply because ETFMG netted Nasdaq's expense obligations against the Fund Profit amounts, noting that it would be "unfair to the HACK partners to bear the full burden" of Nasdaq's separate dispute with ETFMG (*see* DX-142 December 14, 2016 Aponte email); There was "no reason that these partners should not be paid their share", as the "netting [was] an issue between ISE and ETFMG."  *See* DX-143 (December 14, 2016 Wade email); *see also* DX-142 (December 14, 2016 Fisher email: "I sympathize with our revenue share partners and don't think they should have to wait until we get this sorted out with ETFMG.").  Masucci Aff. ¶ 119.

62.     Nasdaq nevertheless decided to withhold Fund Profit from Mr. Chanin and Mr. Magoon, paying them their percentage revenue share based on the netted amount instead of the full Fund Profit indicated in the P&Ls.  Nasdaq misleadingly communicated to its partners that ETFMG had withheld Fund Profit, which resulted in these partners receiving less than their fair share.  *See* DX-134 (December 6, 2016 Chanin email to Wade: "I will also speak with [ETFMG] later today to find out why there are issues with ETFMG making payments on time as you say.").  When pressed by Mr. Chanin as to why Nasdaq was not sending the full split, Nasdaq sought to deflect blame by falsely stating that ETFMG had not provided information sufficient for Nasdaq to calculate the amount of Hack profit owed to them.  *See* DX-173 (Wade

February 15, 2017 email to Chanin: "By not giving us the information we need about revenue and expenses we can't pay the partners.").  Masucci Aff. ¶ 120.

### I.    Mr. Chanin's Interference with the Operations of the Trust and Funds

63.    In the months after the Nasdaq acquisition of ISE, Mr. Chanin began to insert himself into decisions being made by the Trust and ETFMG as fund advisor – a campaign that ultimately interfered with the operations of the Trust and funds.  It appears that Mr. Chanin's dissatisfaction was fomented at least in part by Nasdaq blaming ETFMG for supposedly withholding Fund Profit, when in fact ETFMG had credited Nasdaq for all the Fund Profit to which it was entitled but had simply offset expenses unpaid by Nasdaq. [19]  DX-700 (May 1, 2017 *PureShares, LLC et al. v. ETF Managers Group, LLC et al*. (No. C-63-17) Complaint and Trial Demand), at ¶¶ 90-97.  Mr. Chanin's escalating misconduct eventually contributed to ETFMG's grounds to terminate the PSAs.

64.    In the fall of 2016, Chanin objected to the Board's decision to change fund distributors (a decision within the sole discretion of the Board) and the decision of ETFMG, endorsed by the Board, to replace external portfolio managers with in-house personnel (a basic function of an investment advisor).  *See, e.g.*, DX-128 (November 10, 2016 Chanin email).  Over time, his objections grew more belligerent in tone.  *See* DX-195 (March 11, 2017 Chanin letter to Board ) and DX-202 (March 14, 2017 email demanding Masucci's "immediate resignation as the

---

[19] Through failed due diligence and efforts to escape its contractual obligations, Nasdaq upset what had been a productive and successful business relationship between its predecessor ISE and its partners.  *See* DX-133 (December 5, 2016 Chanin email to Wade: "In the past, ETFMG has been pretty consistent with timely payments").  Mr. Magoon also noted that the relationship stopped working properly when Nasdaq took over.  DX-220 (May 10, 2017 Magoon  email: "With ISE everything was regular in terms of monthly HACK statement and payments versus how erratic it has become."); DX-227 (June 26, 2017 Magoon email: "As I have mentioned before these projects all had regular statements and payments before the NASDAQ became involved.  I understand a transition delay and vacations but almost a year later I am shocked not one project is on schedule.").

fund Advisor").  By April 2017 Mr. Chanin was expressly threatening to file suit because the

independent members of the Board had decided to reduce the Management Fee for HACK, *see*

DX-213 (April 20, 2017 Chanin email).  Indeed, in his April 20, 2017 email, Mr. Chanin took

the position that he "[did] not authorize" the press release announcing the reduction and included

the explicit threat that "[t]o the extent you proceed with this we will include this in our claim for

relief."  *Id*.  But like the matters about which Mr. Chanin had complained earlier, the '40 Act

vests authority for fee adjustments with the Board, a point repeatedly made to Mr. Chanin,

including in the email from ETFMG's president Barney Karol to which Mr. Chanin was

responding.  *Id*;  Masucci Aff. ¶¶ 98-99, 106, 121.

        65.     Mr. Chanin followed through on his threat against the Board and the

funds' advisor.  On May 2, 2017, the day after the HACK fee cut went into effect, PureFunds

and Mr. Chanin filed a lawsuit and order to show cause application against the Trust, its

independent trustees, ETFMG, and ETFMG's principals in New Jersey Superior Court

(Chancery Division, Union County).  Masucci Aff. ¶¶ 122-23.

        66.     Most alarmingly for the Board, Mr. Chanin's application sought

emergency injunctive relief that, if granted, would have frozen all funds, income, profits, and

assets derived from the operation of the PureFunds ETFs, required the appointment of a "special

fiscal agent" for ETFMG and the Trust, and enjoined the Trustees or the Trust advisor ETFMG

from taking any action with respect to the PureFunds ETFs absent the approval of this agent.

DX-700 (May 1, 2017 *PureShares, LLC et al. v. ETF Managers Group, LLC et al*. (No. C-63-

17) Complaint and Trial Demand); DX-701 (May 9, 2017 *PureShares, LLC et al. v. ETF

Managers Group, LLC et al*. (No. C-63-17) Order to Show Cause for Restraints and a

Preliminary Injunction).  By this application, based on the notion that PureFunds, as marketer,

somehow had management rights over the Trust and its funds, PureFunds and Mr. Chanin sought to prohibit the Trust and the fund advisor from carrying out their respective responsibilities to public shareholders under the '40 Act and other authorities.  The New Jersey court denied the application (DX-704), but the suit has inflicted significant costs and disruption on ETFMG and the other defendants.  Masucci Aff. ¶ 123; Loebs Aff. ¶ 34; Mahaffey Aff. ¶ 6.

### J.      ETFMG Terminates the PureFunds PSAs and Oral Agreement Governing HACK Profits

67.     The filing of the PureFunds lawsuit, combined with the overall course of conduct by Nasdaq and PureFunds, led ETFMG to conclude that the parties' relationships had irretrievably broken down and that Nasdaq and PureFunds were acting in a manner that undermined the authority of the Trust over the ETFs and threatened to harm the interests of shareholders.  Masucci Aff. ¶ 125.

68.     ETFMG therefore determined that the cooperative relationship and good will concomitant with maintaining the parties' oral agreement to pay HACK Fund Profit no longer existed, and it wrote to Nasdaq terminating that agreement.  DX-274 (May 24, 2017 ETFMG correspondence).  Neither the HACK PSA nor any other written contract required ETFMG to distribute HACK's Fund Profit.  *See* ¶ 25, *supra*.  While not necessary to justify terminating an oral agreement, ETFMG's letter nevertheless described the overall course of conduct by Nasdaq and Mr. Chanin underlying this decision, including Nasdaq's apparent role in inducing Mr. Chanin to file the New Jersey Action by blaming ETFMG for his failure to receive his share of HACK Fund Profit, as well as Nasdaq's own failure to address concerns about the HACK index; its attempt to pressure the Board into rejecting the HACK fee cut; and its attempt to apply economic pressure by delaying payments due to support the Wholesaling Platform. Masucci Aff. ¶¶ 126-28.

69.     ETFMG wrote a second letter a week later terminating the PSAs based on the same course of conduct.  DX-276 (June 2, 2017 letter).  Nasdaq's and PureFunds' conduct violated an express covenant contained in each PSA to "not take any action, or fail to take any action, that would, or could reasonably be expected to … adversely affect the operations of the Trust or the Funds."  This language was included in the PSA for HACK (JX-5, at § 7(d)), as to which only PureFunds and ETFMG were parties; and the remaining ones for BIDG/IPAY (JX-6, at § 7 (e)); FINQ (JX-7, at § 7(e)); GAMR (JX-8, at § 7 (e)); IFLY (JX-9, at § 7 (e)); and IMED (JX-9, at § 7 (e)), as to which both PureFunds *and* ISE (and thus Nasdaq) were parties along with ETFMG.  Breach of this duty is a terminable event.  JX-6-10, all at § 9.  Masucci Aff. ¶¶ 129-30; Mahaffey Aff. ¶ 7.

70.     On June 16, 2017, Nasdaq's counsel responded to ETFMG's letter terminating the PureFunds PSAs and agreed to the termination of every PureFunds PSA except those for HACK and IPAY.  DX-279-283 (June 16, 2017 Ballard Spahr LLP letters).  Each letter confirmed that Nasdaq agreed to "cease performing under" the applicable PSA as of July 31, 2017.  *Id*.; Masucci Aff. ¶ 131.[20]

71.     Nasdaq responded a month later to ETFMG's termination of the HACK and IPAY PSAs.  DX-289-290.  These letters denied ETFMG's bases for termination but did not address the termination events or offer any cure.  *Id.*  Nasdaq's response regarding the HACK PSA failed to address that Nasdaq is not a party to the HACK PSA or that the PSA does not mention Fund Profit.  DX-290; JX-5 (HACK PSA); *see also* DX-127 (November 10, 2016 email

---

[20] Nasdaq's letters also instructed ETFMG to close BIGD, GAMR, and IFLY on account of their not having reached $50 million AUM, invoking Section 9 of the funds' respective PSAs.  DX-279-83.  But this was not a decision Nasdaq (or even ETFMG) could make; only the Board has the authority to close a '40 Act fund.  This demand is another example of Nasdaq's apparent lack of familiarity with the '40 Act.

from Nasdaq's in-house counsel noting his preference to enter Morgan Stanley distribution deal separately from HACK PSA "which ISE is not a party to."). Masucci Aff. ¶ 132.

72.     It was imperative that Nasdaq find a way to recover the HACK profits, since it could not derive any right under the written contracts. One employee told the GIS leadership team, "Adena [Friedman] was adamant that we need to figure out how to get our share of ISE ETF revenue back, even if legal proceeding[s] are necessary. Got the sense that she and/or Michael convey their support of this to OGC." DX-312 (June 28, 2017 Aponte email). Ms. Friedman's employees listened to her instructions, proclaiming that "ETFMG is cancer" and "[t]his has to be a marketing/pr win that we are prepared to fight to get." DX-230 (July 20, 2017 Gedeon email); Masucci Aff. ¶ 140.

### K.     Nasdaq's Refusal to Confirm Indexes

73.     Despite ETFMG's termination of the PSAs, the Sublicense Agreement among Nasdaq, PureFunds, and ETFMG remained in effect. JX-2A. This agreement obligated Nasdaq to continue providing indexes for the PureFunds ETFs. On June 29, 2017, counsel for the Board and ETFMG, Mr. Mahaffey, sent a letter to Nasdaq's outside counsel, David Axelrod of Ballard Spahr LLP, requesting confirmation by July 7, 2017 that Nasdaq would continue providing indexes for SILJ, HACK, IPAY, BIGD, GAMR, and IFLY. DX-284. As the advisor to the Trust, ETFMG required either confirmation of the index or, in the alternative, notice to make an orderly transition for the funds. ETFs must track functioning indexes to comply with their stated investment objectives and strategies. ETFMG has regulatory obligations to notify the financial markets of any changes regarding fund indexes. Mr. Mahaffey again invited Nasdaq to meet to discuss the indexes and overall relationship between the parties. *Id.*; Mahaffey Aff. ¶ 9; Masucci Aff. ¶ 135; DX-804 (Chambers Report), at ¶¶ 61-62.

74.     Declining to confirm or deny that Nasdaq would provide the indexes or give notice that ETFMG needed to transition the funds to a new index provider, Mr. Axelrod replied to Mr. Mahaffey's letter on July 7, 2017 asking how ETFMG envisioned its relationship with Nasdaq going forward.  DX-285; Masucci Aff. ¶ 135; Loebs Aff. ¶ 41; Mahaffey Aff. ¶ 10.

75.     On July 11, 2017, Mr. Mahaffey sent Mr. Axelrod another letter requesting confirmation by close of business on July 13 of Nasdaq's commitment to continue providing the indexes pursuant to the Sublicense Agreement.  DX-286.  The letter underscored the exigency of receiving a definitive answer: either Nasdaq would continue providing the indexes, or ETFMG would need to make prompt arrangements for moving to another index provider to meet its regulatory and contractual obligations and provide appropriate notice to the financial markets.  *Id.*; Mahaffey Aff. ¶ 11; Masucci Aff. ¶ 137.

76.     The same day, Mr. Mahaffey followed-up with a phone call to Mr. Axelrod.  Over the next few days, Mr. Axelrod and Mr. Mahaffey engaged in a series of phone calls to negotiate a new arrangement suitable to both parties.  ETFMG made a new proposal for Nasdaq to provide the indexes in exchange for a fee of five basis points of the funds' assets under management.  Nasdaq rejected this offer.  Mahaffey Aff. ¶ 12.

77.     In a telephone call on July 13, 2017, Mr. Mahaffey pressed Mr. Axelrod to confirm that Nasdaq would continue to supply the indexes or to provide notice that Nasdaq would not honor its obligations.  He would not do so.  Rather, Mr. Axelrod told Mr. Mahaffey that, "Nasdaq is not saying it would not continue to supply the indexes but will not confirm that it will."  Mahaffey Aff. ¶ 13; *see also* DX-288 (July 14, 2017 Coffey letter to Axelrod), at 3-4; Masucci Aff. ¶ 38.

78.     Without assurances, ETFMG, the Trust, and the public shareholders of the PureFunds ETFs were at significant risk.  Nasdaq's refusal to confirm its intentions one way or the other raised the specter that one day the market would open and ETFMG would find that the funds were without an index.  Concluding that it could no longer rely on Nasdaq to provide indexes for the funds, ETFMG notified Nasdaq that its conduct manifested an intent to terminate the Sublicense Agreement.  DX-288 (July 14, 2017 Coffey letter to Axelrod), at 4.  The letter stated that ETFMG was agreeable to termination upon a reasonable transition time.  *Id.* Mahaffey Aff. ¶ 14; Masucci Aff. ¶¶ 139-40.

79.     To protect the funds and its shareholders against the prospect of a shutoff of access to indexes by Nasdaq, ETFMG swiftly arranged to have the funds supported by indexes supplied by Prime Indexes, a transition approved by the Board in late July 2017.  DX-421 (July 24, 2017 Board Minutes), at 3; Mahaffey Aff. ¶¶ 15-16; Loebs Aff. ¶ 42; Masucci Aff. ¶¶ 141-43.

**L.     Nasdaq's August 2017 Index Interruption**

80.     On Friday, August 4, 2017, Travis Trampe, a portfolio manager at ETFMG discovered that he was unable to access important on-line index files necessary to running the ETFs – more specifically, the calculations to the underlying indexes for GAMR and IFLY.  Although ETFMG had, by this point, migrated certain ETFs to a new index provider (*supra* ¶ 79), Nasdaq was on notice that it was still obligated to provide the indexes for these two funds.  DX-294 (August 2, 2017 letter to Nasdaq counsel notifying that three PureFunds ETFs had begun using new indexes and that "IFLY, GAMR and IMED [would] begin using new indexes no later than October 1, 2017" with advance notice to Nasdaq).  Masucci Aff. ¶ 144; Karol Aff. ¶ 27.

81.     Losing access to these index files during trading hours was a serious problem.  The investment goal of these ETFs is to track the underlying index.  The index is a basket of stocks, which are grouped together in certain proportions according to a rule book or methodology.  Investors and the SEC expect the ETF to closely track the performance of the index.  An ETF will often slightly lag the index, because the index is a hypothetical portfolio without transaction costs; the portfolio is judged by how closely it tracks the index.  Therefore, it is critical that the ETF have real time access to the index while public shareholders are considering whether to buy or sell.  Karol Aff. ¶ 28; DX-804 (Chambers Report), at ¶¶ 40-43.

82.     Indexes usually rebalance on a periodic, often monthly, basis.  A rebalance is often a significant change.  However, indexes can also change on a daily basis depending on corporate actions such as stock splits or acquisitions in which a stock ceases trading. Accordingly, portfolio managers need to have uninterrupted, continuous access to an index.  So it was troubling and unusual for Mr. Trampe not to have access to these index files.  Mr. Trampe notified Mr. Karol, and the two immediately called Natasha Selzer, Senior Director of Nasdaq's GIS, who told them that it was probably an oversight and she would look into it.  Mr. Karol underscored the need for a timely response within the hour so that ETFMG could meet its responsibilities regarding the ETFs.  Mr. Trampe called again at 11 a.m. and left a voicemail.  He followed-up with an email about an hour later after receiving no response from anyone at Nasdaq.  DX-248 (August 4, 2017 (12:11 p.m.) Trampe email to Selzer).  Karol Aff. ¶ 29.

83.     The excuse of an "oversight" coupled with the non-responsiveness was suspicious.  Nasdaq was sending a message that it could and would disrupt the maintenance and trading of public securities if ETFMG continued to assert its rights in reaction to Nasdaq's intimidation.  *See* DX-231 (July 28, 2017 Wade email to Gedeon and Nayan Acharya (Managing

Director in Nasdaq's OMX exchange operation unit): "We will also need to discuss what we should do w[ith] any ISE index data feeds due to recent actions by ETFMG."). This was confirmed when later that day, counsel for ETFMG and the Trust received a letter from Nasdaq's counsel Mr. Axelrod demanding that ETFMG agree to pay Nasdaq "the majority of profits generated by these funds." DX-297. Karol Aff. ¶ 30.

84.     Having not heard back by 2 p.m. on August 4, 2017 counsel for ETFMG and the Trust Mr. Mahaffey sent a letter to Mr. Axelrod detailing the events and informing Nasdaq that ETFMG would immediately transfer all remaining indexes to Prime Indexes. DX-296. Although certain historical files were provided later that afternoon, full access was not restored until Monday, August 7. The following day, Nasdaq officially terminated the Sublicense Agreement. DX-298. Masucci Aff. ¶ 143; Karol Aff. ¶ 30.

85.     Discovery has since revealed that the index interruption was a deliberate, "active decision" by Nasdaq. *See* October 30, 2018 deposition of David Gedeon, at 324:23-325:23; *see also* DX-242 (August 4, 2017 (10:33 a.m.) Lync message from Selzer to Nayan Acharya: "did we switch off rsd and gmb"); *id.* (August 4, 2017 (10:33 a.m.) Lync message from Acharya to Selzer: "switched of[f] all"). When alerted to ETFMG's inquiries on August 4, Mr. Gedeon told Ms. Selzer to put ETFMG off with the statement that "you are checking with the technical team." DX-238 (August 4, 2017 (10:44 a.m.) Gedeon email to Selzer); *see also* DX-242 (August 4, 2017 Lync message to Selzer from Nayan Acharya: "say you will get back to them. *Dave has asked for it to be switched off* don't mention that on the call though") (emphasis added). By late afternoon, however, it was clear that hard-ball maneuvering rather than any technical issues was holding up restoring access: Mr. Gedeon instructed a colleague, "while lawyers review, can you work to setup Travis on just these two indexes? *Don't flip anything on*

- 38 -

*yet though.*" *Id.* (August 4, 2017 (4:16 p.m.) Gedeon email to multiple colleagues) (emphasis added).  After access was finally restored the following Monday morning, Mr. Gedeon instructed Ms. Selzer to offer ETFMG no further explanation for the interruption.  DX-248 (August 7, 2017 (8:37 a.m.) Selzer email to Gedeon: "Please let me know how I should respond to the client.  We can say something that there was issues with the FTP site or something"); *id.* (August 7, 2017 (8:46 a.m.) response from Gedeon: "No further comments are necessary"); *see also* Karol Aff. ¶ 31.

86.     Nasdaq's action, which interfered with ETFMG's ability to manage the GAMR and IFLY ETFs for the benefit of public shareholders represented a "serious breach of Nasdaq's responsibilities as index calculation agent" and "an extreme departure from industry norms").  DX-804 (Chambers Report), at ¶ 41.

**M.     Nasdaq's Improper Termination of the Wholesaling Agreement**

87.     On July 11, 2017, Nasdaq's attorneys wrote a letter to ETFMG's attorneys purporting to terminate the Wholesaling Agreement on the basis that ETFMG had supposedly failed to perform its obligations under the agreement.  DX-287.  None of Nasdaq's allegations was a proper basis for termination.  Masucci Aff. ¶ 147.

88.     First, Nasdaq asserted that by engaging ETFMG Financial, LLC as statutory distributor for the funds on the Platform (DX-287), at 1, ETFMG breached paragraph 3 of the Wholesaling Agreement.  JX-11, at ¶ 3 ("The parties acknowledge that GENCAP shall not provide statutory distribution services…").  This acknowledgement was included in the contract at the request of Mr. Masucci and not intended to be a prohibition on GENCAP (or its successor ETFMG) acting as the broker-dealer.  Masucci Aff. ¶ 91.  Indeed, this provision is included in the section of the Wholesaling Agreement listing services to be provided by GENCAP, rather

than the covenants section.  Because GENCAP was not a FINRA-licensed broker-dealer, Mr.

Masucci needed to ensure that the Wholesaling Agreement would not obligate it to provide the

necessary statutory distribution function for the funds.  In fact, Mr. Monaco discussed and

concurred with ETFMG's long term plan to create an affiliated broker-dealer to act as statutory

distributor for the funds.[21]  Masucci Aff. ¶¶ 91, 148.

89.     Second, Nasdaq asserted that ETFMG breached the contract by charging

Wholesaling Fees for funds never added as "Products" to Exhibit B of the Wholesaling

Agreement: BIGD, FINQ, GAMR, IFLY, IMED, IPAY, LARE, and CNCR.  DX-287, at 2.

However, as noted above in ¶ 137, Mr. Monaco and Mr. Masucci orally amended the Wholesale

Platform to include these funds, a mutual agreement permissible under the Wholesaling

Agreement.  *See* JX-11, at § 7(b);  Masucci Aff. ¶ 149.

90.     Third, Nasdaq asserted that ETFMG breached the contract by charging

Wholesaling Expenses in excess of the set cap and without seeking pre-approval, including

among the supposed overcharges expenses that ISE had paid without objection in 2015 and

2016.  DX-287, at 2.  As noted in ¶ 39 above, ISE authorized and paid various Wholesaling

Expenses without pre-authorization and exceeding $50,000 in both 2015 and 2016.  ISE did not

view exceeding the cap as a problem and understood that ETFMG was best suited to decide

which expenses were appropriate.  Masucci Aff. ¶ 149; Ilyevsky Aff. ¶ 17.

91.     Fourth, Nasdaq asserted that ETFMG breached the contract by charging

Nasdaq for various "unauthorized" Wholesaling Expenses related to:  (i) the WSKY and ITEQ

ETFs; (ii) a ForceShares ETF not yet in market; (iii) the wholesalers' office supplies and

---

[21] Mr. Masucci told Mr. Wade at a meeting in February 2017 that ETFMG Financial was on the verge of receiving its broker-dealer license such that it could distribute the funds, which would be a positive outcome for everyone.  Mr. Wade agreed, and Nasdaq never objected to this move prior to the July 2017 letter.  Masucci Aff. n 31.

training; and (iv) "unreasonable" travel and entertainment including sports tickets.  DX-287 at 2.

In each case, however, either no such expenses were charged or the expenses were permitted by

the Wholesaling Agreement.  Masucci Aff. ¶ 151.

> 92.     Fifth, Nasdaq asserted that ETFMG breached the Wholesaling Agreement

by adding two additional wholesalers and charging Nasdaq for those new wholesalers' salaries,

which exceed the annual compensation cap of $250,000.  DX-287, at 3.  However, as noted in

¶ 38 above, ISE agreed to add more wholesalers to the platform in 2015 and 2016 and to increase

their salaries.  *See, e.g.*, JX-393 (December 16, 2015 wholesaler invoice); DX-81 (Monaco's

May 12, 2016 email to Ilyevsky re wholesalers); DX-109 (August 22, 2016 wholesaler invoice

reflecting higher salaries); Masucci Aff. ¶ 152.

> 93.     Sixth, Nasdaq asserted that ETFMG failed to provide Nasdaq with

invoices to service providers underlying the Third Party Fees paid to Nasdaq.  However, the sum

of such invoices was included in ETFMG's monthly statements.  DX-287, at 3; DX-514

(statement of November 2016 Third Party Fees); Masucci Aff. ¶ 153.

> 94.     Seventh, Nasdaq asserted that ETFMG violated the Wholesaling

Agreement by "netting" its HACK payments to Nasdaq.  But Nasdaq did not point to anything in

the parties' agreements barring ETFMG from setting off the balance of what Nasdaq owed to

ETFMG under the Wholesaling Agreement against  HACK profit owed to Nasdaq under the

parties' oral agreement.  Masucci Aff. ¶ 154.

> 95.     On August 2, 2017, within the thirty day cure period provided by the

Wholesaling Agreement, counsel for ETFMG responded to Nasdaq's alleged termination letter

explaining why none of Nasdaq's bases for termination were valid and reminded Nasdaq of its

obligation under the Wholesaling Agreement to "refrain from initiating or participating in any

action related to the removal of GENCAP from its role in the Wholesaling Platform." DX-295

(quoting JX-11, at § 7(c)). Nasdaq never responded to this letter, and has not demonstrated any

material breaches of the Wholesaling Agreement by ETFMG. Masucci Aff. ¶ 155.

## II.   PROPOSED CONCLUSIONS OF LAW

### A.   Governing Law

96.     All claims arising from the PureFunds PSAs and Wholesale Agreement

are governed by Delaware law. Parties' Stipulations of Law ("SL") 1, 3; JX-5-10, all at § 13(d);

JX-11, at § 13(d).

97.     All claims arising from the Index License Agreement and the Sublicense

Agreement are governed by New York law. SL-2; JX-1, at § 11(K); JX-2, at § 4;

98.     The question of the BMA's continued enforceability is governed by New

York law. JX-12B, at § 7.

99.     Nasdaq's remaining tort and equitable claims – conversion, unfair

competition, unjust enrichment, *quantum meruit*, and breach of the duty of good faith and fair

dealing – are governed by New York law. SL-4.

### B.   Nasdaq Is Not Entitled to HACK Fund Profit

#### i.   ISE Was Entitled to HACK Fund Profit Only Pursuant to an Oral Agreement

100.    The core of Nasdaq's complaint is that ETFMG effectuated "a scheme to

take Nasdaq's property – the PureFunds [] ETFs." Compl. ¶ 3. This claim is critically flawed;

the PureFunds ETFs are owed by their shareholders, not by Nasdaq *or* ETFMG. Masucci Aff. ¶

167; DX-804 (Chambers Report), at ¶¶ 16-18. In actuality, Nasdaq's claim boils to a stated

entitlement to Fund Profit, if any, collected from the PureFunds ETFs, and in particular to the

Fund Profit collected from HACK, far and away the most successful of those funds. There is no basis for this entitlement, however, contractual or otherwise.

101.    Only one *written* contract has anything to do with HACK Fund Profit: the Investment Advisory Agreement between the Trust and ETFMG. DX-9 (June 24, 2016 Amended Investment Advisory Agreement). Pursuant to that agreement, ETFMG may retain HACK's Management Fee (and thus its Fund Profit) as compensation for ETFMG's services rendered as advisor. *Id.* §§ 6-7. ETFMG's entitlement to HACK's Management Fee is terminable by the Trust at any time, and must be affirmatively renewed at least once every year by the Board's independent trustees. *Id.* § 12; DX-804 (Chambers Report), at ¶ 23; Loebs Aff. ¶ 9; Masucci Aff. ¶¶ 11-12. Absent a separate enforceable agreement requiring ETFMG to pay some or all of HACK's Fund Profit to a third party, ETFMG may rightfully retain the entire Management Fee, as is industry custom. DX-804 (Chambers Report), at ¶ 32.

102.    Nasdaq has no basis upon which to recover HACK Fund Profit after June 30, 2017. ETFMG paid ISE (and then Nasdaq) HACK Fund Profit from December 2014 until December 2016 pursuant to an oral agreement between Messrs. Masucci and Monaco (as representatives of ETFMG and ISE, respectively). Masucci Aff. ¶¶ 43-44; Ilyvesky Aff. ¶ 13. That oral agreement was entered into at a time when there was a longstanding partnership between the parties based upon mutual trust, and the obligations of the parties thereunder were contingent on the maintenance of that partnership. ¶¶ 25, 32 *supra*.

103.    Under New York law, an oral agreement "with no provision for its termination [is] terminable at will upon reasonable notice." *Majestic Farms Supply Ltd. v. Serv. Riding Apparel, Ltd.*, 137 A.D.2d 501, 502 (2d Dep't 1988). *See also Hadami S.A. v. Xerox*

*Corp.*, 272 F. Supp. 3d 587, 597 (S.D.N.Y. 2017) (Engelmayer, J.) (to avoid falling within statute of frauds, oral agreement without stated duration must be terminable at will).[22]

104.    Following a series of bad faith actions by Nasdaq, and the subsequent deterioration of the parties' business relationship, ETFMG gave Nasdaq notice on May 24, 2017 that it would cease distributing HACK Fund Profit under its oral agreement with ISE effective June 30, 2017.  DX-274.  While ETFMG acknowledges that it is liable to Nasdaq for a true-up of HACK Fund Profit collected from January 1, 2017 until June 30, 2017 – a total of $2,271,524.96 (Flanagan Aff. ¶¶ 40) – it has no ongoing contractual obligation to remit HACK Fund Profit collected after that date.  ETFMG may rightfully retain Fund Profit for HACK, a fund for which it has borne the full expense of operating since August 2017.

105.    Nasdaq claims an ongoing entitlement to HACK Fund Profit pursuant to the HACK PSA, the Index License Agreement, and the Sublicense Agreement.  Compl. ¶¶ 60-63.  As described below, none of these agreements confers this entitlement.[23]

---

[22] The oral agreement was negotiated and performed in both New York (by ISE) and New Jersey (by ETFMG).  Under New York's choice of law rules, the question of whether ETFMG properly terminated its oral agreement with ISE is governed by New York law because the applicable New York and New Jersey substantive law do not differ on this question.  See *Mercon v DiPasquale*, No. 04 CIV. 2793, 2005 WL 696885, at *3 (S.D.N.Y. Mar. 25, 2005) ("Federal courts sitting in diversity must apply the choice of law rules of the forum state to determine the law applicable to the substantive issues."); *Preston Frankford Shopping Ctr. Dallas TX. Ltd. P'ship v Butler Dining Serv., LLC*, No. 10-CV-6448L, 2010 WL 3609469, at *2 n.3 (W.D.N.Y. Sept. 15, 2010) ("It is immaterial whether New York or [the other state's] law applies . . . since they are identical in this respect.").

[23] Nasdaq's equitable plea – that it should receive HACK Fund Profit because it invested in the fund – holds no water.  ISE paid the initial launch costs and one month of Fund Shortfall, a total of $72,328.47.  JX-173-174.  Since the acquisition, Nasdaq has expended nothing to support HACK and yet as successor to ISE has received over $2 million in HACK Fund Profit (not including the true-up of another approximately $2 million ETFMG agrees it will credit Nasdaq in offset to any damage award ETFMG receives).  JX-196-200, 202; Flanagan Aff. ¶ 40.

ii.   The HACK PSA Does Not Entitle Nasdaq To HACK Fund Profit

106.   ETFMG and PureFunds are the only parties to the HACK PSA.  *See* JX-5.[24]  Nasdaq nevertheless contends that it is entitled to HACK Fund Profit under that agreement.  Compl. ¶ 47.  As a non-party, Nasdaq presumptively has no rights under the HACK PSA or standing to enforce its terms.  *See Gerstley v Mayer*, No. N12C-10-126, 2015 WL 756981, at *6 (Del. Super. Ct. Feb. 11, 2015) ("Generally, only the parties to a contract have enforceable rights and obligations and may sue for breach of that contract.").

107.   Nor is Nasdaq an intended third party beneficiary of the HACK PSA so as to confer it rights under that agreement.  Under Delaware law, intent to confer third party beneficiary status can be established only by looking at the text of the contract itself.  *See id.* at *7 ("The Court will look to the language of the contract to determine whether an intended third party beneficiary is created."); *Crow v. Erectors*, 1988 WL 7617, at *2 (Del. Super. Ct. Jan. 21, 1988) ("This Court concludes that an intent by contracting parties to benefit a third party *must* appear either explicitly or implicitly in the contract itself. . . . This Court concludes that an intent to benefit a third party *must* depend on the language of the contract.") (emphasis added); *Bromwich v. Hanby*, No. So8C-07-008, 2010 WL 8250796 at *2 (Del. Super. Ct. July 1, 2010) (contract language must "clearly contemplate" third party beneficiary status); *Merial Inc. v. Ceva Sante Animale S.A.*, No. 3:15-CV-40, 2015 WL 5882964, at *4 (M.D.Ga. Oct. 7, 2015) (Under Delaware law, "[i]f the contract does not mention the third party by name or by general reference and if it does not contain language indicating an intent to confer a benefit on a third party, then the third party is not a third party beneficiary.").  Here, because there is no indication in the

---

[24] ETFMG proposed an amendment to the HACK PSA in October 2016 that would have added Nasdaq as a party, but Nasdaq declined.  ¶ 51, *supra;* DX-122.  .

HACK PSA itself that *any* third party was intended to benefit from its terms, Nasdaq is a stranger to that agreement and thus lacks standing to enforce its terms.

108.    This conclusion is further supported by the fact that the HACK PSA contains both a standard merger clause (JX-5, at § 13(j)) and a clause requiring that all modifications must be "set forth in a document duly executed by" the parties.  *Id.*, at § 13(k).  These provisions bar Nasdaq from offering parol evidence to confer on it third party beneficiary status.  As the parties agree (SL-12), under Delaware law the parol evidence rule bars the admission of evidence extrinsic to an unambiguous, integrated written contract.  *See Axis Reinsurance Co. v. HLTH Corp.*, 993 A.2d 1057, 1063 (Del. 2010), *as corrected* (May 10, 2010).  *See also Street Search Partners, L.P. v. Ricon Int'l, L.L.C.*, No. Civ.A.04C-09-156, 2005 WL 1953094, at *2 (Del. Super. Ct. Aug. 1, 2005) ("The Contract does not objectively indicate any intent to benefit [plaintiff], nor even acknowledge [plaintiff]'s existence. The Contract also contains standard merger and no oral modification clauses. The only possible evidence that could indicate [defendant]'s knowledge of or intent to benefit [plaintiff] is therefore extrinsic to the Contract and barred by the parole evidence rule.").

109.    Moreover, even if Nasdaq were an intended third party beneficiary of the HACK PSA (which it was not), the claimed benefit – namely, an entitlement to HACK Fund Profit – is not even mentioned, much less expressly provided for, in that agreement.  JX-5.  Whereas the expired BMA (which pre-dates the HACK PSA)  and each of the Remaining PureFunds PSAs (which post-date the HACK PSA) contain explicit terms dictating how Fund Profit is to be distributed between the parties thereto, the HACK PSA does not contain any such term.  *Compare* JX-12B, at Ex. B, *and* JX-6-10, all at § 8, *with* JX-5.  This intentional silence on profit-sharing in the HACK PSA alone disposes of Nasdaq's assertion that the HACK PSA

somehow grants it rights to HACK Fund Profit.  *See Bricklayers & Allied Crafts Union Local No. 1 of DE/PA Welfare Fund v. Edward Wilkinson Co.*, No. 07-145-GMS, 2008 WL 4948654, at *3 (D. Del. Nov. 19, 2008) (refusing to enforce alleged contract right to require audit where "plaintiffs have failed to cite or identify anywhere in the Agreement that an audit is contemplated" and "[s]uch a provision just does not exist").

110.    Nasdaq correctly states in its complaint that that "[w]ith limited exception, each [PSA] explicitly requires ETFMG to pay ISE/Nasdaq and PureFunds the profits generated from each fund. . . ."  Compl. ¶ 32.  That "limited exception", however, is the HACK PSA, which contains no payment provision and thus cannot be the basis for Nasdaq's claimed entitlement to payment.

      iii.     Neither the Index License Agreement Nor the
             <u>Sublicense Agreement Entitle Nasdaq To HACK Fund Profit</u>

111.    Perhaps in recognition of the foregoing, Nasdaq principally rests its case on a theory that the obligation to pay HACK profit arises from the Index License Agreement and the Sublicense Agreement.  Compl. ¶¶ 7, 23, 29, 50, 56, 60.  This effort does not withstand scrutiny.

112.    ISE and PureFunds are the only named parties to the Index License Agreement.  JX-1.  That agreement had two unrelated purposes: granting PureFunds a license to use ISE's indexes and creating a joint ETF venture between ISE and PureFunds.  *Id.*; *see* ¶ 17.b., *supra*.[25]  Only the first purpose was relevant for ETFMG.  In return for granting the right to use ISE's indexes, the Sublicense Agreement bound ETFMG to PureFunds' operational obligations in the Index License Agreement.  JX-2, at § 2.  However, the Sublicense Agreement specifically

---

[25] The dual purposes are reflected in the full name of the agreement, the "Index License and Exchange Traded Product Agreement."

excluded from ETFMG's obligations anything contained in the Index License Agreement's Schedule, which, among other things, laid out the license fees and certain fee-splitting terms between PureFunds and ISE.  *Id.* ("[ETFMG] acknowledges that it has received and read a copy of the [Index] License Agreement (*excluding the Schedule setting forth the license fees*) and agrees to be bound by all the provisions thereof . . . .") (emphasis added)).

113.     As this Court noted in its August 21, 2018 decision in this case, "the Court's role is to give effect to the intent of the contracting parties as revealed by the language they chose to use.'"  D.E. 50, at 16-17  (quoting *Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993)).  The parties do not contest this point of law. SL-7.  Here, the limiting language in the parenthetical unambiguously bound ETFMG to PureFunds' obligations in the body of the Index License Agreement but *not* the Schedule.  JX-2, at § 4; ¶ 17(b), *supra*.  This is further supported by the fact that, when the Sublicense Agreement was executed, and at every time thereafter that the Schedule was supplemented, the copy of the Index License Agreement sent to ETFMG redacted the Schedule's fee-splitting terms.  JX-1A; JX-3A; ¶ 17(b)., *supra*.  Moreover, even if ETFMG were somehow bound by the Schedule, the fee-splitting provisions therein specifically apply to profit allocation between *PureFunds and ISE* and are silent as to the source of that profit.

114.     Nasdaq's suggested reading of the Sublicense – binding ETFMG to the ISE/PureFunds fee split in the Index License Agreement's Schedule from which it was contractually excluded and barred even from seeing – is rejected as a matter of law.  *See Brause v. Goldman*, 10 A.D.2d 328, 334 (1st Dep't 1960) (under New York law, the court's job is to "enforce agreements only if they exist, and not to create them by the imposition of such terms as it considers reasonable"), *aff'd*, 9 N.Y.2d 620 (1961); *Law Debenture Trust Co. of N.Y. v.*

*Maverick Tube Corp.*, 595 F.3d 459, 467 (2d Cir. 2010) ("[T]he objective of contract interpretation is to give effect to the *expressed* intentions of the parties." (citation omitted)). Thus neither the Sublicense Agreement nor the Index License Agreement requires ETFMG to pay Fund Profit for HACK or any of the other PureFunds ETFs.[26]

### C.   Nasdaq Is Not Entitled To SILJ Fund Profit

115.   Nasdaq asserts that "[b]y the terms of the [Index License] Agreement and the [PureFunds PSAs], Nasdaq is entitled to the majority of the profits for . . . SILJ." Compl. ¶ 56. As a threshold factual matter, there is and never has been a PSA for SILJ. The only agreement governing Fund Profit generated by SILJ was the BMA between PureFunds and the Trust (DX-12B), which Nasdaq never mentions in its Complaint.

116.   The BMA is unenforceable by Nasdaq for two reasons. First, the BMA was executed solely by the Trust and PureFunds (*id.*), and, as with the HACK PSA, there is no evidence in the BMA itself that ISE was an intended third party beneficiary. *See Lester v. Basner*, 676 F. Supp. 481, 485 (S.D.N.Y. 1987) (under New York law, a contract that is silent as to whether it applies to third party cannot be enforced by that third party). Second, the BMA expired by its own terms on October 18, 2015. JX-12B (BMA), at § 4. The fact of its expiration some eight months before Nasdaq acquired ISE was acknowledged by the Board, contained in a publicly available supplement to the SILJ prospectus, and later conceded by Nasdaq at Mr. Wade's deposition. *See* DX-410 (September 10, 2015 Board Minutes), at 23-24; DX-413

---

[26] As described below, Nasdaq's malfeasance breached the Sublicense Agreement's covenant of good faith and fair dealing. Accordingly, even if the Court were to read a requirement to pay Fund Profit into the Sublicense Agreement – which it does not – ETFMG would still be justified in ceasing payment of that profit.

(March 27, 2016 Board Minutes), at 20-23; DX-51 (screenshot of October 19, 2015 SILJ prospectus supplement posted on PureFunds website as of November 12, 2015).

117.    Separate and apart from the BMA, ISE paid SILJ's Fund Shortfall directly to ETFMG from October 2012 until June 2016.  Masucci Aff. ¶¶ 107-09.  ISE did so because, as with HACK, it had an oral agreement with ETFMG to cover all Fund Shortfall in return for any Fund Profit.  ¶ 17(c)-(d), *supra*.  That oral agreement (like the oral agreement governing HACK) was terminable at will by ETFMG, and ETFMG properly exercised its termination right after the Nasdaq acquisition and Mr. Monaco's departure.  ETFMG attempted in good faith to negotiate a new contract for SILJ with Nasdaq in January 2017 (*supra* ¶ 51), but that deal was never finalized.  Masucci Aff. ¶ 110; DX-163.  Accordingly, ETFMG may rightfully retain Fund Profit from SILJ, a fund that it now bears the full expense of operating.[27]

### D.    Nasdaq, Not ETFMG, Breached the Sublicense Agreement

118.    Nasdaq alleges that ETFMG breached the Sublicense Agreement (including the obligations ETFMG assumed under the Index License Agreement) by failing to pay Fund Profit collected from the PureFunds ETFs.  Compl. ¶¶ 21, 23-24, 29, 49-50, 56, 60(A).  As described above, however, the Sublicense Agreement imposed no such requirement on ETFMG, and thus ETFMG's failure to remit Fund Profit does not constitute a violation.[28]

---

[27] To the extent Nasdaq relies on the Index License Agreement and/or Sublicense Agreement to substitute for the lack of a governing contract for SILJ Fund Profit, that argument is rejected for the reasons discussed above with respect to HACK Fund Profit.

[28] Even if the Court were to hold that ETFMG owed Nasdaq Fund Profit pursuant to the Index License Agreement, Nasdaq's damages would be subject to the agreement's limitation of liability provision.  JX-1, at § 7(e).  This section expressly limits any party's damages to the amount of fees "actually paid" by the opposing party during the previous twelve months before "the act or omission giving rise to the loss."  *Id.*  While the Court held that ETFMG lacked standing to enforce PureFunds' *rights* under the Index License Agreement (D.E. 50), Section 7(e) operates not as a right of PureFunds but as a built-in limitation of Nasdaq's *remedy*.  Moreover, ISE understood that this provision would be bilateral and expected it to be enforceable to limit damages that PureFunds *or* ETFMG could assert against it.  ETFMG paid Nasdaq

119.    Nasdaq further alleges that ETFMG breached the Sublicense Agreement by violating the Index License Agreement's prohibition (contained in its Schedule) against creating competing ETFs that are "Substantially Similar" to the PureFunds ETFs.  Compl. ¶¶ 24, 51, 57, 60(B).  This prohibition does not apply to ETFMG because it is contained in the Schedule as to which ETFMG is explicitly not bound.  JX-2, 2A ¶ 2; ¶ 179(b), *supra*; JX-1, 3, 4 (Schedule), all at § (I).  Moreover, even if it did apply, ETFMG's renaming of the PureFunds ETFs in the summer of 2017 did not, as Nasdaq asserts, amount to either the "creation" or "launching" of "'Substantially Similar' products".  Compl. ¶¶ 48, 51.  No new products were created or launched; rather, in light of Nasdaq's evasions as to whether it would continue to provide indexes, ETFMG (with Board approval) prudently switched the index provider and changed the names of six already operational funds:  HACK, IPAY, SILJ, GAMR, IFLY, and IMED.  ¶ 79, *supra*; DX-421 (July 24, 2017 Board Minutes), at 3.

120.    ETFMG therefore did not breach the Sublicense Agreement and Nasdaq's claims premised on that breach must be dismissed.  Nasdaq, by contrast, breached the Sublicense Agreement through its bad faith conduct.

121.    The Sublicense Agreement granted ETFMG "a non-exclusive and non-transferable sublicense to use the Intellectual Property in connection with the issuance, distribution, marketing, and/or promotion" of the PureFunds ETFs.  JX-2, at § 1.  Implicit in Nasdaq's agreement to provide these indexes to ETFMG is a promise that Nasdaq would properly maintain the indexes and not take any action to thwart or undermine ETFMG's ability to benefit from their use.  *See* D.E. 50 ("[I]mplicit in every contract is a covenant of good faith

---

Fund Profit through December 2016.  Accordingly, Nasdaq's damages for ETFMG's breach of the Index License Agreement (had such a breach occurred) would be limited to $3,811,072.25, the sum of Fund Profit ETFMG actually paid in the 2016 calendar year.  JX-190-200, 202.

and fair dealing which encompasses any promises that a reasonable promisee would understand

to be included." (quoting *N.Y. Univ. v. Continental Ins. Co.*, 87 N.Y. 2d 308, 318 (1995)).

122.    Prior to discovery, this Court explained how Nasdaq's actions as alleged

in the Counterclaims support ETFMG's claim for breach of the Sublicense Agreement's implied

duty of good faith and fair dealing.  *See* D.E. 50 at 15-17 ("[T]he Sublicense Agreement may

include an implicit promise that Nasdaq would maintain and provide access to the indexes, such

that the agreement would support a claim for breach of the duty of good faith and fair dealing.");

D.E. 51 at 2 ("[W]hether Nasdaq conspired with (or at minimum, was partial to) one of

ETFMG's competitors so as to favor a competing ETF also relates squarely to whether Nasdaq

breached its duty of good faith and fair dealing in connection with the Sublicense Agreement.").

123.    Discovery has confirmed the following actions by Nasdaq in

contravention of its duty of good faith:

- Nasdaq disregarded ETFMG's concerns (as expressed repeatedly, beginning at the time of the ISE acquisition) that Nasdaq's indexing of both HACK and CIBR created a serious conflict of interest.  Nasdaq's failure to address this conflict was motivated by a clear preference for CIBR over HACK.  *See* ¶¶ 52-57, *supra*.

- Nasdaq never implemented any safeguards to prevent or mitigate this conflict of interest, nor did it take steps to address ETFMG's concerns regarding the disparate implied liquidity between the indexes for HACK and CIBR.  Masucci Aff. ¶¶ 72-80.  Quite the opposite; Nasdaq attempted to intimidate ETFMG and the Trust into abandoning their efforts to address the conflict of interest.  *See* ¶¶ 53-57, *supra*.

- Nasdaq disregarded ETFMG's legitimate concern (shared by Mr. Chanin) that Nasdaq's indexing of an Australian ETF with the "HACK" ticker had the potential to confuse or mislead actual and potential HACK investors.  Masucci Aff. ¶ 81.

- In June and July 2017 Nasdaq failed to confirm whether it would honor its obligations under the Sublicense Agreement to continue providing indexes for SILJ, HACK, IPAY, BIGD, GAMR, and IFLY.  Nor did Nasdaq accept an ETFMG proposal under which Nasdaq would receive a market fee to provide these indexes.  This uncertainty constituted anticipatory breach and put ETFMG

and the Trust in an impossible position, because with over $1 billion in AUM, neither ETFMG nor the Trust could risk losing access to regularly updated indexes.  *See* ¶¶ 73-79, *supra*.

- In August 2017, Nasdaq intentionally shut off ETFMG's access to critical index files during trading hours and then misled ETFMG about its reason for doing so. *See* ¶¶ 80-86, *supra*.

124.    Each of these actions had the effect of denying ETFMG the benefit of its bargain under the Sublicense Agreement, and thereby violated that agreement's implied duty of good faith and fair dealing.  *See Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 769 F.3d 807, 817 (2d Cir. 2014) (covenant of good faith and fair dealing ensures that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract") (quoting *Moran v. Erk*, 11 N.Y.3d 452, 456 (2008)).[29]

125.    As the parties agree (SL-10), under New York law a party's performance under a contract is excused where the other party has committed a material breach.  *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 136 (2d Cir. 2016).  When Nasdaq breached the Sublicense Agreement as described above, that breach relieved ETFMG of all of its duties under that agreement.  Accordingly, even if ETFMG were obligated to pay Nasdaq Fund Profit under the Sublicense Agreement (which it was not), that obligation ceased as the result of Nasdaq's bad faith conduct.

---

[29]  Nasdaq argues that comparison of certain financial attributes of HACK and CIBR before and after the Nasdaq acquisition – including cumulative returns, AUM growth, and implied liquidity – show HACK performing similarly to CIBR and thus tend to disprove bias or favoritism against HACK.  *See* Juneja Report ¶¶ 51-56.  However, Nasdaq did not allege that any of these metrics are positively affected by anything Nasdaq itself did.  Rather, they appear to reflect market factors out of the control of the parties.  Moreover, these variables are not relevant to ETFMG's claims.  For example, while HACK's implied liquidity might at times have improved on its own terms, Nasdaq offered no evidence to dispute ETFMG's argument that CIBR's implied liquidity was of a different order of magnitude because of structural differences in the two indexes, and that it is that structural difference (and not market-driven fluctuations in each fund's liquidity) that constituted CIBR's competitive advantage.  *See* DX-839 (May Rebuttal Report), at ¶¶ 50-67.

### E.      Nasdaq, Not ETFMG, Breached the Remaining PureFunds PSAs

126.    The same above-listed actions by Nasdaq that constituted breaches of the Sublicense Agreement also each constituted a breach of Nasdaq's obligation under each of the Remaining PureFunds PSAs that it "shall not take any action, or fail to take any action, that, would, or could reasonably be expected to . . . result in a material violation of [the PSA] of adversely affect the operations of the Trust or the Funds." JX-6-10 (all at § 7(e)). Violation of this obligation is a terminable event.  *Id.* (all at § 9).[30]

127.    In addition to Nasdaq's actions that also constituted violations of the Sublicense Agreement, the following Nasdaq actions violated §7(d) and support ETFMG's decision to terminate the Remaining PureFunds PSAs:

- Following its acquisition of ISE, Nasdaq failed to undertake adequate due diligence with respect to ISE ETF Ventures business, resulting in a fundamental lack of understanding of the relevant contracts and economic mechanics governing the tripartite business relationship among ISE, ETFMG, and PureFunds concerning the PureFunds ETFs.  This resulted in delayed payments to counterparties and disruption in the functioning of the funds.  *See* ¶¶ 43-45, *supra.*

- Nasdaq displayed immediate and sustained hostility towards ISE ETF Ventures generally and a corresponding unwillingness to work with ETFMG to grow and market the PureFunds ETFs.  *See* Masucci Aff. ¶ 60-68.

- Nasdaq employed improper pressure tactics to escape its contractual obligations with ETFMG, including but not limited to inappropriately interfering with the Trust's decision to reduce HACK's Management Fee and delaying or contesting previously routine payments to support the Wholesaling Platform.  *See* ¶¶ 56-61, *supra.*

- Although Mr. Wade expressed to Mr. Masucci that he "hate[d]" the Wholesaling Agreement and twice asked for a buyout offer, Nasdaq ignored ETFMG's subsequent proposals and merely ramped up its improper pressure tactics to escape its contract obligations, hindering ETFMG and the Trust's ability to devote their full time and attention to operating the funds.  *See* ¶¶ 49-50, *supra.*

---

[30] While Nasdaq's failure to confirm index provision and intentional withholding of index files occurred after ETFMG's June 2, 2017 letter terminating the PureFunds PSAs, each of these actions constituted independent, additional grounds for termination.

128.     Each of these actions by Nasdaq – as well as each of Nasdaq's actions described above as valid bases for terminating the Sublicense Agreement – constituted improper interference with ETFMG and the Trust's ability to make judgments in the best interests of the PureFunds ETFs' shareholders, and therefore were permissible grounds for termination of the Remaining PureFunds PSAs.

129.     But that is not all.  Because PureFunds is also ETFMG's counterparty to the Remaining PureFunds PSAs – and ETFMG's only counterparty to the HACK PSA – Mr. Chanin's malfeasance also constituted a terminable breach of the Remaining PureFunds PSAs (and of the HACK PSA).  That malfeasance included:

- Mr. Chanin improperly attempt to interfere with the Board's decisions to cut the HACK fee and to move distribution to ETFMG Financial and portfolio management in house.  *See* ¶ 64, *supra*.

- Mr. Chanin refused to transfer his securities sale license to the funds' new statutory distributor even though he was the marketing face of the PureFunds ETFs.  Masucci Aff. ¶¶ 100-02; Karol Aff. ¶¶ 20-24.

- Mr. Chanin filed the New Jersey Action – which included patently frivolous claims against ETFMG, the Trust, and the independent trustees personally (without any allegations of misconduct on their part) – along with a meritless application for injunctive relief that attempted improperly to wrest control of the funds from the Trust and ETFMG.  *See* ¶¶ 65-66, *supra*.

- Mr. Chanin induced, or at least allowed, Mr. Lewellyn to disclose confidential information in his certification supporting PureFunds' request for injunctive relief in the New Jersey Action.  Masucci Aff. ¶ 128.

130.     Together, Nasdaq and PureFunds' actions "adversely affect[ed] the operations of the Trust [and] the Funds" warranting ETFMG's termination of the PureFunds

PSAs.[31]  Masucci Aff. ¶ 129.  ETFMG's June 2, 2017 termination letter provided Nasdaq with

the required sixty day cure period, during which time Nasdaq failed to take any action to remedy

its breaches.  JX-5-10, all at § 9; Masucci Aff. ¶¶ 129-31.  Upon the completion of that cure

period on July 31, 2017, ETFMG was relieved of any duties under the Remaining PureFunds

PSAs.  *See Preferred Fin. Servs., Inc. v. Bus. Builders for Entrepreneurs, LLC*, No. CPU4-15-

001583, 2016 WL 4537759, at *2 (Del. Ct. Comm. Pl. Aug. 30, 2016) (material contract breach

relieves non-breaching party of contractual obligations).

      131.    Nasdaq assented to the termination of the PSAs for the funds that were not

yielding Fund Profit (BIGD, FINQ, GAMR, IFLY, and IMED) – *see* DX-279-283 – contesting

only termination of the two that were then showing Fund Profit (HACK and IPAY).  DX-289-

290.  Nasdaq is thus barred from seeking damages for any later Fund Profit for GAMR or IFLY

(BIGD and FINQ have no Fund Profit), as it seeks in DX-838 (Juneja Report), at ¶ 50.  This

leaves just Nasdaq's claim that ETFMG breached the IPAY PSA by failing to remit ongoing

IPAY Fund Profit.  That claim is denied; ETFMG had more than adequate bases for terminating

the IPAY PSA.  ¶¶ 126-30, *supra*.  Therefore, Nasdaq's entitlement to IPAY Fund Profit ended

on July 31, 2017, the effective termination date of the IPAY PSA, and ETFMG is liable only for

a true-up of $201,087.10 for unpaid IPAY Fund Profit up until that date.  Flanagan Aff. ¶ 41.[32]

---

[31] The fact that ETFMG had several valid bases for terminating the PureFunds PSAs vitiates Nasdaq's claim that ETFMG's termination was *itself* a breach of those agreements.  Compl. ¶ 47.

[32] To the extent other funds governed by the Remaining PureFunds PSAs surpassed breakeven after July 31, 2017, ETFMG is relieved of any obligation to share the resulting Fund Profit on account of both Nasdaq's acquiescence to the termination of their respective PSAs and Nasdaq's breach of those agreements as described above.  The Court also notes that Nasdaq has provided neither index nor financial support for these ETFs since July 2017.

### F. __Nasdaq, Not ETFMG, Breached the Wholesaling Agreement__

i. Nasdaq Could Not Terminate the Agreement Under Section 9(c)

132.    The Wholesaling Agreement can be terminated by either party upon thirty days written notice "if the other party fails to perform its obligations."  JX-11, at § 9(c).

133.    Nasdaq's attempt to terminate the Wholesaling Agreement on July 11, 2017 (DX-287) pursuant to Section 9(c) was ineffective because each of Nasdaq's seven asserted "breaches" cannot be squared with the facts.  DX-295 (August 2, 2017 Coffey Letter).  ¶¶ 87-95, *supra*.

134.    *First*, ETFMG did not breach by engaging ETFMG Financial as statutory distributor for the PureFunds ETFs.  Section 3 of the agreement, which lists GENCAP's services, includes the following language:  "The parties *acknowledge* that GENCAP shall not provide statutory distribution services. . . ." JX-11, at § 3 (emphasis added).  Contrary to Nasdaq's contention, this language cannot reasonably be read as a prohibition against the advisor ever using an affiliated statutory distributor.  If it had been the parties' intent to bar GENCAP from ever serving as a distributor, such a bar would have been included in the covenants section of the contract, not as an "acknowledgement" at the end of the list of services to be provided by GENCAP.  *See* JX-11, at § 8 ("Covenants of GENCAP").  The more reasonable interpretation is that the parties included this acknowledgement to highlight the fact that GENCAP did not have a broker-dealer license at the time.  Masucci Aff. ¶¶ 91, 148.  *See also* DX-804 (Chambers Report), at ¶¶ 64-70.  Thus the retention of ETFMG Financial was permissible (and, indeed, beneficial to the funds and their shareholders).  *See* ¶ 88, *supra*.

135.    *Second*, ETFMG did not breach by charging Nasdaq Wholesaling Fees for ETFs added to the Wholesaling Platform with the oral consent of ISE.  ¶ 89, *supra*.  Although

the Wholesaling Agreement itself recites that it may only be amended only by a signed writing, changes to the Wholesale Platform require only mutual consent.  *Compare* DX-11, at § 13(k) ("No variations, modifications or changes [of the Wholesaling Agreement] shall be binding upon any party hereto unless set forth in a document duly executed by or on behalf of such party"), *with id.*, at § 7(b) ("All material changes to the Wholesaling Platform must be mutually agreed upon by ISE and [ETFMG]").  Mutual consent to add these funds, in addition to being uncontested, was memorialized in several writings – invoices for the Wholesaling Fees – that were promptly paid by ISE.  ¶¶ 36, 89, *supra*; Masucci ¶ 56.  Thus, contrary to Nasdaq's position, ETFMG's addition of BIGD, FINQ, GAMR, IFLY, IMED, IPAY, LARE, and CNCR to the Wholesaling Platform was permissible.[33]

        136.    *Third*, ETFMG did not breach the Wholesaling Agreement by charging Wholesaling Expenses in 2015 and 2016 in excess of the set annual cap and without seeking pre-approval for every single expense.  There is no dispute that, before the acquisition in June 2016, ETFMG charged ISE many Wholesaling Expenses without pre-approval, and that such expenses were paid without question.  ¶ 39, *supra*.  And when ETFMG *did* seek pre-approval from Mr. Monaco – because the expenses were large and thus Mr. Monaco needed approval from his boss, Mr. Ilyevsky – in every instance that approval was granted, regardless of whether the total annual expenses well exceeded $50,000.  ¶¶ 38-39, *supra*; DX-530-539, 542 (2015 invoices for non-salary Wholesaling Expenses totaling $164,801.89).  This conduct demonstrated an intent by ISE to waive both the requirement that ETFMG seek approval for every expense and that the $50,000 cap be strictly observed.  , As the parties agree (SL-13), Delaware law permits this type

---

[33] In Mr. Wade's July 18, 2016 letter to Mr. Masucci, he ackowledged that at least two of these funds – IPAY and BIGD – were on the Wholesaling Platform.  DX-259.  Nasdaq cannot, more than a year later, claim that the addition of those funds constituted breach justifying termination.

of waiver even where the agreement at issue contains a clause requiring amendments to be by signed writing; ETFMG thus acted permissibly in charging ISE (and its successor to that waiver, Nasdaq) for Wholesaling Expenses in excess of the annual cap and without seeking pre-approval for every expense.  *See Weyerhaeuser Co. v. Domtar Corp.*, 721 Fed. Appx. 186, 190 (3d Cir. 2018).

137.    *Fourth*, ETFMG did not breach the Wholesaling Agreement by charging Nasdaq for Wholesaling Expenses related to wholesalers' training, travel, expenses, and supplies – these expenses were specifically contemplated by the Wholesaling Agreement.  JX-11, at §§ 3(q), 3(n), 7(a).  In addition, each of the challenged charges was either expressly approved by ISE or consistent with the parties' overall course of dealing.  ¶¶ 38-40, *supra*.

138.    *Fifth*, ETFMG did not breach the Wholesaling Agreement by hiring, with ISE's consent, two additional wholesalers and thereby doubling their combined annual compensation cap from $250,000 to $500,000.  *See* JX-11, at Ex. C ("The number of Wholesalers and the Compensation Cap may be amended from time to time as mutually agreed by the parties.").[34]  ¶ 38, *supra*.

139.    *Sixth*, ETFMG did not breach the Wholesaling Agreement by not providing Nasdaq with invoices to service providers underlying the Third Party Fees paid to Nasdaq.  The sum of such invoices was included in ETFMG's monthly statements.  *See*, *e.g.*, DX-514 (statement of November 2016 Third Party Fees).  Following Nasdaq's July 11, 2017 "notice of breach" letter, ETFMG's lawyers offered to provide Nasdaq with the invoices it sought notwithstanding that the relevant information therein had already been provided.  DX-295.  ¶ 93, *supra*.

---

[34] The fact that many of Nasdaq's purported breaches by ETFMG were actions *specifically permitted* by the Wholesaling Agreement is further evidence that Nasdaq's termination was pretextual.

140.     *Seventh*, ETFMG did not violate the Wholesaling Agreement by paying the delta of what it owed Nasdaq and what Nasdaq owed it.  This type of "netting" or "setoff" is expressly permitted by the law.  *See In re Garden Ridge Corp.*, 386 Fed. Appx. 41, 43 (3d Cir. 2010) ("Setoff rights arise under the common law of equity and 'allow [ ] entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A.'") (quoting *Citizens Bank v. Strumpf*, 516 U.S. 16, 19 (1995)). Nasdaq's claim that ETFMG's netting practice amounted to ETFMG "unlawfully [keeping] HACK profits" is belied both by the law and by the fact that, as discussed earlier, Nasdaq had no contractual right to those profits in the first place.  ¶¶ 59-61, 94, *supra*.  ETFMG thus acted permissibly when it protected itself from Nasdaq's intimidation tactics by netting.  In light of the Court's finding that ETFMG's obligation to pay HACK Fund Profit to Nasdaq was terminable at will, ETFMG's decision to continue crediting any of that profit to offset unpaid expenses was not only permissible but in fact restrained.

141.     Even if any (or even all) of the above actions by ETFMG constituted a breach of the Wholesaling Agreement, that breach was not *material*, and thus was insufficient to justify Nasdaq escaping its ongoing financial obligations under that agreement.  *See Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 315 (3d Cir 2001) ("Materiality goes to the essence of the contract; a breach is material if it "will deprive the injured party of the benefit that is justifiably expected" under the contract.") (quoting Farnsworth on Contracts § 8.16 (2d ed. 1998)); *Biolife Solutions, Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003) (holding that failure of company to timely provide competitor with all of its patent files was not a material breach of parties agreement and noting that a breach is only material if it is "of sufficient importance to justify non-performance by the non-breaching party").

142.    Nasdaq had every intention of escaping its obligations under the Wholesaling Agreement from the beginning.  Masucci Aff. ¶¶ 118, 147; ¶ 46, *supra*.  That the "Wholesaler agreement [was] costing approximately $1M per year, but demonstrating little benefit" and "[a]ppear[ed] to be terminable in 11/2019" was discussed with Nasdaq CEO. Friedman in August 2016.  DX-110 (Nasdaq ISE Integration deck:), at slide 2 ("Summary"). When the time came (not coincidentally, soon after ETFMG expressed its intention to cease distributing HACK Fund Profit), Nasdaq terminated the agreement.  DX-287.  Its asserted bases for the termination were pretextual and at best immaterial, and thus the termination was ineffective.  *See 2009 Caiola Family Trust v. PWA, LLC*, No. 8028-VCP, 2015 WL 6007596, at *28 (Del. Ch. Oct. 14, 2015) ("[Because] Plaintiffs appear to have made their claims that DPW's financial records are inadequate for self-interested, pre-textual reasons, I find that the breaches they allege are not material.").

143.    By attempting to terminate the Wholesaling Agreement and ceasing performance thereunder, *Nasdaq* breached the agreement.  Termination based on that breach became effective upon completion of the sixty day cure period – August 10, 2017 (the "Breach Date").  ETFMG's damages as of the Breach Date are described below, at ¶¶156-65.

ii.   Nasdaq Could Not Terminate the Agreement Under Section 9(d)

144.   Through its expert in this litigation, Vinita Juneja, Nasdaq now claims that the Wholesaling Agreement was terminable for an entirely different reason; namely, failure of products on the Wholesaling Platform to accumulate sufficient AUM.  DX-838 (Juneja Report), at ¶¶ 16-27.  This post hoc claim – not asserted as a ground for terminating the Wholesaling Agreement in 2017 – is belied by the facts in any event.

145.   Section 9(b)(i) of the Wholesaling Agreement states that if the products on the Wholesaling Platform fail to accumulate $100 million aggregate AUM at any point after the second anniversary of the agreement, ISE may terminate with thirty days' notice.  JX-11, at § 9(b).

146.   There can be no dispute that, as of the Breach Date, this threshold was far exceeded: aggregate AUM of products on the platform was more than $500 million.  DX-848 (AUM Chart).  Nor can there be any dispute that, at all times *since* the Breach Date, the $100 million threshold has been satisfied.  *Id.*; Masucci Aff. ¶¶ 161-62; May Aff. ¶ 10.

147.   Therefore the only question remaining is whether certain funds should have been "automatically removed" from the Wholesaling Platform when they failed on their own to reach certain AUM thresholds, potentially leading to failure of the $100 million threshold at an earlier date.  JX-11, at Ex. B.  There is ample evidence that ISE *in every instance* chose *not* to invoke the removal provision in Exhibit B.  Masucci Aff. ¶¶ 163-64.  Funds that did not even come near the listed one and two year thresholds were kept on the Wholesaling Platform without objection from – and with the continuing financial support of – ISE.  *See* ¶ 40, *supra*.  SILJ, for instance, did not begin to approach the $75 million two year threshold until 2017, five years after its launch.  DX-848 (AUM Chart).  Yet ISE continued to voluntarily pay SILJ Wholesaling Fees

- 62 -

for that entire period.  *See*, *e.g.*, JX-322-329 (November 2015 to June 2016 SILJ P&L Statements).  ISE waived the removal provision in Exhibit B for multiple other funds including ISE-Supported YYY and Third Party EMQQ.  Masucci Aff. ¶¶ 163-64; DX-848 (AUM Chart); JX-383 (June 2017 Wholesaling Fees invoice including YYY); JX-353 (June 2017 Third-Party Fees statement including EMQQ).  This is a pattern of intentional waiver that is recognized under Delaware law.  *See Weyerhaeuser Co.*, 721 Fed. App'x at 189.  Nasdaq cannot go back in time to remove funds its predecessor intended to keep on the platform for the purposes of retroactively terminating the agreement.

148.    Nasdaq could not have terminated the Wholesaling Agreement under Section 9(b) had it attempted to do so in 2017, and it certainly cannot do so now.

### G.    Nasdaq's Tort and Quasi-Contract Claims Seeking Fund Profit Are Barred As Duplicative

149.    In addition to its claim for breach of the PureFunds PSAs, Index License Agreement, Sublicense Agreement, and Wholesaling Agreement, Nasdaq asserts four causes of action against ETFMG sounding in either tort or quasi-contract.  Compl. ¶¶ 64-89.  All of these claims are duplicative and must be dismissed because they seek to enforce the same alleged rights (Fund Profit) – and recoup the same alleged damages (Fund Profit) – as Nasdaq's breach of contract claim.  *See NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008) ("[C]laims are duplicative of one another if they arise from the same facts and do not allege distinct damages.").  (citations and quotations omitted).

#### i.    Conversion

150.    In order to survive, a conversion claim must be based "on acts that constitute unlawful or wrongful behavior separate and apart from a violation of contractual rights."  *Elma RT v. Landesmann Int'l Mktg Corp.*, No. 98 CIV. 3662, 2000 WL 297197, at *3

(S.D.N.Y. Mar. 22, 2000). *See also Briarpatch Ltd. v. Geisler Roberdeau, Inc.*, 148 F. Supp. 2d 321, 328 (S.D.N.Y. 2001) ("New York law is clear in barring claims for conversion where damages are merely sought for breach of contract."). The only question for courts is "whether defendants had a duty separate and apart from any duties imposed by defendants' contractual obligations." *Elma*, 2000 WL 297197, at *4.

151. As pled, Nasdaq's conversion claim merely reiterates the key allegation underpinning its claim for breach of the PureFunds PSAs, the Index License Agreement, and the Sublicense Agreement; namely, that ETFMG "intentionally and without authority interfered with Nasdaq's right" to Fund Profit from the PureFunds ETFs. Compl. ¶ 67. Nasdaq does not allege any independent or pre-existing relationship between itself and ETFMG giving rise to any duties independent of these contracts.[35] Nor can Nasdaq turn its contract claim into a tort merely by adding pejorative language, such as the allegation that defendants acted "intentionally and without authority" when they "interfered" with Nasdaq's rights with respect to the PureFunds ETFs. *Id.* ¶ 6. "Under New York law a breach of contract – even an 'intentional' or 'malicious' breach of contract – does not give rise to a tort action." *Mayer v. Morgan Stanley & Co.*, 703 F. Supp. 249, 253 (S.D.N.Y. 1988).

    ii.    Unfair Competition

152. Nasdaq's unfair competition claim, like its conversion claim, is premised on ETFMG's alleged "misappropriation" of "Nasdaq's prospective profits" and contains no allegation of an independent legal duty on the part of ETFMG. Compl. ¶¶ 71-74. Accordingly,

---

[35] Nasdaq dresses up its claim with the language of theft — alleging that Defendants hatched a "scheme to take Nasdaq's property" (Compl. ¶ 4); acted to "unlawfully steal the PureFunds ETFs" (*id.*); and "misappropriated from Nasdaq the PureFunds ETFs" (*id.* ¶ 66). But such rhetoric is unavailing because, as noted earlier, Nasdaq never "owned" the PureFunds ETFs. DX-804 (Chambers Report), at ¶ 32.

the claim must be dismissed as duplicative.  *See Dorset Indus., Inc. v. Unified Grocers, Inc.*, 893

F. Supp. 2d 395, 414 (E.D.N.Y. 2012). ("In the allegations underlying the unfair competition

claim in complaint, the Plaintiff does not allege that the Defendant had an independent legal duty

other than its duty to comply with its express and implied obligations under the Agreements.

Thus, the Plaintiff has not plead an 'alternative theory' under which it could recover separate and

apart from the breach of contract claims, and therefore the unfair competition claim must be

dismissed as duplicative of the breach of contract claims.").[36]

### iii.   Unjust Enrichment

153.    Where the matter in dispute is controlled by contract and the claim for

unjust enrichment seeks the same relief as is sought for breach of contract, the unjust enrichment

claim is properly dismissed as duplicative.  That is the case here, where Nasdaq's unjust

enrichment claim specifically refers to the contracts, the benefits of which it alleges were

wrongfully retained by ETFMG.  Compl. ¶¶ 77-78.  *See Prof'l Merch. Advance Capital, LLC v.*

*C Care Servs., LLC*, No 13-cv-6562, 2015 WL 4392081, at *6 (S.D.N.Y. July 15, 2015)

(dismissing *sua sponte* plaintiff's unjust enrichment claim as duplicative of its breach of contract

claim where 'there [was] an enforceable agreement and the same damages [were] sought.'").

### iv.   Quantum Meruit

154.    Nasdaq's *quantum meruit* claim fails on the same ground as unjust

enrichment: it is precluded by the contract claim.  *See Chesapeake Energy Corp. v Bank of New*

*York Mellon Tr. Co., N.A.*, No. 13 CIV. 1582, 2015 WL 4191419, at *9 (S.D.N.Y. July 10, 2015)

(Engelmayer, J.) ("'Under New York law, the existence of an express contract governing a

---

[36] Nasdaq also claims that ETFMG misappropriated Nasdaq's "labor, skill, expenditures,[] good will, and . . . commercial advantage," but the rights underlying this claim are not alleged to arise from anything other than the contracts between the parties.

particular subject matter ordinarily precludes recovery in *quantum meruit* for events arising out of the same subject matter.'") (internal quotation omitted), *aff'd*, 837 F.3d 146 (2d Cir. 2016).

      v.    <u>Breach of the Duty of Good Faith and Fair Dealing</u>

155.    Nasdaq's claim for breach of the duty of good faith and fair dealing is explicitly premised on ETFMG's alleged "scheme to take" precisely what Nasdaq asserts a contractual entitlement to (namely, Fund Profit from the PureFunds ETFs) and seeks the same compensatory damages as its contract claim ("lost profits and [] prospective profits").  Comp. ¶¶ 87-89.  It therefore must be dismissed as duplicative.  *See Salomon v Citigroup Inc.*, 123 A.D.3d 517, 518 (1st Dep't 2014) ("Plaintiff's claim for breach of covenant of good faith and fair dealing . . . is essentially duplicative of the allegations in his breach of contract claim, and should be dismissed, particularly as it seeks the same damages as the breach of contract claim.").

**H.**    **<u>ETFMG's Damages</u>**

156.    As discussed above, because Nasdaq had no basis for terminating the Wholesaling Agreement under §§ 9(c) or 9(b), its failure to continue performing thereunder constituted a material breach.  JX-11, at § 7(c)-(d).  ETFMG is therefore entitled to the value of Nasdaq's future payments under that agreement in perpetuity.

157.    Under Delaware law, "the standard remedy for breach of contract is based on the reasonable expectations of the parties that existed before or at the time of the breach." *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.2d 1109, 1132-33 (Del. 2015).  Here, the reasonable expectation at the Breach Date was that aggregate AUM on the Wholesaling Platform (which at the time exceeded $500 million) would only continue to grow, and thus that the $100 AUM threshold set by § 9(b) would be met in perpetuity.  *See* DX-848 (AUM Chart).

158.    This conclusion is not disturbed by Nasdaq's contractual ability to remove ISE-Supported ETFs from the Wholesaling Platform on their fifth year anniversaries.  There is ample evidence that the $100 million AUM threshold in § 9(b) would have continued to be satisfied in perpetuity past the Breach Date *even if* Nasdaq chose to remove all ISE-Supported ETFs from the Wholesaling Platform.  *See* DX-848 (AUM Chart).  As of the Breach Date, aggregate AUM for Third Party ETFs far exceeded $300 million and would have been expected to continue growing given, in particular, the success of RISE, EMQQ, ETHO, and ITEQ.  *Id.*; DX-848 (AUM Chart).  And indeed the $100 million threshold has been satisfied by aggregate Third Party ETF AUM from the Breach Date until the present.  DX-848 (AUM Chart).

159.    The May Report (DX-800) provides an ample basis for projecting reasonable damages for Nasdaq's breach of the Wholesaling Agreement.  DX-800 (May Report), at ¶¶ 22-52.

160.    Dr. May quantified the annual obligation under the Wholesaling Agreement based on salaries and expenses reaching a conservative total of $765,891.  Although there is evidence that Nasdaq understood its annual obligation to be approximately $1 million per year, Dr. May's more conservative total is an appropriate benchmark for reasonably foreseeable damages.  *Id.* at ¶¶ 26-33.

161.    To calculate the present value of this annual obligation in perpetuity, Dr. May appropriately identified a discount rate that took into account the risk of Nasdaq failing to satisfy its contractual obligation going forward.  This risk is reasonably analogous to the risk associated with an unsecured bond, but since available examples of Nasdaq bonds were for relatively short terms reflecting lower risk, Dr. May reasonably substituted a rate derived from the BofA Merrill Lynch BBB 15+ Corporate Debt Index, which is comprised of bonds with

credit ratings similar to Nasdaq's but an average of 25+ years to maturity.  The rate for that index as of the breach date was 4.68%, and the Court finds that this is a reasonable discount rate to apply to Nasdaq's unsecured obligation to fund the Wholesaling Platform.  *See id.* at ¶¶ 34-37.

162.    Nasdaq has objected that this discount rate is too low because it does not take account of the risk of the Wholesaling Platform failing.  However, the Court has already rejected Nasdaq's arguments about past events that it argues could or should have led to termination of the Platform, and based on the parties' reasonable understanding as of the Breach Date, the Court finds that the risk of the Platform ever going below $100 million in AUM was highly remote.  Therefore, the principal risk to be measured is Nasdaq's nonpayment.  Nasdaq has not argued that the rate Dr. May selected does not appropriately measure that risk.

163.    Dr. May then applied the standard perpetuity calculation formula, which consists of dividing the annual damages amount (grossed by the annual growth rate) divided by the annual yield (interest rate) less the expected growth rate.  Employing a conservative 1.9 percent growth rate, this calculation yielded a present value of $27,550,030 based on the annual obligation of $765,891.  *See id.* at ¶¶ 38-39.

164.    Dr. May then calculated the present value of AUM-based fees to which ETFMG would be entitled going forward under the Wholesaling Agreement for two ISE-supported funds remaining on the Platform, YYY and CNCR.  Conservatively basing projections on average AUM at the time of the breach with only 1.9% growth, he applies discount rates based on the assets underlying each fund, and calculates a present value for the future cash flows of $1,639,284, or total damages under the Wholesaling Agreement of $29,189,314.  The Court finds this total to be reasonable.

165.    ETFMG's damages are subject to certain adjustments to account for a true-up of amounts owed between the parties as of the Breach Date: $101,800.80 owed by Nasdaq to ETFMG, and $2,805,469.30 owed by ETFMG to Nasdaq.  *See* Flanagan Aff. ¶¶ 36-48.  Taking that into account, as of the Breach Date Nasdaq owed ETFMG $26,485,645.50.  ETFMG is also entitled to prejudgment interest.  Under New York (and federal) law, prejudgment interest compensates the prevailing party for the breaching party's interest-free use of the non-breaching party's money.  *See Gierlinger v. Gleason*, 160 F.3d 858, 874 (2d Cir. 1998).  The New York prejudgment interest rate applies.  *McLean v. Garage Mgmt. Corp.*, No. Civ. 3950(DLC), 09 Ci. 9325(DLC), 2012 WL 1358739 (S.D.N.Y. April 19, 2012).  Under N.Y. C.P.L.R. § 5004, prejudgment interest runs at the rate of nine percent (9%) per annum simple interest.  ETFMG may therefore recover prejudgment interest on the $26,485,645.50 in damages awarded.  measured from the August 10, 2017 Breach Date.

### I.    Alternative Conclusions on Nasdaq's Damages

166.    As noted above, ETFMG was within its rights to terminate the oral agreement regarding HACK Fund Profit as well as the PSAs governing Fund Profit for other ETFs, and as a result Nasdaq is not entitled to damages on its breach of contract claim.

167.    In the alternative, even if Nasdaq were entitled to HACK Fund Profit, Nasdaq has not met its burden to demonstrate future profits with reasonable economic certainty. *See Siga Techs., Inc.*, 132 A.2d at 1130-31 (plaintiff's burden to prove expectation damages with reasonable certainty).  A number of factors contribute to this conclusion, several of which are cogently analyzed in the May Affidavit and May Rebuttal Report (DX-839).

168.    *First*, ETFMG has demonstrated that there is a strong trend in the ETF industry towards fee compression, and indeed the Trust has already been compelled to cut the

Management Fee for HACK from 75 to 60 basis points, in large part to remain competitive with CIBR.  Given the overall trend as well as the recent announcement that iShares, a large-volume, low-cost ETF brand backed by BlackStone, will be introducing a cybersecurity ETF that will compete with HACK, there is a high likelihood that the Trust will be forced to reduce the HACK fee significantly more in the future, which would correspondingly reduce HACK Fund Profit, conceivably to zero.  DX-195 (ETF Managers Group, Management Fee Compression in Indexed ETFs, March 10, 2017); *see also* May Aff. ¶¶ 14-16.  This factor by itself makes it impossible to project future HACK profits with sufficient certainty, and Dr. Juneja's failure to give this factor any weight in her projections makes it impossible to credit her assumption that the HACK fee will stay at 60 basis points indefinitely.  The same fee compression pressures could well affect the more limited profits projected for the other former PureFunds ETFs.

169.    *Second*, as noted above, Nasdaq forfeited any right to Fund Profit in connection with GAMR and IFLY by assenting to termination of the PSAs for those funds.

170.    *Third*, Dr. Juneja's projections were inflated by failing to take into account the need for Nasdaq to replace the marketing efforts previously conducted through the Wholesaling Platform.  *See* DX-839 (May Rebuttal Report), at ¶¶ 26-30.

171.    *Fourth*, Dr. Juneja's projections were inflated by the unreasonable and unsupported assumption that the PureFunds ETFs would continue to experience double-digit AUM growth for the full 14-year period covered by her projections.  *See id.* at ¶¶ 31-49.

172.    Based on all of these factors, the Court finds that, even if it could establish a right to received ETF Fund Profit notwithstanding the misconduct of Nasdaq and PureFunds justifying termination of the parties' written and oral agreements, Nasdaq has failed to satisfy its burden to demonstrate future profits with reasonable economic certainty.

173.    Finally, even if Nasdaq could project future profits with reasonable certainty, to the extent it was held to have a right to damages pursuant to the Index License Agreement – its principal argument – such damages would be subject to a built-in contractual cap.  *See* n.28, *supra*.

**J.    Conclusion**

174.    Because ETFMG performed all of its duties under the PureFunds PSAs, the Sublicense Agreement, the Index License Agreement, and the Wholesaling Agreement, Nasdaq's claim for breach of those agreements is dismissed.

175.    Nasdaq's remaining claims – for conversion, unjust enrichment, *quantum meruit*, unfair competition, and breach of the duty of good faith and fair dealing – are dismissed because they are duplicative of Nasdaq's breach of contract claim.

176.    Nasdaq breached the Sublicense Agreement's covenant of good faith and fair dealing by its persistent pattern of intimidation tactics and failure to provide ETFMG with properly managed indexes.

177.    Nasdaq breached the Wholesaling Agreement by its pretextual attempted termination of that agreement and its subsequent failure to perform its obligations thereunder.

178.    Nasdaq is liable to ETFMG the present value of the Wholesaling Agreement as of the Breach Date, $29,189,314, and a true-up of $101,800.80 owed ETFMG as of that date, minus a true-up of $2,805,469.30 owed Nasdaq as of that date, which includes the correction of payment errors discovered during this litigation.  ETFMG is hereby entitled to a final award of damages in the amount of $26,485,645.50, plus prejudgment interest on that amount at the New York statutory rate of nine percent per annum measured from August 10, 2017.

Dated: New York, New York
      April 15, 2019

                        KRAMER LEVIN NAFTALIS
                        & FRANKEL LLP

                        By:  /s/ John P. Coffey_____

                            John P. Coffey
                            Jeffrey S. Trachtman
                            Michael J. Calb
                            Leah S. Friedman

                        1177 Avenue of the Americas
                        New York, New York 10036
                        Tel: (212) 715-9100

                        BRIAN J. FRUEHLING, ESQ.
                        14 Main Street
                        Suite 300
                        P.O. Box 476
                        Madison, New Jersey 07940
                        (973) 377-0505

                        *Attorneys for Defendants/Counterclaim-Plaintiffs*