UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————— X
:
NASDAQ, INC.,                                        :
:
Plaintiff/Counterclaim-Defendant,    :
:
- against -                             :
:                    Case No. 1:17-cv-08252 (PAE)
EXCHANGE TRADED MANAGERS GROUP, LLC    :
AND ETF MANAGERS GROUP, LLC,            :
:
Defendants/Counterclaim-Plaintiffs.    :
———————————————————————— X

## DEFENDANTS'/COUNTERCLAIM-PLAINTIFFS'
## POST-TRIAL MEMORANDUM OF LAW

KRAMER LEVIN NAFTALIS & FRANKEL LLP

John P. Coffey
Jeffrey S. Trachtman
Michael J. Calb
Leah S. Friedman
1177 Avenue of the Americas
New York, New York 10036
Tel: (212) 715-9100

BRIAN J. FRUEHLING, ESQ.
14 Main Street
Suite 300
P.O. Box 476
Madison, New Jersey 07940
(973) 377-0505

*Attorneys for Defendants/Counterclaim-Plaintiffs*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ....................................................................................................... iii

TABLE OF DEFINED TERMS ................................................................................................... v

PRELIMINARY STATEMENT ................................................................................................... 1

FACTS ........................................................................................................................................... 4

A.   The Trilateral Relationship: ETFMG, ISE and PureFunds .................................. 4

    1.   The Original PureFunds ETFs ............................................................. 4

        a.   Business Management Agreement .......................................... 5

        b.   Investment Advisory Agreement ........................................... 5

        c.   Index License Agreement ....................................................... 6

        d.   Sublicense Agreement ............................................................ 6

        e.   Oral Agreements ..................................................................... 7

    2.   The HACK ETF .................................................................................... 9

    3.   The Remaining PureFunds ETFs ...................................................... 11

B.   The Wholesaling Agreement .................................................................................. 12

C.   Nasdaq's Acquisition of ISE and Destruction of the Parties' Relationship ......................... 15

    1.   Nasdaq's Conflict of Interest Over the HACK ETF ......................... 15

    2.   Nasdaq's Increasingly Aggressive Conduct Towards ETFMG ................................. 17

D.   Breach and Termination of the PSAs ..................................................................... 18

    1.   Mr. Chanin's Interference with the Operations of the  Trust and Funds and Unauthorized Marketing Activity ................................................ 18

    2.   Mr. Chanin's Attempt to Seize Control of the Trust and Funds ................................... 21

    3.   ETFMG Terminates the Oral Agreement Governing HACK Profits and Gives Notice to Terminate the PureFunds PSAs ........................... 22

E.   Nasdaq's Breach of the Sublicense Agreement .................................................... 24

1.    Nasdaq's Refusal to Confirm Indexes ................................................ 24

2.    Without Notice, Nasdaq Cuts Off Index Data for the Remaining PureFunds
      Indexes During Trading Hours, Then Lies About it ....................................... 25

F.    Nasdaq's Breach of the Wholesaling Agreement ................................................. 26

ARGUMENT ........................................................................................................................... 29

I.    THE WRITTEN CONTRACTS PROVIDE NASDAQ WITH NO RIGHT TO HACK
      PROFITS ........................................................................................................................ 29

II.   ANY RIGHT TO HACK PROFITS IS GOVERNED BY A SEPARATE ORAL
      CONTRACT TERMINABLE AT WILL ......................................................................... 35

III.  EVEN IF THE RIGHT TO PROFITS WERE GOVERNED BY THE WRITTEN
      CONTRACTS, ETFMG PROPERLY TERMINATED THEM ...................................... 36

IV.   ETFMG IS ENTITLED TO RECOVER FUTURE DAMAGES FOR NASDAQ'S
      IMPROPER REPUDIATION OF THE WHOLESALING AGREEMENT ................... 43

V.    NASDAQ SEEKS INFLATED DAMAGES AND UNAVAILABLE EQUITABLE
      RELIEF ........................................................................................................................... 46

      A.    Damages for Future ETF Profits Should be Limited to Amounts That Can be
            Projected with Reasonable Certainty ................................................................. 46

      B.    The Equitable Relief Sought by Nasdaq is Neither Proper Nor Available ..................... 49

CONCLUSION ......................................................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brause v. Goldman*,
    10 A.D.2d 328 (1st Dep't 1960), *aff'd*, 9 N.Y.2d 620 (1961) ............................................................ 31

*Bricklayers & Allied Crafts Union Local No. 1 of DE/PA Welfare Fund v. Edward Wilkinson Co.*,
    No. 07-145, 2008 WL 4948654 (D. Del. Nov. 19, 2008) .................................................................. 31

*Bromwich v. Hanby*,
    No. S08C-07-008, 2010 WL 8250796 (Del. Super. Ct. July 1, 2013) ............................................... 31

*Carpenter v. Texas Air Corp.*,
    No. 7976, 1985 WL 11548 (Del. Ch. Apr. 18, 1985) ........................................................................ 26

*Cerberus Int'l, Ltd. v. Apollo Mgmt.*,
    L.P., 794 A.2d 1141 (Del. 2002) ....................................................................................................... 34

*Falco v. Alpha Affiliates, Inc.*,
    No. Civ. A. 97-494, 2000 WL 727116 (D. Del. Feb. 9, 2000) .......................................................... 37

*In re Garden Ridge Corp.*,
    386 Fed. Appx. 41 (3d Cir. 2010) ..................................................................................................... 41

*Hadami, S.A. v. Xerox Corp.*,
    272 F. Supp. 3d 587 (S.D.N.Y. 2017) (Engelmayer, J.) .................................................................... 35

*Heritage Handoff Holdings LLC v. Fontanella*,
    No. 1:16-cv-00691, 2019 WL 1056270 (D. Del. Mar. 6, 2019) ....................................................... 34

*Horowitz v. La France Indus.*,
    274 A.D. 46 (1st Dep't 1948) ............................................................................................................ 29

*Jones v. J.C. Penney's Dep't Stores, Inc.*,
    No. 03-CV-0920A, 2005 WL 1313442 (W.D.N.Y. May 31, 2005) ................................................... 50

*Kramer v. Miller*,
    No. 94 Civ. 3439, 1995 WL 699794 (S.D.N.Y. Nov. 24, 1995) ....................................................... 37

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*,
    595 F.3d 459 (2d Cir. 2010) .............................................................................................................. 31

*Majestic Farms Supply Ltd. v. Service Riding Apparel, Ltd.*,
    137 A.D.2d 501 (2d Dep't 1988) ....................................................................................................... 35

*SCM Corp. v. Xerox Corp.*,
    507 F.2d 358 (2d Cir. 1974) .............................................................................................................. 49

*Soley v. Wasserman*,
No. 08 Civ. 9262, 2013 WL 5780814 (S.D.N.Y. Oct. 24, 2013) ........................................................ 49

*VICI Racing, LLC v. T-Mobile USA, Inc.*,
763 F.3d 273 (3d Cir. 2014) ............................................................................................................ 46

*WyPie Invests., LLC v. Homschek*,
No. N14C-08-140, 2018 WL 1581981 (Del. Super. Ct. Mar. 28, 2018) ............................................. 40

**Statutes**

Investment Company Act of 1940 ......................................................................................... *passim*

## TABLE OF DEFINED TERMS

| Defined Term | Description |
| --- | --- |
| BMA | October 19, 2012 Business Management Agreement |
| Board | The Trust's Board of Trustees |
| Chambers Report | Expert report of Matthew A. Chambers (DX-804) |
| DX | ETFMG Trial Exhibit |
| ETFMG | ETF Managers Group, LLC<br>*Except where otherwise noted, "ETFMG" is used collectively to refer to ETFMG, ETMG, and their predecessors |
| ETFMG Financial | ETFMG Financial, LLC |
| ETMG | Exchange Traded Managers Group, LLC |
| Factor | Factor Advisors, LLC |
| GENCAP | GENCAP Advisors, LLC |
| Index License Agreement | Index License and Exchange Traded Product Agreement (JX-1) |
| Investment Advisory Agreement | FactorShares Trust Form of Investment Advisory Agreement with Factor Advisors LLC, (DX-7, 8) as amended (DX-9) |
| ISE | International Securities Exchange |
| JPO | Parties' Joint Pretrial Order |
| JX | Parties' Joint Trial Exhibit |
| May Aff. | Expert affidavit of Donald M. May, Ph.D |
| May Rebuttal Report | Expert rebuttal report of Donald M. May, Ph.D (DX-839) |
| May Report | Expert report of Donald M. May, Ph.D. (DX-800) |
| Nasdaq | Nasdaq Inc. |
| P&L Statement | Profit and Loss Statement |
| PFF | ETFMG's Proposed Findings of Fact and Conclusions of Law |
| PSA | SEC '40 Act Platform Service Agreement |
| PureFunds | PureShares, LLC (d/b/a PureFunds) |
| Schedule | Schedule 1 to the Index License and Exchange Traded Product Agreement (JX-1), as amended (JX-3, 4) |
| Sublicense Agreement | 2012 Sublicense Agreement (JX-2), as amended in 2015 (JX-2A) |
| Tr. ___ | Reference to the trial transcript. |
| Trust | Factorshares Trust, renamed ETF Managers Trust |
| Trustee | Member of the Trust's Board of Trustees |
| Wholesaling Agreement | April 22, 2013 Wholesaling Platform Services Agreement, as amended (JX-11, 11A, 11B) |
| Wholesaling Fees | Monthly AUM-based fees to keep each of its ISE-Supported ETFs on the Wholesaling Platform |
| Wholesaling Platform | ETFMG's wholesaling sales operation |

# PRELIMINARY STATEMENT[1]

Nothing learned at trial has changed the fundamental nature of this case:  its outcome must be determined based on the contracts as they are, not as Nasdaq would prefer them to be.  Nasdaq conceded after the close of its case that the two contracts on which it rests its claim to HACK profits – the Sublicense Agreement and the HACK PSA – are "unambiguous".  Tr. 2249:15-17.  This admission consigned to irrelevance the bulk of Nasdaq's trial presentation, which sought to supplant the plain terms of those contracts by focusing instead on ETFMG's white label business model and other extrinsic evidence.

The contracts say what they say.  No speculative testimony or lawyers' arguments can change the fact that only one written contract addresses which party is entitled to the management fee for HACK:  the Investment Advisory Agreement between the Trust and ETFMG.  The other written agreements at issue say *nothing* about ETFMG's obligation to pass along any of that fee to any other party.  The Schedule to the Index License Agreement contains provisions governing how ISE and PureFunds would split any amounts they received, but the Sublicense Agreement expressly *excludes* those provisions from the obligations undertaken by ETFMG.  The HACK PSA, in turn, contains no provision at all governing the distribution of HACK fund profit – and ISE is not even mentioned in that agreement, let alone a party to it.

Despite conceding that these contracts are unambiguous, Nasdaq argues that they should be "read" to include its desired payment terms or otherwise altered or reformed to achieve its desired result.  But there is no legal basis to read terms into contracts on subjects they do not

---

[1] Please refer to the Table of Defined Terms (above at iii) for a description of capitalized terms used herein.  Pursuant to the Court's request at the close of trial, ETFMG is filing with this brief a chronology of pertinent events.  ETFMG also respectfully refers the Court to its April 15, 2019 proposed findings of facts and conclusions of law.  D.E. 112.

even cover – particularly when the principal contract that would be expected to address the subject (the HACK PSA) intentionally excluded as a party the predecessor of the litigant now seeking to reform that contract.  As a result, any right Nasdaq might claim to HACK profits turns entirely on ISE's oral agreement with ETFMG.  That oral agreement was terminable at will, and terminated – defeating Nasdaq's principal claim at the threshold.

But even if the oral agreement to share HACK profits were somehow "read" into the written contracts, ETFMG properly *terminated* those contracts, effective July 31, 2017.  This conclusion can be reached without resolving whether Nasdaq's increasingly hostile conduct towards ETFMG independently breached the PSAs.  That is because the breaches by PureFunds – the only counterparty to the HACK PSA and defined together with ISE as the "Client" in the other PSAs – were alone sufficient basis for ETFMG to terminate the PSAs.

The evidence at trial amply demonstrated that PureFunds CEO Andrew Chanin engaged in a belligerent course of conduct that created substantial alarm at ETFMG and the Trust, meddling in issues as to which The Investment Company Act of 1940  ("'40 Act") gave him no role, most notably the independent Trustees' setting of management fees.  Mr. Chanin's lack of understanding of his limited role – and arrogance – are summed up in his demand at trial to know "what law" empowered the Trust to cut the HACK management fee over his objection. Tr. 405:20-406:3.  The answer, of course, is the '40 Act.  In flagrant violation of that act as well as the PSA covenants to which he was bound, Mr. Chanin threatened and, on the very day after the HACK fee cut went into effect, sued the Trustees and ETFMG.  His remarkable attempt to wrest away control of the Trust from the Trustees constituted the most egregious in a series of actions "that would, or could reasonably be expected to … adversely affect the operations of the Trust or the Funds."  *See, e.g.*, JX-5, § 7(d) ("Covenants of Client").  PureFunds' destructive and

reckless actions standing alone – even without considering Nasdaq's own misconduct – threatened interference with the operation of the funds and thus provided ample grounds to terminate the PSAs.

ETFMG's right to terminate was not affected by the fact that ETFMG owed Nasdaq certain profits accruing prior to the July 31, 2017 termination date.  By the time ETFMG stopped making payments based on its net obligations, it was already embroiled in an escalating dispute with Nasdaq.  Notably, Nasdaq never declared ETFMG to be in breach of the HACK or IPAY PSAs and *never provided the 60-day minimum notice and opportunity to cure prescribed in those contracts*.  *See, e.g.*, JX-6, § 9.  In any event, the eventual need to "true-up" the parties' mutual obligations cannot act as a bar to ETFMG's right to terminate the PSAs based on the independent misconduct of counterparty PureFunds.

Any amounts owed to Nasdaq through the July 31, 2017 termination date (approximately $ 2.8 million, assuming the written contracts are somehow construed to oblige ETFMG to pay HACK profits to Nasdaq) are dramatically outweighed by the approximately $29 million that Nasdaq owes ETFMG for its improper repudiation of the Wholesaling Agreement.  Nasdaq's purported grounds for the termination were pretextual or immaterial – as ETFMG explained in a detailed letter to which Nasdaq never responded.  ETFMG is entitled to damages in perpetuity, because Nasdaq has no power to terminate so long as the combined AUM on the Wholesaling Platform remains above $100 million.  At the time of termination, there was more than $500 million in AUM, $300 million of which was in Third-Party ETFs, which Nasdaq has no power to remove – and that total has remained above $100 million at all relevant times.

In contrast, even if Nasdaq were deemed entitled to receive fund profits accruing after July 31, 2017, the wildly inflated damages it claims must be significantly reduced for

multiple reasons.  First, the Index License Agreement – the contract on which Nasdaq principally relies – contains a clause that would cap damages at approximately $3.8 million.  JX-1, § 7(E).  Even if that limitation were improperly ignored, Nasdaq's claimed damages should be reduced based on a variety of factors: the trend towards fee compression that might eventually eliminate any profit margin for the HACK and IPAY funds; the need to offset potential profits with the cost of replacing the marketing previously conducted through the Wholesaling Platform; removing claimed damages for funds as to which Nasdaq acceded to termination of the relevant PSAs; and other factors which bring the profits that can be projected with any certainty for the remaining funds down to $10 million or even less.

Finally, Nasdaq's requested "equitable" relief – to require ETFMG to "direct" the Trust to transfer the profitable funds to another trust – cannot be granted.  Even if Nasdaq had otherwise established the inadequacy of a remedy at law, which it hasn't, ETFMG has no contractual or statutory power to direct the Trust to do anything, and neither the Trust nor any of the independent Trustees is a party before the Court.

## FACTS

### A.    The Trilateral Relationship: ETFMG, ISE and PureFunds

#### 1.    The Original PureFunds ETFs

Prior to its acquisition by Nasdaq in June 2016, ISE was an equity options exchange that had a small business developing and marketing various ETFs, called ISE ETF Ventures ("Ventures").  In or about late 2011, Ventures' Kris Monaco entered into discussions with PureFunds, an ETF branding and marketing firm, about ISE providing index design and financial support for three new thematic equity ETFs.  DX-12.  In exchange, ISE would receive a tiered revenue share with PureFunds if and when those ETFs (together, the "Original PureFunds ETFs") reached "breakeven" (that is, once the Management Fee exceeded expenses, generating

"Fund Profit"). *Id.*; Ilyevsky Aff. ¶¶ 3-4, 6. PureFunds, a small entity then operated by Paul Zimnisky and Andrew Chanin, had neither the operational expertise nor regulatory approvals needed to launch and operate ETFs. ISE had no interest in taking on day-to-day fund operations, so Mr. Monaco and PureFunds engaged Samuel Masucci at Factor to create the Trust to issue these ETFs and act as advisor to the Trust pursuant to the '40 Act.

The parties agreed that (i) Mr. Chanin would manage fund marketing and act as the public face of the funds (Ilyevsky Aff. ¶ 7; Masucci Aff. ¶ 22); (ii) Factor would issue the ETFs via the Trust, act as advisor pursuant to the '40 Act, and run day-to-day operations; and (iii) ISE would pay start-up costs and operational expenses, and provide and maintain the funds' indexes. At the time, ISE's senior leadership, including CEO Katz and General Counsel Simon, had concerns about engaging directly in writing with an investment advisor such as Factor, based both on perceived regulatory issues and a preference to maintain lower visibility in what was then a novel business arrangement. Ilyevsky Aff. ¶ 10. This led to a number of agreements, both written and oral, among the various parties. *Id.*; Tr. 791:15-792:17, 937:24-939:4 (Monaco).

### a. Business Management Agreement

The Trust and PureFunds entered into the BMA, under which PureFunds would be responsible for "general management of the Funds' affairs" and was obligated to pay the start-up and most of the ongoing operating expenses of the Original PureFunds ETFs. JX-12B, § 1 & Ex. A; Masucci Aff. ¶ 24. In exchange for the financial support and management required by the BMA, the Trust would pay to PureFunds a Management Fee of 69 basis points ("bps") based on AUM. JX-12B, Ex. B. In practice, the parties ignored the BMA. *See* pp. 7-9, below.

### b. Investment Advisory Agreement

The Trust and Factor also entered into an Investment Advisory Agreement, which obligated Factor to act as advisor to the Trust on behalf of the PureFunds ETFs and to perform

related services.  Pursuant to this 2012 agreement, PureFunds was to pay a portion of the

Management Fee received under the BMA to Factor as compensation for its services.  DX-7,

Schedule A.  This agreement was superseded by updated Investment Advisory Agreements in

2014 (DX-8) and 2016 (DX-9), pursuant to which (at Schedule A to each agreement) the entire

Management Fee for all ETFs issued by the Trust was paid directly to ETFMG.

   **c.**  **Index License Agreement**

   ISE also entered into the Index License Agreement with PureFunds.  JX-1.  This

agreement had two purposes – to grant intellectual property rights to properly maintained

indexes, and to create a joint venture between ISE and PureFunds.  Tr. 714:14-715:15, 1124:7-

10, 724:16-19 (Monaco).  Pursuant to the first purpose, this agreement granted PureFunds a

license to use ISE's indexes for the Original PureFunds ETFs in return for PureFunds' promise

to perform, or engage someone else (*i.e.*, Factor) to perform, day-to-day operations.  JX-1, §

2(C); Masucci Aff. ¶ 30.  Pursuant to the second purpose – the joint venture – the Index License

Agreement attached a schedule (the "Schedule"), which obligated ISE to pay the funds' start-up

and operational expenses and set license fees and profit-splitting terms between PureFunds and

ISE.  JX-1, at 18.  The Index License Agreement did not quantify what fee was to be charged for

use of the indexes covered by the agreement.  It simply addressed, in the Schedule, how ISE

and/or PureFunds would split any fee they might receive, presumably pursuant to some other

agreement.

   **d.**  **Sublicense Agreement**

   Because ISE, PureFunds, and Factor all intended that Factor – not PureFunds –

would create and operate the funds, ISE and PureFunds entered into a contemporaneous

Sublicense Agreement with Factor, which granted Factor "a non-exclusive and non-transferable

sublicense to use the Intellectual Property in connection with the issuance, distribution,

marketing, and/or promotion" of the Original PureFunds ETFs.  JX-2, at § 1; Masucci Aff. ¶ 31.

The Sublicense Agreement imposed no financial obligation on Factor.  Rather, it was intended to

protect ISE's intellectual property rights; it permitted Factor to use ISE's index, marks, and data

but required Factor to recognize ISE's ownership over that property.[2]

        Section 3 of the Sublicense Agreement bound Factor to some but not all

PureFunds' obligations under the Index License Agreement; that provision expressly tied the

scope of those inherited obligations to Section 2 of the Sublicense Agreement.  JX-2, § 3

(Factor's "obligations under the [Index] License Agreement pursuant to Section 2").  Section 2

expressly excluded from those obligations anything contained in the Schedule:  "[Factor]

acknowledges that it has received and read a copy of the [Index] License Agreement (*excluding*

*the Schedule setting forth the license fees*) and agrees to be bound by all the provisions thereof . .

. ."  *Id.*, § 2 (emphasis added).  Consistent with this explicit limitation, the copy of the Index

License Agreement provided to the Trust had the fee split schedules and all payment provisions

redacted.  Masucci Aff. ¶ 32; DX-301 (Monaco October 2012 email exchange with PureFunds);

DX- 302 (Monaco November 14, 2012 email forwarding redacted copy to Factor).

       **e.**    **Oral Agreements**

        Factor understood that the Board would not be comfortable authorizing the launch

of the Original PureFunds ETFs without assurance that a party other than PureFunds – which had

no financial means – would pay any operating costs of the ETFs not covered by the Management

---

[2] Tr. 760:21-25 (Monaco: "My understanding of the sublicense agreement is simply to extend ISE's IP
rights" which were "[e]ssentially the marks of the index and forward-looking data."); Tr. 761:7-9
(Monaco: "I know that the sublicense agreement was created in order to give the adviser comfort that it
could use ISE's marks, the index provider's marks."); *see* DX-303 (November 15, 2012 email from
Monaco noting that Sublicense Agreement was "standard form" that was "meant to address . . . usage of
marks, copyrights, logos, and other IP").

Fee (the "Fund Shortfall") until the funds reached breakeven.  Masucci Aff. ¶ 26.  While

PureFunds could call on ISE to backstop those expenses on *its* behalf by virtue of the Index

License Agreement (JX-1, at 18), neither that agreement nor the BMA gave the Trust or Factor a

contractual right vis-à-vis ISE to enforce that obligation.  The Trust and Factor were not parties

to the Index License Agreement.  JX-1; *see also* D.E. 50 (Court's ruling on motion to dismiss), at

13.  And ISE was not a party to the BMA.  JX-12B.  As Mr. Monaco observed, "So ISE was not

party to any agreement with, written agreement with ETFMG.  So I don't believe we had any

obligation."  Tr. 1044:16-20.  Conversely, none of the written agreements would allow ISE to

enforce the Trust's obligation under the BMA to pay to *PureFunds* any Fund Profit associated

with the Original PureFunds ETFs; rather, ISE had to rely on PureFunds' obligation in the Index

License Agreement Schedule to split any profit derived from the Management Fee to be paid by

the Trust.  This put ISE at risk of not receiving profit "in case there were ever a situation with

[its] counterparty [to the written agreements], in this case PureShares."  Tr. 768:4-5 (Monaco).

ISE wanted to be able to "get the money directly from ETFMG."  Tr. 768:6 (Monaco).

Accordingly, it was orally agreed between Factor (by its principal, Mr. Masucci)

and ISE (by Mr. Monaco, with the concurrence of Ventures' Managing Director Ilyevsky and

ISE CEO Katz) that ISE, not PureFunds, would pay to Factor the start-up costs and any shortfall

in the operating expenses of the Original PureFunds ETFs.  Tr. 766:20-767:7 (Monaco).  In

return, Factor and ISE orally agreed that Factor would send to ISE, not PureFunds, any Fund

Profit generated by the Original PureFunds ETFs.  Tr. 767:8-11, 1044:9-1045:9 (Monaco

testimony regarding oral agreement for Original PureFunds ETFs); Ilyevsky Aff. ¶¶ 9-10;

Masucci Aff. ¶¶ 24-25.  Messrs. Chanin, Monaco, and Masucci explained their oral financial

arrangement to the Board in October 2012.  Masucci Aff. ¶ 26; DX-400 (October 3, 2012 Board

Minutes), at 26-27.  Mr. Monaco affirmed what ISE had orally promised Factor: ISE would pay

operating expenses directly to Factor in return for Factor sending Fund Profit directly to ISE.  Tr.

1042:16-19 (Monaco).  Based on this oral commitment, the Board authorized launching the

funds on October 3, 2012.  DX-400 at 27-29; Masucci Aff. ¶ 26.  A similar oral agreement was

reached in connection with the eventual launch of the HACK ETF.  *See* below at 10-11.

When the Original PureFunds ETFs launched in November 2012, the financial

obligation and payment terms of the written agreements were disregarded.  Tr. 326:6-11 (Chanin

testimony that management fee was sent to Factor bank account even though BMA provided that

PureFunds would get management fee).  Each month, pursuant to the oral agreement, Factor sent

to ISE statements for each ETF showing the amount of the Management Fee that Factor had

received, the monthly operating expenses, and the amount ISE needed to pay to Factor because

these ETFs had not yet reached breakeven.  *See, e.g.*, JX-309-321 (October 2014 – October 2015

SILJ Profit and Loss Statements).  Pursuant to the oral agreement, ISE approved and paid every

invoice received from Factor or Factor's successor ETFMG.  Tr. 758:4-5 (Monaco: "ISE paid

Factor [the expenses listed in the BMA] directly through a separate agreement with Factor.").

## 2.    **The HACK ETF**

In 2014, Mr. Monaco and a colleague at ISE came up with the idea to create the

industry's first cybersecurity fund, ultimately given the ticker symbol "HACK."  DX-27.  Rather

than expand the scope of the BMA and 2012 Investment Advisory Agreement, the Trust and

ETFMG entered into the new 2014 Investment Advisory Agreement, which named ETFMG as

advisor and obligated the Trust to pay the Management Fee to ETFMG as compensation for its

services as advisor.  PFF ¶¶ 11-12; DX-8, at § 7 & Schedule A.  ETFMG and PureFunds entered

into a separate PSA to govern regulatory and operational matters for HACK.  JX-5.  As with the

BMA, Messrs. Katz and Simon did not want ISE to be party to a written agreement to finance a

- 9 -

fund with the advisor (now owned by ETFMG).  *See* DX-306 (October 9, 2014 related email chain).  Accordingly, ISE chose not to be a party to the HACK PSA.  In consideration for launching and operating HACK, the HACK PSA guaranteed ETFMG a minimum fee and reimbursement of expenses for performing the listed services.  JX-5, § 1 & p. 13.  The contract was silent regarding any Fund Profit.  ISE and PureFunds amended the Schedule to the Index License Agreement to include HACK (JX-3, HACK Supplement to Schedule) and provided ETFMG and the Trust with a redacted copy (JX-3A, Redacted HACK Supplement to Schedule).

However, the parties again entered into an oral agreement that differed from – and addressed certain matters not covered by – the written agreements.  As with the Original PureFunds ETFs, Factor understood that the Board would not authorize the launch of HACK without a party other than PureFunds having a directly enforceable obligation to ETFMG to pay the costs.  *See* DX-306 (Masucci email to Monaco: "The board members are going to want us to be able to go directly to the ISE for the shortfall. We can't have our recourse stop with [Chanin].").  Similarly, Mr. Monaco testified that one of the reasons the parties entered into an oral agreement for HACK was because "we wanted some connection between us and ETFMG." Tr. 1043:16-18.  Mr. Masucci and ISE agreed – with the concurrence of Mr. Chanin – that the oral financial arrangement the parties had in place for the Original PureFunds ETFs would apply as well to HACK.  Namely, ISE would pay ETFMG start-up costs and backstop operating expenses for HACK and, in turn, ETFMG would pay any Fund Profit generated by HACK to ISE.  Tr. 793:24-794:3, 856:10-25, 1052:24-1053:8, 1058:5-1059:24 (Monaco testimony regarding HACK oral agreement); Masucci Aff. ¶¶ 37-40; Ilyevsky Aff. ¶ 13.  As with the Original PureFunds ETFs, without this oral agreement, ISE's only entitlement to profit would have been based on its separate agreement in the Index License Agreement Schedule to share in

any proceeds PureFunds received.  Tr. 783:11-15 (Monaco testimony that he told Masucci it was "because of ISE's partnership with PureShares, that ISE was entitled to some or most of the revenue for the [HACK] ETF."); Tr. 795:13-14 (Monaco: "ISE's expectation was to be paid based on – be paid PureShares profits, based on its agreement with PureShares.").

   In October 2014, the Board authorized the launch of HACK under the PureFunds brand, with ETFMG as advisor.  DX-407 (October 16, 2014 Board Minutes), at 7-10.  HACK launched on November 12, 2014.  ISE paid to ETFMG HACK's start-up costs (JX-173) and first month's Fund Shortfall (JX-175), a total of approximately $70,000.  Masucci Aff. ¶¶ 42-43; Ilyevsky Aff. ¶ 14.  HACK was a huge success and hit breakeven one month after its launch.  By June 2015, its AUM had surpassed $1.2 billion.  JX-183 (HACK P&L Statement).  Each month, the Trust paid ETFMG the HACK Management Fee per the 2014 Investment Advisory Agreement.  DX-8, at § 7 & Schedule A.  ISE no longer needed to pay any of HACK's operating expenses, which were fully covered by the Management Fee.  Notwithstanding the lack of any written agreement requiring it to do so, ETFMG paid the difference (*i.e.*, the Fund Profit) to ISE. Masucci Aff. ¶ 44; JX-176-195 (December 2014 – June 2016 HACK P&L Statements).

  **3.**  **The Remaining PureFunds ETFs**

   After HACK was launched to great success, ISE established a separate Ventures LLC to conduct its ETF business, alleviating the regulatory and policy concerns that had previously led ISE to stay off the written agreements.  Ilyevsky Aff. ¶ 15.  Each of these ETFs (the "Remaining PureFunds PSAs") included ISE as a party and an obligation by ETFMG to pay Fund Profit to its "Client" (defined as both ISE and PureFunds).  PFF ¶¶ 29-33; JX-6-10 (all at § 7(d)).  The split of any profits between ISE and PureFunds continued to be governed by the updated Schedule to the Index License Agreement.  ISE never sought to modify the HACK PSA

to add itself as a party or to add a payment provision.  After the acquisition, ETFMG offered

Nasdaq the opportunity to be added to the HACK PSA, but it declined.  PFF ¶ 32; DX-127.

**B.**     **The Wholesaling Agreement**

In 2013, an opportunity arose for ISE to invest in the creation and support of a

wholesaling sales operation at GENCAP, Factor's parent.  The idea was to market not only the

funds that ISE launched in partnership with Factor, but also funds that ISE or Factor launched

with other partners.  Tr. 890:20-24 (Monaco); DX-15.  Mr. Masucci and Mr. Monaco negotiated

the Wholesaling Agreement.  JX-11.  ISE would pay monthly to GENCAP AUM-based fees

("Wholesaling Fees") to keep each of ISE's ETFs on the Wholesaling Platform.  *Id.*, Exs. A, B.

Conversely, GENCAP would pay ISE a cut of the AUM-based Wholesaling Fees that Factor

received from third-party ETFs added to the Platform.  *Id.*, Ex. A.  Additionally, ISE agreed to

pay all expenses for the sales force necessary to sell the funds on the Platform ("Wholesaling

Expenses").  *Id.*, Ex. A.  These expenses included the wholesalers' annual compensation (*id.*, Ex.

C), as well as regulatory fees, administration, accounting, travel, entertainment, conferences, and

trade shows (*id.*, Ex. A); Masucci Aff. ¶¶ 51-54; Flanagan Aff. ¶ 26.

Over time, ISE and GENCAP (and later ETFMG) agreed to add various funds to

the Platform.  In some cases – such as HACK, IFLY, and GAMR – a written amendment to

Exhibit B (listing funds) was executed.  JX-11A; JX-11B.  In other cases, per the Wholesaling

Agreement provision requiring only that "changes to the Wholesaling Platform must be mutually

agreed upon [by] ISE and GENCAP" (JX-11, § 7(b)), Mr. Monaco and Mr. Masucci orally

agreed to add ISE-Supported Funds and Third-Party Funds to the Platform.  Tr. 911:21-912:17

(Monaco); Masucci Aff. ¶ 56; *see* DX-315 (June 29, 2016 email from Monaco explaining that

"we never had a chance to execute addenda for the other funds [not listed on Ex. B]").

The Wholesaling Agreement continued to evolve as the ETFMG-ISE relationship grew and the support needs for HACK and the other ETFs increased. Although the Wholesaling Agreement originally called for two wholesalers with combined annual compensation of $250,000, it provided that the "number of Wholesalers and the Compensation Cap may be amended from time to time as mutually agreed to by the parties." JX-11, at Ex. C. ISE orally agreed with ETFMG to add more wholesalers to the platform in 2015 and 2016 and to increase their salaries. *See, e.g.*, JX-393 (December 16, 2015 wholesaler invoice reflecting three wholesalers); DX-81 (Monaco May 12, 2016 email to Ilyevsky approving invoice reflecting four wholesalers); DX-109 (August 22, 2016 invoice reflecting higher salaries).

The Wholesaling Agreement provided that Wholesaling Expenses "be agreed upon by ISE and [ETFMG] in advance of those expenses being incurred" and "not exceed $50,000" annually per wholesaler absent ISE consent. JX-11, at Ex. A (describing cap as relating to "all reasonable expenses in connection with *a Wholesaler's* sales and marketing activities") (emphasis added).[3] However, Mr. Ilyevsky and Mr. Monaco authorized and ISE paid various Wholesaling Expenses without pre-authorization (Tr. 1100:6-8 (Monaco)) and which exceeded $50,000 in both 2015 and 2016 (DX-530-539, 542 (2015 invoices showing more than $50,000); Tr. 917:8-11 (Monaco)). This practice was based in part on the understanding that ETFMG was best suited to decide which expenses were reasonable and necessary for marketing the funds on the Platform. Tr. 1105:7-1106:3, 1143:3-10 (Monaco: "[W]e had a general understanding of these were expenses that were typical for the wholesaling platform to incur."). The fact that ETFMG was exceeding $50,000 was discussed at ISE, and given ISE's relationship

---

[3] Given the language of the contract, the expense cap in play at the time Nasdaq began to complain about expenses was in fact $200,000 ($50,000 times four wholesalers).

with ETFMG, they did not view this as a problem.  Tr. 1104:24-1105:6.  In fact, ISE was

considering whether to enter into an even closer relationship with ETFMG, either by making

additional investments in the Wholesaling Platform or restructuring the Wholesaling Agreement.

*See, e.g.*, DX-304; DX-76; DX-78; DX-79 (emails concerning potential modifications to

ETFMG relationship); Tr. 922:18-25 (Monaco: "We were contemplating making a significant

expansion to the agreement.  But ISE was also interested in making investments into ETFMG,

which would obviate the need for a wholesale agreement or simply replace the wholesale

agreement.").

    ISE and ETFMG envisioned that the Wholesaling Platform would exist in

perpetuity, so long as the funds on the Platform continued to maintain a certain asset level.  Tr.

889:14-23 (Monaco testimony that "[t]his was meant to be a long-term strategic investment" and

he therefore did not recall wanting to make sure that there was some out for ISE if the contract

wasn't working); Tr. 1541:14-19 (Masucci: "I looked at this as a 10, 20-year, 30-year agreement.

We're growing a business. I believe it's very difficult to terminate the agreement. And so I

expected this to be a multidecade agreement.").  ISE decided to waive the obligation to

automatically remove funds from the Wholesaling Platform that were performing below the set

asset level.  Tr. 424:17-425:3 (Chanin: "ISE did not want to remove it"; "We had agreed with []

ISE to allow [the funds] to stay on the platform.").  These sunset provisions allowed the funds to

be removed without any affirmative action by ISE, but also allowed ISE to retain the option to

continue paying for promising funds to remain on the Wholesaling Platform regardless of

whether they were below their AUM milestones, as changes to the Platform itself could be

mutually agreed upon by ISE and ETFMG.  JX-11, § 7(b); Masucci Aff. ¶ 58.

C.    **Nasdaq's Acquisition of ISE and Destruction of the Parties' Relationship**

    1.    **Nasdaq's Conflict of Interest Over the HACK ETF**

          The ISE-ETFMG partnership functioned smoothly and fruitfully for several years. By the time Nasdaq acquired ISE in June 2016, HACK was turning a substantial profit for the Ventures part of the ISE business and certain other funds were showing promise.  Up until then, ETFMG and ISE had worked together cooperatively – with ISE properly maintaining the ETF indexes, backstopping the ETFs not yet at breakeven, and honoring its obligation to cover the substantial cost of the Wholesaling Platform.  PFF ¶ 41.

          Nasdaq, however, did not want to continue in business with ETFMG, in part because it had become saddled with a conflict of interest.  Nasdaq was already providing the underlying index to the First Trust, Advisors, L.P. ("First Trust") Nasdaq Cybersecurity ETF ("CIBR"), which competed directly with HACK.[4]  First Trust is a major customer of Nasdaq, which provides index services to over sixty First Trust ETFs with approximately $13 billion in AUM.  DX-547 (July 2016 Nasdaq ETF revenue calculation); DX-126, at 009752-58 (November 3, 2016 Nasdaq Global Indexes Monthly Report circulated to Nasdaq leadership).  Nasdaq had created the CIBR index to take aim directly at HACK.  DX-57 (September 30, 2015 Friske email to Gedeon noting "great opportunity to hack HACK"); DX-46 (July 9, 2015 internal First Trust email: "people are already talking about how much better [CIBR] is than HACK. Time to get in the trenches and fight").  Although indexing competing funds is not categorically barred, the

---

[4] Nasdaq further wanted out because ISE's Ventures business actually conflicted with Nasdaq's main business model.  *See* DX-68 (March 4, 2016 Gedeon email: "Ventures business model is not consistent with our own."); DX-71 (March 14, 2016 Gedeon email: "[Ventures] creates unnecessary tension with ou[r] ETF provider customers.  If we have the ability to take a concept directly to market through funding [] ETF operational expenses, I believe our customers will stop candid interaction with us on product development.").  Nasdaq employees viewed Ventures as a "horrific" business (DX-90 (June 20, 2016 Gedeon and Spector Lync conversation)) and focused on "strategic alternatives" around its ownership of Ventures (DX-116); *see also* PFF ¶¶ 42-51.

index provider must take steps to ameliorate the conflict of interest.  Masucci Aff. ¶ 60; DX-804

(Chambers Report), at ¶¶ 33-36.[5]  A conflict is most likely when indexes are similar; here, the

market viewed HACK and CIBR to be as closely related as Coke and Pepsi.  *See* DX-55; DX-

841, DX-605-606 (market reports); Karol Aff. ¶ 14.

In July 2016, HACK had higher AUM than CIBR, but CIBR was growing at a

faster rate in part because it had two significant competitive advantages over HACK:  (i) higher

implied liquidity of its index;[6] and (ii) a lower Management Fee.[7]  However, because a fund's

index provider has sole discretion over the holdings and weightings of the index, neither ETFMG

nor the Board could address HACK's implied liquidity without Nasdaq's cooperation.

Despite concerns regarding the conflict inherent in indexing both HACK and

CIBR, ETFMG was optimistic about partnering with Nasdaq.  Masucci Aff. ¶ 60.  After a July

2016 meeting with Terry Wade, however, ETFMG grew concerned about Nasdaq's failure even

to acknowledge the conflict.  *Id.* ¶¶ 60, 69; Loebs Aff. ¶ 37; DX-131 (November 22, 2016 Wade

email to Masucci: "[W]e continue to believe there is no conflict of interest."); DX-123 (October

25, 2016 Wade email to Masucci: "[W]e do not believe that there is a current conflict of

---

[5] As a global provider of indexes, Nasdaq is obligated to "disclose any material conflicts of interests to [its] users" and to "mitigate existing or potential conflicts created by its ownership structure or control." DX-600 (IOSCO Principles for Financial Benchmarks Final Report), at 16.

[6] Implied liquidity is a measure of the liquidity of the underlying assets referenced by an ETF.  Investors are highly interested in implied liquidity because an ETF with higher implied liquidity is easier to sell. More information on how that measure differed as between HACK and CIBR is found in the May Rebuttal Report.  DX-839, at ¶¶ 59-61.  *See also* DX-804 (Chambers Report), at ¶ 59.

[7] Masucci Aff. ¶ 72*; see also* DX-144 (December 15, 2016 internal First Trust email noting success of CIBR has been "primarily driven by differences in index methodology, which led CIBR to avoid (or relatively underweight) many of the smallest stocks that have been a drag on the performance of HACK over the past year and a half.  These differences have also provided a much more liquid underlying portfolio for CIBR vs. HACK."); DX-237 (August 3, 2018 internal First Trust email noting that "One of the reasons that HACK underperformed CIBR over the past couple years was its exposure to small, illiquid stocks.").

interest.").[8]  There was no doubt about Nasdaq's conflict among observers at First Trust; they immediately recognized after the announcement of the ISE acquisition that Nasdaq "[would] have to go from poking holes in [the HACK] index to supporting it" (DX-59) and speculated that inevitably "Nasdaq was going to have to do something with the index behind HACK." (October 22, 2018 deposition of Scott Friske at 105:11-12); *see also* Masucci Aff. ¶¶ 73-76.

        **2.**      **Nasdaq's Increasingly Aggressive Conduct Towards ETFMG**

Motivated by its intent to escape the inherited business with ETFMG, Nasdaq engaged in a series of increasingly provocative actions that, together with even more reckless conduct by PureFunds, eventually destroyed the parties' relationship.  For one thing, Nasdaq began objecting to and delaying payment of expenses under the Wholesaling Agreement – disputing charges that ISE had routinely approved.  *Compare* DX-123 (October 25, 2016 Wade email informing Masucci that Nasdaq would only pay for funds and fees "explicitly detailed in the agreement") *with* Tr. 1100:6-8 (Monaco: "Well, there were certain expenses that were routine that we were OK with, without having to come to us for approval every time."); Tr. 1102:10-1103:1 (Monaco testimony that ISE agreed to pay wholesaler salaries a quarter in advance).  ETFMG responded by offsetting wholesaling expenses against HACK Fund Profit. PFF ¶¶ 58-59.  Although Nasdaq was aware of this netting and was able to calculate, from the HACK P&L statements, what it owed to PureFunds under the split in the Index License

---

[8] The shrugging off of ETFMG's concerns appears to have been part of a broader effort to marginalize and eventually exclude ETFMG from any discussion concerning the PureFunds ETFs.  *See* DX-88 (June 9, 2016 Fisher email to Wade regarding how to "work with PureShares to terminate the ETFMG"); DX-95 (July 12, 2016 Wade email to Gedeon relaying Chanin's request for Nasdaq not to communicate about ETFMG on Chanin's business email account, which ETFMG monitored as part of its supervisory regulatory duties); DX-98 (July 26, 2016 Wade email that he was "not sure we can or should share this with ETF MG" with regard to Chanin's potential new distribution platform); DX-137 (December 8, 2016 Gedeon email to Wade: "I don't feel a need to bring in ETFMG to these conversations.").

Agreement Schedule, Nasdaq nevertheless reduced its payments to PureFunds, which increased tensions between PureFunds and ETFMG.  PFF ¶¶ 60-62; Tr. 638:7-639:13-20 (Wade).

Nasdaq also sought to interfere with the Trust's consideration of ETFMG's recommendation to lower the HACK Management Fee from 75 to 60 basis points – an action that the independent Trustees, in their business judgment, decided was in the best interests of shareholders.  Loebs Aff. ¶¶ 27-30; Masucci Aff. ¶¶ 82-84; DX-419 (March 22, 2017 Board Minutes), at 20.  Nasdaq knew that reducing HACK's fee would reduce HACK's Fund Profit to Nasdaq. *See* DX-212 (April 19, 2017 Wade email to Gedeon noting that fee cut "will reduce the HACK revenue by 20% after May 1").  Accordingly, Nasdaq sought to intimidate the independent Trustees into not cutting HACK's Management Fee by having its outside counsel send a confrontational letter  eight days before they would be voting on the fee cut.  DX-265 ("K&L Gates Letter").  That letter took aim at the Trustees with a threat of liability, twice stating that ETFMG's actions (which included recommending the fee cut) should "concern" the Board. *Id.* at 1-2; Loebs Aff. ¶ 31; Tr. 2393:19-2394:5 (Loebs); DX-804 (Chambers Report), at ¶¶ 49-54; Mahaffey Aff. ¶ 8; Masucci Aff. ¶¶ 85-86.

## D.   Breach and Termination of the PSAs

### 1.   Mr. Chanin's Interference with the Operations of the Trust and Funds and Unauthorized Marketing Activity

In the months after the Nasdaq acquisition of ISE, Mr. Chanin began to insert himself into decisions being made by the Trust and its advisor ETFMG – a campaign that was reasonably expected to and did adversely affect with the operations of the Trust and its funds. Despite his limited role in marketing the PureFunds ETFs, in the fall of 2016 Mr. Chanin began objecting to two decisions squarely within the discretion of the Board, namely, to permit ETFMG to replace external portfolio managers with in-house personnel and to replace an

external statutory distributor with an ETFMG affiliate, ETFMG Financial.  *See, e.g.*, DX-128 (November 10, 2016 Chanin email).

Mr. Chanin's reaction to the change in distributors was particularly problematic. That change went into effect April 1, 2017.[9]  However, Mr. Chanin refused to transfer his securities sale license to the funds' new statutory distributor even though he was the marketing face of the PureFunds ETFs and supervised employees who would continue to market those funds.  DX-203 ("At this time, I do not wish to have my 7 or 63 registered with ETFMG Financial LLC and I understand that it will mean that I will not have those licenses registered with a BD starting 4/1/17"); Masucci Aff. ¶¶ 100-02; Karol Aff. ¶¶ 20-24; Tr. 236:15-25, 276:2-277:9 (Chanin); DX-268 (March 30, 2017 ETFMG letter to Chanin).

As of April 1, 2017, ETFMG Financial as distributor became responsible for all sales activities of the ETFs in the Trust, including those of Mr. Chanin, his company, and his employees.  By refusing to shift his license, Mr. Chanin put ETFMG Financial in the position of having to supervise sales activity by the two PureFunds salesmen who had moved their licenses to ETFMG Financial while the principal who employed those salesmen was not legally permitted to engage in sales activities himself.

ETFMG warned Mr. Chanin that he was no longer authorized, per FINRA regulations, to engage in any marketing or sales activities with respect to the PureFunds ETFs. DX-203 (March 15, 2017 Masucci email to Chanin: "If your license does go inactive you will have to immediately stop all wholesale activities and discussion of any PureFunds ETFs in the public."); *see also* DX-206; DX-264; DX-268 (other March 2017 email and letters regarding

---

[9] The Board authorized the change in distributors at its September 29, 2016 meeting (DX-417, Board Minutes, at 11) and confirmed that ETFMG had secured the necessary FINRA approvals and licenses at its March 22, 2017 meeting (DX-419, Board Minutes, at 18-19).

same).  However, following expiration of his license on April 1, Mr. Chanin spoke on the record

for an article in MarketWatch regarding thematic ETFs, skirting the prohibition on fund

marketing by touting the benefits of a pure-play drone technology fund and naming the index

tracked by IFLY – not literally naming IFLY but effectively promoting it nonetheless.  Mr.

Chanin insisted that by not explicitly saying "IFLY" and only naming its index (PX-194; PX-

198, at 3) he was not marketing the fund.  Tr. 239:2-13.  But this is too cute by half.  Reasonable

observers (and FINRA) would certainly understand that he was marketing IFLY, as the investing

public makes no distinction between the index and the ETF itself, particularly when discussed by

the CEO of the company bearing the name of the ETF.[10]

As a brand new FINRA broker-dealer, ETFMG Financial was concerned that it

was effectively on "probation" and could be subjected to heightened FINRA scrutiny.  Karol Aff.

¶ 23; Tr. 2059:3-20 (Karol).  ETFMG Financial feared that Mr. Chanin's apparent unauthorized

sales activities might lead FINRA to conclude that ETFMG Financial was not able to perform its

supervisory responsibilities adequately.  Karol Aff. ¶ 23; Tr. 2046:6-12 (Karol).   It was important

not only to ensure that Mr. Chanin was not engaged in illegal selling activities but also to

demonstrate to FINRA that ETFMG Financial would take appropriate and effective action when

faced with potential regulatory violations.  Karol Aff. ¶ 23; Tr. 2065:15-17 (Karol).[11]

---

[10] Mr. Chanin also violated FINRA regulations by making the promissory statement that "as more drone specific companies went public, they would become components."  PX-198, at 3.  Even for properly registered representatives, such promissory statements are clear violations of FINRA Rule 2210.

[11] ETFMG also acted out of concern over Mr. Chanin's record of marketing HACK as "his" and creating the misimpression that he was the dominant force behind HACK.  *See, e.g.*, Tr. 1578:4-24 (Masucci: "the SEC called me at my office asking questions about who Andrew Chanin was, why they had read some of these articles, and asked why his role in the operation of the fund wasn't identified in the prospectus"); Tr. 874:22-875:12 (Monaco testimony regarding SEC and Board concern); DX-41 (Monaco April 21, 2015 email to Katz and Ilyevsky); *see also* DX-601 (June 26, 2015 MarketWatch article, "How a 29-year-old grew a $1 billion tech fund in 7 months"); DX-603 (August 26, 2015 Bloomberg article, "The One-Man, $1.2 Billion ETF Shop").  This had led to problems in the past, such as wirehouses declining to approve

Accordingly, to ensure Mr. Chanin's compliance and document for FINRA

ETFMG Financial's swift and proper response to the situation, Mr. Karol sent Mr. Chanin two

letters that instructed him to cease and desist from any sales activity.  To reinforce the

seriousness of the situation, the letters put him on notice of ETFMG's intent to terminate the

PSAs after the contractually required sixty-day cure period if he did not cure the apparent

violation.  DX-271 (April 21, 2017 Karol letter to Chanin); DX-272 (April 27, 2017 Karol letter

to Chanin).[12]  The letters flagged the MarketWatch article as well as two podcasts broadcast after

April 1.  Because the MarketWatch article also erroneously identified PureFunds as the operator

of HACK (PX-198, at 3), ETFMG also asked Mr. Chanin to issue a corrective statement to the

publication.  Regardless of who identified PureFunds as HACK's operator, FINRA Rule 2210

requires that "[m]embers must ensure that statements are clear and not misleading within the

context in which they are made."  Mr. Chanin never responded to Mr. Karol's letters.[13]

## 2.  Mr. Chanin's Attempt to Seize Control of the Trust and Funds

Over time, Mr. Chanin's objections grew more belligerent.  DX-195 (March 11,

2017 Chanin letter sent to each Trustee alleging misconduct by ETFMG); DX-202 (March 14,

---

HACK for distribution to their financial advisors based on concerns that HACK was a one-man show operating without adequate infrastructure to support fund operations and compliance.

[12] Because "Client" is defined jointly as both ISE and PureFunds in all PSAs other than the HACK PSA, ETFMG also informed Nasdaq of Mr. Chanin's actions and their potential adverse effects, which included termination of the PSAs.  PX-197.

[13] While ETFMG later discovered – through no help of Mr. Chanin – that the podcasts were re-publications of interviews recorded before April 1, 2017, ETFMG had no way to know whether Mr. Chanin had a hand in causing the podcasts to be re-published.  In light of this, and given Mr. Chanin's failure to answer ETFMG's inquiries on the matter, his overseeing two employees who were marketing the funds while not being licensed to do so himself, and his being quoted in the new MarketWatch article after April 1, ETFMG had a good faith basis to believe that Mr. Chanin was a supervisory problem and in breach of his obligations under the various PSAs.  That said, the two April 2017 Karol letters did not lead to termination of the PSAs; the formal notice that did so was sent on June 2, 2017.  DX-276.

2017 email demanding Masucci's "immediate resignation as the fund Advisor").  By April 2017, Mr. Chanin was expressly threatening to sue over the independent Trustees' decision to reduce the HACK Management Fee.  DX-213 (April 20, 2017 Chanin email).  Indeed, in the April 20 email, Mr. Chanin stated that he "[did] not authorize" the reduction and included the explicit threat that *"[t]o the extent you proceed with this [fee cut] we will include this in our claim for relief."*  *Id.* (emphasis added).

Mr. Chanin followed through on his threat.  On May 2, 2017 – the day after the HACK fee cut went into effect – PureFunds and Mr. Chanin filed a lawsuit against the independent Trustees, ETFMG, and Messrs. Masucci and Karol in New Jersey Superior Court.  DX-700 (Complaint); Masucci Aff. ¶¶ 122-23.  Most alarmingly, Mr. Chanin also sought emergency injunctive relief that, if granted, would have frozen all funds, income, profits, and assets derived from the operation of the PureFunds ETFs, required the appointment of a "special fiscal agent" for the Trust and ETFMG, and enjoined the Trustees or ETFMG from taking any action with respect to the PureFunds ETFs absent the approval of this agent.  DX-701 (Order to Show Cause for Restraints and a Preliminary Injunction).  By this application, PureFunds and Mr. Chanin sought to prohibit the Trustees and the fund advisor from carrying out their respective responsibilities to public shareholders under the '40 Act and other authorities.  The New Jersey court denied the application (DX-704), but the suit inflicted significant costs and disruption on ETFMG and the Trust.  Masucci Aff. ¶ 123; Loebs Aff. ¶ 34; Mahaffey Aff. ¶ 6.

### 3.   ETFMG Terminates the Oral Agreement Governing HACK Profits and Gives Notice to Terminate the PureFunds PSAs

The course of conduct by Nasdaq and PureFunds led ETFMG to conclude that they were acting in a manner that undermined the authority of the Trust over the ETFs.  Masucci Aff. ¶ 125.  ETFMG therefore determined that the cooperative relationship and good will

concomitant with maintaining the parties' oral agreement to pay HACK Fund Profit no longer

existed, and it informed Nasdaq and PureFunds that it would no longer pay HACK Fund Profit to

Nasdaq, effective June 30, 2017.  DX-274 (May 24, 2017 letter).  While not necessary to justify

terminating an oral agreement, ETFMG's letter described the course of conduct by Nasdaq and

Mr. Chanin underlying this decision.  As to Nasdaq, the letter described its failure to address its

conflict involving HACK and CIBR and other indexing issues; its failure to timely pay expenses

and thereby force ETFMG to turn to netting; its attempt through the K&L Gates Letter to

intimidate the Board into not reducing the HACK fee; and its role in misleading Mr. Chanin

regarding the netted funds and provoking him to file the baseless New Jersey action.  *Id.*; PFF

¶¶ 68, 104.  As to Mr. Chanin, the letter described his improper attempts to interfere with the fee

cut and other Board decisions, his filing the New Jersey action, and his shocking attempt to wrest

control of the Trust and ETFs from the Board and ETFMG.  PFF ¶ 68.[14]

       ETFMG sent another letter on June 2, 2017, this time formally terminating all

PureFunds PSAs on the same grounds, which separately and collectively breached PureFunds'

and (other than for HACK) Nasdaq's duty not to take any action "that would, or could

reasonably be expected to . . . adversely affect the operations of the Trust or the Funds."  DX-

276; PFF ¶ 69; JX-5 (HACK PSA), at § 7(c); JX-6-10 (Remaining PureFunds PSAs), all at

§ 7(d).  This letter triggered a 60-day cure period, but neither Nasdaq nor PureFunds took any

steps to cure.  Indeed, Nasdaq expressly *assented* in the termination of every PSA except for

---

[14] Given the rapid deterioration of the relationship, ETFMG tendered no further moneys to Nasdaq after
sending its termination letters, including $71,510.52 due under the final netting statement dated May 26,
2017.  Tr. 1451:17-20 (Masucci); PFF ¶ 60 n.16.  That netting statement noted the first relatively small
amounts due for IPAY Fund Profit as well as HACK Fund Profit through February 2017.  A true-up
reflecting the HACK and IPAY profit through the formal termination date of July 31, 2017 is accounted
for in ETFMG's calculation of damages.  *See* PFF ¶ 165.

those governing HACK and IPAY.  DX-279-283; DX-289; DX-290; PFF ¶ 70.  While Nasdaq

denied ETFMG's bases for termination of the HACK and IPAY PSAs, it did not address the

termination events or offer any cure.  DX-289; DX-290.  In fact, Nasdaq's response regarding

the HACK PSA failed to address that ISE was not a party to that contract and that the PSA does

not mention Fund Profit.  DX-290.

**E.     Nasdaq's Breach of the Sublicense Agreement**

      **1.     Nasdaq's Refusal to Confirm Indexes**

Notwithstanding ETFMG's termination of the PSAs, the Sublicense Agreement

among Nasdaq, PureFunds, and ETFMG remained in effect.  JX-2A.  This agreement obligated

Nasdaq (which did not assert any breach or otherwise give notice of termination) to continue

providing indexes for the PureFunds ETFs.  During the 60-day PSA cure period, ETFMG

sought, through counsel, to confirm that Nasdaq would continue to honor its obligation under the

Sublicense Agreement to provide indexes, or at least cooperate in an orderly transition to a new

provider.  PFF ¶ 73.  Nasdaq rejected ETFMG's proposal to pay a market fee for the indexes for

a transitional period and, through its litigation counsel, pointedly declined to confirm whether it

would continue to honor its obligations.  When pressed to confirm whether Nasdaq would

continue to supply the indexes or to otherwise provide notice, Nasdaq's counsel reported that,

"Nasdaq is not saying it would not continue to supply the indexes but will not confirm that it

will" – which ETFMG reasonably understood as an anticipatory breach of Nasdaq's obligations.

PFF ¶¶ 74-77; Tr. 834:14-21 (Mahaffey); Tr. 1647:12-15 (Masucci).  While Nasdaq has sought

to justify its conduct by observing that ETFMG had stopped paying Fund Profit, it remained

under a regulatory and ethical duty to communicate its intentions and facilitate an orderly

transition of index providers to ensure continuity in the functioning of the publicly traded funds,

rather than using the issue as a bargaining chip.  Tr. 2350:13-16 (Loebs: "My belief was that

Nasdaq, given its reputation in the marketplace, would not just throw a switch, and that there would be some degree of cooperation in resolving the conflict."); Chambers Aff. ¶ 61.

Nasdaq's refusal to confirm put ETFMG in an impossible position. As the advisor to the Trust, ETFMG required either confirmation of the indexes or, in the alternative, notice to make an orderly transition for the funds. Without assurances, ETFMG, the Trust, and the public shareholders of the PureFunds ETFs were at significant risk. Tr. 2352:24-2354:3 (Loebs: "Basically [if] there's no index or an index is broken or if it's not maintained, prices can't – or market can't be made, there's no price discovery, and the shareholders have no liquidity. And, you know, again, lots of bad things happen pretty quickly."). Nasdaq's equivocal response raised the specter that one day the market would open and ETFMG would find that the funds were without indexes. ETFs must track functioning indexes to comply with their stated investment objectives and strategies, and ETFMG has regulatory obligations to notify the financial markets of any changes regarding fund indexes. With over $1 billion in publicly traded assets under management, ETFMG could not risk losing access to regularly updated indexes; it had no choice but to notify Nasdaq that Nasdaq's conduct manifested an intent to terminate the Sublicense Agreement, and ETFMG would work to transition to new indexes within a reasonable time. PFF ¶¶ 78-79; DX-288 (July 14, 2017 Coffey letter to Axelrod), at 4.

## 2. Without Notice, Nasdaq Cuts Off Index Data for the Remaining PureFunds Indexes During Trading Hours, Then Lies About it

Yet Nasdaq's bullying was not over. While ETFMG was in the process of transferring the funds to indexes supplied by Prime Indexes, Nasdaq used the opportunity to take retaliatory action against ETFMG via the two funds (GAMR and IFLY) that still tracked indexes from Nasdaq, recklessly disregarding potential harm to those funds' public shareholders. In an effort David Gedeon admitted was to exert leverage over ETFMG, Nasdaq made a deliberate

decision to cut off the index data feed for the GAMR and IFLY ETFs without notice, *during trading hours*, and then lie about it.  Tr. 1853:1-11 (Q (by the Court): "Was any part of turning [the data feed] off intended to give you more leverage in business discussions with ETFMG?"  Gedeon: "Yes."; Q: "The data was basically a hostage here?"  Gedeon: "Yeah."); Tr. 1847:24-1848:14 (discussion between the Court and Gedeon regarding false explanation given to ETFMG).[15]  This gambit – cutting off ETFMG's access to critical index files and then lying about it – was an egregious breach of ethics and industry practice by a major index provider.  PFF ¶¶ 80-86; DX-804 (Chambers Report), at ¶¶ 40-43.  ETFMG was forced to make immediate arrangements to replace Nasdaq as index provider on the remaining two funds.  PFF ¶ 84.[16]

## F.    **Nasdaq's Breach of the Wholesaling Agreement**

Finally, although ISE and ETFMG had expressly agreed that the Wholesaling Agreement would "continue in full force and effect for as long as the Wholesaling Platform is in

---

[15] Although not focused on at the time, in addition to the Sublicense Agreement Nasdaq was also under a separate contractual obligation to provide the index data at issue.  DX-854 (December 5, 2016 Global Data Agreement).  Accordingly, Mr. Gedeon's testimony that there was "no contract" obligating Nasdaq to provide this data (Gedeon Aff. ¶ 60) was incorrect on at least two bases.  Tr. 1837:18-20 (Gedeon).

[16] Nasdaq's bad faith behavior and bullying has continued even post-trial, with its most recent stunt being a blatant effort to intimidate the independent Trustees.  Last Friday, Ballard Spahr served on the Trust a books and records demand for inspection on behalf of a purported holder of 100 HACK shares – none other than Terry Wade.  Farcically representing that the inquiry pertains "to Mr. Wade's interest as a beneficial owner of the HACK ETF", the demand seeks information to permit "Mr. Wade" to communicate with other HACK shareholders regarding the solicitation of proxies.  The obvious inference from this gambit is that Mr. Wade's employer, unhappy with its recent communications with the independent Trustees' counsel at Schiff Hardin, has opted for a course of intimidation that involves a threat to solicit proxies to replace those Trustees with pliable alternatives more to Nasdaq's liking.

We understand that Trust counsel will respond to this demand in due course, but we note here that case law under 8 Del. Code § 220 (the corporate analogue to a demand made to a statutory trust under 12 Del. Code § 3819) establishes that where, as here, the demand's true purpose is a sham, the demand may be denied.  *See Carpenter v. Texas Air Corp.*, No. 7976, 1985 WL 11548, at *3 (Del. Ch. Apr. 18, 1985) (denying demand for inspection as "merely a sham" and improper where plaintiffs' true intent was to exert economic pressure on corporation in which defendant was majority stockholder).

operation" (JX-11, at § 9(a)), Nasdaq sent a letter on July 11, 2017 purporting to terminate the

Agreement based on a flimsy series of allegations that ETFMG had "fail[ed] to perform it

obligations."  PFF ¶ 87.  Nasdaq's lead reason was that ETFMG supposedly violated a

prohibition in the Wholesaling Agreement by moving the statutory distribution function to an

affiliate, ETFMG Financial.  PFF ¶ 88.  But the Wholesaling Agreement merely states, after

reciting all the services that GENCAP will provide directly: "The parties acknowledge that

GENCAP shall not provide statutory distribution services . . . which will be provided by a third-

party service provider."  JX-11, at 3.  This language is not a prohibition (which would have been

included in the covenants rather than services section of the Agreement), but merely what it says

it is:  an "*acknowledge[ment]*" that, since GENCAP was not a FINRA-licensed broker-dealer, it

would need to outsource the statutory distribution function. Tr. 1099:4-6 (Q: "Did you intend

this to be a prohibition against GENCAP acting as statutory distributor at some point?" Monaco:

"No.").  ISE understood that this was the long-term intention and agreed it made sense.  Tr.

1099:15-19 (Monaco); PFF ¶ 134.  Mr. Wade *agreed* with this switch when he was informed of

it in February 2017, never objecting until Nasdaq was conjuring up complaints many months

later.  PFF ¶ 88 n.21.  And it made no sense to prohibit a practice that is both common in the

industry and in the best interests of fund shareholders.  DX-804 (Chambers Report), at ¶¶ 64-70.

Nasdaq's other grounds for terminating the Wholesaling Agreement were also

specious – centering on complaints that ETFMG hired too many wholesalers at too high a total

compensation; submitted expenses above the contractual cap and without preapproval; and

charged for expenses related to unauthorized funds.  All of these additions were either expressly

approved by ISE, consistent with the parties' pattern and practice prior to the Nasdaq takeover,

or immaterial.  Tr. 919:8-10 (Q: "But at some point, ISE agreed to additional wholesalers for the

wholesaling platform; is that right?"  Monaco: "Yes."); Tr. 1100:9-18 (Q: "So there were

expenses, am I right, there were expenses that, at one point, [ETFMG] would come to you for

preapproval but eventually you were OK with them not seeking preapproval?"  Monaco: "Yes,

especially if we approved them in a prior matter."  Q: "Is it fair to say that, over time – well, did

you ever receive an invoice from Mr. Masucci on wholesaling fees that you pushed back on?"

Monaco: "No."  Q: "Did you review them when they came in?"  A: "Yes."); PFF ¶¶ 89-93, 135-

39.  The Wholesaling Agreement specifically stated that the number of wholesalers and their

total compensation – by far the largest item about which Nasdaq complained – "may be amended

from time to time as mutually agreed to by the parties," with no requirement that such a change

be approved in writing.  JX-11, § 7(b) & Ex. C.  Once ISE and ETFMG had mutually agreed to

increase the number of wholesalers to four (*see* DX-81 (Q3 2016 wholesaling invoice); Tr.

919:8-24 (Monaco); Tr. 1532:20-1534:6 (Masucci)), that number could not be amended (i.e.,

reduced) absent ETFMG's consent.  JX-11, at Exhibit C.  Finally, Nasdaq complained that

ETFMG netted unpaid expenses against Fund Profit, but not only was this ETFMG's common

law right, *see* below at 41, it was also reasonable in light of the pressure Nasdaq sought to wield

by resisting expense payments.  PFF ¶¶ 57, 94, 140; Tr. 1417:2-6, 1439:22-1440:7 (Masucci).

It is clear that Nasdaq's purported grounds for terminating the Wholesaling

Agreement were pretextual, and any quibbles over particular expense items were not sufficiently

material to justify terminating the entire agreement.  ETFMG wrote to Nasdaq's counsel within

the 30-day termination cure period with detailed responses on each item (DX-295), but Nasdaq

never responded – choosing instead to file this lawsuit.  PFF ¶ 95.

## ARGUMENT

### I.  THE WRITTEN CONTRACTS PROVIDE NASDAQ WITH NO RIGHT TO HACK PROFITS

As set forth above – and in ETFMG's pending Rule 52(c) Motion (Tr. 2242:2-2249:8) – the written contracts give Nasdaq no right to receive profits from the HACK ETF.

As a threshold and dispositive matter, the *only* written contract addressing the right to receive any part of the HACK Management Fee is the Investment Advisory Agreement, which designates ETFMG as the advisor to be so compensated.  DX-9, at Schedule A.  Nothing that took place at the trial undermines the import of this contract regarding HACK profits: unless ETFMG agreed to give away some part of the HACK Management Fee to someone else, that fee belongs to ETFMG.  Here, ETFMG had agreed via the oral agreement with ISE to send HACK Fund Profit to ISE.  That agreement was terminable at will.  *Horowitz v. La France Indus.*, 274 A.D. 46, 47 (1st Dep't 1948) ("Plaintiff was engaged by defendant under an oral agreement without any specified duration. The contract was therefore one terminable at will by either party.").  *See* Point II, below.  After ETFMG exercised its right to terminate on May 24, 2017 (DX-274), the only contract addressing HACK fees was the Investment Advisory Agreement and that contract directs those fees to ETFMG.[17]

In the face of the foregoing facts, Nasdaq straddles two different contracts, without ever committing to which horse it intends to ride.  Even after Nasdaq had rested its case, the Court was left to wonder.  The colloquy after ETFMG raised its Rule 52(c) motion is telling:

> THE COURT: But in other words, if the question were put to you, what agreement, what writing is the surest foundation of

---

[17] Nasdaq's aversion to this contract was evident when it refused to include it with all the other contracts listed as Joint Exhibits.

> [Nasdaq's] claim that failure to make profits from HACK was a breach, the answer would be –
>
> Mr. AXELROD:  Would be, I'll be equivocating, but it's the sublicense agreement and then the HACK PSA as well.

Tr. 2253:10-15.   Whether Nasdaq in its post-trial brief continues to equivocate or finally chooses, it matters not; neither horse gets Nasdaq around the track.

Option one – Nasdaq's reliance on the Sublicense Agreement – asks the Court to ignore the pivotal language in the parenthetical in Section 2 of that contract, which expressly *excludes* from ETFMG's obligations the fee-splitting terms contained in the Schedule to the Index License Agreement.  JX-2, § 2 ("[Factor] acknowledges that it has received and read a copy of the [Index] License Agreement (*excluding the Schedule setting forth the license fees*) and agrees to be bound by all the provisions thereof . . . .") (emphasis added)).   Nasdaq embraces Section 3 of the contract as binding ETFMG to all of PureFunds' obligations "as principal", but ignores that the *scope* of those obligations is expressly limited "pursuant to Section 2".  *Id.,* § 3.[18]

Nasdaq also has no answer for why the drafters of the Index License Agreement and Sublicense Agreement chose to use "royalty-bearing" in the former (at § 1(A) ("a non-transferable, non-exclusive, royalty-bearing license") but not the latter (*see* § 1 ("a non-exclusive and non-transferable sublicense")).  That choice reinforces the conclusion that the Sublicense Agreement did *not* impose any financial obligation on ETFMG.  *See* above at 6-7.

---

[18] Nasdaq has been ignoring these critical words since the start of the case.  *See* D.E. 1 (Complaint), at ¶ 28(A) (distorting Section 2 by substituting "[Index License Agreement]" for the "thereof" that incorporates the critical parenthetical), ¶ 29 (distorting Section 3 by using ellipsis to delete the "pursuant to Section 2" scope limitation); *see also* Nasdaq Response to Defendants' Pre-Trial Memorandum (similarly distorting Section 2).

In sum, when it comes to the Sublicense Agreement, Nasdaq cannot evade the words that the contracting parties chose to use, and those words *excluded* the very terms that Nasdaq contends bound ETFMG to pay HACK profits. "'[T]he Court's role is to give effect to the intent of the contracting parties as revealed by the language they chose to use.'" D.E. 50, at 16-17 (quoting *Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993)); *see also Brause v. Goldman*, 10 A.D.2d 328, 334 (1st Dep't 1960) (court's job is to "enforce agreements only if they exist, and not to create them by the imposition of such terms as it considers reasonable"), *aff'd*, 9 N.Y.2d 620 (1961); *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 459, 467 (2d Cir. 2010) ("[T]he objective of contract interpretation is to give effect to the expressed intentions of the parties." (citation omitted)). The Court should reject Nasdaq's invitation to deviate from the language chosen by the parties.

Option Two – the HACK PSA – invites even more mischief. That contract is of course silent on the question of HACK profits, and ISE purposefully *chose* not to become a party. Indeed, its name appears nowhere in the contract. Notably, after the acquisition Nasdaq *turned down* ETFMG's offer to be added as a party to the HACK PSA. Tr. 649:14-17 (Wade). Interpreting the plain language of this contract, Nasdaq has no standing to stake a claim to HACK profits.

These facts also defeat any claim that Nasdaq could be viewed as a third-party beneficiary under the HACK PSA. *See Bromwich v. Hanby*, No. S08C-07-008, 2010 WL 8250796, at *2 (Del. Super. Ct. July 1, 2013) (contract language must "clearly contemplate a third party"); *see also* cases cited in PFF ¶¶ 106-09. Not only is there no reference to ISE anywhere in the HACK PSA, but the absence of any reference to HACK profits means that claimed "benefit" was not even part of the contract. *See Bricklayers & Allied Crafts Union*

*Local No. 1 of DE/PA Welfare Fund v. Edward Wilkinson Co.*, No. 07-145, 2008 WL 4948654, at *3 (D. Del. Nov. 19, 2008) (refusing to enforce alleged right to require audit where "plaintiffs have failed to cite or identify anywhere in the Agreement, that an audit is contemplated" and "such a provision just does not exist").

The HACK PSA specifies that ETFMG will receive certain fees and expense reimbursement in consideration for certain services.  JX-5, § 1.  Nasdaq contends that this is a cap on compensation, and thus the only "reasonable" inference is that the HACK profits must go to someone else.  D.E. 109, at 14.  Not so.  If the Court were to accept Nasdaq's invitation to speculate – and ETFMG submits that speculation in the face of the HACK PSA's unambiguous text would be error – then the more compelling inference is that the consideration is a *floor*, that is, a guarantee that PureFunds would reimburse ETFMG for the expense of launching and operating the ETF, plus a minimum fee, even if that ETF never succeeded.  Given that ETFMG operated in a business with both failures and successes and that none of the Original PureFunds ETFs had reached breakeven as of November 2014, this is the far more logical inference.  But where, as here, the contracting parties knew how to include (and later did include) a written term regarding HACK profits but chose not to, surmise and speculation are improper.

As discussed above, the parties chose to address various aspects of their relationship through different contracts often involving different combinations of parties.  The HACK PSA was negotiated alongside the updated Investment Advisory Agreement, which provides that the entire HACK management fee goes to ETFMG as advisor.  The HACK PSA then addresses certain other issues:  the crux of the contract was PureFunds' promise that all expenses and a minimum fee would be paid, in return for which ETFMG undertook to perform or cause to be performed all necessary functions for the operation of the HACK fund.  The

HACK PSA does not address one way or the other disposition of the balance of the Management Fee after all operational expenses have been paid (*i.e.*, the profit).  That issue was addressed separately through the parties' oral agreement.

The Court asked whether, in connection with HACK, the parties should be presumed to have simply continued performing as they did under the BMA, which pertained to the three Original PureFunds ETFs.  Tr. 2644:19-22.  The evidence showed, however, that parties had *ignored* the BMA and operated pursuant to a different, *oral* agreement.  Tr. 326:6-11 (Chanin); Tr. 758:2-5, 1054:18-24 (Monaco).  *See* above at 7-9.

The BMA was a contract solely between the Trust and PureFunds; ISE was not a party.  The BMA provided that all profits would go solely to PureFunds, which was to act as manager of the funds and, indeed, directly receive the management fee.  JX-12B; PFF ¶ 17(c).  However, when it became clear that PureFunds had limited resources and was unable meaningfully to discharge its obligations under the BMA, the parties entered into an oral agreement that overrode and disregarded the economic structure of the BMA:  the management fee went to the bank account of ETFMG's predecessor, Factor; Factor, not PureFunds, acted as manager; ISE, not PureFunds, paid the expenses; and any profits would have gone directly to ISE, not PureFunds.  None of this is embodied in the BMA, so such terms cannot be read into the HACK PSA through some theory of presumed continuation or through reading the two contracts together.  PFF ¶ 17(d).  As a result, one cannot look to the BMA to inform the parties' understanding of the HACK PSA.  And there is no merit in doing so because the HACK PSA is, as Nasdaq has conceded (Tr. 2249:15-17), unambiguous.

Nasdaq has nevertheless suggested that an obligation to pay HACK profits to ISE should somehow be read into the written contracts based on some generalized assessment of the

parties' intentions – although Nasdaq avoids referring to such understandings as oral contracts. But it is not entirely clear what legal doctrine Nasdaq would have the Court apply to change the written contracts in the way that it desires. Under Delaware law, a court faced with a mutual drafting mistake "may reform a written agreement to reflect the parties' actual understanding at the time of contracting." *Heritage Handoff Holdings LLC v. Fontanella*, No. 1:16-cv-00691, 2019 WL 1056270, at *13 (D. Del. Mar. 6, 2019). However, ISE's exclusion from the HACK PSA was no drafting error; it is undisputed that ISE *chose* not to be a party to the agreement. And ETFMG's actual counterparty – PureFunds – is not a party here and thus obviously has no standing to seek any relief, much less "reformation" of the contract. Indeed, PureFunds has not sought any such relief in the parallel New Jersey action. *See* DX-700 (Complaint).

Even if the Court were somehow to find that ISE privately believed the HACK PSA contained a provision to pay HACK profits to PureFunds, that would not permit reformation of the contract because there is no evidence that ETFMG and ISE actually *agreed* to include such a term and that it was omitted through a drafting error. Unilateral mistake cannot support contract reformation absent evidence that "the other party knew of the mistake but remained silent." *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1151 (Del. 2002).

Nor can Nasdaq overrule these requirements by arguing that the contracts as written do not make commercial sense. Each written contract addresses certain topics in a way that is both logical and enforceable. For example, the Index License Agreement addresses (1) how ISE and PureFunds would split any profits received for the ETFs, and (2) the licensing of ISE's intellectual property (including the indexes) so that PureFunds or its designee could operate the funds. The Sublicense Agreement, in turn, addresses the second of those two issues – extending PureFunds' intellectual property license to ETFMG in return for its agreement to

honor PureFunds' operational obligations under the main body of the Index License Agreement (but expressly excluding the financial obligations addressed in the Schedule).  Similarly, the HACK PSA outlines certain functions that ETFMG would perform in return for specific fees and an overall guarantee of payment of expenses, but (like the Sublicense Agreement) does not address the subject of payment of HACK *profits*.  However, there is no suggestion that any of the contracts fail for want of consideration simply because they do not address this additional issue.

## II.   ANY RIGHT TO HACK PROFITS IS GOVERNED BY A SEPARATE ORAL CONTRACT TERMINABLE AT WILL

As described above, Mr. Monaco and Mr. Masucci – the only witnesses whose expressed intention would be relevant – both testified that ISE's right to receive HACK profits directly from ETFMG was based on an oral agreement.  Tr. 1052:2-8 (Q: "And if you weren't relying on the PSA, what were you relying on to have some certainty that you would receive funds from the operation – profits from the operation of HACK?" Monaco: "Either our agreement with PureShares that it would send to ISE whatever profits it received or an oral agreement we had in place with ETFMG where it agreed that it would send the profits to ISE."); Tr. 1385:12-14 (Masucci: "And the [HACK] profit that was being paid to the ISE prior to the acquisition was based on a verbal agreement that the ISE and ETF managers had.").

It is well-settled that an oral agreement with "no provision for its termination [is] terminable at will upon reasonable notice."  *Majestic Farms Supply Ltd. v. Service Riding Apparel, Ltd.*, 137 A.D.2d 501, 502 (2d Dep't 1988).  *See also Hadami, S.A. v. Xerox Corp.*, 272 F. Supp. 3d 587, 597 (S.D.N.Y. 2017) (Engelmayer, J.) (to avoid falling within statute of frauds, oral agreement without stated duration must be terminable at will).

There is no evidence that the parties agreed to alter the default rule and make the oral agreements governing HACK profits subject to the termination provisions of any of the

written contracts.  For his part, Mr. Masucci believed the oral agreement would last only so long as the parties maintained a positive working relationship (Masucci Aff. ¶ 38), which essentially makes it terminable at will.  Mr. Monaco testified that he subjectively understood the payment obligation would continue "[a]s long as everybody abided by the agreements" (Tr. 1129:15), but he also testified that the question of whether the oral agreements were terminable at will "was never discussed" (Tr. 1061:25).  As a result, the default "at will" termination rule controls.

III.   **EVEN IF THE RIGHT TO PROFITS WERE GOVERNED BY THE WRITTEN CONTRACTS, ETFMG PROPERLY TERMINATED THEM**

Even assuming, *arguendo*, that the oral agreement to pay HACK profits to ISE somehow became part of the written contracts and thus subject to their termination provisions, ETFMG had solid grounds for terminating both the PSAs and the Sublicense Agreement based on destructive and confrontational behavior by both Nasdaq and PureFunds, as described above at 15-22 and catalogued in more detail at PFF ¶¶ 118-31.

Each of the PSAs following the HACK PSA (including the one governing IPAY) provides that the "Client" (defined to include both PureFunds and ISE) "shall not take any action, or fail to take any action, that, would, or could reasonably be expected to . . . result in a material violation of [the PSA] or adversely affect the operations of the Trust or the Funds."  JX-6-10 (all at § 7(e)).  The same provision is included in the HACK PSA (JX-5) (under which only PureFunds is the "Client") at § 7(d).  Violation of this obligation is a terminable event under each PSA.  JX-5-10 (all at § 9).

The Court asked the parties to address the consequences for Nasdaq if the Court finds, as we submit it must, that Mr. Chanin's conduct justified the termination of the PSAs in June 2017.  The answer:  whatever rights Nasdaq had under those PSAs terminated as of July 31, 2017, whether or not Nasdaq contributed to the underlying breaches.

Because PureFunds is either the sole "Client" (for HACK) or defined along with ISE as the "Client" (for the subsequent funds), all of the PSAs were terminable if PureFunds took actions that could reasonably be expected to adversely affect operations of the Trust or the funds.  Delaware law provides that "[a]n obligation or written contract of several persons shall be joint and several, unless otherwise expressed." 6 Del. Code § 2701. "This presumption of joint and several liability can only be rebutted by evidence revealing the objective intent of the parties to have a different type of obligation." *Falco v. Alpha Affiliates, Inc.*, No. Civ. A. 97-494, 2000 WL 727116, at *11 (D. Del. Feb. 9, 2000); *see also Kramer v. Miller*, No. 94 Civ. 3439, 1995 WL 699794, at *3 (S.D.N.Y. Nov. 24, 1995) (parties not jointly and severally liable where express terms of agreement at issue assigned responsibility to one party and not the other).  Here, there is no indication that the parties intended the contracts to be terminable only if *both* parties defined as the Client breached it, so the statutory presumption controls that each party defined as the "Client" is jointly and severally liable for the breaches of the other.

Focusing on PureFunds' misconduct, ETFMG had multiple grounds to terminate the IPAY PSA and, *a fortiori*, the HACK PSA, under which only PureFunds was the "Client":

*First*, Mr. Chanin improperly attempted to interfere with the Board's decisions to cut the HACK fee and to move distribution to ETFMG Financial and portfolio management in-house.  This included belligerent communications that, among other things, threatened to sue the Trustees personally.  *See* above at 18-19.

*Second*, Mr. Chanin refused to transfer his securities sale license to the funds' new statutory distributor even though he was still supervising salesmen for those funds and was the marketing face of the PureFunds ETFs.  *See* above at 19.

*Third*, Mr. Chanin gave an interview to Marketwatch after he was no longer legally authorized to market the PureFunds ETFs, touting the benefits of a pure play drone ETF and discussing the index for IFLY, as if by not actually naming the fund he was not in effect marketing it illegally.  This coy skirting of legal responsibilities exposed ETFMG Financial to potential regulatory liability for failing to supervise fund marketing.  Mr. Chanin's conduct was also a breach of his agreements with ETFMG.  Each PSA contains under the "Representations and Warranties of Client" that "[o]nly those sales persons properly licensed by FINRA, and registered with statutory distribution agent to the applicable Fund, shall market the Funds to investors."  JX-5-10, all at § 5(e).  *See* above at 19-20.

*Finally*, Mr. Chanin filed the New Jersey Action – which included patently frivolous claims against ETFMG and the independent Trustees (with no allegations of misconduct on their part) – along with a meritless application for injunctive relief that attempted to wrest control of the funds from the Trust and its advisor, ETFMG.  *See* above at 21-22.

These actions unquestionably threatened to adversely affect the Trust and funds, by distracting the Trustees and ETFMG from running the funds, causing needless waste of time and money, injuring the Trust and ETFMG in the public eye, and threatening to disrupt operations by stripping control from parties authorized under the '40 Act to operate the funds.

While PureFunds' conduct alone provided ETFMG with sufficient grounds to terminate the PSAs, several aspects of Nasdaq's conduct also threatened to adversely affect the Trust and funds, including (1) Nasdaq's failure to implement safeguards to address its obvious conflict of interest in maintaining the HACK index, which it had previously been coordinating with its major client First Trust to attack; (2) failing to constructively engage ETFMG's concerns about implied liquidity and other issues in maintaining the HACK index; and (3) applying

pressure tactics as part of a plan to escape its inherited business obligations to ETFMG, including by inappropriately interfering with the Trust's decision to reduce the HACK fee and delaying or contesting previously routine payments to support the Wholesaling Platform.  *See* above at 15-18.

Moreover, to the extent the Court were to find a right for Nasdaq to receive HACK or IPAY profits based on the Sublicense Agreement, ETFMG properly terminated that agreement as a necessary consequence of Nasdaq's anticipatory repudiation of its obligation to continue providing access to necessary fund indexes.  *See* above at 24-25.  Nasdaq's failure to address its conflict of interest or ETFMG's issues with maintenance of the indexes independently breached its obligation of good faith and fair dealing under the Sublicense Agreement – as did Nasdaq's outrageous conduct in cutting off, without notice, access during trading hours to crucial index files for GAMR and IFLY, and then lying to ETFMG about it – a tack hardly consistent with an actor genuinely believing that it was justified in what it had done.  *See* above at 25-26.

All of these grounds and more were set forth in ETFMG's June 2, 2017 termination letter, which also provided Nasdaq with the required 60-day cure period, during which time Nasdaq failed to take any action to cure.  JX-5-10, all at § 9; DX-276.  Thus, regardless of whether the oral agreements concerning payment of HACK profits are somehow imported into the written contracts, ETFMG properly terminated the PSAs and the Sublicense Agreement and thus is not liable to Nasdaq for fund profits accruing after July 31, 2017.

This conclusion is not affected by any of the issues potentially related to termination flagged by the Court in its colloquy on the last day of trial.  Tr. 2642:5-2650:20.

*First*, any amounts that ETFMG owed to Nasdaq at the time it declared Nasdaq in breach of the PSAs did not bar ETFMG from terminating the contracts.  Each of the PSAs

contains a requirement for notice and an opportunity to cure, which ETFMG properly triggered in terminating the PSAs.  JX-5-10, all at § 9.  In contrast, Nasdaq *never gave notice* prior to ETFMG's termination that it considered ETFMG itself to be in breach of the PSAs based on nonpayment of Fund Profit.  Such notice and opportunity to cure would be a prerequisite for asserting a claim based on an alleged breach.  "[W]here a contract's terms clearly evidence an intent that litigation be pursued only after notice and an opportunity to cure, a party must generally comply with prescribed notice and cure procedures in order to pursue a claim of breach under the agreement."  *WyPie Invests., LLC v. Homschek*, No. N14C-08-140, 2018 WL 1581981, at *13 (Del. Super. Ct. Mar. 28, 2018) (quotations and citations omitted).

Moreover, while an accounting performed in preparation for trial calculated that ETFMG owed Nasdaq approximately $2.8 million in Fund Profit as of the July 31, 2017 termination of the PSAs (PFF ¶ 165), the amount and timing of any payment obligation – and thus the point when ETFMG could arguably have been seen to be in material breach – were far from clear at the time these events were unfolding.  ETFMG attempted to keep up with amounts due by netting HACK (and after January 2017 IPAY) Fund Profit against Wholesaling Agreement obligations, and corrected any errors that were brought to its attention.  Masucci Aff. ¶ 115 n.30; Tr.  1300:13-23 (Masucci); Tr. 636:1-9 (Wade); DX-210.  When ETFMG determined not to transmit the payment due on the May netting statement, the situation had become dire, as Mr. Chanin had already attempted to take control of the funds through a Temporary Restraining Order and the parties appeared headed towards termination of their agreements – rendering it not unreasonable to suspend payments pending a global resolution of disputes.  In any event, the amount due on the May netting invoice was only $71,510.52 (JX-410), and for March and April 2017 (the months not yet covered by netting statements for which payments were due as of the

June 2 termination), Nasdaq was owed only another $52,469 for IPAY profits – both immaterial

amounts hardly justifying finding ETFMG in material breach, particularly when Nasdaq never

gave the contractually required notice of default and opportunity to cure.

Meanwhile, the timing of any obligation to HACK Fund Profit was far from clear.

Neither the oral agreement nor the HACK PSA contained a payment timing provision, and if, as

Nasdaq urges, the Index License Agreement plays a role, payment was not due until 30 days

after the end of each quarter (JX-1 (Schedule), at 20), meaning that as of June 2, 2017, only the

first quarter HACK profits were even due to be paid.  Of that, January and February were

included in the May netting statement, leaving only March arguably overdue independent of the

netting.  In any event, with no breach declared, ETFMG was fully within its rights to terminate

the PSAs based on valid, unrelated grounds.

*Second*, ETFMG's practice of netting was not inherently a breach of any contract.

The type of "netting" or "setoff" ETFMG employed is expressly permitted by the law.  *See In re

Garden Ridge Corp.*, 386 Fed. Appx. 41, 43 (3d Cir. 2010) ("Setoff rights arise under the

common law of equity and 'allow [ ] entities that owe each other money to apply their mutual

debts against each other, thereby avoiding the absurdity of making A pay B when B owes A.'")

(quoting *Citizens Bank v. Strumpf*, 516 U.S. 16, 19 (1995)).

While Nasdaq has complained that netting Wholesaling Expenses against Fund

Profit deprived it of the opportunity to challenge disputed charges, this is a non-issue because (1)

ETFMG corrected errors brought to its attention (*e.g.*, DX-210, April 10, 2017 Freire email that

ETFMG double-charge error was resolved once it was brought to its attention) and any further

errors may be corrected in a final true-up; (2) most of the disputed items were immaterial and, in

any event, types and categories of expenses that ISE customarily approved without question

- 41 -

(*e.g.*, Tr. 1104:19-1106:3, 1142:7-11, 1143:3-10) (Monaco testimony regarding preapproval not needed for certain types of expenses, as signed off on by superiors at ISE); and (3) the only material item in dispute – the number of wholesalers – was agreed to between ETFMG and ISE and could not be reduced without agreement of the parties. *See* above at 27-28.

*Third*, ETFMG is not arguing that the conflict of interest inherent in Nasdaq's simultaneous involvement with HACK and CIBR was, in and of itself, a breach of fiduciary duty, a breach of contract, or a statutory or regulatory violation. However, Nasdaq's refusal to acknowledge and failure to adequately address the consequences of that conflict, or to engage constructively to address issues with maintenance of the HACK index, constituted a breach of the duty of good faith and fair dealing implicit in the Sublicense Agreement and an additional ground for termination of the PSAs. *See* D.E. 50, at 15-17.

As discussed above at 15-17, the conflict of interest into which Nasdaq stepped upon acquiring ISE presented a serious ethical problem under industry standards. Nasdaq could have ameliorated this problem by, among other things, putting control of the HACK and CIBR indexes under completely separate chains of command and working with ETFMG to address its concerns about the HACK index and – in particular – one of the issues that gave CIBR a structural advantage over HACK, *i.e.*, its greater implied liquidity. Nasdaq failed to take any such steps, however, leaving HACK under the control of Mr. Gedeon – a key architect of the strategy to help CIBR "hack HACK" (DX-57) – and failing to engage constructively with ETFMG over its issues. By failing to make any improvements in the HACK index, Nasdaq essentially locked in the competitive advantage that CIBR had enjoyed at the time of the acquisition. Tr. 1821:8-22 (Gedeon testimony that, pre-acquisition, he believed CIBR's index had a competitive advantage over HACK's index, and that Nasdaq froze indexes for CIBR and

HACK in place throughout the relationship with ETFMG).[19]  Nasdaq also actively *opposed*
cutting HACK's management fee to make it more competitive with CIBR, through an
inappropriate and threatening lawyer's letter sent to the Trust.  *See* above at 15-17.

It was this conduct, not the mere existence of the conflict of interest, that violated
Nasdaq's duty of good faith and fair dealing to ETFMG.  Together with Nasdaq's sordid conduct
in refusing to confirm whether it would continue supplying contractually mandated access to the
indexes and then actually cutting off access to crucial index files during trading hours (and lying
about it to ETFMG), this conduct amounted to a breach of the duty of good faith and fair dealing
that denied ETFMG the benefit of its bargain under the Sublicense Agreement.  *See* D.E. 50, at
15-17.  Because this conduct also threatened to impact the Trust and the funds, it provided
further basis for termination of the PSAs (or, in the case of Nasdaq's later index shenanigans,
confirmation during the cure period that ETFMG had been justified in terminated the PSAs).

Thus, while ETFMG is not arguing that the mere existence of the conflict of
interest was a contract violation relieving it of the obligation to pay HACK profits pursuant to its
oral agreement and IPAY profits pursuant to the IPAY PSA, it is part of the overall fact pattern
that ultimately justified ETFMG in terminating these agreements in May and June 2017.

## IV.  ETFMG IS ENTITLED TO RECOVER FUTURE DAMAGES FOR NASDAQ'S IMPROPER REPUDIATION OF THE WHOLESALING AGREEMENT

Although Nasdaq arguably breached the Wholesaling Agreement when it began in
the Fall of 2016 to challenge and delay categories of expenses that had been approved and agreed

---

[19] Mr. Gedeon's testimony regarding the existence (or non-existence) of CIBR's edge was curious.  *See*
Tr. 1821:23-1824:17 (Q: "On June 29 you believed that your index has a competitive advantage over
HXR?"  Gedeon: "Yes."  Q: "You no longer believe[d] that two days later even though the two
methodologies are identical?"  Gedeon: "Yes.").  Mr. Gedeon acknowledged reaching out to First Trust to
discuss promoting CIBR versus HACK immediately after HACK moved index providers. Tr. 1835:1-
1836:7.

to by ISE, ETFMG alleges a formal breach only from the date of Nasdaq's July 11, 2017 letter

purporting to terminate the agreement on seven specified grounds.  DX-287.   On August 2,

2017, ETFMG responded to Nasdaq's letter, demonstrating that each of the seven purported

grounds was pretextual or immaterial.  DX-295, at 2-6.  Nasdaq never responded.

       In its letter, ETFMG noted that Nasdaq's letter was itself a violation of Sections

7(c) and 7(d) of the Wholesaling Agreement, thus putting Nasdaq on notice that ETFMG viewed

the Nasdaq letter as a breach of the Wholesaling Agreement.  *Id.* at 1.  ETFMG also stated that it

"[was] of the view that the [Wholesaling] Agreement continue[d] to be in effect[.]  *Id.* at 6.

       ETFMG's claim for repudiation and breach of the Wholesaling Agreement is not

affected by Nasdaq's claims of breach of any of the other contracts at issue in this dispute, for

two separate reasons.  *First*, as discussed above in Point III, Nasdaq never gave notice of and an

opportunity to cure any breach of ETFMG's payment obligations.  *Second*, the contracts under

which Nasdaq claims a right to fund profits are separate from the Wholesaling Agreement, have

their own separate terms and termination provisions, and cover different subject matters.  For

example, the Wholesaling Agreement, unlike the PSAs, is not limited to the PureFunds ETFs but

involves other ISE-Supported funds and even Third-Party funds.

       With respect to the damages due for Nasdaq's breach of the Wholesaling

Agreement, the most reasonable basis remains as stated in ETFMG's PFF at ¶¶ 156-65.  ETFMG

seeks damages based on the lower of Dr. May's two calculations, derived from the actual

expenditures in the period prior to the breach, and limited by the salary cap of $500,000 for four

agreed wholesalers, or an annual total of $765,891 including other expenses.  DX-800 (May

Report), ¶¶ 24-29.  The testimony at trial confirmed that the parties intended that the Platform

would exist in perpetuity.  Tr.889:14-20 (Monaco: "This was meant to be a long-term strategic

investment."); Tr. 1541:16-19 (Masucci).  It also established that ISE agreed to expand the

Platform to four wholesalers, binding Nasdaq unless the parties agreed to change the Platform

again.  *See* above at 26-28.  The annual cost of $765,891 is conservative as a going forward

number assuming the parties had proceeded in good faith.

      Dr. May appropriately calculated the present value of the expected future

payments under the Wholesaling Platform using a standard perpetuity analysis.  DX-800, ¶¶ 36-

39.  He employed a discount rate that Nasdaq's own expert agreed was appropriate to measure

the risk that Nasdaq would fail to discharge its contractual obligation to fund the Wholesaling

Platform.  *Id.* ¶¶ 43-35; Tr. 2225:23-2225:1 (Juneja).  Dr. May applied a similar analysis to

calculate the present value of AUM-based fees.  *See* DX-800, ¶ 33.[20]

      Finally, Nasdaq's argument that ETFMG cannot recover damages based on future

wholesaling salaries and expenses because it supposedly could avoid those expenses by firing its

staff and shutting down the Wholesaling Platform (Response to Defendants' Pretrial

Memorandum of Law at 24-25) makes no sense.  Nasdaq relies on *lost profit* cases, which

logically provide that a plaintiff may claim as damages only the *profits* it would have made from

---

[20] Analyzing damages in perpetuity is appropriate because Nasdaq did not have the ability to terminate the Wholesaling Platform unless total AUM on the Platform went below $100 million.  *See* JX-11 (Wholesaling Agreement), at § 9(b).  Based on the facts existing at the time of Nasdaq's breach, it was not reasonable to assume that this would ever occur.  The combined AUM of funds on the Platform as of the breach date was more that $500 million – and, significantly, more than $300 million of that was in Third-Party funds *not* sponsored by ISE, which Nasdaq had no power to remove from the Platform.  *See* PFF ¶¶ 157-58; DX-848 (AUM chart).  It is not disputed that at all relevant times the Third-Party ETFs on the Platform have had combined AUM above $100 million.  Indeed, the most recent information available, for February 2019, showed that the three current Third-Party ETFs – RISE, ETHO, and ITEQ – had combined AUM of approximately $134 million.  DX-848.  RISE has been in existence more than four years and the other two for more than three years.  *Id.*  In view of Dr. Juneja's testimony that funds surviving at least a few years tend to go on indefinitely (Juneja Aff. ¶ 56), there is no reason to believe that they will not continue to grow at a reasonable rate and remain comfortably over the cancellation threshold – supporting the reasonableness of Dr. May's perpetuity analysis.

a breached contract, not the gross revenue it would have received, without accounting for expenses that would have been necessary to *generate* that profit. *See VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273 (3d Cir. 2014). This rule actually applies to *Nasdaq's* damages claim – where its projections of future HACK profits must be reduced, among other things, to account for replacing the marketing that would have been conducted by the Platform. *See* Point V below. But this principle has no logical application to *ETFMG's* damages. ETFMG seeks to enforce the right to have Nasdaq support a Wholesaling Platform that would, in turn, drive AUM growth and generate fees and profits for both parties. Thus, the wholesaling expenses *themselves* are not the lost profits. Treating them as such would be nonsensical – and would also essentially render the Wholesaling Agreement unenforceable, because ETFMG would have no remedy for Nasdaq's breach. If, as happened here, ETFMG continued to maintain the Platform at its own expense (Tr. 1678:23-1679:8 (Masucci)), Nasdaq would say it failed to mitigate damages; if it shut down the entire operation, Nasdaq would say there *were* no damages – although either way ETFMG would be deprived of the benefit of its bargain. There is no evidence that the parties intended to render the contractual obligation a nullity in this way.

## V.   NASDAQ SEEKS INFLATED DAMAGES AND UNAVAILABLE EQUITABLE RELIEF

### A.   Damages for Future ETF Profits Should be Limited to Amounts That Can be Projected with Reasonable Certainty

If Nasdaq's right to HACK profits existed regardless of the written contracts, this right ended upon the termination of the PSAs on July 31, 2017 and results in damages of no more than $2.8 million. Assuming, *arguendo*, that Nasdaq is entitled to any fund profit for the period after July 31, 2017, the amounts claimed are significantly inflated for several reasons. *See* PFF ¶¶ 166-73; DX-839 (May Rebuttal Report) ¶¶ 21-49.

At the outset, if the Court were to base such liability on the Index License

Agreement, Nasdaq's damages would be subject to that agreement's limitation of liability

provision.  JX-1, at § 7(E).  This section expressly limits any party's damages to the amount of

fees "actually paid" by the opposing party during the previous twelve months before "the act or

omission giving rise to the loss."  *Id.*  While the Court has held that ETFMG lacked standing to

enforce PureFunds' *rights* under the Index License Agreement (D.E. 50, at 13), Section 7(E)

operates not as a right of PureFunds but as a built-in limitation of Nasdaq's *remedy*.  ETFMG

paid Nasdaq Fund Profit through December 2016.  Accordingly, Nasdaq's damages for

ETFMG's breach of the Index License Agreement (had such a breach occurred) would be limited

to $3,811,072.25, the sum of Fund Profit ETFMG paid in calendar year 2016.  JX-190-200, 202.

But even if that cap did not apply, Dr. Juneja's projections are grossly inflated.

Dr. Juneja has already essentially conceded ETFMG's core argument on this point – that fee

compression will almost certainly continue to reduce the profit margins going forward – by

reducing her most aggressive projection for future (post-November 2018) ETF profits from

approximately $94 million to approximately $77 million.  However, that takes into account only

the initial 47 bps fee for the iShares cybersecurity ETF that Blackrock has created to compete

with HACK and CIBR.  The uncontradicted evidence shows a strong trend towards fee

compression that is likely to continue intensifying.  *See* PFF ¶ 168; May Aff. ¶¶ 14-16; DX-195

(fee compression presentation to Trust); DX-609-612 (financial press articles on fee

compression).  As a result, HACK's profit margin (and likely IPAY's too) will almost certainly

continue to shrink – rendering any future projection of profits speculative.

This problem is exacerbated by the fourteen-year horizon Dr. Juneja selected for

her most aggressive post-November 2018 projections.  Using her projected five-year profit figure

of approximately $35 million as the starting point reduces (but does not eliminate) the long-term

concern about future fee compression.  PX-2050.  That number should be adjusted to take account of several issues with Dr. Juneja's analysis:

- A reduction of another $4 million would be reasonable to account for likely additional fee compression in the next five years.[21]

- This amount should be further reduced by approximately $3.5 million to eliminate GAMR and IFLY profits, to which Nasdaq forfeited any rights when it acceded to the termination of the PSAs for those funds as of July 31, 2017.  PFF ¶ 70.

- Nasdaq's damages should be further reduced to provide for a more realistic projection of AUM growth, particularly given the likely future dominance of iShares' new fund in accumulating AUM.  While Dr. Juneja assumed that HACK would grow at a 25 percent rate in its fifth year and continue to grow at approximately 11% thereafter, applying the more reasonable growth rates based on the median ETFs in the FactSet database (9.37 and 3.98 percent respectively) reduces that five year projection by approximately another $10.7 million.[22]

- Nasdaq's damages also must be offset by the amounts it presumptively would have to spend to replace the marketing conducted through the Wholesaling Platform – or approximately $6.8 million for a five-year period based on the lower FactSet AUM growth rates. DX-839 (May Rebuttal Report), at ¶ 49.  While Dr. Juneja suggested that accounting for such expenditures was unnecessary because other parties may have been involved in marketing the

---

[21] Dr. Juneja reduced her five-year projection by $7,341,400 based on a presumed reduction in the HACK management fee from 60 to 47 bps, or $564,723 per basis point.  Assuming, conservatively, that future fee compression pushes the HACK fee down only another 7 bps, to 40 bps, that would mean a reduction in future projected present value profits for the five-year period of approximately $3.95 million.

[22] Dr. May calculated the reduction in damages for the five-year period at approximately $13 million based on the original profit margin; we have adjusted the reduction downward in rough proportion to the 18 percent decrease in Dr. Juneja's five-year projection based on the 47 bps management fee.

PureFunds ETFs (Juneja Aff. ¶ 40), Nasdaq nevertheless rationally spent more than $2.8 million

to support the Wholesaling Platform alongside those other marketing efforts.  There is no dispute

that HACK remained on the Platform until the parties' relationship terminated, and that despite

the June 2016 "removal" of IPAY from the Platform (which simply meant that ETFMG stopped

charging Nasdaq AUM-based fees), ETFMG's wholesalers never stopped marketing IPAY as

part of the overall suite of funds.  Tr. 1509:1-15 (Masucci).

Together, these reductions bring the five year projected profit total down to

approximately $10 million – which represents the highest reasonable projection of Plaintiffs'

post-November 2018 lost profits.

### B.       The Equitable Relief Sought by Nasdaq is Neither Proper Nor Available

Finally, Nasdaq's request for injunctive relief requiring Defendants to "direct the

ETFMG trust to transfer oversight of the legacy PureFunds ETFs to another trust identified by

Nasdaq and consented to by PureShares to oversee and operate these funds" (Nasdaq PFF  ¶

344(c)) is a non-starter.  Under New York law, "it is basic that equitable relief will not be

granted where an adequate remedy at law exists."  *See SCM Corp. v. Xerox Corp.*, 507 F.2d 358,

363 (2d Cir. 1974); *see also Soley v. Wasserman*, No. 08 Civ. 9262, 2013 WL 5780814, at *1

(S.D.N.Y. Oct. 24, 2013) ("a court may not grant equitable relief unless it first determines that

the party seeking equitable relief has no adequate legal remedy") (citations and quotations

omitted).  Nasdaq has made no such showing.

Even more fundamentally, ETFMG has no power to "direct" the Trust (and in

particular the independent Trustees) to do anything.  Under the '40 Act, ETFMG as advisor

works for and serves at the pleasure of the Trust, not the other way around.  DX-804 (Chambers

Report) ¶¶ 22-23, 28-29.

Finally, Nasdaq chose not to sue the Trust or the independent Trustees.  A transfer of any legacy PureFund ETF to a different trust requires the majority vote of trustees pursuant to the Trust's Declaration of Trust ((DX-1, at Article VIII, Section 2) and, if it involves a change in the ETF's investment adviser, Section 15 of the '40 Act requires the vote of a majority of the independent trustees and a majority of the ETF's outstanding voting securities.  Because the Trust itself is not a party to this action, the Court lacks the power to order Nasdaq's desired outcome.  "[I]t is fundamental that equitable relief pursuant to Fed. R. Civ. P. 65(b) requires a complaint against the party over whom the court has personal jurisdiction and against whom equitable relief is sought."  *Jones v. J.C. Penney's Dep't Stores, Inc.*, No. 03-CV-0920A, 2005 WL 1313442, at *2 (W.D.N.Y. May 31, 2005).

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should find in favor of ETFMG on all pending claims; award ETFMG appropriate damages for breach of the Wholesaling Agreement; and award such other and further relief as justice may require.

Dated:  New York, New York
      June 25, 2019

KRAMER LEVIN NAFTALIS &
 FRANKEL LLP

/s/ Brian J. Fruehling           By: /s/ John P. Coffey
14 Main Street, Suite 300         John P. Coffey
Madison, NJ  07940             Jeffrey S. Trachtman
Tel: (973) 377-0505             Michael J. Calb
                                       Leah S. Friedman
                                       1177 Avenue of the Americas
                                       New York, New York 10036
                                       Tel: (212) 715-9100

*Attorneys for Defendants/Counterclaim-Plaintiffs*