## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **NASDAQ, INC.** | |
| **Plaintiff,** | **CIVIL ACTION NO. 1:17-CV-08252-PAE** |
| **v.** | |
| **EXCHANGE TRADED MANAGERS GROUP, LLC,** | |
| **ETF MANAGERS GROUP, LLC, AND** | |
| **SAMUEL MASUCCI** | |
| **Defendants.** | |

## NASDAQ, INC.'S POST-TRIAL MEMORANDUM OF LAW

Date:  June 25, 2019

Justin W. Lamson
  lamsonjw@ballardspahr.com
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, New York  10019
Tel:  212.223.0200
Fax:  212.223.1942

Stephen J. Kastenberg*
  kastenberg@ballardspahr.com
David L. Axelrod*
  axelrodd@ballardspahr.com
Lindsey Zionts*
  ziontsl@ballardspahr.com
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania  19103
Tel:  215.665.8500
Fax:  215.864.8999
*Admitted pro hac vice*

*Attorneys for Plaintiff, Nasdaq, Inc.*

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ..................................................................................IV

INTRODUCTION ........................................................................................... 1

FACTS OF THE CASE....................................................................................... 4

ARGUMENT ................................................................................................... 5

    I.    Nasdaq Has Two Contractual Bases for Its Entitlement to Profits from the
PureFunds ETFs .............................................................................. 5

        A.    Nasdaq Has a Contractual Right to the Profits from the PureFunds
ETFs Through the Index License and Sublicense Agreement................... 6

            1.    ETFMG's payment obligation is unambiguous............................. 7

            2.    Extrinsic evidence confirms ETFMG's obligation to pay
profits under the Sublicense Agreement ........................................ 9

                a.    The PureFunds ETFs' prospectus stated that
ETFMG pays ISE a license fee ........................................... 9

                b.    In 2016, ETFMG told the SEC that ETFMG pays
ISE HACK profits due to the Index License ................... 10

        B.    Nasdaq Has a Contractual Right to HACK Profits Through the
HACK PSA ...................................................................................... 12

            1.    The HACK PSA obligates ETFMG to pay HACK profits ........... 12

            2.    Nasdaq has a right to enforce this obligation as an intended
beneficiary of the HACK PSA.................................................... 15

            3.    If ISE did not initially have a right to enforce receipt of
HACK profits, the parties modified the HACK PSA to
provide that right....................................................................... 16

            4.    Mr. Masucci's testimony that ETFMG only paid ISE
HACK profits because of a stand-alone oral agreement
should be rejected ...................................................................... 18

        C.    Nasdaq's Rights to Profits from the Remaining PureFunds ETFs,
Including IPAY, Are Explicitly Spelled Out in the Relevant PSAs......... 19

II.  ETFMG Breached its Contractual Obligations to Pay Nasdaq the Profits on the Three Profitable ETFs ............................................................................ 19

    A.  ETFMG Breached Its Payment Obligations for HACK and IPAY Shortly After Nasdaq Acquired ISE ............................................. 19

        1.  ETFMG first breached its contractual obligations by delaying HACK payments in 2016 .............................................. 20

        2.  ETFMG further breached its contractual obligations when it decided to stop paying HACK and IPAY profits in early 2017 ...................................................................................... 21

    B.  ETFMG's Bad Faith Termination Letters Do Not Excuse Its Breaches of the Parties' Contracts ............................................. 23

    C.  ETFMG Breached Its Contractual Obligations When It Continued to Operate and Profit from the PureFunds ETFs After Supposedly Terminating the PSAs ........................................................................ 27

    D.  Nasdaq Had No Obligation to Provide ETFMG Notice of Its Failure to Pay HACK and IPAY Profits in 2016/2017 ........................... 27

    E.  ETFMG Breached Its Obligation to Pay SILJ Profits Immediately After the Acquisition ................................................................... 28

    F.  Andrew Chanin Did Not Breach the PureFunds PSAs, and His Conduct is Irrelevant to Nasdaq's Rights to Recover for ETFMG's Breaches ...................................................................................... 30

III.  ETFMG Breached the Wholesaling Agreement ................................................. 33

    A.  ETFMG Breached the Wholesaling Agreement by Netting Expenses that Nasdaq Did Not Approve and Otherwise Did Not Have to Pay ...................................................................................... 33

    B.  ETFMG Breached the Wholesaling Agreement by Failing to Split Revenue from Third-Party ETFs and by Exceeding Contractual Expense Caps ...................................................................................... 36

    C.  ETFMG Breached the Wholesaling Agreement by Using a Subsidiary to Act as Statutory Distributor ......................................... 37

    D.  ETFMG's Termination of ISE's Interest in PureFunds ETFs Was a Breach of the Wholesaling Agreement ...................................... 38

IV.  Nasdaq is Entitled to Recovery on Its Non-Contract Claims ............................. 39

V.  ETFMG Cannot Prevail on Its Counterclaims ..................................................... 40

    A.  Nasdaq Did Not Breach the Wholesaling Agreement by
        Terminating It ........................................................................................... 40

        1.  ETFMG never alleged an earlier breach of the Wholesaling
            Agreement .................................................................................. 41

        2.  ETFMG's claim for damages from the Wholesaling
            Agreement is, in any event, limited ........................................... 41

        3.  A purported breach by Nasdaq of the Wholesaling
            Agreement does not allow ETFMG to forgo payment of
            profits to ISE ............................................................................. 44

    B.  Nasdaq Met Its Duty of Good Faith and Fair Dealing ............................. 46

RELIEF REQUESTED ...................................................................................................... 48

    I.  Nasdaq is Entitled to Approximately $10.8 Million in Retrospective
      Damages, and Approximately $94 Million in Prospective Damages .................. 48

    II.  Nasdaq is Entitled to Prejudgment Interest on its Retrospective Damages .......... 52

    III.  The Extensive Pattern of Misconduct by ETFMG and Its Principals
       Supports Entry of an Award of Punitive Damages and Injunctive Relief ........... 54

    IV.  Nasdaq is Entitled to Punitive Damages in Contract and in Tort ........................ 57

    V.  The Court Should Protect Nasdaq's Interests Through Injunctive Relief ............ 59

        A.  Imposition of a Constructive Trust is Needed to Prevent ETFMG
           From Interfering with Nasdaq's Profit Interest in the PureFunds
           ETFs ........................................................................................................ 59

        B.  ETFMG Should be Enjoined from Involvement in the PureFunds
           ETFs ........................................................................................................ 61

CONCLUSION ................................................................................................................. 65

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*,
727 F. Supp. 256 (S.D.N.Y. 2010) ................................................................52, 53

*In re Best Payphones, Inc.*,
2007 Bankr. LEXIS 1677 ...........................................................................26

*Broad. Music, Inc. v. Prana Hosp., Inc.*,
158 F. Supp. 3d 184 (S.D.N.Y. 2016).............................................................62

*Christ v. Cormick*,
No. 06-275-GMS, 2008 U.S. Dist. LEXIS 92770, at *8-9 (D. Del. Nov. 10,
2008) ..............................................................................................57

*City of New York v. Gordon*,
1 F. Supp. 3d 94 (S.D.N.Y. 2013) ..............................................................62

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*,
631 F.3d 42 (2d Cir. 2011)........................................................................46

*Doubleline Capital LP v. Odebrecht Fin., Ltd.*,
323 F. Supp. 3d 393 (S.D.N.Y. 2018)..........................................................56

*ESPN, Inc. v. Office of the Comm'r of Baseball*,
76 F. Supp. 2d 383 (S.D.N.Y. 1999)...........................................................28

*Federated Strategic Income Fund v. Mechala Grp. Jam. Ltd.*,
No. 99-cv-10517, 1999 U.S. Dist. LEXIS 16996 (S.D.N.Y. Nov. 1, 1999) ...........................61

*Getty Petrol. Corp. v. Island Transp. Corp.*,
878 F.2d 650 (2d Cir. 1989).......................................................................58

*Graham v. James*,
144 F.3d 229 (2d Cir. 1998).......................................................................52

*Hutton v. Klabal*,
726 F. Supp. 57 (S.D.N.Y. 1989) ................................................................58

*JP Morgan Chase Bank, N.A. v. IDW Group, LLC*,
08 Civ. 9116 (PGG), 2009 WL 321222 (S.D.N.Y. Feb. 9, 2009) .........................................46

*Kapsis v. Am. Home Mortg. Servicing Inc.*,
923 F. Supp. 2d 430 (E.D.N.Y. 2013) ...........................................................46

*In re Koreag, Controle et Revision S.A.*,
    961 F.2d 341 (2d Cir. 1992) ........................................................................59

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    No. 11 MDL 2262 (NRB), 2015 U.S. Dist. Lᴇxɪs 147561 (S.D.N.Y. Oct. 19,
    2015) ...........................................................................................................59

*Mallis v. Bankers Tr. Co.*,
    717 F.2d 683 (2d Cir. 1983) ........................................................................52

*Martin v. Campanaro*,
    156 F.2d 127 (2d Cir. 1946) ........................................................................29

*Maryland Cas. Co. v. Bd. of Educ.*,
    20 F.2d 799 (3d Cir. 1927) ..........................................................................45

*Moon Express, Inc. v. Intuitive Machs.*,
    LLC, No. 16-cv-344, 2017 U.S. Dist. Lᴇxɪs 155487 (D. Del. Sept. 22, 2017) ......................45

*New Castle Cty., Del. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
    174 F.3d 338 (3d Cir. 1999) ........................................................................14

*New York State NOW v. Terry*,
    886 F.2d 1339 (2d Cir. 1989) ......................................................................61

*Quantum Corporate Funding, Ltd. v. Assist You Home Health Care Servs. of Va.,
    L.L.C.*,
    144 F. Supp. 2d 241 (S.D.N.Y. 2001) .........................................................62

*Republic of Philippines v. Marcos*,
    806 F.2d 344 (2d Cir. 1986) ........................................................................61

*Rothenberg v. Lincoln Farm Camp, Inc.*,
    755 F.2d 1017 (2d Cir. 1985) ........................................................................8

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010) ..........................................................................61

*Samad v. Goldberg*,
    No. 12cv5459 (DLC), 2016 U.S. Dist. Lᴇxɪs 157217 (S.D.N.Y. Nov. 14,
    2016) ...........................................................................................................22

*Sharette v. Credit Suisse Int'l*,
    127 F. Supp. 3d 60 (S.D.N.Y. 2015) ...........................................................50

*Smith v. New Castle Cty. Vocational-Technical Sch. Dist.*,
    574 F. Supp. 813 (D. Del. 1983) .................................................................57

*Ticor Title Ins. Co. v. Cohen*,
  173 F.3d 63 (2d Cir. 1999)......................................................................................61

*Travellers Int'l AG v. Trans World Airlines*,
  722 F. Supp. 1087 (S.D.N.Y. 1989)........................................................................62

*United States v. Lennox Metal Mfg. Co.*,
  131 F. Supp. 717 (E.D.N.Y. 1954) .........................................................................26

*VICI Racing, LLC v. T-Mobile USA, Inc.*,
  763 F. 3d 273 (3d Cir. 2014)........................................................................41, 42, 44

*Weyerhaeuser Co. v. Domtar Corp.*,
  204 F. Supp. 3d 731 (D. Del. 2016)........................................................................36

*Wolff v. Rare Medium, Inc.*,
  171 F. Supp. 2d 354 (S.D.N.Y. 2001)......................................................................47

## State Cases

*Adams v. Jankouskas*,
  452 A.2d 148 (Del. 1982) ........................................................................................59

*Agilent Techs. v. Kirkland*,
  C.A. No. 3512-VCS, 2010 Del. Ch. LEXIS 34 (Del. Ch. Feb. 18, 2010) ..............57

*Ajettix Inc. v. Raub*,
  804 N.Y.S.2d 580 (N.Y. Sup. Ct. 2005) .................................................................25

*Atlanta & S. A. B. R. Co. v. Thomas*,
  53 So. 510 (Fla. 1910)..............................................................................................33

*Auriga Capital Corp. v. Gatz Props., LLC*,
  40 A.3d 839 (Del. Ch. 2012)....................................................................................25

*Axis Reinsurance Co. v. HLTH Corp.*,
  993 A.2d 1057 (Del. 2010) ......................................................................................13

*BAE Sys. N. Am. Inc. v. Lockheed Martin Corp.*,
  C.A. No. 20456, 2004 Del. Ch. LEXIS 119 (Del. Ch. Aug. 3, 2004) ................12, 14

*Brand v. Ogden-Howard Co.*,
  111 A. 370 (Del. 1920) ............................................................................................28

*Cantor Fitzgerald, L.P. v. Cantor*,
  No. 16297, 2000 Del. Ch. LEXIS 43 (Del. Ch. Mar. 13, 2000) .............................17

*Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co.*,
  166 A.3d 912 (Del. 2017) ....................................................................................13, 14

*Comrie v. Enterasys Networks, Inc.*,
   No. CIV. A. 19254, 2004 Del. Ch. LEXIS 196 (Del. Ch. Feb. 17, 2004) ........................15, 32

*Delphi Petrol., Inc. v. Magellan Terminal Holdings, L.P.*,
   No. 47, 2017, 2017 Del. LEXIS 511 (Del. Dec. 12, 2017) ........................................53

*E.I. DuPont de Nemours and Co. v. Pressman*,
   679 A.2d 436 (Del. 1996) ........................................................................57

*Fabcon E., L.L.C. v. Steiner Bldg. Co. NYC, LLC*,
   No. 24639/02, 2005 N.Y. Misc. LEXIS 2960 (N.Y. Sup. Ct. Dec. 12, 2005) ........................52

*Gee v. Zee Ying Wong*,
   29 N.Y.S.3d 847 (N.Y. Sup. Ct. 2015) ............................................................20

*Global Energy Fin. LLC v. Peabody Energy Corp.*,
   No. 08C-10-129 RRC, 2010 Del. Super. LEXIS 430 (Del. Super. Ct. Oct. 14,
   2010) ........................................................................................15, 32

*Good v. Moyer*,
   No. N12C-03-033, 2012 Del. Super. LEXIS 453 (Del. Super. Ct. Oct. 10,
   2012) ..........................................................................................16

*iBIO, Inc. v. Fraunhofer USA, Inc.*,
   No. 10256-VCMR, 2016 Del. Ch. LEXIS 113 (Del. Ch. Jul. 29, 2016) ..............................38

*In re Lipper Holdings, LLC*,
   766 N.Y.S.2d 561 (1st Dep't 2003) ................................................................8

*Majkowski v. Am. Imaging Mgmt. Servs.*,
   913 A.2d 572 (Del. Ch. 2006) ....................................................................13

*Matthew v. Laudamiel*,
   No. 5957-VCN, 2012 Del. Ch. LEXIS 145 (Del. Ch. Jun. 29, 2012) ..............................30, 32

*McDougald v. Garber*,
   536 N.E.2d 372 (N.Y. 1989) ......................................................................58

*Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*,
   No. 5589-VCP, 2014 Del. Ch. LEXIS 106 (Del. Ch. Jun. 25, 2014), *aff'd*, 116
   A.3d 1244 (Del. 2015) ...........................................................................38

*Nash v. Blessing*,
   439 S.E.2d 393 (Va. 1994).........................................................................33

*Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc.*,
   297 A.2d 28 (Del. 1972) ..........................................................................16

*Peter R. Friedman, Ltd. v. Tishman Speyer Hudson Ltd. P'ship*,
    968 N.Y.S.2d 41 (1st Dep't 2013) ........................................................47

*PharmAthene, Inc. v. SIGA Techs., Inc.*,
    Civil Action No. 2627-VCP, 2011 Del. Ch. LEXIS 136 (Del. Ch. Sept. 22,
    2011), *rev'd in part on other grounds*, 67 A.3d 330 (Del. 2013) ...........................59

*Schneider v. Wien & Malkin LLP*,
    No. 601363/02, 2004 N.Y. Misc. LEXIS 2044 (N.Y. Sup. Ct. Nov. 1, 2004) .........................25

*Segovia v. Equities First Holdings, LLC*,
    2008 Del. Super. LEXIS 197 (Del. Super. Ct. May 30, 2008) ................................57

*Simon-Mills II, LLC v. Kan Am United States XVI Ltd. P'ship*,
    No. 8520-VCG, 2017 Del. Ch. LEXIS 50 (Del. Ch. Mar. 30, 2017) .....................................36

*Tackett v. State Farm Fire & Casualty Ins. Co.*,
    653 A.2d 254 (Del. 1995) ...................................................................56, 57

*TWA Res. v. Complete Prod. Servs.*,
    No. N11C-08-100 MMJ CCLD, 2013 Del. Super. LEXIS 112, at *23 (Del.
    Super. Ct. 2013) ......................................................................................22

*Union Oil Co. v. Mobil Pipeline Co.*,
    No. 19395-N, 2006 Del. Ch. LEXIS 213 (Del. Ch. Dec. 15, 2006) ......................37

*UtiliSave, LLC v. Miele*,
    No. 10729-VCP, 2015 Del. Ch. LEXIS 242 (Del. Ch. Sept. 17, 2015) ....................38

*Walker v. Res. Dev. Co., L.L.C.*,
    791 A.2d 799 (Del. Ch. 2000).........................................................................59

*Watts v. Columbia Artists Mgmt., Inc.*,
    591 N.Y.S.2d 234 (N.Y. App. Div. 1992) ..............................................29

*Westbury Post Ave. Assocs. v Great Atl. & Pac. Tea Co.*,
    361 N.Y.S.2d 377 (N.Y. App. Div. 1974), *aff'd*, 346 N.E.2d 548 (N.Y. 1976) ......................8

*Zayo Grp., LLC v. Latisys Holdings, LLC*,
    No. 12874-VCS, 2018 Del. Ch. LEXIS 540 (Del. Ch. Nov. 26, 2018).........................12, 13, 20

**Federal Statutes**

18 U.S.C. § 1001 ...................................................................................12

SECURITIES ACT of 1933, § 17(a) ...........................................................10

SECURITIES EXCHANGE ACT of 1934, § 10(b) .................................................10

**State Statutes**

6 DEL. CODE ANN. § 2301............................................................................................53

**Rules**

N.Y. C.P.L.R. § 5001(b) ............................................................................................52

N.Y. C.P.L.R. § 5004 ................................................................................................53

**Treatises**

RESTATEMENT (SECOND) OF CONTRACTS § 223 ........................................................22

RESTATEMENT (SECOND) OF CONTRACTS § 297 ........................................................33

RESTATEMENT (SECOND) OF CONTRACTS § 298 ........................................................33

RESTATEMENT (SECOND) OF CONTRACTS § 301 ........................................................33

12 WILLISTON ON CONTRACTS § 36.8 (4th ed. West 2012) ........................................33

12 WILLISTON ON CONTRACTS § 36.12 (4th ed. West 2012) ......................................33

## INTRODUCTION

Since 2012, plaintiff Nasdaq, Inc. and its predecessor, International Securities Exchange, LLC ("ISE"), invested millions of dollars under a series of agreements built around the following core business terms:  (i) ISE/Nasdaq would develop indexes, and license index data necessary to operate the "PureFunds"-branded Exchange Traded Funds ("ETFs"), and would fund the expenses to launch and operate those funds, accepting the financial risk of such expenses in exchange for the potential reward of future profits, subject to any profit sharing agreements with ISE/Nasdaq's business partner(s); (ii) PureShares LLC, as ISE's (and then Nasdaq's) business partner in the PureFunds ETFs, would generate ideas for and market the PureFunds ETFs; and (iii) defendant Exchange Traded Managers Group, LLC ("ETFMG") would operate the PureFunds ETFs for a fee on a "white label" or "private label" basis, as a service provider, without financial obligation for the expense of forming and maintaining the PureFunds ETFs, and without a right to profits on any ETF funds that attained profitability.[1]

From 2012, with the launch of the first three PureFunds ETFs, though June 2016, ISE provided the indexes, the index data, and the financing for ten PureFunds ETFs, investing more than $10 million in direct support, in addition to the cost and effort of developing and marketing the indexes undergirding the PureFunds ETFs.  For this entire period, only one PureFunds ETF—stock ticker "HACK," based, as the Court knows, on an index of pure cybersecurity-focused firms—generated any profits.  (In July 2016, a mining-related PureFunds

---

[1]      Defendant Exchange Traded Managers Group, LLC appears to be the corporate parent of defendant ETF Managers Group, LLC, *see* PX-257A, but there is no clear delineation between these two entities.  The PureFunds PSAs, described below, are printed on "ETF Managers Group" letterhead, but they are agreements between Exchange Traded Managers Group, LLC and ISE/PureShares.  *See*, *e.g.*, JX-5.  In these agreements, Exchange Traded Managers Group, LLC is defined as "ETFMG."  *Id*.  For simplicity, "ETFMG" refers to both defendants throughout this Memorandum.

ETF, with the ticker "SILJ," first turned a profit, and another five months later, in December 2016, another PureFunds ETF with the ticker "IPAY" became profitable.)  Each month, regardless of the profitability of the PureFunds ETFs, individually or collectively, ISE funded the ETFs' expenses, including by paying ETFMG's service fees and expenses.  For a time, the converse also was true: after HACK became profitable, each month ETFMG sent HACK profits (approximately $300,000 to $400,000 per month) to ISE promptly after month-end, as ISE, PureShares, and ETFMG all understood would be the case when they entered into the various agreements.

Then, when Nasdaq acquired ISE in June 2016, everything changed.  Although Nasdaq showed every intent of honoring the parties' contracts, ETFMG, hoping to inexpensively buy out Nasdaq, interposed hurdles to hinder the effectuation of the agreements, and then flat out breached them.  First, when SILJ became profitable immediately following Nasdaq's acquisition, ETFMG decided that it would not send the profits to Nasdaq, and claimed the agreement for that ETF terminated almost a year earlier, despite having continued to obtain approval and reimbursement for SILJ costs ***after*** the supposed termination.  Second, that same month, ETFMG established a new administrative hurdle, and required Nasdaq to submit an "invoice" for HACK profits before ETFMG would pay such contractually due profits to Nasdaq, significantly delaying ETFMG's payment of these profits compared to ETFMG's prior, consistent payments to ISE.  Third, a few months later, in early October 2016, ETFMG began "netting" expenses it claimed Nasdaq owed against payments ETFMG owed Nasdaq, based on the knowingly false assertion that Nasdaq had failed to make such payments to ETFMG.  This deprived Nasdaq of its cost approval rights, and imposed on it the cost of a conference expense already rejected by Nasdaq. Fourth, EFTMG never paid Nasdaq a dime of IPAY profits after that ETF became profitable in December 2016, despite not having even the fig leaf of contract arguments it has offered as to

HACK profits.  And finally, ETFMG concedes HACK profits were due until June 2017, but ETFMG first delayed and then, at the beginning of 2017, stopped paying those profits entirely.

All of these decisions, and subsequent conduct, amounted to ETFMG walking away from the parties' business arrangement and agreements, and stealing the profit stream generated by the operation of the PureFunds ETFs.  ETFMG should compensate Nasdaq for the damages its and its principals' decisions caused.

Through all of the testimony and documents introduced at trial, a common thread emerged:  ETFMG, its controlling principal Samuel Masucci, and its President and additional principal, Barnard Karol, believed they could do whatever they wished.  ETFMG could pay Nasdaq profits due under agreements when it wished.  ETFMG could keep over $2 million that it owed Nasdaq.  Despite knowing this amount was owed, ETFMG could represent to this Court and to the New Jersey Superior Court (and to PureShares), that it had paid all amounts due Nasdaq. ETFMG could conceal from Nasdaq the existence of a so-called "oral agreement" that it claimed was Nasdaq's sole basis to receive HACK profits, and then declare Nasdaq in breach of that undisclosed oral agreement.  ETFMG could, as a bare knuckles tactic and without even a pretextual justification, breach the agreements related to the IPAY ETF.  ETFMG could mislead the trustees overseeing the HACK ETF into lowering the ETF's management fee, thereby reducing HACK's profits, to punish Nasdaq, and keep material facts from those trustees about its failure to pay Nasdaq, placing all the PureFunds ETFs at risk.

The other common thread is Mr. Masucci's lack of credibility.  He repeatedly showed himself willing to lie to Nasdaq in the ordinary course of business, to engage in hardball tactics that he was forced to admit under questioning from the Court had no good faith (or contractual) basis, and undoubtedly also violated his fiduciary duties as a trustee of the ETF trust.

At trial, the Court repeatedly admonished Mr. Masucci for his evasiveness on the witness stand. Yet he plowed on, and testified innumerable times inconsistently with other testimony he gave in Court or at his deposition, and with testimony by other witnesses.

The evidence at trial established that ETFMG breached its contractual obligation to pay Nasdaq profits generated from the operation of the PureFunds ETFs, and that Nasdaq also is entitled to recover under legal theories other than breach of contract. Conversely, the evidence established that Nasdaq is not liable to ETFMG for any counterclaim. ETFMG's complaints about Nasdaq's conduct are far overblown, not legally cognizable, and pretexts offered in service of ETFMG trying to avoid its own breaches, and to compel Nasdaq to sell its interest in the PureFunds ETFs to ETFMG on the cheap.

Given ETFMG's pattern and practice of deceit and self-dealing, in addition to an award of compensatory damages to put Nasdaq in the position it would have been had it realized the fruits of its investment in the PureFunds ETFs, the Court has a compelling basis to award Nasdaq punitive damages, and to impose injunctive relief to protect Nasdaq's interests to prevent ETFMG from causing Nasdaq additional harm.

## FACTS OF THE CASE

The relevant factual background of this case is set forth in Nasdaq's accompanying Chronology of Facts, and we will not repeat it here.[2]

---

[2]     Citations in this Memorandum of Law in the form "D.E." are to the Court's docket. Citations in the form "JX", "PX", or "DX" are to the parties' trial exhibits. Citations in the form "Chron." are to Nasdaq's detailed factual chronology, filed contemporaneously with this brief.

## ARGUMENT

### I.   NASDAQ HAS TWO CONTRACTUAL BASES FOR ITS ENTITLEMENT TO PROFITS FROM THE PUREFUNDS ETFS

The evidence at trial overwhelmingly established that Nasdaq has a contractual right to profits from the PureFunds ETFs through two sets of contracts:  (1) the Index License and Exchange-Traded Product Agreement, dated June 18, 2012 (the "Index License"), and Sublicense Agreements to the Index License (collectively, the "Sublicense Agreement"); and (2) each of the SEC '40 Act Platform Services Agreements (the "PSAs") for the PureFunds ETFs.  ETFMG attempts to escape liability for its deliberate breach of contract by arguing its obligation to pay HACK profits was found only in a standalone oral agreement.  But the evidence does not support this contention.  The so-called oral agreement must either be considered an expression of the parties' understanding of the written agreements, or a modification of those agreements regarding the flows of funds.  There is no evidence that any oral agreement altered the contracts' fundamental business terms or termination provisions.

Understanding the roles of the parties is key.  ISE was the index provider and financier of the PureFunds ETFs, and ISE partnered with PureShares to launch these products.  Chron. ¶ 7.  PureShares chose ETFMG to act as the white label service provider for the PureFunds ETFs, to administer day-to-day operations of the ETFs.  Chron. ¶¶ 16-20.  Importantly, because of ETFMG's role as a white label service provider, paid a fee for its service, no one involved in launching the PureFunds ETFs understood or intended that ETFMG was entitled to profits from the ETFs.  Chron. ¶ 20.  ETFMG's obligation was to launch and operate the ETFs, and, if the ETFs produced a profit, to pass that profit to ISE/Nasdaq and PureShares.  Chron. ¶ 17.  All of the contracts at issue in this case are premised on this basic business structure.

**A.     Nasdaq Has a Contractual Right to the Profits from the PureFunds ETFs**
**Through the Index License and Sublicense Agreement**

The Index License established Nasdaq's right to its shares of the profits generated

by operation of the PureFunds ETFs.  The agreement, front and center, in Paragraph 1(a) provides

that ISE is granting PureShares a "royalty-bearing license . . . to use the Index(es) solely in

connection with issuing and listing for trading of the Products, [*i.e.*, the PureFunds ETFs]."  JX-1

at 1.  Schedule I to the Index License specifies how that royalty will be split between Nasdaq and

PureShares from profits generated by GEMS, MSXX, and SILJ, Chron. ¶ 13, and obligates

PureShares to send that profit share to ISE/Nasdaq.  *Id.*

Although ETFMG has made much of the fact that the exact profit split between ISE

and PureShares was redacted in the copy of the Index License it initially received from ISE,

ETFMG knew from the ***unredacted*** language that ISE's royalty was a "Profit Split" in the ETFs.

*See* JX-1A, Schedule I § 1(H).  Equally important, ETFMG knew this profit split was due to ISE,

not just in exchange for its intellectual property, but also because ISE committed to the

"Financing" of "all listing, legal, and regulatory costs and expenses," and, "upon launch," ISE

would "bear all costs and expenses associated with the on-going operation of the PureFunds

[ETFs]."  *See* JX-1A, Schedule I § 1(H)(i).  In exchange,

> the parties agree that they shall each be entitled to share on a fixed basis, all of the
> remaining profit, if any, generated from the PureFunds [ETF] ("Shared Profit").
> ISE and PureShares shall be entitled to respective percentages of all such Shared
> Profit in accordance with the following tiered fee schedule:

JX-1A, Schedule I § 1(H)(iii).  The agreement thus provides, and ETFMG knew when it

signed the sublicense, that (1) ISE was to receive a royalty from PureShares in the form of

a profit split from the operation of the PureFunds ETFs; (2) in exchange for its intellectual

property and financing of the ETF start up and operational costs.

Through supplements to Schedule I, ISE and PureShares added HACK (the "Hack Supplement"), IPAY and BIGD (the "IPAY/BIGD Supplement"), and GAMR (the "GAMR Supplement") to the Index License, and all included analogous provisions about financing and profit splits.  *See* Chron. ¶ 51, 52, 77, 90; *see also* JX-3 § 1(G)(iii) (unredacted); JX-3A §1(G)(iii) (redacted).

In June 2012, ISE and PureShares sublicensed the indexes covered by the Index License to ETFMG in the 2012 Sublicense Agreement.  JX-2.  Through the supplements to the Index License, the parties added additional PureFunds ETFs to the Sublicense Agreement with ETFMG as the ETFs prepared to launch.  *See* Chron. ¶ 61.  In 2015, the parties executed a new version of the Sublicense Agreement virtually identical to the 2012 version, but for including Appendix A.  JX-2A.  That Appendix A stated that it was adding two "New Funds" to the "Existing Funds" comprised of SILJ, HACK, BIGD, and IPAY.  JX-2A at 3.  Appendix A also included a column that described the "Rate" for each of the six funds covered by the 2015 Sublicense Agreement.  *Id.*

Collectively, the Sublicense Agreement gave ETFMG the right to use the indexes licensed to PureShares in exchange for ETFMG agreeing to "be bound by all the provisions of the [Index License], including, without limitation, those provisions imposing any obligations on PureShares."  JX-2 § 2.  This language bound ETFMG to, *inter alia*, pay over to ISE and PureShares profits generated from the operation of the funds based on indexes licensed to ETFMG under the Index License, including SILJ, HACK, IPAY, BIGD, GAMR, and IFLY.  *See* JX-2A.

### 1.    ETFMG's payment obligation is unambiguous

The foregoing language imposing a payment obligation on ETFMG is unambiguous.  Contrary to ETFMG's arguments, it is of no moment that the Sublicense Agreement says that the "Sublicensee acknowledges that it has received and read a copy of the

License Agreement (excluding the Schedule setting forth the license fees) . . . ." *Id.* This language acknowledges that ETFMG received a copy of the Index License that redacted the body of the "tiered fee schedule" showing the profit split among ISE and PureShares, because ETFMG concededly had no need for this information. The acknowledgment refers only to what was factually received; it does not exempt ETFMG from the sublicensee's obligations to pay a royalty in the form of ETF profits.

Moreover, the 2015 Sublicense Agreement's inclusion of the "Rate" information supports the conclusion that the Sublicense Agreement imposed a payment obligation on ETFMG. The "Rate" provided the basis for the calculation of the revenue generated by each of the six funds covered by the Sublicense Agreement. Inclusion of this information would be surplusage without ETFMG's payment obligation. *See Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985) ("an interpretation that gives a reasonable and effective meaning to all the terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect").

In any event, New York law, which governs the Index License and Sublicense Agreement, dictates that contracts are to be read in a way that makes logical, economic sense. *See, e.g.*, *Westbury Post Ave. Assocs. v Great Atl. & Pac. Tea Co.*, 361 N.Y.S.2d 377 (N.Y. App. Div. 1974) (rejecting interpretation that would have "made no economic sense for defendant and would have frustrated defendant's explicit central purpose in entering into the transaction."), *aff'd*, 346 N.E.2d 548 (N.Y. 1976). Reading a payment obligation out of the Sublicense Agreement makes no sense for a number of reasons. First, ISE witnesses testified that ISE devised and licensed indexes for profit. Chron. ¶ 10. Providing a ***free*** sublicense to this valuable intellectual property, developed by ISE, would make no economic sense from ISE's perspective. *See In re Lipper Holdings, LLC*, 766 N.Y.S.2d 561, 562 (1st Dep't 2003) ("contract should not be

interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties").  Second, it would make no sense for PureShares to sublicense its rights to a "royalty-bearing" license without a corresponding payment obligation on its sublicensee.  Indeed, given the profit-split due and owing by PureShares to ISE under the Index License, it would be inconsistent with PureShares' obligation to sublicense without a profit payment obligation applicable to ETFMG, the white label service provider.  Third, it would make no sense for a white label service provider like ETFMG to receive a sublicense with no payment obligation.  As discussed above, all of the parties involved in the PureFunds ETFs uniformly understood that ETFMG would not keep the profits generated by the funds, so it would make little sense to provide ETFMG a license that did not impose an obligation to pay.

> ### 2. Extrinsic evidence confirms ETFMG's obligation to pay profits under the Sublicense Agreement

To the extent the Court finds any ambiguity in the plain language of the Index License or Sublicense Agreement, extrinsic evidence demonstrates that ETFMG had a payment obligation under those contracts.

> #### a. The PureFunds ETFs' prospectus stated that ETFMG pays ISE a license fee

In the HACK prospectus filed with the SEC prior to the HACK launch, ETFMG described the parties' roles, and disclosed it was obligated to pay a license fee to use ISE's indexes and intellectual property:

> The Adviser [ETFMG] has entered into an Agreement with PureShares, LLC (the "Sponsor"), under which the Sponsor agrees to sub-license the use of the Underlying Index to the Adviser and assumes the obligation of the Adviser to pay all expenses of the Fund, except Excluded Expenses.  Although the Sponsor has agreed to be responsible for the payment of certain expenses of the Fund, the Adviser retains the ultimate obligation to the Fund to pay such expenses.  The Sponsor will also provide marketing support for the Fund, including distributing marketing materials related to the Fund.

9

PX-21 at 18 of 102.  Regarding ISE, the HACK prospectus, filed with the SEC by ETFMG, and

subject to the antifraud provisions of the securities laws, *see* Section 17(a) of the Securities Act of

1933; Section 10(b) of the Securities Exchange Act of 1934, stated:

> The ISE Cyber Security Index (Symbol: HXR) (the "ISE Index") is a product of
> ISE.  ***The Adviser [ETFMG] has entered into a license agreement pursuant to
> which the Adviser pays a fee to use the ISE Index and the marketing name and
> licensed trademark of ISE ("Index Trademark").***

PX-21 at 11 of 102 (emphasis supplied).  As the Sublicense Agreement states, the "license fees"

were Nasdaq's share of the PureFunds ETF profits.  This language in the HACK prospectus was

not a mistake or an oversight.  The prospectus filed for IPAY/BIGD and GAMR/IFLY—the other

four funds covered by the Sublicense Agreement—also stated that ETFMG was paying a fee to

use the ISE Index.  *See* Chron. ¶ 83, 96 (quoting PX-22, PX-23).

### b.    In 2016, ETFMG told the SEC that ETFMG pays ISE HACK profits due to the Index License

In early 2016, ETFMG confirmed its understanding accorded with ISE's, when it

explained to the SEC, and then to the ETFMG Trust board, that its obligations to pay ISE flowed

from the Index License.  In late 2015, examiners with the SEC conducted an examination at

ETFMG.  Chron. ¶ 98.  During this examination, they met with Messrs. Karol and Masucci to

understand ETFMG's business model, and aspects of its relationship with ISE.  *Id.*  Following this

inspection, the SEC sent ETFMG a deficiency letter identifying problems or issues it discovered

during its examination.  Chron. ¶ 98.  The first issue the SEC identified in the deficiency letter was

a "Conflict of Interest/Relationship with Index Provider," advising of the SEC's concern about the

relationship among ISE, PureShares, and ETFMG, and requesting, accordingly, that ETFMG

obtain and provide the ETFMG Trust board a copy of the unredacted Index License and HACK

Supplement, to ensure that the Trust board understood why ETFMG was paying ISE and

PureShares the profit generated from HACK and SILJ.  PX-73 at 5-6 (requesting "the Trust

immediately provide the Board with complete information regarding the backstops made by ISE and the collection of Shared Profit and determine whether the Trust's relationship with such entities warrants further evaluation . . . ").  The SEC's understanding had to come from ETFMG, and ETFMG never corrected the SEC that the Index License did not impose a payment obligation on ETFMG via the Sublicense Agreement.

Instead, following the receipt of this letter, ETFMG's Mr. Karol sent an email to ISE's Kris Monaco requesting a copy of the unredacted Index License.  PX-74.  In this email, Mr. Karol explained that the SEC wanted the Trust board to see the unredacted agreement, which Mr. Karol described as "a simple contract with [a] duty to pay and right to receive."  Chron. ¶ 99. ISE's Mr. Monaco provided Mr. Karol with an unredacted version of the Index License and HACK Supplement.  PX-142.  Messrs. Masucci and Karol then met with the ETFMG Trust board and explained that the Index License was the reason why ETFMG paid ISE and PureShares the HACK profits.  Chron. ¶ 100.  Following that board meeting, Mr. Karol sent a response letter to the SEC addressing this issue.  Chron. ¶ 101.  In this letter Mr. Karol described ETFMG's private label model:  "All of the funds now in the Trust are based on this model which provides that the sponsor will pay the expenses of the fund until it achieves a 'break-even' asset level and then receive payments."  *Id.*  Mr. Karol further described the March 17, 2016 Trust board meeting, which included a presentation to the board that "reviewed this business model and described with particularity those arrangements in the case of each existing and proposed fund.  This presentation included . . . unredacted copies to the [Index License and the HACK Supplement]."  *Id.*  Contrary to the positions they have taken in this dispute, Mr. Masucci and Mr. Karol did not tell the Trust board **_or_** the SEC about a separate oral agreement that supposedly formed the basis of ETFMG's payment obligation.  Chron. ¶ 100.  Indeed, Mr. Karol, the President and co-founder of ETFMG,

testified that, at that time, he did not know about the existence of any purported oral agreement.[3]

*Id.*

**B.**   **Nasdaq Has a Contractual Right to HACK Profits Through the HACK PSA**

      **1.**   **The HACK PSA obligates ETFMG to pay HACK profits**

The HACK PSA is silent as to whether and when ETFMG must pay the profits from the operation of HACK to ISE/PureShares.  However, the only logical reading of the contract is that it requires ETFMG to make such payments.  First, this contract must be read in light of ETFMG's role as a white label service provider.  From the formation of the relationship, none of the parties involved in HACK intended that ETFMG would keep HACK profits, so it would make no sense to read the HACK PSA to contemplate such an outcome.  *See* Chron. ¶¶ 58, 59; *see also*, *e.g.*, *Zayo Grp., LLC v. Latisys Holdings, LLC*, No. 12874-VCS, 2018 Del. Ch. LEXIS 540, at *26 (Del. Ch. Nov. 26, 2018) (courts "must respect, 'to the extent possible, the ***reasonable shared expectations*** of the parties at the time they contracted'") (emphasis added) (quoting *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1 (Del. Ch. 2003)); *BAE Sys. N. Am. Inc. v. Lockheed Martin Corp.*, C.A. No. 20456, 2004 Del. Ch. LEXIS 119, at *15 (Del. Ch. Aug. 3, 2004) (same).  .  Second, the HACK PSA specifically sets out the "consideration" ETFMG was to receive for performing under the contract:

> ***For and in consideration of the fees set forth on Exhibits A and B*** attached hereto and made a part hereof for all purposes, ETFMG hereby agrees to file all documents as required to lawfully create and operate the Funds. . . .  Upon execution of this agreement Client will be required to make an initial payment, as shown on Exhibit A.  Client acknowledges that all third party service provider fees as detailed in Exhibits A and B are estimates and that ETFMG and the Trust will not enter into any third party agreement in excess of the estimated fees without prior Client approval and that such approval will not be unreasonably withheld.

---

[3]    If Mr. Masucci truly believed that this oral agreement was the basis for ETFMG's obligation to pay HACK profits, his failure to inform the SEC about this agreement was a violation of 18 U.S.C. § 1001 (making false statements to the government).

> Client further acknowledges that it is responsible for all fees related to the issuance
> and management of the Funds and that ETFMG and the Trust will enter into
> service agreements on behalf of each Fund.

JX-5 § 1 (emphasis supplied).  Exhibits A and B to the HACK PSA specify the fees that ETFMG

would receive for launching and operating the HACK ETF, including ETFMG's "product

management fee" (which itself provided larger fees for ETFMG contingent on the growth of the

ETF's AUM), and fees due third parties.

> The HACK PSA would make no sense if ETFMG was paid the foregoing

"consideration," and then allowed ETFMG to keep the profits generated from the ETF, but

without being responsible for the ETF's costs.  All of the provisions as to ETFMG's fees would be

surplusage if ETFMG had the right retain the entirety of the management fee charged to the

shareholders, and not just the portion designated by the HACK PSA.  *Zayo Grp., LLC*, 2018 Del.

Ch. LEXIS 540, at *25 ("interpretation operates under the assumption that the parties never include

superfluous verbiage in their agreement, and that each word should be given meaning and effect

by the court") (quotations omitted); *Majkowski v. Am. Imaging Mgmt. Servs.*, 913 A.2d 572, 588

(Del. Ch. 2006) (courts "attempt to interpret each word or phrase in a contract to have an

independent meaning so as to avoid rendering contractual language mere surplusage").

> Nor would this reading make sense.  Mr. Monaco and PureShares' Andrew Chanin

both testified that they never would have entered into the HACK PSA without the expectation that

ETFMG would pay HACK profits.  Chron. ¶ 60.  Under Delaware law, where a contract provision

"lends itself to two interpretations, a court will not adopt the interpretation that leads to

unreasonable results, but instead will adopt the construction that is reasonable and that harmonizes

the affected contract provisions."  *Axis Reinsurance Co. v. HLTH Corp.*, 993 A.2d 1057, 1063

(Del. 2010), *as corrected*, (May 10, 2010); *see also Chi. Bridge & Iron Co. N.V. v. Westinghouse

Elec. Co.*, 166 A.3d 912, 913 (Del. 2017) ("[i]n giving **sensible** life to a real-world contract, courts

must read the specific provisions of the contract *in light of the entire contract*") (emphasis

added); *BAE Sys. N. Am. Inc.*, 2004 Del. Ch. LEXIS 119, at *15 (courts "'must interpret contractual

provisions in a way that gives effect to every term of the instrument, and that, if possible,

reconciles all of the provisions of the instrument when read as a whole'") (quoting *Council of*

*Dorset Condo. Apartments v. Gordon*, 801 A.2d 1 (Del. 2002)).  And Delaware law requires

courts to interpret contracts "'in a common sense manner.'"  *New Castle Cty., Del. v. Nat'l Union*

*Fire Ins. Co. of Pittsburgh, Pa*., 174 F.3d 338, 343 (3d Cir. 1999) (quoting *SI Management L.P. v.*

*Wininger*, 707 A.2d 37 (Del. 1998)); *see also Chi. Bridge & Iron Co. N.V.*, 166 A.3d at 913; *BAE*

*Sys. N. Am. Inc.*, 2004 Del. Ch. LEXIS 119, at *15 ("Court will give those terms the meaning that

'would be ascribed to [them] by a reasonable third party'") (quotation omitted).

> To the extent the Court reads the HACK PSA as ambiguous, the parties' course of

conduct also demonstrates that the HACK PSA requires ETFMG to pay the HACK profits.  Since

HACK launched, ETFMG consistently sent the monthly profits to ISE/Nasdaq, as ISE/Nasdaq,

PureShares, and ETFMG all agreed ETFMG should do.  Chron ¶ 69.  Additionally, in the lead up

to Nasdaq's acquisition of ISE, ETFMG's co-founder and President, Mr. Karol, conducted an

"analysis" of the contracts between ISE, PureShares, and ETFMG to "mirror the due diligence

exercise that [he] supposed Nasdaq had been going through . . . to see how [Nasdaq] would be

viewing this situation for our benefit . . . [and to give him] an overview of all" of the documents.

Chron. ¶ 114.  In this "analysis," Mr. Karol concluded:

> The HACK PSA is bi-lateral between ETFMG and PureFunds.  We have no legal
> relationship with the ISE under the HACK PSA.  However we have been paying
> HACK profits to ISE even though the PSA states that payments should go to
> PureFunds.  *We could go either way on this.  If it was __in our interest__ to take away*
> *the payment from the ISE* we could pay PureFunds as required by the PSA-ISE is
> not a party*.  Or if was __in our interest__ to keep paying ISE* even if PureFunds
> objects, *we have a good argument under Delaware law (the chosen law of the*

*PSA) that the PSA was modified by conduct* and assent even though the PSA has a clause that says modifications must be in writing.

PX-232D (emphasis supplied).  This admission that, in June 2016, ETFMG's president believed that the HACK PSA required ETFMG to pay Nasdaq or PureShares the profits from HACK also supports the conclusion that, under the HACK PSA, ETFMG was not permitted to keep HACK profits for itself.  Also, this is entirely consistent with the white label model on which ETFMG's entire business was based.  *See* PX-72.

### 2.   Nasdaq has a right to enforce this obligation as an intended beneficiary of the HACK PSA

Even though Nasdaq is not a signatory to the HACK PSA, under Delaware law, "a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate the promisee intends to give the beneficiary the benefit of the promised performance."  *See Comrie v. Enterasys Networks, Inc.*, No. CIV. A. 19254, 2004 Del. Ch. LEXIS 196, at *13 n.25 (Del. Ch. Feb. 17, 2004); *see also Global Energy Fin. LLC v. Peabody Energy Corp.*, No. 08C-10-129 RRC, 2010 Del. Super. LEXIS 430, at *75-76 (Del. Super. Ct. Oct. 14, 2010) (citing *Insituform of N. Am., Inc. v. Chandler*, 534 A.2d 257 (Del. Ch. 1987)).

The evidence demonstrates that all the parties knew in advance that, while ISE was not a party to the HACK PSA, ISE was PureShares' partner in that agreement.  Chron. ¶ 24.  First, ETFMG as a party to the Sublicense Agreement and the service provider for the first three PureShares ETFs knew that that ISE and PureShares were dividing the profits from all the PureFunds ETFs.  Second, ISE negotiated the HACK PSA with ETFMG.  *See* PX-80, 83, 87, 88, 88A, 88B; Chron. ¶ 53.  Third, from the inception of the PSA, ETFMG knew and expected ISE to pay the expenses that PureShares was obligated to pay ETFMG in the HACK PSA, and ISE did

so.  Chron. ¶¶ 26.  Fourth, the parties understood that, if HACK was profitable, ETFMG would

send the profit to ISE, rather than to PureShares.  Chron. ¶¶ 26, 27; 29.  And, as soon as HACK

was profitable, ETFMG consistently did so.  Fifth, the parties understood that, at the time the

HACK PSA was agreed to, ISE and PureShares had already entered into the HACK Supplement

to the Index License, in which ISE agreed to pay the expenses necessary to launch and operate

HACK in exchange for a share of the HACK profits.  Chron. ¶¶ 51, 52.

### 3.  If ISE did not initially have a right to enforce receipt of HACK profits, the parties modified the HACK PSA to provide that right

To the extent the Court concludes that ISE was not an intended beneficiary of the

HACK PSA at the time the contract was formed such that it (and now Nasdaq) can enforce a

breach of the HACK PSA, the evidence supports the conclusion that the parties modified the

HACK PSA to make ISE/Nasdaq an intended beneficiary of that agreement.  The HACK PSA

contained a provision stating that the agreement could not be modified or changed except in

writing.  JX-5 § 13(k).  However, Delaware law recognizes that, even in such a situation, parties to

a contract can modify the contract by conduct.  An integration clause "does nothing to prevent the

Court's consideration of subsequent promises, communications, or modifications to the express

agreement."  *Good v. Moyer*, No. N12C-03-033, 2012 Del. Super. LEXIS 453, at *16 (Del. Super.

Ct. Oct. 10, 2012).  And parties can modify a written agreement, through their conduct or

otherwise, even where the terms of the agreement bar it.  *See Pepsi-Cola Bottling Co. of Asbury

Park v. Pepsico, Inc.*, 297 A.2d 28, 33 (Del. 1972) ("a prohibition against amendment except by

written change may be waived or modified in the same way in which any other provision of a

written agreement may be waived or modified, including a change in the provisions of the written

agreement by the course of conduct of the parties").  In this case, "the alleged modification 'must

be of such specificity and directness as to leave no doubt of the intention of the parties to change

what they previously solemnized by formal document,'" *Cantor Fitzgerald, L.P. v. Cantor*, No. 16297, 2000 Del. Ch. LEXIS 43, at *95 (Del. Ch. Mar. 13, 2000) (quotations omitted), and the parties' actions clearly satisfied this standard.

The evidence at trial showed that, while the HACK PSA contemplated PureShares paying ETFMG the fund operating expenses, and ETFMG paying PureShares the profits from HACK, at or about the time the HACK PSA was entered, the parties agreed to vary from these written mechanics. Messrs. Monaco, Chanin, and Ilyvesky[4] all testified that:

1.  through the Index License, ISE agreed to finance the launch and operation of the PureFunds ETFs and ISE, and PureShares had agreed to split the profits generated from the operation of the PureFunds ETFs with ISE, Chron. ¶¶ 11-14;

2.  through an earlier Business Management Agreement (the "BMA"), and the HACK PSA, PureShares contracted directly with ETFMG to pay ETFMG to launch and operate the first four PureFunds ETFs, and ETFMG was obligated to pay PureShares the profits generated by these funds, Chron. ¶¶ 23-25; and

3.  rather than follow this two-step process whereby ISE paid PureShares and PureShares then paid ETFMG, and whereby ETFMG paid PureShares the profits from these ETFs, and PureShares paid ISE, ISE just paid ETFMG the expenses to launch and operate the funds directly, and ETFMG paid ISE the profits directly. Chron. ¶¶ 26, 27.

This testimony showed that, while the parties' conduct with respect to the HACK PSA varied from the explicit terms of that contract, this variance was either reflecting their understanding of the terms of the agreement, or modifying the contract to reflect changes to the

---

[4]     Mr. Monaco and Mr. Ilyevsky were hostile witnesses to Nasdaq. Nasdaq let go both witnesses after Nasdaq's acquisition of ISE, and both now work for Nasdaq competitors. Tr. at 2264:22-2265:4; 2274:2-18 (B. Ilyevsky); 711: 5-712: 4 (K. Monaco); PX-202. Mr. Monaco's company is also heavily financially dependent on ETFMG. Tr. at 1151:24-1152:25 (K. Monaco). Through the early stages of his testimony, Mr. Monaco established that he identified "strongly with the defense table as opposed to the plaintiff's table," and his animosity towards Nasdaq was, "if not readily apparent, strongly suggested by the manner of inquiry." Tr. at 741:10-14; 743:17-18 (Judge Engelmayer). That these hostile witnesses testified that this oral understanding was not a separate agreement, but an implementation of the written agreements, strengthens the credibility of their testimony on this point.

flow of dollars, leaving the substance of the agreement intact.  From that point forward, ISE paid ETFMG directly, and ETFMG paid ISE/Nasdaq directly.  Indeed, as discussed above, in June 2016, ETFMG's Mr. Karol concluded that ETFMG could continue to pay ISE directly, even over PureShares' objection, because there is a "good argument under Delaware law (the chosen law of the PSA) that the PSA was modified by conduct and assent even though the PSA has a clause that says modifications must be in writing."  PX-232D.

### 4.     Mr. Masucci's testimony that ETFMG only paid ISE HACK profits because of a stand-alone oral agreement should be rejected

Mr. Masucci testified that ETFMG only paid ISE/Nasdaq HACK profits because of a separate oral agreement.  Chron. ¶ 258.  Mr. Masucci's self-serving testimony on this point, and almost any other point, can and should be disregarded because of his lack of credibility.  As described below, and set forth in greater detail in the summary tables attached as Exhibits 3-6 to this Memorandum, Mr. Masucci's trial testimony:  (i) contradicted documents that he had written; (ii) contradicted provable truths; (iii) contradicted his deposition testimony; (iv) at times was inconsistent with other testimony that he gave at trial; and (v) contradicted the trial testimony other witnesses, including that of Mr. Monaco, a witness called by ETFMG and whose business is heavily dependent on ETFMG.  Tr. at 1151:24-1152:25 (K. Monaco).  Setting aside Mr. Masucci's credibility problems, Messrs. Monaco, Ilyevsky, and Chanin all testified that, to the extent there was an oral agreement, it was simply a change to the mechanics of the payments among the parties as described above.  *See* Chron. ¶¶ 26, 27.

For this reason, ETFMG's chief defense—that ETFMG only paid ISE/Nasdaq HACK profits because of a standalone oral agreement, and that it could simply decide to stop paying Nasdaq and PureShares profits whenever it wanted—can be summarily rejected.

C.   **Nasdaq's Rights to Profits from the Remaining PureFunds ETFs, Including IPAY, Are Explicitly Spelled Out in the Relevant PSAs**

       The PSAs for the PureFunds ETFs following HACK included ISE as a party, and contained a provision stating how ETFMG was to pay profits from the PureFunds ETFs to ISE and PureShares.  The IPAY PSA, which for all relevant purposes is identical to the PSAs for the remaining funds, provides:

> This SEC '40 Act Platform Services Agreement . . . is made and entered into the 9th day of April 2015 . . . by and between PureShares, LLC and International Securities Exchange, LLC (together, "Client"), and Exchange Traded Managers Group, a NJ limited liability company  ("ETFMG").

JX-6 at 1.  The IPAY PSA further states, "ETFMG shall collect on behalf [of] Client all fees assessed to shareholders of each Fund, and shall distribute to Client all such fees in excess of each Fund's stated operating agreement ('Fund Profits')."  JX-6 at 1.  The Agreement continues:

> ETFMG hereby agrees to distribute all Funds Profits to Client within ten (10) days of such Fund Profit being made available to ETFMG or the administrator of the Funds.  ETFMG shall distribute Fund Profit to the party or parties as instructed by Client.

JX-6 § 8(d), (e).  Accordingly, there is no dispute that ISE/Nasdaq was a party to these agreements and had a right to the profits generated by these ETFs.

II.   **ETFMG BREACHED ITS CONTRACTUAL OBLIGATIONS TO PAY NASDAQ THE PROFITS ON THE THREE PROFITABLE ETFS**

       Regardless of the source of ETFMG's contractual obligation, following the Nasdaq acquisition of ISE, ETFMG materially breached its obligation to pay Nasdaq the profits from HACK, IPAY, and SILJ.

A.   **ETFMG Breached Its Payment Obligations for HACK and IPAY Shortly After Nasdaq Acquired ISE**

       ETFMG's failure to timely pay Nasdaq HACK profits beginning in October 2016, and refusal to pay Nasdaq HACK and IPAY profits altogether in February 2017, was a material

breach of the Sublicense Agreement, HACK PSA, and IPAY PSA.  Although the Sublicense Agreement and HACK PSA do not specify when payment must be made, the Court should conclude that payment was due no later than approximately ten days after receipt of the management fee by ETFMG from US Bank for the following reasons.

First, the parties' conduct in implementing an agreement is strong evidence of their understanding of its terms, and their intent.  *See, e.g.*, *Zayo Grp., LLC*, 2018 Del. Ch. LEXIS 540, at *26-27 ("'[i]n giving effect to the parties' intentions, it is generally accepted that the parties' conduct [in performance of the contract] before any controversy has arisen [should be] given 'great weight'") (quoting *Ostroff v. Quality Servs. Labs., Inc.*, C.A. No. 423-N, 2007 Del. Ch. LEXIS 2 (Del. Ch. Jan. 5, 2007)); *Gee v. Zee Ying Wong*, 29 N.Y.S.3d 847 (N.Y. Sup. Ct. 2015) (same).  From the time HACK became profitable in January 2015 until the June 30, 2016 Nasdaq acquisition of ISE, ETFMG conveyed the monthly HACK profits to ISE by the middle of the next month.  Chron. ¶ 69.

Second, the BMA and the PSAs for IPAY/BIGD, GAMR, IFLY, FINQ, and IMED all require payment within 10 days of the close of the prior month, which was consistent with the parties' conduct as to the HACK ETF.  *See, e.g.*, JX-12B; JX-6 § 8(d) (IPAY PSA).  The testimony at trial was that the post-HACK PSAs documented the terms under which the parties had been earlier operating, but had not necessarily documented, in part because ISE was now comfortable interfacing directly with an adviser.  Tr. at 206:16-207:23 (A. Chanin); 870:15-871:6 (K. Monaco); 1342:21-1343:8 (S. Masucci).

### 1.     ETFMG first breached its contractual obligations by delaying HACK payments in 2016

Prior to Nasdaq's acquisition of ISE, every month ETFMG would send ISE a P&L statement showing the prior month's HACK profit, and then, shortly thereafter, send ISE this

amount.  PX-1001; Chron. ¶ 69.  All of this changed after Nasdaq came on the scene.  ETFMG implemented a new invoice policy whereby it would only pay Nasdaq HACK profit after ETFMG sent Nasdaq the P&L statement, and then Nasdaq sent ETFMG a corresponding invoice.  Chron. ¶ 137.  This added step created an additional delay in ETFMG's payment of the HACK profit.

The evidence showed that, after Nasdaq acquired ISE, ETFMG deliberately delayed paying Nasdaq.  Whereas ETFMG sent ISE P&L statements within a week of the close of the prior month, ETFMG waited weeks (and at times months) to send Nasdaq these same P&L statements.  *See* PX-1001.  ETFMG's delayed delivery of P&L statements meant that Nasdaq could not send ETFMG an invoice, and this delayed payment.  But even after Nasdaq sent ETFMG an invoice for HACK profit, ETFMG simply waited additional months to pay.  Chron. ¶ 197.  For instance, Nasdaq invoiced ETFMG for August HACK profit by October 4, 2016 (PX-1014), but ETFMG did not pay any part of these profits until mid-December.  Chron. ¶ 197.  This deliberate delay in payments was ETFMG's first breach of its obligation to pay HACK profits.

## 2. ETFMG further breached its contractual obligations when it decided to stop paying HACK and IPAY profits in early 2017

In January 2017, ETFMG stopped making payments to Nasdaq altogether.  By this time IPAY also was generating monthly profits.  Mr. Masucci and ETFMG disregarded the contracts for HACK and IPAY, and simply decided not to pay Nasdaq this money.  Chron. ¶ 205; *see also* Tr. at 1452:4-15 (S. Masucci).  ETFMG's failure to turn over such profits was in violation of its duties under the Index License (arising through the Sublicense Agreement with Nasdaq and PureShares), the HACK PSA, and the IPAY PSA.  The parties' agreements—and the parties' course of conduct until ETFMG affirmatively decided to breach its payment obligations—required ETFMG to pay to Nasdaq the profits generated by these funds shortly after the end of each month in which the funds generated such profits.

21

As discussed above, the Index License and HACK PSA both obligated ETFMG to send ISE/Nasdaq HACK profits.  And, from the time HACK was profitable, this is just what happened.  This course of conduct by the parties filled in whatever gap may exist in the HACK PSA and Index License regarding the logistics of ETFMG turning profits over to Nasdaq.  *See Samad v. Goldberg*, No. 12cv5459 (DLC), 2016 U.S. Dist. Lexis 157217, at *29-30 (S.D.N.Y. Nov. 14, 2016) ("'additional contractual provisions may be implied into a contract as a result of a course of dealing between the parties'") (quoting *Looney v. Black*, 702 F.3d 701 (2d Cir. 2012)); *TWA Res. v. Complete Prod. Servs.*, No. N11C-08-100 MMJ CCLD, 2013 Del. Super. Lexis 112, at *23 (Del. Super. Ct. 2013) ("parties' course of performance . . . 'may also be used to supply an omitted term when a contract is silent on an issue'") (quotations, citations omitted); Restatement (Second) of Contracts § 223 cmt. b ("[c]ourse of dealing . . . may guide the court in supplying an omitted term . . . it may determine the meaning of language or it may annex an agreed but unstated term").

There is no question that the IPAY PSA includes explicit language regarding the timing and mechanics of ETFMG paying profits from that fund to Nasdaq:

> ETFMG hereby agrees to distribute all Fund Profits to Client [*i.e.*, Nasdaq and PureShares, collectively] ***with ten (10) days*** of such Fund Profit being made available to ETFMG or the administrator of the Funds.  ***ETFMG shall distribute*** Fund Profit to the party or parties ***as instructed by Client***.

JX-6 § 8(d) (emphasis supplied).  While the earlier HACK PSA and Index License admittedly do not contain the same contractual mechanism, in practice, until late 2016, ETFMG followed the same process set forth in the IPAY contract, quickly sent documentation of HACK profits at the beginning of each month for the prior month, and, shortly thereafter, transferred such profits to ISE/Nasdaq.  Chron. ¶ 69; *see also, e.g.*, JX-194 (HACK profit and loss statement).

Thus, based on the explicit terms of the IPAY PSA, and on the parties' course of conduct as to the earlier Index License and HACK PSA, ETFMG further breached its payment obligations for HACK and IPAY in early 2017 when it deliberately failed to turn over profits for IPAY and HACK.

ETFMG never told Nasdaq that it had made the decision to stop making these payments, or that (earlier) it purposefully was delaying such payments. In the first quarter of 2017, Nasdaq repeatedly inquired about when ETFMG would make payment. *See, e.g.*, PX-184, PX-185. ETFMG never owned up to its decision, and instead provided assurances of payment as late as May 26, 2017, when, ETFMG's CFO John Flanagan told Nasdaq that ETFMG would send Nasdaq the netted profit payment shortly. PX-224. Similarly, Mr. Masucci took the same misleading tack when, on May 24, 2017, he sent Nasdaq and PureShares a letter regarding the "Cessation of HACK Profit-Sharing," stating that ETFMG would cease paying Nasdaq HACK and IPAY profits after June 2017. Chron. ¶ 258.

## B.   ETFMG's Bad Faith Termination Letters Do Not Excuse Its Breaches of the Parties' Contracts

Beginning on April 21, 2017 and continuing through June 2, 2017, ETFMG sent Nasdaq and PureShares a series of four letters purporting to terminate the PSAs for the PureFunds ETFs based on the pretext of PureShares' breach. Chron. ¶¶ 238, 247, 258, 264. As discussed above, the evidence proves that, as of April 2017, ETFMG itself had already breached its obligations to pay HACK and IPAY profits (even though not making these payments was one of the actions ETFMG threatened in its letters).[5] But these letters—in which ETFMG made

---

[5]     None of the four termination letters addressed the Index License and Sublicense Agreement, which demonstrates that, regardless of whether ETFMG thought it could terminate the PSAs, it still had payment obligations under the Sublicense Agreement.

knowingly frivolous and groundless allegations of breach to justify its own nonperformance under the contracts, and to attempt to force Nasdaq into renegotiating the contract terms—do not excuse a breach, and further evidence ETFMG's bad faith conduct.

In its four letters, ETFMG generally justifies its purported termination of the contracts on three grounds:  (1) Mr. Chanin's illegal marketing; (2) Mr. Chanin's lawsuit; and (3) Nasdaq's and Mr. Chanin "interference" with the ETFMG Trust.  Each of these grounds is baseless.  First, ETFMG's did nothing to verify its assertion that Mr. Chanin engaged in illegal marketing, which was, in fact, incorrect.  Chron. ¶¶ 241, 248.  For all of ETFMG's bombast—after all, they accused Mr. Chanin of violating federal securities laws and claimed they suffered resulting harm "beyond dispute"—ETFMG did not even report Mr. Chanin's alleged violation to the ETFMG Trust board in its quarterly compliance report.  Chron. ¶ 250.  And ETFMG's Mr. Karol admitted his claim of harm simply was "rhetoric."  Tr. at 2058:3-17 (B. Karol).

Second, it is preposterous that PureShares' litigation against ETFMG would have constituted a breach, or given ETFMG grounds for termination.[6]  That PureShares brought its litigation in good faith—after ETFMG had not paid Nasdaq and PureShares any IPAY profits, and had not paid HACK profits for any month in 2017, Chron. ¶ 213—is self-evident.  And, regardless, none of the agreements deprived the parties of their rights to seek recourse from the courts in the event of a breach.  Although Mr. Masucci testified that Mr. Chanin breached the PureFunds PSAs by filing the lawsuit (and therefore allowed ETFMG to cease paying fund profits), Tr. at 1716:5-1717:14, such an arrangement would be absurd, and appears nowhere in the contracts.  If Mr. Masucci were correct, it would mean that ETFMG could refuse to pay any

---

[6]        According to Mr. Masucci, the PureShares litigation was the primary reason for termination.  Tr. at 1616:13-1617:17 (S. Masucci).

profits, and Nasdaq and PureShares would have no recourse.  ETFMG's deliberate failure to pay

necessitated legal action, which ETFMG cannot use to justify its termination of the agreements.

Third, Nasdaq and PureShares did not "interfere" with the ETFMG Trust by

sending correspondence to the Trustees and objecting to certain actions by ETFMG.  Chron.

¶ 229.  There is no contractual provision or law that prohibited Nasdaq and PureShares from

communicating with the Trust.  *Id.*  The evidence at trial showed that the ETFMG Trust had itself

reached out to ISE and PureShares in the past, *see, e.g.,* Chron. ¶ 28, and that the ETFMG Trust

board had a duty to assess whether ETFMG as an investment advisor was acting in the best

interests of the investors in the PureFunds ETFs.  Chron. ¶ 117.  Indeed, Mr. Masucci's admitted

desire to control the independent trustees' access to criticism of ETFMG's functioning as an

advisor itself breaches his fiduciary duty to the PureFunds ETFs' shareholders.  *See Ajettix Inc. v.

Raub*, 804 N.Y.S.2d 580, 588 (N.Y. Sup. Ct. 2005) (fiduciary has "an obligation of utmost

candor," and duty to disclose all material information about his potential conflicts) (citing *Alpert

v. 28 Williams St. Corp.*, 473 N.E.2d 19 (N.Y. 1984)); *see also*, *e.g.*, *Schneider v. Wien & Malkin

LLP*, No. 601363/02, 2004 N.Y. Misc. Lexis 2044, at *48 (N.Y. Sup. Ct. Nov. 1, 2004) (fiduciary

breached duty by failing to disclose conflict and continuing to act as supervisor of partnership);

*Auriga Capital Corp. v. Gatz Props., LLC*, 40 A.3d 839, 875 (Del. Ch. 2012) (member breached

fiduciary duty in part by "misleading" minority members about self-interested conduct).

Rather than justifying termination, the evidence shows that ETFMG's allegation of

interference was pretextual.  On March 14, 2017, Nasdaq's attorneys sent the ETFMG Trust board

a letter raising concerns in connection with their consideration whether to lower the management

fee.  Chron. ¶ 228.  Upon receiving this letter, Mr. Masucci forwarded it to the two independent

trustees, and wrote that he found the letter "encouraging."  PX-190 at 1-2; Chron. ¶ 229.  But just

25

weeks later, in the two termination letters, Mr. Masucci asserted that what he found to be "encouraging" was now "inappropriately confrontational" and an "apparent attempt to intimidate us." Chron. ¶ 258 (PX-202). This fact alone demonstrates ETFMG's bad faith.

       The balance of the allegations in the four termination letter were similarly frivolous.[7] And the reason for ETFMG's gambit soon became clear. In July 2017, after sending the four termination letters, ETFMG proposed to enter into a new contract to pay Nasdaq for indexes for the PureFunds ETFs—at a much lower fee. Chron. ¶¶ 282-284. ETFMG's attorney wrote to Nasdaq stating that "ETFMG terminated the [PSA] in response to the breaches of contract by PureShares, rather than as an effort to end its relationship with Nasdaq," and that ETFMG "looks forward to working with NASDAQ" on new products. Chron. ¶ 282. ETFMG, therefore, was using the threatened termination as leverage in extracting more favorable contract terms from Nasdaq. This was pure bad faith, and further shows that ETFMG's purported grounds for termination could not hold water. Because ETFMG knew that the purported bases for its threat to continue its nonperformance under the PSAs were false or not valid contractual grounds for terminating the deal, ETFMG's letters themselves constituted a breach. *See United States v. Lennox Metal Mfg. Co.*, 131 F. Supp. 717, 726 (E.D.N.Y. 1954) (a party's reliance on "specious" claims of breach to "willful[ly] and wrongful[ly] put[] an end to a contract, and prevent[] the other party from carrying it out, is itself a breach of the contract" (quotation omitted)); *see also In re Best Payphones, Inc.*, 2007 Bankr. LEXIS 1677, at *17-20 (party's termination of agreement constituted breach when inadequate opportunity to cure was motivated by party's bad faith desire to avoid contractual payments).

---

[7]     For example, there is no basis to the allegation that Terry Wade failed to negotiate a new SILJ agreement and was unsuccessful in convincing Mr. Chanin to not file a lawsuit against ETFMG. Tr. at 659:4-661:20 (T. Wade).

**C.**     **ETFMG Breached Its Contractual Obligations When It Continued to Operate and Profit from the PureFunds ETFs After Supposedly Terminating the PSAs**

The HACK PSA, like the PSAs for all the other ETFs, was drafted to ensure that

ETFMG could not terminate the agreement and continue to profit from the funds, as it has in fact

done here.  The PSA states:

> Upon termination of this Agreement, the parties agree to cooperate and provide the services necessary to wrap up and liquidate the Fund(s) in an orderly and timely fashion including, but not limited to, the preparation and filing of required regulatory documents, financial statements, tax filings, and investor statements.

JX-5 § 9; *see also* Chron. ¶¶ 82, 270.  By terminating the HACK PSA (and the PSA for the other

ETFs), but not liquidating the ETF, ETFMG breached the agreement again.

**D.**     **Nasdaq Had No Obligation to Provide ETFMG Notice of Its Failure to Pay HACK and IPAY Profits in 2016/2017**

Following ETFMG's non-performance of its payment obligations under the parties'

agreements in late 2016 and early 2017, and its affirmative statements in April 2017 that it would

not carry out such obligations, Nasdaq's claims in this case immediately became actionable.

Although each of the contracts at issue require that written notice of breach be provided to the

breaching party, with varying times to cure, those provisions apply to the non-breaching party

seeking to *terminate* the agreements before their expiration by their terms.  For example, the

HACK PSA states: "Client *may terminate* this Agreement if the other party fails to meet any of its

obligations under this agreement.  *The terminating party* will provide the other party at least sixty

(60) days written notice."  JX-5 § 9 (emphasis supplied); *see also* JX-6 § 9 (same provision in

IPAY PSA).

Though ETFMG clearly breached the PSA for HACK and IPAY when it failed to

pay the profits associated with these funds, Nasdaq did not—and does not—seek to *terminate* the

HACK PSA or the IPAY PSA.  Rather, Nasdaq elected to bring claims to be made whole for the

harm caused by ETFMG's wrongful conduct through money damages and other equitable relief. *See*, *e.g.*, *ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F. Supp. 2d 383, 387 (S.D.N.Y. 1999) ("non-breaching party must choose between two remedies—[it] can elect to terminate the contract and recover liquidated damages or [it] can continue the contract and recover damages") (quotation omitted); *Brand v. Ogden-Howard Co.*, 111 A. 370, 374 (Del. 1920) (non-breaching party can treat contract as rescinded, or "may treat the contract as continuing and sue for a breach thereof, and recover his probable damages occasioned by the breach").

ETFMG breached the Index License, the HACK PSA, and the IPAY PSA starting late 2016, and by no later than April 2017.  Those same agreements did **_not_** require Nasdaq to notify ETFMG in writing of its breaches, or give ETFMG an opportunity to cure, because Nasdaq has never opted to terminate the contracts early.

### E.   ETFMG Breached Its Obligation to Pay SILJ Profits Immediately After the Acquisition

After ISE and PureShares entered into the Index License, PureShares entered into the BMA with ETFMG's predecessors, and the predecessor to the ETFMG Trust.  Chron. ¶ 23. All parties involved understood that because of the Index License, ISE was the party truly responsible for financing these ETFs and was entitled to the majority of the profits generated, and acted in accordance with that understanding.  *Id.*  Accordingly, the parties decided that, rather than ISE paying PureShares and PureShares then paying ETFMG the expenses associated with these funds, ISE would pay ETFMG directly.  Chron. ¶¶ 23-27.

The BMA, by its terms, stated that agreement would continue until October 18, 2015.  JX-12B at 3.  The BMA provided that it could be renewed from year to year by "mutual consent," according to the terms of the agreement.  *Id.*  ETFMG contends the BMA expired on October 18, 2015.  Chron. ¶ 136.  Yet, the evidence at trial showed ETFMG never informed ISE

or PureShares that the BMA expired in October 2015, and that ETFMG continued to send P&L statements to ISE for SILJ, ISE continued to pay SILJ's expenses, and ETFMG continued to market the fund as the PureFunds ISE Junior Silver ETF.  Chron. ¶¶ 85-89; 202.

In May 2016, ETFMG proceeded with business as usual, continuing to seek the approval and financial support of ISE and PureShares for SILJ-related expenses.  Chron. ¶¶ 112-13, 120.  However, as soon as SILJ became profitable in July 2016 and made $12,682.14, and $27,621.18 in August 2016, ETFMG **stopped** sending ISE/Nasdaq P&L statements for SILJ. Chron. ¶¶ 136, 202.  Indeed, SILJ's AUM stayed above the $50 million AUM breakeven point through August 2017, when ETFMG purported to sever the relationship with Nasdaq.  DX-848. ETFMG never sent Nasdaq and/or PureShares the profits generated by SILJ.  Chron. ¶ 202.

The evidence showed that either the parties extended the contract by conduct and agreement, or that the parties orally agreed to an extension.  In either case, the law is clear that the BMA's obligations continued to apply after the expiration date that appears on the face of the document.  *See Martin v. Campanaro*, 156 F.2d 127, 129 (2d Cir. 1946) ("[w]hen an agreement expires by its terms, if . . . the parties continue to perform . . . an implication arises that they have mutually assented to a new contract containing the same provisions as the old") (citations omitted); *Watts v. Columbia Artists Mgmt., Inc.*, 591 N.Y.S.2d 234, 236-37 (N.Y. App. Div. 1992) ("parties' conduct after the expiration of the written contract . . . establish a contract implied in fact with substantially the same terms and conditions as embodied in the expired written contract between" parties) (citations omitted).  But, in any event, as of July 2016, ETFMG was still obligated to pay the SILJ profit to ISE and PureShares.  Chron. ¶ 112.

ETFMG's failure to convey the SILJ profits to Nasdaq and PureShares was a breach of its obligations under the BMA.  JX-12B.  Moreover, the evidence shows that this breach

was deliberate and in bad faith because ETFMG charged ISE the expenses every month for

SILJ—until the point that SILJ was profitable—and then asserted the BMA expired a year earlier.

### F.     Andrew Chanin Did Not Breach the PureFunds PSAs, and His Conduct is Irrelevant to Nasdaq's Rights to Recover for ETFMG's Breaches

In both its purported termination letters from April, May, and June 2017, and in this

case, ETFMG accused Mr. Chanin of breaching the HACK and IPAY PSAs by wrongfully

engaging in marketing of the HACK and IPAY funds, and by filing suit against ETFMG in New

Jersey state court.  The evidence at trial demonstrated that ETFMG's accusations as to supposed

marketing efforts were baseless, and made for tactical purposes.  Even so, ETFMG's claims of Mr.

Chanin's wrongdoing did not excuse ETFMG's payment obligations, and they are irrelevant as to

Nasdaq, which ETFMG never accused of engaging in the conduct of which ETFMG accused Mr.

Chanin.  Nasdaq is entitled to all of the relief it is seeking in this case, regardless of the truth or

falsity of ETFMG's claims as to Mr. Chanin.

First, as discussed above, ETFMG's accusations regarding much of the purported

wrongful conduct by Mr. Chanin simply were not true.  ETFMG admitted during trial that it did

nothing to check the accuracy of its (incorrect) claims, Chron. ¶¶ 241, 248, and also admitted that

its statements that Mr. Chanin's supposed actions were harming the PureShares' funds were

tactical, and nothing more than "rhetoric."  Chron. ¶¶ 248-250.  The evidence shows that, at least

with respect to ETFMG's claims that Mr. Chanin engaged in illegal "marketing," ETFMG's

assertions hold no water, and, thus, have no impact on Nasdaq's rights.[8]

---

[8]     To the extent that the Court finds Mr. Chanin engaged in the "marketing" activities
ETFMG asserted, such conduct would not justify ETFMG terminating the PSAs, nor would it
impact Nasdaq's rights.  A breach must be "substantial" and "material" for a party to terminate a
contract, or to excuse non-performance.  *See*, *e.g.*, *Matthew v. Laudamiel*, No. 5957-VCN, 2012
Del. Ch. LEXIS 145, at *32-33 (Del. Ch. Jun. 29, 2012) (citing *DeMarie v. Neff*, 2005 Del. Ch.
LEXIS 5 (Del. Ch. Jan. 12, 2005)).  Here, the alleged breach by Mr. Chanin was neither substantial,

Second, even as to the undisputed fact that Mr. Chanin brought suit against ETFMG in New Jersey state court, such action did not excuse ETFMG from performance of its contractual duties to pay the profits from the HACK and IPAY funds to Nasdaq.  There plainly is not a covenant not to sue, or a waiver of rights to pursue claims for breach of contract through litigation, in ***any*** of the parties' agreements.  *See generally* JX-5-10.  For this supposed "breach," ETFMG relies on Sections 7(d) and 7(e) of the HACK and IPAY PSAs, respectively.  Section 7(d) of the HACK PSA says,

> During the term of this Agreement, Client [*i.e.*, PureShares LLC] shall not take any action . . . that would, or could reasonably be expected to result in any of Client's representations and warranties set forth herein being or becoming untrue in any material respect, result in a material violation of this Agreement or adversely affect the operations of the Trust or the Funds.

JX-5 § 7.d.; *see also* JX-6 § 7.e. (same provision in IPAY PSA).  There is no evidence the parties intended this language to act as, in effect, a covenant not to sue; as sophisticated parties, Nasdaq, PureShares, and ETFMG knew how to include such a covenant if they wished, but they did not.

In any event, to the extent that Mr. Chanin exercising his right to file suit to address ETFMG's breaches of the parties' agreements qualifies as "any action" prohibited in these provisions of the PSAs, there is no evidence that such "action"—bringing claims ***against ETFMG*** for its breaches of contract—has or will "adversely affect the operations ***of the Trust or the Funds***."  *See* JX-5 § 7(d); JX-6 § 7(e).  Indeed, the PureFunds ETFs continue to operate, and generate profits, with seemingly no negative impact from the New Jersey state case Mr. Chanin filed, this case before the Court, or, for that matter, the publicity these cases have generated.

---

nor material.  Mr. Chanin supposedly confusing the market about ETFMG's role in managing the HACK and IPAY is not a substantial or material breach of these provisions.  This is demonstrated by ETFMG's admission that ETFMG's assertion Mr. Chanin was hurting the funds through his actions was nothing more than "rhetoric," and by the evidence ETFMG did nothing about similar conduct by Mr. Chanin in 2015.  *See* Tr. at 2058:3-17 (B. Karol); Chron. ¶¶ 248-250.

Third, assuming that Mr. Chanin acted as accused, and that such actions were material breaches of the HACK and IPAY PSAs, Nasdaq still would be entitled to recover in this case based on ETFMG's breaches of the Index License. As discussed above, the royalty-bearing license ISE granted to PureShares, then sublicensed to ETFMG, required ETFMG to pay to Nasdaq the profits generated by ***all*** of the funds ETFMG manages, including the HACK and IPAY ETFs, which Nasdaq then is to allocate between itself and PureShares. *See* JX-1-4. ETFMG never claimed—as it cannot—that it could terminate the Sublicense Agreement based on the cited indiscretions by Mr. Chanin. Thus, even by its own assertions, ETFMG had no excuse for non-performance under the Index License and Sublicense Agreement.

Fourth, and finally, even if the Court finds that ETFMG has no payment obligation under the Sublicense Agreement, and Mr. Chanin breached the HACK and IPAY PSAs, Nasdaq still should recover damages from ETFMG. As discussed above, ETFMG's allegations against Nasdaq purportedly supporting termination are insubstantial (so much so that ETFMG sought to continue to work with Nasdaq after terminating these agreements). *See*, *e.g.*, *Matthew*, 2012 Del. Ch. Lexis 145, at *32-33. Nasdaq is a party to the HACK and IPAY PSAs, explicitly in the case of the IPAY PSA, and as a known, intended beneficiary of the HACK PSA. *See* JX-6 at 1 (ISE and PureShares collectively referred to as "Client" in IPAY PSA); *Global Energy Fin. LLC*, 2010 Del. Super. Lexis 430, at *75-76 (intended beneficiaries of an agreement have a right to enforce a contract, even if not a signatory) (citing *Insituform of N. Am., Inc. v. Chandler*, 534 A.2d 257 (Del. Ch. 1987)); *Comrie*, 2004 Del. Ch. LEXIS 196, at *13 n.25 (same). If ETFMG has a valid basis to avoid or terminate its contractual obligations to PureShares—which it does not—that does not mean it has the same right to avoid or terminate its obligations to Nasdaq. When there are multiple obligees (*i.e.*, Nasdaq and PureShares) to a promise (*i.e.*, ETFMG paying the profits

generated by the HACK and IPAY funds), and where the parties specified how such promise will be allocated between the obligees, the obligor (*i.e.*, ETFMG) owes complete performance as to ***each*** of the obligees.  *See generally* RESTATEMENT (SECOND) OF CONTRACTS § 297; *id*. at cmt. a ("even though the same performance is promised to a number of obligees, they may in the event of breach have separate claims for relief"); *id*. at § 298 cmt. b ("Modern procedure" allows courts to grant "partial or conditional relief" as to fewer than all joint obligees); *cf. id*. at § 301 (surviving joint obligee has a right to recover against obligor, even after claims of fellow obligee extinguished); *see also*, *e.g.*, 12 WILLISTON ON CONTRACTS §§ 36.8, 36.12 (4th ed. West 2012); *Nash v. Blessing*, 439 S.E.2d 393 (Va. 1994) (joint obligee could pursue claim where other obligee's claim extinguished by statute of limitations); *Atlanta & S. A. B. R. Co. v. Thomas*, 53 So. 510, 513 (Fla. 1910) ("[w]here for any valid reason a joint obligee is not a plaintiff . . . , the failure to make such party a plaintiff should be ***sufficiently accounted for in the proceedings***") (emphasis added).

## III.   ETFMG BREACHED THE WHOLESALING AGREEMENT

In addition to its breaches related to payment of profits under the Index License, the Sublicense Agreement, and the various PSAs for the PureFunds ETFs, ETFMG also breached a separate agreement with ISE/Nasdaq (the Wholesaling Agreement) based on ETFMG's charging of expenses.  These breaches also support granting Nasdaq the relief it seeks in this case.

### A.   ETFMG Breached the Wholesaling Agreement by Netting Expenses that Nasdaq Did Not Approve and Otherwise Did Not Have to Pay

Shortly after Nasdaq acquired ISE, ETFMG began forcing Nasdaq's payment of ETFMG's expenses by "netting" those expenses from payments ETFMG indisputably owed to Nasdaq.  This process, which caused significant problems with Nasdaq's accounting and made little sense from an accounting perspective, Chron. ¶ 172, 188, materially breached the

Wholesaling Agreement in three ways.  First, the Wholesaling Agreement obligated Nasdaq to reimburse ETFMG for certain wholesaling expenses, but only if those expenses were agreed to in advance and under a contractual cap.  JX-11 at 11 (providing that "[a]ll such expenses shall be agreed by ISE and [ETFMG] in advance of those expenses being incurred").  Second, and relatedly, Nasdaq was on the hook only for "reasonable expenses" that were related to "a Wholesaler's sales and marketing duties."  JX-11 at 11.  And third, the Agreement established a schedule whereby Nasdaq covered wholesaler compensation expenses only a month in advance at a time.  JX-11 at 14.  By disregarding Nasdaq's approval authority, and charging Nasdaq, for expenses unrelated to the Agreement altogether or for expenses months in advance, ETFMG disregarded these contractual provisions and deprived Nasdaq of its critically important rights to control its wholesaling costs.

In August 2016, ETFMG invoiced Nasdaq for the prior month's wholesaling expenses.  PX-121.  This invoice included a charge for ETFMG's booth at an industry conference that Nasdaq had not approved.  PX-121; PX-114.  Nasdaq rejected this expense and did not pay it.  *See* PX-157; PX-160.  In response, ETFMG then began sending invoice statements to Nasdaq in which ETFMG unilaterally deducted wholesaling and other expenses from payments to Nasdaq that ETFMG indisputably owed.  This occurred on four occasions:

- In October 2016, ETFMG deducted from $342,648 it owed to Nasdaq "outstanding invoices" in the amount of $270,340, including—among unsupported expenses and charges for amounts Nasdaq already paid—$17,750 in unapproved wholesaling expenses.  PX-221; PX-4001 (Wade Aff.) ¶ 73(f); PX-4002 (Freire Aff.) ¶ 15.

- In December 2016, ETFMG stated that it owed Nasdaq $700,095 but deducted from it $570,847.  PX-222.  Nasdaq did not pre-approve any of the charged wholesaling expenses, which included three months' worth of future wholesaler compensation and charges for marketing costs that were unrelated to wholesaler services.  PX-222; PX-4002 (Freire Aff.) ¶¶ 35-39.

- In February 2017, ETFMG stated that it owed Nasdaq $969,022 but deducted from it $799,914.  PX-223.  These amounts again included significant wholesaling

34

expenses, none of which Nasdaq approved, some of which inexplicably were for future costs, and some of which had already been charged to Nasdaq multiple times.  PX-223; PX-4002 (Freire Aff.) ¶¶ 48-52.  Several charges also clearly were outside the scope of the Agreement, including a bill for $200 spent at a liquor store and expenses to market ETFs that had been removed from the wholesaling platform.  PX-4002 (Freire Aff.) ¶ 52.

- In May 2017, ETFMG owed Nasdaq $775,682 but deducted from it $697,688, which included significant unapproved and unrelated expenses, including $43,727 for ETFMG's "Legal Expense," charges for an iPad for Sam Masucci, and expenses billed by "Bryan Masucci," presumably related to Sam Masucci but not a wholesaler.  PX-224; PX-4002 (Freire Aff.) ¶¶ 54, 59-62.

By withholding these amounts from payments it made to Nasdaq, ETFMG effectively billed and collected from Nasdaq costs that were unapproved, not yet due, and unrelated to the Wholesaling Agreement.  Nasdaq continually challenged and objected to this practice, asserting its contractual preapproval rights.  Chron. ¶ 216.  Rather than accede to Nasdaq's refusal to approve certain expenses, ETFMG falsely claimed that the netting statements constituted a longstanding "policy" that it followed with ISE (it did not),[9] *see* Chron. ¶ 191; PX-4002 (Freire Aff.) ¶ 43; Tr. at 917:24 (K. Monaco) (Mr. Monaco agreeing that ETFMG would seek ISE's approval before incurring certain expenses), and that ETFMG could simply incur expenses and debit them against monies otherwise owed Nasdaq.  This "netting" practice violated the Wholesaling Agreement and constituted a material breach of its preapproval and timing provisions.  ETFMG owes Nasdaq the monies it used to reimburse itself for these unapproved, unrelated, and otherwise improper expenses.

To the extent ETFMG maintains its pre-trial argument that Nasdaq somehow waived its approval rights by paying other expenses under the Wholesaling Agreement, that contention is belied by the facts and the law.  First, ETFMG ***did*** seek prior approval for significant

---

[9]     At trial, ETFMG's netting "policy" traces not to some legitimate business practice, but to Mr. Masucci's deliberate decision to withhold HACK profits from Nasdaq.  Chron. ¶ 191.

expenses from ISE before Nasdaq acquired it.  *See* K. Monaco Dep. Tr. at 220:21-24; PX-4002

(Freire Aff.) ¶ 43.  Second, under Delaware law, waiver of a contractual right can only be shown

by "clear and convincing evidence."  *Weyerhaeuser Co. v. Domtar Corp.*, 204 F. Supp. 3d 731,

740 (D. Del. 2016) (quotation omitted).  Even if Nasdaq at times reimbursed ETFMG for

wholesaling expenses that it did not expressly pre-approve, *e.g.*, PX-4002 (Freire Aff.) ¶ 51—

indicating, at most, that it approved of those expenses—that does not clearly and convincingly

demonstrate that Nasdaq intended to give up entirely its pre-approval rights, which were important

because they allowed Nasdaq to monitor and control costs ETFMG incurred in connection with

the Wholesaling Agreement.  *See Simon-Mills II, LLC v. Kan Am United States XVI Ltd. P'ship*,

No. 8520-VCG, 2017 Del. Ch. LEXIS 50, at *100-01 (Del. Ch. Mar. 30, 2017) ("[w]aiver

involves 'knowledge of all material facts and an intent to waive, together with a willingness to

refrain from enforcing those contractual rights'") (quoting *AeroGlobal Capital Mgmt., LLC v.

Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005)).  There is no evidence that Nasdaq agreed to

waive these rights.

### B.    ETFMG Breached the Wholesaling Agreement by Failing to Split Revenue from Third-Party ETFs and by Exceeding Contractual Expense Caps

ETFMG breached the Wholesaling Agreement in two additional ways.  First, much

like the profits under the PSAs, ETFMG failed to pay Nasdaq portions of revenue it earned from

providing wholesaling services to third-party ETFs that, pursuant to the Wholesaling Agreement,

the parties agreed to split.  *See* JX-11 at 11, 12 (requiring ETFMG to pay ISE, within 20 days, its

share of profits earned from non-ISE ETFs listed on the wholesaling platform).  In the first netting

statement, ETFMG included third-party wholesaling fees it owed ISE/Nasdaq for November 2015

through August 2016.  PX-4002 (Freire Aff.) ¶ 31; PX-221 at 24475.  After that, ETFMG stopped

making these contractually required payments, and ETFMG never paid Nasdaq these fees.  PX-

4002 (Freire Aff.) ¶ 63.  In all, ETFMG failed to pay Nasdaq almost $40,000 to which it was

entitled under the Wholesaling Agreement.  PX-4002 (Freire Aff.) ¶ 74.

        ETFMG also breached the Wholesaling Agreement by exceeding the contract's

express expense caps.  The Agreement set a wholesaler "Compensation Cap" at $250,000.  JX-11

at 14.  Yet, following Nasdaq's June 2016 acquisition of ISE, ETFMG increased wholesaler

compensation to more than double the bargained-for limit.  *See* PX-1005 (Wholesaler

compensation chart showing annualized compensation expenses of $511,872, $529,872, and

$554,552); PX-4002 (Freire Aff.) ¶ 83.  Although Mr. Monaco testified that ISE and ETFMG,

prior to ISE's acquisition by Nasdaq, orally agreed that the parties would increase ISE's

wholesaler compensation obligations as part of a broader renegotiation of the Wholesaling

Agreement, Mr. Monaco eventually admitted that such agreement never was consummated.  Tr. at

959:8.  And, in any event, Nasdaq was unaware that any such agreement was even contemplated.

Tr. at 962:14-17.  Nasdaq cannot be obligated to honor a supposed oral modification to increase

wholesaler compensation immediately upon assumption of the contract when Nasdaq had no

notice of that change in terms and witnesses admitted that such amendment never was

consummated.  *Union Oil Co. v. Mobil Pipeline Co.*, No. 19395-N, 2006 Del. Ch. LEXIS 213, at

*55-56 (Del. Ch. Dec. 15, 2006) ("[a party] cannot force [the other party] to accept other terms

that [it] had no reason to suspect"); Tr. at 947:2-948:9; 959:2-8 (K. Monaco); PX-147.  The caps

set forth in the Wholesaling Agreement are still in force, and ETFMG's excess charges constituted

a breach.

    **C.**    **ETFMG Breached the Wholesaling Agreement by Using a Subsidiary to Act as Statutory Distributor**

        The Wholesaling Agreement prohibited ETFMG from providing "statutory

distribution services" for the securities on the wholesaling platform.  JX-11 at 3 ("[t]he parties

acknowledge that GENCAP shall not provide statutory distribution services for the securities on

the platform . . . which will be provided by a third-party service provider . . . ").  This provision is

unambiguous, as evidenced by the fact that in 2016, when ISE and ETFMG were negotiating a

new Wholesaling Agreement, ETFMG drafted language eliminating this restriction.  Chron. ¶ 82.

However, in April 2017, "ETFMG Financial," a subsidiary of ETFMG, became the statutory

distributor for all of the securities on the wholesaling platform.  Chron. ¶ 157.  This was a material

breach of the Wholesaling Agreement that permitted Nasdaq to terminate the agreement.

> **D.    ETFMG's Termination of ISE's Interest in PureFunds ETFs Was a Breach of the Wholesaling Agreement**

ISE entered into the Wholesaling Agreement to finance a platform that would

market ISE's ETFs including the PureFunds ETFs.  The Wholesaling Agreement spells out its

purpose in the very first page:

> GENCAP and ISE have determined that it is in their best interests for GENCAP
> and ISE to jointly support a platform offering third-party wholesaling services
> ("Wholesaling Platform") to support the selling and marketing of ETFs that are
> financially supported by ISE ("ISE-Supported ETFs") as well as ETFs that are not
> financially supported by ISE ("Third-Party ETFs"), collectively called "Products"
> and shown in Exhibit B . . . .

JX-11 at 1.  *See also* Tr. at 890:20891:1 (K. Monaco).

When ETFMG purported to terminate the PSAs for the PureFunds ETFs, it

frustrated the very purpose of the Wholesaling Agreement, as the introductory clauses of the

contract explain.  *See* JX-11 at 1; *see also iBIO, Inc. v. Fraunhofer USA, Inc.*, No. 10256-VCMR,

2016 Del. Ch. LEXIS 113, at *15-16 (Del. Ch. Jul. 29, 2016) (in interpreting parties' duties under

contract, recitals provided important definitions, and statement of parties' overall purposes in

entering contract) (citations omitted); *UtiliSave, LLC v. Miele*, No. 10729-VCP, 2015 Del. Ch.

LEXIS 242, at *22 (Del. Ch. Sept. 17, 2015) (court considered preliminary recitals in interpreting

contract because they "include[d] substantive, definitional language that [was] consistent" with

other terms in the agreement); *Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, No. 5589-VCP, 2014 Del. Ch. LEXIS 106, at *88-90 (Del. Ch. Jun. 25, 2014) (statements in "whereas" clause considered in interpreting scope of contract rights), *aff'd*, 116 A.3d 1244 (Del. 2015).  By terminating the PSAs, the PureFunds ETFs were no longer financially supported by ISE/Nasdaq, and all of the PureFunds ETFs that were ISE-Supported ETFs on the Wholesaling Platform were effectively removed.  Chron. ¶ 264.  This meant that Nasdaq was left obligated to financially support a Wholesaling Platform that was no longer promoting the PureFunds ETFs.  This, too, constituted a breach of the Wholesaling Agreement.

## IV.   NASDAQ IS ENTITLED TO RECOVERY ON ITS NON-CONTRACT CLAIMS

The evidence establishes that, in the alternative to its contract claims, Nasdaq is entitled to recovery on its tort and equitable claims under the legal standards set forth in Nasdaq' pre-trial findings of fact and conclusions of law.  D.E. 97, pp. 73-77.  First, ETFMG unlawfully converted Nasdaq's property by retaining the ETF profits to which Nasdaq was entitled.  Here, ISE created the concepts underlying the PureFunds ETFs (and HACK in particular) and developed indexes based on those concepts, which it then licensed to PureShares and, eventually, ETFMG, through a royalty-bearing license.  Chron. ¶ 7-10.  The profits generated by the ETFs belonged to Nasdaq, less amounts owed other parties to the licensing and related agreements.  Nasdaq therefore had a possessory interest in a certain discrete and identifiable sum of money.  By refusing to pay Nasdaq its portion of the profits generated by the PureFunds ETFs, ETFMG unlawfully converted Nasdaq's property.

Second, ETFMG engaged in unfair competition.  The evidence shows that ETFMG acted in bad faith to create conflict with Nasdaq, terminated the contracts with Nasdaq on grounds that were frivolous, incorrect, or fabricated, and then sought to renegotiate the contracts with Nasdaq on more favorable terms to ETFMG.  Chron. ¶¶ 264-265, 283.  In addition, prior to

seizing the ETF profits that belonged to Nasdaq, ETFMG sought Nasdaq's proprietary data and gave it to a competitor without Nasdaq's consent, so that the competitor could use that data to replace Nasdaq.  Chron. ¶¶ 254, 281.  ETFMG's misconduct amounted to unfair competition.

Third, and finally, the evidence establishes unjust enrichment on the part of ETFMG, and that Nasdaq is entitled to recovery under a theory of *quantum meruit*.  ETFMG was a service provider.  Nasdaq and PureShares paid it a fee for service, understanding it would deliver the profits from the operation of the PureFunds ETFs to Nasdaq and PureShares.  ISE/Nasdaq invested in the PureFunds ETFs and paid ETFMG significant sums of money to launch and operate the ETFs with the reasonable expectation that Nasdaq/ISE would be entitled to any profits generated by the operation of the funds.  It would be inequitable and against good conscience to allow ETFMG to retain the profits generated by these ETFs, especially when it already has been paid all that it was due.  Moreover, pursuant to the Index License, the Wholesaling Agreement, and the PureFunds PSAs, Nasdaq provided significant and valuable benefits to ETFMG in the form of the contributions ISE/Nasdaq made toward development of the PureFunds ETFs, and the payments it made to finance the launch, marketing, and operation of the ETFs.  ETFMG knowingly accepted and retained these benefits, and Nasdaq had a reasonable expectation that it would be compensated for the value of the benefit it conferred on ETFMG through a share of the profits generated by the PureFunds ETFs.

## V.    ETFMG CANNOT PREVAIL ON ITS COUNTERCLAIMS

### A.    Nasdaq Did Not Breach the Wholesaling Agreement by Terminating It

ETFMG breached the Wholesaling Agreement in at least four ways, as discussed above.  On July 11, 2017, Nasdaq sent ETFMG a letter informing ETFMG of Nasdaq's termination of the Wholesaling Agreement based on ETFMG's breaches.  PX-218.  ETFMG's

actions, as discussed above, demonstrate that Nasdaq had a lawful basis to terminate the Wholesaling Agreement, and ETFMG has no valid claim against Nasdaq for such termination.

### 1. ETFMG never alleged an earlier breach of the Wholesaling Agreement

Prior to Nasdaq's letter informing ETFMG it was terminating the Wholesaling Agreement, ETFMG never asserted that Nasdaq had breached that contract. While ETFMG claimed in this litigation that Nasdaq failed to make certain payments under the Wholesaling Agreement requiring ETFMG to begin "netting," at the time ETFMG did not claim that it was netting because of a breach, nor could it. Indeed, ETFMG told Nasdaq that it was "netting" because it was ETFMG's "policy" to net. Chron. ¶ 191. And ETFMG's own CFO said that he never heard that Nasdaq had failed to make the required payments under the Wholesaling Agreement. Chron. ¶ 177.

### 2. ETFMG's claim for damages from the Wholesaling Agreement is, in any event, limited

As discussed above, the evidence showed that ETFMG breached the Wholesaling Agreement in a number of ways, and that Nasdaq was entitled to stop performing under that agreement. However, assuming, *arguendo*, that the Court concludes that Nasdaq's termination of the Wholesaling Agreement was a breach, ETFMG's damages are limited to monies it would have received before Nasdaq would have terminated the Wholesaling Agreement in September 2018.

Under Delaware law, damages for breach of contract are limited to expectation damages, which are "calculated by (1) the loss to the non-breaching party (2) plus any loss, including incidental or consequential loss, caused by the breach (3) less any cost or other loss that the non-breaching party avoided by not having to perform." *VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F. 3d 273, 293 (3d Cir. 2014) (citing RESTATEMENT (SECOND) OF CONTRACTS § 347). "Once the loss attributable to nonperformance has been determined, a court must subtract any

costs avoided as a result of the breach that are evident in the record." *Id.* at 294.  "Contract damages 'are designed to place the injured party in an action for breach of contract in the same place as he would have been if the contract had been performed.  Such damages should not act as a windfall.'" *Id.* (quoting *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146-47 (Del. 2009)).

It is undisputed Nasdaq did not think the Wholesaling Agreement was worth the money that Nasdaq was obligated to pay, and that Nasdaq intended to terminate the Wholesaling Agreement as soon as was legally permissible.  Chron. ¶ 123.  The Wholesaling Agreement states that "ISE may terminate this Agreement, with a minimum thirty (30) day notice period to GENCAP if . . . after the second anniversary of the first Product being added to Exhibit B, the aggregate AUM of all Products is less than $100 million at any time."  *See* JX-11 at 6.  In addition to this provision, the Wholesaling Agreement included provisions that allowed for the removal of individual ETFs for failure to reach certain AUM levels.  The Second Amendment to the Wholesaling Agreement, which is the most recent version of the agreement, states that

> a Product shall be automatically removed from the Wholesaling Platform if:  (i) the applicable Product has not achieved at least $35 million AUM above the Hurdle AUM on average per day over the thirty (30) day period immediately preceding the first anniversary of such Product being added to this Exhibit B, or (ii) at any time after the second anniversary of such Product being added to this Exhibit B in which such Product ceases to have at least $75 million AUM above the Hurdle AUM.

*See* JX-11B at 2.  In July 2016, Nasdaq requested that IPAY, BIGD, and SILJ be removed from the Wholesaling Agreement under this provision.  Chron. ¶ 124.  ETFMG did so.  Chron. ¶ 126.

In addition to the automatic removal of funds from the wholesaling platform, ISE/Nasdaq also had the right to remove any ISE/Nasdaq-supported funds after five years.  Specifically, the Wholesaling Agreement states that "at any time after the fifth anniversary of the applicable Product being added to Exhibit B ISE may, upon thirty (30) days prior written notice to GENCAP, remove an ISE-Supported ETF from the Wholesaling Platform."  *See* JX-11B at 2.

When Nasdaq terminated the Wholesaling Agreement there were eight "ISE-Supported ETFs" on the wholesaling platform, PX-670, and four "Third-Party ETFs" on the wholesaling platform, PX-667.  When ETFMG terminated the PSAs for the PureFunds ETFs, it eliminated ISE/Nasdaq's obligation to financially support these ETFs.  This had the effect of removing HACK, GAMR, IFLY, FINQ, and IMED from the wholesaling platform.  *See also* PX-209 at 1 (asking Nasdaq whether it wanted to put these funds back on the wholesaling platform as "third-party" ETFs).  LARE was shut down soon after.  DX-848.  So at the time of Nasdaq's termination of the Wholesaling Agreement, the only ISE-Supported ETFs on the wholesaling platform were YYY and CNCR.  As to the third-party ETFs, EMQQ was removed from the wholesaling platform by its sponsor in 2017.  Tr. at 1191:22-1192:4 (J. Flanagan); PX-2026.  For purposes of analyzing when Nasdaq could terminate the Wholesaling Agreement, the only remaining ETFs at issue were:  YYY, CNCR, RISE, ETHO, and ITEQ.

Nasdaq's expert, Dr. Vinita Juneja of NERA, analyzed when these five funds would be eligible for removal from the wholesaling platform.  PX-4004 (Juneja Aff.) ¶¶ 76-88.  Her analysis is summarized in the chart attached as Exhibit 1.  Dr. Juneja's undisputed analysis shows that all funds subject to the Wholesaling Agreement could have been removed by August 2018, *id.*, ¶ 88, leaving the AUM of the products on the Wholesaling Agreement at zero, and allowing Nasdaq to terminate with thirty-day notice.  JX-11 at 6.  In other words, Nasdaq could have terminated the Wholesaling Agreement in September 2018, *id.* ¶ 72.

Dr. Juneja concluded that ETFMG's damages through September 2018 for a breach of the Wholesaling Agreement would have been at most $944,810.[10]  PX-2030 ¶¶ 32, 33

---

[10]     Dr. May calculated ETFMG's damages based on the assumption that Nasdaq was obligated to pay ETFMG $1 million a year for wholesaler and out-of-pocket reimbursements.

(including AUM fees for YYY and CNCR of $62,236 and $4,370, respectively, and wholesaler and out-of-pocket reimbursements of $878,204).  However, this number overstates ETFMG's damages because it fails to discount for (1) expenses ETFMG could have avoided after being notified of Nasdaq's termination; and (2) payments that ETFMG did not have to make to Nasdaq for Nasdaq's share of the revenue generated from third-party ETFs.  *See VICI Racing, LLC*, 763 F. 3d at 293 (costs avoided should be accounted for in expectation damages).  Both of these amounts could have been substantial.  *See* PX-667 (showing that for May 2017 alone, ETFMG owed Nasdaq over $5,000 for third-party ETF revenue).

### 3.     A purported breach by Nasdaq of the Wholesaling Agreement does not allow ETFMG to forgo payment of profits to ISE

At the close of trial, the Court asked the parties to address in post-trial briefing the interplay between the parties' primary claims—Nasdaq's claim for breach of the Index License/Sublicense Agreement and PSAs, and ETFMG's claim for breach of the Wholesaling Agreement.  Tr. at 2646:4-18.  ETFMG's claim that Nasdaq breached the Wholesaling Agreement does not in any way impact Nasdaq's claims.

Nasdaq did not breach the Wholesaling Agreement.  And, until this litigation, ETFMG has not asserted that (a) Nasdaq breached the Wholesaling Agreement prior to the time Nasdaq terminated the Wholesaling Agreement in July 2017, *see* D.E. 24 ¶¶ 35-41; or (b) such a breach of the Wholesaling Agreement allowed ETFMG to forgo payment of profits for HACK, IPAY, or any of the other PureFunds ETFs.  Nor could it.  After Nasdaq acquired ISE, Nasdaq paid ETFMG substantial amounts of money pursuant to the Wholesaling Agreement.  Chron.

---

DX-1006 (May Aff. ¶ 4).  This assumption makes little sense, but using it as a point of reference, ETFMG's damages had the Wholesaling Agreement terminated in September 2018 would have been $1,213,250.  PX-4004 (Juneja Aff.) ¶ 33.

¶¶ 142, 146.  While ETFMG claims that it had to begin netting payments it owed Nasdaq against payments Nasdaq allegedly owed ETFMG, Chron. ¶ 165, the evidence proves that ETFMG actually began netting to eliminate Nasdaq's right to pre-approve or reject proposed marketing expenses.  *See* PX-160 ("I see this as a dance rather than a declaration of war"); PX-174 (Terry Wade offered to pay ETFMG "quickly"); PX-176 (Mr. Masucci falsely stating that ETFMG's policy was always to net).  Following trial, ETFMG cannot legitimately assert that any Nasdaq conduct constituted a material breach.

Assuming for purposes of argument that Nasdaq breached the Wholesaling Agreement, ETFMG would still not be permitted to unilaterally forgo payment of the HACK and IPAY profits.  The Wholesaling Agreement does address breaches by providing a mechanism to terminate for breach of contract.  JX-11 § 9(c).  But nothing in that provision or elsewhere in the agreement permits ETFMG based on a breach to stop paying Nasdaq HACK and IPAY profits otherwise due under *other* agreements.

Similarly, nothing in the Sublicense Agreement, the HACK PSA, or the IPAY PSA, allowed ETFMG to stop making these payments for a purported breach of the Wholesaling Agreement.  A party to two different contracts with the same counterparty should not be permitted to breach Contract B with the counterparty because it believes the counterparty breached Contract A.  *See, e.g.*, *Maryland Cas. Co. v. Bd. of Educ.*, 20 F.2d 799, 800 (3d Cir. 1927) (in dispute over separate contracts on related matter, stating, "[t]he right to sue and defend on one has no relation to the right to sue and defend on the other"); *cf.*, *Moon Express, Inc. v. Intuitive Machs.*, LLC, No. 16-cv-344, 2017 U.S. Dist. LEXIS 155487, at *15-16 (D. Del. Sept. 22, 2017) (rejecting defendant's attempt to "combin[e] the two contracts into one with regard to Defendant's arguments for dismissal," and stating, "each contract requires separate treatment when assessing

each of the counts at issue") (citations omitted).  ETFMG does not allege that Nasdaq's breach of

the Wholesaling Agreement permitted it to terminate these other agreements, but even if it had,

there is no legal basis under the relevant contracts permitting ETFMG to stop paying fund profits.

      **B.**      <u>**Nasdaq Met Its Duty of Good Faith and Fair Dealing**</u>

      ETFMG claims that Nasdaq breached the implied covenant of good faith and fair

dealing by (a) not increasing the implied liquidity in the index underlying the HACK ETF; (b) and

by interrupting the index feed in August 2017.[11]  D.E. 87 at page 17-21.  To prevail on a breach of

the duty of good faith and fair dealing claim under New York law, the claimant must prove:

(1) the existence of a contract between the parties; (2) performance of plaintiff's obligations under

the contract; (3) breach of the contract by defendant; and (4) damages to plaintiff caused by

defendant's breach.  *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir.

2011); *see also Kapsis v. Am. Home Mortg. Servicing Inc.*, 923 F. Supp. 2d 430, 452 (E.D.N.Y.

2013) ("[a] breach of the implied covenant of good faith and fair dealing is merely a breach of the

underlying contract").  To succeed on its claim, ETFMG must establish that Nasdaq's actions "so

directly destroy[ed] the value of the contract . . . that the acts may be presumed to be contrary to

the intention of the parties . . . ."  *JP Morgan Chase Bank, N.A. v. IDW Group, LLC*, 08 Civ. 9116

(PGG), 2009 WL 321222, *4 (S.D.N.Y. Feb. 9, 2009).

      ETFMG asserts that Nasdaq's conduct sprang from a conflict of interest that

Nasdaq had as a result of Nasdaq serving as the index provider for First Trust's CIBR ETF, and as

an index provider and profit participant for HACK.  Chron. ¶ 134.  As an initial matter, there is no

law or statute that prohibited Nasdaq from indexing competing ETFs.  Tr. at 2573:6-9 (M.

---

[11]    ETFMG initially alleged Nasdaq also breached the Index License by indexing a
"Substantially Similar" exchange traded product.  D.E. 24 at 24.  The Court dismissed ETFMG's
claim for breach of the Index License and ETFMG cannot prevail on this claim.  D.E. 50 at 12-19.

Chambers).  Indeed, it is common for index providers to provide the same or similar indexes to multiple ETF issuers.  Chron. ¶ 135.  This purported conflict of interest by itself does not support ETFMG's claim for breach of the implied duty of good faith and fair dealing.

ETFMG's allegations of harm from this conflict of interest also fail to support a claim.  Even assuming that ETFMG's complaints about HACK's implied liquidity were legitimate, these complaints cannot form the basis of such a claim.  ETFMG blatantly is trying to use the implied covenant of good faith and fair dealing to add terms to the parties' written agreement, in contravention of New York law.  *See Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 359 (S.D.N.Y. 2001) ("the obligation of good faith cannot be used to create independent obligations beyond those agreed upon and stated in the express language of the contract"); *Peter R. Friedman, Ltd. v. Tishman Speyer Hudson Ltd. P'ship*, 968 N.Y.S.2d 41, 41 (1st Dep't 2013) ("the covenant of good faith and fair dealing . . . cannot be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights").  Implied liquidity measures liquidity of the underlying constituent securities of an ETF.  But the Index License expressly provides that the index and its composition are in the sole discretion of Nasdaq; "the covenant of good faith and fair dealing . . . cannot be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights." *Peter R. Friedman, Ltd.*, 968 N.Y.S.2d at 41.  ETFMG recognized this when writing in the HACK prospectus that "[t]he ISE Index is compiled and calculated by ISE.  ISE has no obligation to take the needs of the Adviser or the owners of the Fund into consideration in determining, composing or calculating the ISE Index."  Chron. ¶ 64.

Similarly, Nasdaq's termination of access to data for the GAMR and IFLY indexes was not an actionable breach of the duty of good faith and fair dealing.  On or about August 1,

2017, Nasdaq terminated ETFMG's access to data feeds related to the PureFunds ETFs.  However,

more than a month earlier, ETFMG had informed Nasdaq that it would no longer pay Nasdaq the

profits from the operation of the PureFunds ETFs, Chron. ¶ 260, and Nasdaq had informed

ETFMG that as a result of that breach, Nasdaq would not verify that it would continue to provide

the indexes for the PureFunds ETFs, Chron. ¶ 285.  After learning that ETFMG unilaterally

rebranded all of the PureFunds ETFs as part of keeping the ETFs' profits for itself, Nasdaq

decided to stop providing this service to ETFMG for free.  Thus, by the time Nasdaq cut off

ETFMG's access to data for GAMR and IFLY, ETFMG had already breached the Sublicense

Agreement, and had no right to enforce the agreement.

   In any event, ETFMG's damages expert offered no opinion of damages flowing

from the alleged breaches of the covenant of good faith and fair dealing.  As a result, ETFMG is

unable to sustain a claim for breach of the covenant of good faith and fair dealing.

## RELIEF REQUESTED

### I. NASDAQ IS ENTITLED TO APPROXIMATELY $10.8 MILLION IN RETROSPECTIVE DAMAGES, AND APPROXIMATELY $94 MILLION IN PROSPECTIVE DAMAGES

   Nasdaq's damages from ETFMG's conduct consist of both retrospective damages

and prospective damages.  For retrospective damages, it is undisputed that, from January 2017

through October 2018 (the "Retrospective Period"), ETFMG owe Nasdaq $10,908,711.  *See* PX-

4004 (Juneja Aff.) ¶ 30.  In addition, ETFMG owes Nasdaq historical damages of $5,379,855 for

the period following the Retrospective Period until the present, *i.e.*, November 2018 through July

2019.  *See* Exhibit 2.  Including this additional eight month period results in a total of $16,288,566

in additional retrospective damages.

   With respect to prospective, or future, damages, Nasdaq's expert, Dr. Juneja,

conducted two analyses.  First, Dr. Juneja created a model that assumed the PureFunds ETFs

maintained constant AUM into the future.  PX-4004 (Juneja Aff.) ¶ 30 (citing PX-2016).  Under this constant AUM model, Nasdaq's damages for a five, ten, and 14-year period (including retrospective damages) were $38,956,316, $51,204,182, and $55,804,192, respectively.  Second, Dr. Juneja created a model that projected AUM growth for the PureFunds ETFs based on each of the PureFunds ETFs' unique growth rates, and growth patterns derived from a data set of over 2,400 other ETFs.  *See id.*  Under this growth AUM model, Nasdaq's damages for a five, ten, and 14-year period (including retrospective damages) were $53,361,379, $85,587,249, and $105,062,425, respectively.  *Id.*  Nasdaq offers the damages reflected in the constant AUM model as a conservative approximation of the pecuniary harm it will suffer from ETFMG's conduct, but the second growth AUM model is analytically superior by incorporating growth trends from the market, and a more accurate measure of Nasdaq's damages.  *See id.* at ¶¶ 41-48 (explaining need to consider market trends for analysis of future performance and profits).

To account for the uncertainty in AUM growth rates and ETF management fees, Dr. Juneja employed a high discount rate (18.0252%) in calculating the present value of Nasdaq's future damages.  *See* PX-4004 (Juneja Aff.) ¶ 58.  Dr. Juneja chose this discount rate because it is the discount rate that Wisdom Tree—an entity that generates revenue solely by operating ETFs— uses to project its own revenue, and the rate accounts for the risks in this particular type of business.[12]  Accordingly, Dr. Juneja's models incorporate the risk that the PureFunds ETFs would not achieve their projected growth rates, or that management fees could decrease (thus reducing revenue, and profits payable to Nasdaq) based on market conditions.  PX-4004 (Juneja Aff.) ¶¶ 48-49; Tr. at 2227:16-2228:21.

---

[12]      Wisdom Tree is the only firm with this business model for which Dr. Juneja could identify discount rate information.  *See* PX-4004 (Juneja Aff.) ¶ 50.

ETFMG argued that Dr. Juneja's AUM growth model overstates Nasdaq's damages. But it is as likely—or more likely—that Dr. Juneja's AUM growth model is overly conservative. For example, as of October 2018, IPAY's AUM was approximately $500 million. JX-308. However, as of June 25, 2019, IPAY's AUM had grown to over $700 million, or more than 40% in approximately eight months. *See* https://www.etfmg.com/ipay/ (*last visited* Jun. 25, 2019). Moreover, Dr. Juneja's use of a high discount rate ensures that her projections of damages further out in time are accorded relatively little weight in the overall damages calculation.

Throughout trial, ETFMG argued that competitive pressures on ETF management fees (or "compression") generally, and especially with respect to HACK, created uncertainty that the HACK management fee would remain at 60 basis points going forward. Masucci Aff. ¶ 89. And, in fact, during trial a large ETF issuer, iShares, filed a registration statement with the SEC for its own cybersecurity-focused ETF, "IHAK," with a 47 basis points management fee. Tr. at 2636:9-16. But, the introduction of a competing ETF does not mean that HACK will face competitive pressure to lower its management fees. It is unknown whether this competing fund will gain investors, or challenge HACK's dominance in the market. Indeed, iShares launched IHAK on June 11, 2019, and has gather immaterial AUM—approximately $3.8 million, *see* https://www.bloomberg.com/quote/IHAK:US (*last visited* Jun. 25, 2019), indicating that its lower management fee is not yet sufficient to draw investors away from HACK.[13]

---

[13]    The Court may take judicial notice of this publicly available information that is not subject to dispute by the parties. *See Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 75 (S.D.N.Y. 2015) ("court may take judicial notice of 'a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned'") (citing FED. R. EVID. 201(b); *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257 (2d Cir. 2005)).

ETFMG also presented no evidence that, if the HACK management fee needs to be reduced because of compression in the market, when it will happen, or to what level it will be reduced.  History indicates that it is very uncertain a reduction in management fees due to competition will occur, and, if it does, it can be an extended period before there is any change. CIBR, the second cybersecurity ETF after HACK, launched in July 2015 with a 60 basis points management fee, which was lower than HACK's then 75 basis points management fee.  First, as discussed above, evidence at trial indicated that ETFMG took action to lower HACK's management fee to 60 basis points to harm Nasdaq and PureShares, rather than as a competitive response to CIBR.  Indeed, in the chart titled "Management Fee Compression in Indexed ETFs," purportedly considered by the Trustees in connection with the decision to lower the HACK management fee, seven PureFunds ETFs faced competition from ETFs with lower management fees—sometimes substantially lower and sometimes including iShares ETFs.  Chron. ¶ 230. Despite that competition, the ETFMG Trust lowered the management fees only for HACK. Further illustrating that fees are not necessarily a meaningful driver of ETF investment, in January 2018, the Trust effectively raised the fee paid by HACK shareholders to 64 basis points by adding a litigation expenses fee.  PX-24 at 8-9.  But, even assuming that ETFMG and the PureFunds Trust lowered HACK's management fee in response to fee compression, that did not happen until May 2017, almost two years after CIBR entered the market.  DX-419 at 20.

For all of these reasons, Dr. Juneja's initial damages projection remains the most likely scenario.  Even so, after iShares filed its registration statement for IHAK, Dr. Juneja completed a new analysis using both her constant and growth models, and assuming that the HACK management fee was reduced to 47 basis points as of June 2019.  PX-2050.  Using this 47 basis points management fee, Dr. Juneja's **constant** AUM model projected damages for five, ten,

and 14-year periods as $23,074,745, $32,728,483, and $36,354,200, respectively; using this 47 basis points management fee, Dr. Juneja's *growth* AUM model projected damages for five, ten, and 14-year periods as $35,111,299, $61,109,143, and $76,927,571, respectively.  PX-2050.

Nasdaq's expert testified that, to a reasonable degree of economic certainty, Nasdaq suffered $10,908,711 in retrospective damages and $94,153,714 in prospective damages as a result of ETFMG's conduct.  The Court should award Nasdaq these damages to compensate it for the harm it has suffered and will suffer in the future.

## II.   NASDAQ IS ENTITLED TO PREJUDGMENT INTEREST ON ITS RETROSPECTIVE DAMAGES

Under New York law, "prejudgment interest is normally recoverable as a matter of right in an action at law for breach of contract," *Graham v. James*, 144 F.3d 229, 239 (2d Cir. 1998) (citations omitted), and "accrues from the date of the breach," *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, 727 F. Supp. 256, 295 (S.D.N.Y. 2010).  Interest on damages incurred after the initial breach is calculated from the date those damages occurred.  *Id.* at 295-96 (citations omitted).  The Court, however, has "wide discretion" to determine a reasonable date from which to calculate interest where "damages are incurred at various times after the cause of action accrues."  *Id.* at 296 (quoting *Conway v. Icahn & Co., Inc.*, 16 F.3d 504 (2d Cir. 1994)).

New York law also allows prejudgment interest on damages from the breach of the implied covenant of good faith and fair dealing, *see, e.g.*, *Fabcon E., L.L.C. v. Steiner Bldg. Co. NYC, LLC*, No. 24639/02, 2005 N.Y. Misc. LEXIS 2960, at *50-51 (N.Y. Sup. Ct. Dec. 12, 2005), as well as "a matter of right in all actions grounded in intentional torts[,] which interfered with property rights."  *Mallis v. Bankers Tr. Co.*, 717 F.2d 683, 694-95 (2d Cir. 1983).  Again, interest is calculated from the date on which the damages were incurred.  *See* N.Y. C.P.L.R. § 5001(b).

Therefore, Nasdaq is entitled to prejudgment interest on its retrospective damages caused by ETFMG's breaches of the Index License, the Sublicense Agreement, and various PSAs;

ETFMG's breaches of its duty of good faith and fair dealing; ETFMG's conversion of Nasdaq's property; and ETFMG's unfair competition.

Similarly, under Delaware law, "[p]re-judgment interest is awarded as a matter of right in a[n] action based on breach of contract or debt." *Delphi Petrol., Inc. v. Magellan Terminal Holdings, L.P.*, No. 47, 2017, 2017 Del. LEXIS 511, at *4 (Del. Dec. 12, 2017). "Generally, pre-judgment interest accumulates from the date payment was due to a party or alternatively when the plaintiff first suffered a loss at the hands of the defendant." *Id.* (quotation omitted).

The prejudgment interest rate for damages from ETFMG's breach of the Index License and Sublicense Agreement, and other violations of New York law, is 9%. *See* N.Y. C.P.L.R. § 5004. The prejudgment interest rate for the damages ETFMG's breach of the PureFunds PSAs, which are governed by Delaware law, are 5% over the Federal Reserve discount rate, including any surcharge thereon. *See* 6 DEL. CODE ANN. § 2301.

Accordingly, in order to fully "indemnify [Nasdaq] for the non-payment of what is due to them," *Aristocrat Leisure Ltd.*, 727 F. Supp. at 295, Nasdaq should be awarded $1,963,567.98 in prejudgment interest based on retrospective damages of $10,908,711 as of August 1, 2017.[14]

---

[14]    Assuming a judgement date of August 1, 2019: $10,908,711 x (0.09 x 2) = $1,963,567.98 (or $2689.82 per day). *See* http://www.nycourts.gov/COURTS/nyc/civil/judgments_atty.shtml. Alternatively, if ETFMG is found to have breached only the PSAs, the Delaware prejudgment interest rate would apply: $10,908,711 x 0.10 = $1,090,871.

### III.   THE EXTENSIVE PATTERN OF MISCONDUCT BY ETFMG AND ITS PRINCIPALS SUPPORTS ENTRY OF AN AWARD OF PUNITIVE DAMAGES AND INJUNCTIVE RELIEF

A material predicate to Nasdaq's requests for punitive damages (Section IV, below), and for injunctive relief (Section V, below) and, is the gross pattern of misconduct by ETFMG, Mr. Masucci, and Mr. Karol.  This misconduct falls into five general categories.

*First*, the evidence at trial demonstrated that Mr. Masucci regularly and intentionally lied to Nasdaq and PureShares to advance his interests.  Attached as Exhibit 3 is a chart documenting the times Mr. Masucci lied to Nasdaq or PureShares about material facts related to the operation of the PureFunds ETFs.  Thus it was no surprise that Mr. Masucci's testimony was punctuated by new lies.  Attached as Exhibit 4 is a chart documenting the times Mr. Masucci was impeached using his prior sworn testimony, and attached as Exhibit 5 is a chart documenting the times Mr. Masucci's trial testimony was contradicted by demonstrable facts.  Indeed, Mr. Masucci also revealed that he had little respect for the trial process.  Attached as Exhibit 6 is a chart documenting the times Mr. Masucci showed contempt for the trial process.  Mr. Masucci's demonstrably false testimony under oath would merit a perjury referral to the United States Attorneys' Office, should the Court deem that appropriate.

*Second*, trial revealed that ETFMG's breaches were undertaken in a calculated, scheming, tortious manner.  Whether it be inducing ISE to continue paying for SILJ expenses, and then claiming the SILJ agreement had expired as soon as SILJ turned a profit; refusing to pay IPAY profits the moment IPAY became profitable with not even the fig leaf of a legitimate rationale; or holding HACK payments hostage to its negotiations and later concocting the notion, averred under oath, of stand-alone oral contract dependent on ISE/Nasdaq's commitment to ETFMG's growth, ETFMG displayed a lack of regard for its contractual commitments.

_**Third**_, ETFMG's conduct in other ways, whether legally tortious or not, further displayed a general disregard for good faith or square dealing with its business counterparties. Without being comprehensive, these include:  under false pretenses obtaining and conveying to Prime confidential information needed to convert the PureFunds indexes to Prime indexes, Chron. ¶ 245-246; Mr. Masucci and Mr. Karol discussing in advance of Nasdaq's purchase of ISE using a cut in management fees as a tool to punish or leverage Nasdaq, Chron. ¶ 179, which they proceeded to do; interposing the HACK invoicing, and then netting constructs; and trying to convince Mr. Chanin at a Halloween meeting to work with ETFMG to squeeze Nasdaq out of the PureFunds ETFs.  Chron. ¶ 178.

_**Fourth**_, Mr. Masucci attempted to use the statutory structure governing the issuance of ETFs and the "independent" trustees to insulate his wrongdoing.  As a board member of the ETFMG Trust, Mr. Masucci knew he had a fiduciary duty to the shareholders of the ETFs issued by the trust.  Chron. ¶ 232.  Yet, neither Mr. Masucci nor anyone else from ETFMG informed the independent trustees that ETFMG had ceased paying Nasdaq—the index provider for the PureFunds ETFs—profits from HACK and IPAY.  _Id._

Mr. Masucci also sought to prevent Nasdaq and PureShares from communicating directly with the independent board members concerns about ETFMG, the investment advisor for the funds.  From 2016 through 2017, ETFMG recommended to the ETFMG Trust board that: (1) ETFMG be permitted to bring the sub-advisory function in house and replace Penserra, Chron. ¶ 116; (2) ETFMG's subsidiary, ETFMG Financial, be permitted to serve as the statutory distributor for the ETFs issued by the trust, Chron. ¶ 157; and (3) the management fee for HACK be reduced from 75 basis points to 60 basis points.  Chron. ¶ 230.  Nasdaq and PureShares had legitimate concerns regarding each of these three recommendations.  However, rather than

permitting Nasdaq and PureShares to have an audience with the independent trustees, Mr. Masucci regularly threatened that they were to have no contact.  *See, e.g.,* PX-202.

As to the management fee, the evidence showed Mr. Masucci recommended the HACK fee cut without fully informing the ETFMG Trust board about the dispute with Nasdaq and PureShares, or his motivation for making the recommendation.  Though Mr. Masucci testified that the board was fully informed about the state of the relationship between Nasdaq and ETFMG, Loebs testified the board did ***not*** know ETFMG had withheld HACK and IPAY profits.  Tr. at 1568:21-1573:22 (S. Masucci); Tr. at 2348:4-2349:19 (T. Loebs).  Then, Mr. Masucci claimed to Nasdaq and PureShares that the Trust had to reduce the HACK fee because of a pressure from CIBR.  Chron. ¶ 230.

Mr. Masucci continues to this day to play fast and loose with both governmental regulators and the Trust shareholders.  On June 6, ETFMG disclosed, as one of its "Legal Matters," that "[t]he defendants in the Southern District actions believe the lawsuit is without merit . . . .  Management of the Trust and the Fund, after consultation with legal counsel, believes that the resolution of these matters will not have a material adverse effect on the Fund's financial statements."  *See* Certified Shareholder Report of Registered Management Investment Companies of ETF Managers Trust at 58 (avail. at https://www.sec.gov/Archives/edgar/data/1467831/ 000089418919003504/etfmg_n-csrs.htm#etfmgncsrsc010); *see also Doubleline Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 434 (S.D.N.Y. 2018) (noting that courts may take judicial notice of documents that both "'bear on the adequacy'" of SEC disclosures and are "'public disclosure documents required by law'") (quotation omitted).  Given ETFMG's own admission that it owes Nasdaq in excess of $2 million, as well as its actual knowledge of the trial and the Court's skepticism of certain issues as stated on the record, these statements in financial

statements continue to display a willingness to disregard the legal process and ETFMG's obligations.

**_Fifth_**, while ETFMG was stiffing Nasdaq money due it, and until very recently denied that fact, Mr. Masucci almost doubled his and Mr. Karol's compensation, and withdrew an additional almost $5 million from ETFMG.  Chron. ¶¶ 196, 199, 200.  ETFMG is ostensibly a company, but it appears that Mr. Masucci made every important decision at the company and used it as a personal piggy bank:  until this litigation ETFMG's CFO did not know Mr. Masucci took $2 million in loans that Mr. Masucci admitted he never intended to pay back, and Mr. Masucci caused ETFMG to issue himself alone millions in non-proportionate ownership distributions. Chron. ¶ 196.

## IV.   NASDAQ IS ENTITLED TO PUNITIVE DAMAGES IN CONTRACT AND IN TORT

Nasdaq provided ample evidentiary support for the recovery of punitive damages from ETFMG for its breach of the PureFunds PSAs.  Delaware courts borrow from the law of torts when determining whether punitive damages are available in a contract action.  *Tackett v. State Farm Fire & Casualty Ins. Co.*, 653 A.2d 254, 265-66 (Del. 1995).  This means, therefore, that a breaching party may be liable for punitive damages where the breach is willful, malicious, or "lacks a reasonable basis."  *Id.* at 266; *see also Smith v. New Castle Cty. Vocational-Technical Sch. Dist.*, 574 F. Supp. 813, 826 (D. Del. 1983) (defendant acting with "malice and intent to injure" warrants punitive damages); *Agilent Techs. v. Kirkland*, C.A. No. 3512-VCS, 2010 Del. Ch. LEXIS 34, at *136 (Del. Ch. Feb. 18, 2010) ("willfulness is defined as 'an awareness, either actual or constructive, of one's conduct and a realization of its probable consequences,' . . . and malice is defined as 'ill-will, hatred or intent to cause injury'" (footnotes omitted)).  Punitive damages also may be available where the breaching party acts in bad faith.  *See E.I. DuPont de Nemours and Co. v. Pressman,* 679 A.2d 436, 445-47 (Del. 1996).

The evidence at trial showed that ETFMG breached the HACK PSA and IPAY PSA in bad faith when it refused to pay Nasdaq the profits derived from the operation of these two funds.  In addition, using deliberately false and misleading tactics, ETFMG misappropriated Nasdaq's confidential information in order to move the PureFunds ETFs to another index provider as part of an effort to deprive Nasdaq of its rights to the profits from those ETFs.  Delaware law supports the imposition of punitive damages in exactly these circumstances.  *See Segovia v. Equities First Holdings, LLC*, 2008 Del. Super. LEXIS 197, at *85 (Del. Super. Ct. May 30, 2008) (punitive damages merited when "breach also amounts to a tort"); *Agilent Technologies*, 2010 Del. Ch. LEXIS 34, at *136-40 (awarding punitive damages when defendant used proprietary information "with the intent to cause commercial injury to [plaintiff] by creating a product based on [plaintiff]'s trade secrets to compete with [plaintiff]").  In *Christ v. Cormick*, the court awarded punitive damages in a breach of contract case when the defendant "intentionally misappropriated funds and . . . continually 'threw up roadblocks' to prevent [plaintiff] from reclaiming those funds," including dilatory conduct during the suit.  No. 06-275-GMS, 2008 U.S. Dist. LEXIS 92770, at *8-9 (D. Del. Nov. 10, 2008).  ETFMG's conduct is no less egregious here.

The evidence at trial also showed that Nasdaq is entitled to punitive damages from ETFMG for its conversion of Nasdaq's property and unfair competition.  New York law authorizes punitive damages where the tortious conduct is "intentional, malicious, outrageous, or otherwise aggravated beyond mere negligence."  *McDougald v. Garber*, 536 N.E.2d 372, 374 (N.Y. 1989).  Punitive damages may be awarded for conversion "if the conversion was accomplished with malice or reckless disregard of plaintiffs' rights."  *Hutton v. Klabal*, 726 F. Supp. 57, 73 (S.D.N.Y. 1989) (quotation omitted).  And for "a claim for unfair competition, New York law permits punitive damages where a wrong is aggravated by recklessness or willfulness, . .

58

. whether or not directed against the public generally . . . ."  *Getty Petrol. Corp. v. Island Transp. Corp.*, 878 F.2d 650, 657 (2d Cir. 1989) (quotation omitted).

## V.    THE COURT SHOULD PROTECT NASDAQ'S INTERESTS THROUGH INJUNCTIVE RELIEF

Nasdaq requests a monetary award as compensation for both its past and future damages suffered as a result of ETFMG's conduct.  Nasdaq also requests two forms of injunctive relief that the Court could enter to protect Nasdaq's interests.  As discussed below, depending on the form of relief, these could be in lieu of or in addition to an award of some or all of Nasdaq's prospective damages from the date of entry of verdict forward.

### A.    Imposition of a Constructive Trust is Needed to Prevent ETFMG From Interfering with Nasdaq's Profit Interest in the PureFunds ETFs

First, in lieu of an award of prospective damages, the Court could order that ETFMG cause the management fees collected every month by the funds' third party custodian, US Bank, be placed into a constructive trust, with Nasdaq designated to receive its share of prospective fund profits monthly directly from the constructive trust, within 10 days of the calendar close of the prior month.  A court may exercise its equitable powers to create a constructive trust to prevent a defendant from being unjustly enriched by retaining assets to which it is not entitled, and to compensate an injured plaintiff when money damages are inadequate.  *See In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 353 (2d Cir. 1992) (applying New York law, "A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee") (quotations, citations omitted); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 (NRB), 2015 U.S. DIST. LEXIS 147561, at *370 (S.D.N.Y. Oct. 19, 2015); *Adams v. Jankouskas*, 452 A.2d 148, 152 (Del. 1982) (a "constructive trust . . . is imposed when a defendant's fraudulent, unfair or

unconscionable conduct causes [it] to be unjustly enriched at the expense of another to whom [it] owed some duty") (citations omitted).  Particularly if the Court concludes that Nasdaq's prospective damages remain uncertain, it could, as an alternative form of remedy, impose such a constructive trust in this case.  *See*, *e.g.*, *PharmAthene, Inc. v. SIGA Techs., Inc.*, Civil Action No. 2627-VCP, 2011 Del. Ch. LEXIS 136, at *130, *137-40 (Del. Ch. Sept. 22, 2011) (granting constructive trust where the court found the future value of parties' agreement uncertain), *rev'd in part on other grounds*, 67 A.3d 330 (Del. 2013);[15] *Walker v. Res. Dev. Co., L.L.C.*, 791 A.2d 799, 811 (Del. Ch. 2000) (creating constructive trust when plaintiff did not prove monetary damages).

Under this constructive trust, Nasdaq would receive the profits generated from the management fees per the HACK, IPAY, GAMR, IFLY, and SILJ PSAs, directly from the administrator of the constructive trust ordered by this Court.  Evidence at trial established ETFMG's expenses for operating the PureFunds ETFs, allowing the Court to order that the profits for the ETF be held in trust for Nasdaq going forward.  For example, ETFMG's monthly expenses for operating the HACK ETF were about 17 basis points under the HACK PSA, which means that, as long as the HACK management fee remains at 60 basis point, Nasdaq would receive 43 basis points, or 71.67% of the total HACK management fees.

If ETFMG retains its position as advisor to the PureFunds ETFs, and Mr. Masucci were to retain his position as a trustee on the PureFunds ETF Trust board, Nasdaq would need protection from ETFMG again exercising its power over the PureFunds ETFs' management fees

---

[15]    On remand, the Chancery Court reconsidered its ruling, concluding damages were not too speculative, and awarded plaintiff money damages for prospective harm based on defendant's breach.  *See PharmAthene, Inc. v. SIGA Techs., Inc.*, Civil Action No. 2627-VCP, 2014 Del. Ch. LEXIS 142 (Del. Ch. Aug. 8, 2014).  This outcome does not change that this Court may create a constructive trust if it determine that some or all of the future damages Nasdaq will suffer from ETFMG's actions are too uncertain to award money damages.

to harm Nasdaq.  Accordingly, if the Court imposes a constructive trust, Nasdaq requests that the

Court fix Nasdaq's share of HACK, IPAY, and the other PureFunds ETFS revenue at 71.67% to

dissuade ETFMG from seeking to harm Nasdaq through another management fee reduction.

**B.      ETFMG Should be Enjoined from Involvement in the PureFunds ETFs**

Given the substantial prospective damages incurred by Nasdaq as a result of

ETFMG's conduct, it is unlikely that ETFMG will be able to make Nasdaq whole and adequately

compensate Nasdaq for its losses absent the continued operation of the legacy PureFunds ETFs.

Even if the Court orders creation of a constructive trust, as requested above, it may be impossible

for the PureFunds ETFs to continue to operate with ETFMG's involvement in light of ETFMG's

and Mr. Masucci's conduct as established at trial.  Accordingly, Nasdaq also seeks a permanent

injunction affirming its rights to the profits generated by the PureFunds ETFs, and prohibiting

ETFMG, its principals (including Messrs. Masucci and Karol), other individual and business

affiliates, and all persons acting under their permission or authority, from having any further

involvement in the PureFunds ETFs as an investment advisor, statutory distributor, portfolio

advisor, or in any other capacity.

Under New York law, "to obtain a permanent injunction a party must show the

absence of an adequate remedy at law and irreparable harm if the relief is not granted."  *New York

State NOW v. Terry*, 886 F.2d 1339, 1362 (2d Cir. 1989) (affirming award of injunctive

relief).  Stated differently, "[a]n injunction should be granted when the intervention of a court of

equity is essential to protect a party's property rights against injuries that would otherwise be

irremediable."  *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999) (same).  A party

seeing permanent injunctive relief must establish the following elements:  (1) that it has suffered

an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate

to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff

and defendant, a remedy in equity is warranted; and (4) that the public interest would not be

disserved by a permanent injunction.  *See Salinger v. Colting*, 607 F.3d 68, 77 (2d Cir. 2010)

(quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

    Nasdaq has suffered an irreparable injury because, absent an injunction ordering the

continued operation of the PureFunds ETFs without ETFMG's involvement, ETFMG will be

unable to adequately compensate Nasdaq for the money damages ETFMG caused to Nasdaq.  In

general, the Second Circuit has held that injunctions are "proper to prevent a defendant from

making a judgment uncollectible."  *Republic of Philippines v. Marcos*, 806 F.2d 344, 356 (2d Cir.

1986) (citing cases).  Even though injunctions typically are unavailable where the harm is

quantifiable, an exception exists where the plaintiff may not be able to collect that money.  "In

those situations, preliminary injunctive relief may be necessary because, while monetary damages

may be theoretically available, 'as a practical matter, the defendant would not or could not respond

fully for those damages.'"  *Federated Strategic Income Fund v. Mechala Grp. Jam. Ltd.*, No. 99-

cv-10517, 1999 U.S. Dist. Lexis 16996, at *24 (S.D.N.Y. Nov. 1, 1999) (quoting *Drobbin v.

Nicolet Instrument Corp.*, 631 F. Supp. 860, 912 (S.D.N.Y. 1986)).  And injunctions ordering

specific performance on a contract are appropriate where, as here, "(1) the contract is valid,

(2) plaintiff has substantially performed under the contract and is willing and able to perform its

remaining obligations, (3) defendant is able to perform its obligations, and (4) plaintiff has no

adequate remedy at law."  *Travellers Int'l AG v. Trans World Airlines*, 722 F. Supp. 1087, 1104

(S.D.N.Y. 1989) (citations omitted) (requiring continued performance of a profit-sharing contract

where terminating the contract would constitute significant and irreparable harm to plaintiff).

    ETFMG's pattern of intentional misconduct further evidences the need for

injunctive relief.  *See Quantum Corporate Funding, Ltd. v. Assist You Home Health Care Servs. of*

*Va., L.L.C.*, 144 F. Supp. 2d 241, 249 (S.D.N.Y. 2001) (citing defendants' prior bad faith as reason to enter injunction preventing them from terminating operations which would impede plaintiff's ability to collect a judgment); *cf. City of New York v. Gordon*, 1 F. Supp. 3d 94, 109 (S.D.N.Y. 2013) ("[w]here a history of misconduct exists, courts may craft broad injunctions . . . to prevent future violation") (quotation omitted).  ETFMG demonstrated that it will repeatedly take actions for its own financial benefit—regardless of whether those actions violate its contractual and other duties to Nasdaq, or violate Mr. Masucci's fiduciary duties as a member of the board of the ETF Trust.

Given ETFMG's pattern of intentional misconduct, and the likelihood of repetition of misconduct absent injunctive relief, ETFMG should have no role, as an investment advisor or otherwise, in connection with the PureFunds ETFs.  *Cf. Broad. Music, Inc. v. Prana Hosp., Inc.*, 158 F. Supp. 3d 184, 195-96 (S.D.N.Y. 2016) (in a copyright case, enjoining the continued infringing conduct by defendants where their prior bad faith and disregard for legal obligations evidenced that continued unlawful conduct was likely).  The public interest also would be served by a permanent injunction.  It would allow the PureFunds ETFs to continue to operate without ETFMG's involvement, for the good of investors, and without improper manipulation of the PureFunds ETF Trust, as trial proved Mr. Masucci and ETFMG did in this case.

Should the Court enjoin ETFMG from any involvement with the PureFunds ETFs, there are other investment advisors who, like ETFMG, operate white label ETFs, who can step in to ETFMG's shoes, honor ETFMG's contracts with Nasdaq, and operate the legacy PureFunds ETFs.  Each of the PureFunds PSAs except for HACK has an express provision requiring ETFMG to ensure that a successor advisor to the trusts honor the profit payment obligations to Nasdaq. *See, e.g.*, JX-6 § 8(e) (IPAY PSA).  As already evident, the HACK PSA did not encompass in

express terms all of the parties' understandings, which were later perfected in follow-on PSA's, but the parties' understanding remained the same as in those agreements.  Nasdaq requests that a final order permit Nasdaq within 7 days of a verdict to submit a recommended replacement advisor to the trusts, and provide ETFMG 7 days from the date of said recommendation to show cause why it should not use its immediate best efforts to have the Trust Board expeditiously approve the identified advisor to replace ETFMG in an orderly fashion.

Indeed, it would be difficult to fathom how the ETFMG Trust Board, given the history of ETFMG's conduct, could within their duties to their shareholders not replace ETFMG as adviser.  And given those duties and its legal duties to Nasdaq, including in quasi-contract and estoppel, it would be difficult to imagine the Board not requiring another adviser to honor obligations to Nasdaq related to the PureFunds ETFs.[16]

---

[16]     Given that the transition to a new advisor should be done promptly but orderly, even if this relief is granted the Court should enter Nasdaq's proposed the constructive trust immediately to continue until such time as the new advisor recommended by Nasdaq assumes operational and regulatory responsibilities for the ETFs.

## <u>CONCLUSION</u>

For the reasons above, and the reasons stated in Nasdaq's Proposed Findings of Fact and Conclusions of Law, Nasdaq respectfully requests that the Court enter judgment in Nasdaq's favor, award it compensatory damages, pre-judgment interest, costs, punitive damages, and injunctive relief, and dismiss ETFMG's claims.

Date:  June 25, 2019

Respectfully submitted,

  /s/ *Justin W. Lamson*
Justin W. Lamson
  lamsonjw@ballardspahr.com
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, New York  10019
Tel:  212.223.0200
Fax:  212.223.1942

Stephen J. Kastenberg*
  kastenberg@ballardspahr.com
David L. Axelrod*
  axelrodd@ballardspahr.com
Lindsey Zionts*
  ziontsl@ballardspahr.com
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania  19103
Tel:  215.665.8500
Fax:  215.864.8999
*Admitted pro hac vice*

*Attorneys for Plaintiff, Nasdaq, Inc.*